FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 651898/2022

RECEIVED NYSCEF: 03/09/2022

contemplative harbinger of expressionism, which was to become so pivotal to Schiele. Both Klimt and Schiele shared a sensitiveness for the ornamental value of lines and areas, but already during the first year in which Schiele displayed his fully developed characteristic, in 1910, he definitely outgrew Klimt by changing the latter's subtle feminine lines into the masculine, powerfully expressive and agitated.

As a painter, Schiele struggled fervently for a new way to express his kind of art. His pictures (with the exception of the portaits and landscapes) were abstract compositions and creations of phantasy. He would cover mighty canvasses with steep gotic figures, but they were left standing in his studio, uncoveted, a material risk to the artist, caught deeply in the struggle for existence. Yet Schiele's pictures, by their character alone, reveal the direction in which the young genius was to receive full compensation: they are focused to a large extent to the quality of the line. His *drawings* made it possible for Schiele to unfold his unusual talent without limitations. During the few years of his short life, his artistic work was flowing in nearly unbelievable abundance.

As a painter, Schiele copied his natural environment avidly and tirelessly. He mastered the crayon (always a pencil or black chalk) with somnambulistic certitude while, to a great extent, possessing the gift of expressively enhancing, without any misrepresentations, the natural picture, to bring out its essence and character and to give a voice to the delightfulness of the graphic ornament. By 1910 already, his drawings exhibited these properties, mellowed to perfect craftsmanship. In them, he by no means limited himself to presenting life from its beautiful and pleasant side, but also from the dark side: the shadows of sin, decay, sickness and death. His works showing the proletarians' children and the bit cities' castaways are speaking a shattering language. He admired the absolute honesty and sincerity shown in Toulouse-Lautrec's lithographic prints, in Van Gogh's drawings. While the outlines of his works were always done in the sitter's presence, he would add the colorings later, drawn from his imagination drenched in contemplations and memories of the natural subject and fraught with the color's own expressiveness. With its help, he transformed the outline's often appalling lucidness into the most delicate poetry. Schiele's water color media range from a thinly glazed watercolor to a tempera-like gouache in a pasty application.

Schiele's artistic production first and foremost focus was the human physique. Landscapes and still lifes only play a small yet particularly attractive role. Schiele soon recognized the intrinsic value of drawings as a special category of art and created drawings for their own individual sake.  His graphic print works remained restricted to

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**   INDEX NO. 654896/2021

NYSCEF DOC. NO. 197   RECEIVED NYSCEF: 03/09/2022

occasional ventures encouraged by others, but they could not permanently absorb him. All the same, to Schiele they were a bridge to being accepted abroad. The writer remembers the happiness Schiele felt when asked for graphic prints by Pfemfert for the "Die Aktion" or by the Delphin publishing house for their Sema portfolio. Schiele was reaping foreign appreciation early, soon exhibiting beyond the borders of old Austria which, at the time, was mother country to both Prague and Budapest. However, things never went far enough for him, who was such an avid traveler, to cross these borders. This could be to blame for his fall into oblivion in the art business centers after his untimely death, while the living, after some hardship in the beginning, were later economically blessed.

1911 was one of the happiest years of his carreer, and yet one of his most tragic. It brought forth a large quantity of drawings, adorned with the utmost charms of the pictorial watercoloring of the time. During the years of 1912 - 1914, he tried for a new plastic synthesis of the human body. The war year of 1915 caused just a brief interruption in the abundant stream which was flowing in overpowering wealth until the end of 1918.

The ecstatic climax of the early works gave way to a masterly depth and the calmness of a natural reflection in the end. During that time, Schiele created his most beautiful portraits to whose psychologically sharp eye and warm human compassion nothing else compares. He completed his life's work with a drawing of his dying wife.

Three major collections of his drawings formed during Schiele's lifetime: Dr. Oskar Reichel, Dr. Heinrich Rieger and Heinrich Benesch. While the former were partly scattered and partly destroyed, the latter continued to exist as the one most complete. One half of it is now in the writer's ownership, the other one was transferred to the Albertina which possesses the most omnibus and most beautiful Schiele collection today.

OTTO BENESCH

P 0058

PAGE 54

PAGE 54

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**    INDEX NO. 651896/2022

NYSCEF DOC. NO. 197                                          RECEIVED NYSCEF: 03/09/2022

## LIFE DATA

1890        Born on June 12, the son of a station master in Tulln near the river Danube (Austria). The mother came from the small Bohemian town of Krumau.

1896        Elementary school, followed by 3 grades in the middle school at Kloster-neuburg, where his only special achievement are his extraordinary drawing skills. First-time drawing lessons with local painters.

1905        The father's death has a lasting effect, leaving him in deep melancholia, which subsequently will play a major role in influencing his style and the choice of his themes.

1905 - 08   General painting lessons by Christian Griepenkerl, a neo-classical painter and follower of Feuerbach, at the Vienna school of arts. Paints landscapes in the style of the secessional painters. With few exceptions, small-sized works on cardboard.
            1907, first meeting with Gustav Klimt, with whom he will join a deep friendship until the master's death.

1909        Due to differences of opinion with his teacher, he breaks off his studies at the school of arts. Participates in the International Art Show in Vienna, exhibiting four pictures. A larger group of pictures by Van Gogh is on display there also. Strong influence by Van Gogh and Gustav Klimt. The "New Art Group of Vienna" founded together with painters Faistauer, Wiegele, Paris von Guetersloh, Boehler and Peschka, going public for the first time at the Pisko Art Room during the same year.

1910        Paints and sketches a number of portaits and self-portraits, in which there is not so much effort to portrait a physical likeness, but rather to represent the sitter's psychological structure. Around 1910, his personal style is found and an absolute craftsmanship is reached, especially as a graphic artist. His drawing material consists mainly of pencil or chalk, on a base of cheap, yellow-brownish packing paper. Most of his sitters are proletarians' children and prostitutes.
            First draft of the "City Near The Blue River" or "Dead City" themes.

1911        Rents a studio in Krumrau, his mother's hometown. This is the place which he will portray again and again in visionary renditions as the "Dead City" and the "Old City". Expelled from Krumrau because of his "depraving influence on our youth". Takes up residence in Neulengbach. Highly interested in folklore and primitive and negroe art. Stylization and emphasis of the graphic element lead to a strong decorative effect. Fervid distortions aggravate the psychological expression.

**P 0059**

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 651898/2022

RECEIVED NYSCEF: 03/09/2022

Collective exhibition at Mietke's Art Parlor in Vienna and at Putze's Art Dealer's in Munich. Displays at the "New Art Group" in Budapest.

1912    Arrested on April 13 in Neulengbach on charges of producing "pornographic" pictures and kept in custody for 24 days at the local district court. At the court hearing, one of the artist's drawings is burned over a candle as a symbolic act. He describes the horrors of his confinement in a shattering journal (Egon Schiele in Jail. Notes and Drawings; edited by Arthur Roessler. Vienna, 1922).
Takes part in the exhibitions of the Munich Secession, at the "Hagen Alliance" in Vienna and the great international exhibition at the "Special Alliance" in Cologne. Creates the first lithographic "Male Nude", which is going to appear in the "Sema" portfolio in Munich.

1913    Takes employ with the "Die Aktion" newspaper by Franz Pfemfert of Berlin, next to the "Sturm" the most important print media of the German expressionism before 1920.
During June - July, Hans Goltz's art shop in Munich, having given the right of abode to the "Blue Rider" the previous year, holds a large collective show of the artist's works. Participates in the Secession Exhibitions in Vienna and the grand art show in Duesseldorf, which are followed by collective displays at the Folkwang Museum in Hagen, in Hamburg, Breslau, Stuttgart, Berlin.

1914    In a letter dated February 19, he asks his friend, Arthur Roessler, to get etching tools. During the summer, he etches the sheets, "Cowering", "Grievance", "Picture of Arthur Roessler", "Portrait of Franz Hauer", "Self-Portrait" and "Head". "Die Aktion" publishes poems and prose writings by the artist, his essay "The Art of the New Artists" and two cover drawings. Participates in the exhibitions of the Munic Secession and the "Allgemeene Tenttonstelling der schonen Kunsten" in Brussels.

1915    Collective art show in Arnot's Art Room in Vienna. Marries Edith Harms on June 18. Labeled "unfit for service" and called to Prague on June 21. Training in Bohemia. Assigned to Vienna in October.
First small publication about the artist by Paris von Guetersloh.
"Die Aktion" publishes poems and sketches by the artist.

1916    Redeployed to "landsturm service without weapons". Arrives at the "supply room" at a camp housing Russian prisoners in Muehling. Paints and draws some of his most beautiful landscapes and a number of portraits of Russian war captives.
Issue No. 3 of the "Graphic Arts" publishes a richly illustrated essay by Leopold Liegler. Franz Pfemfert publises in Nos. 35 - 36 of "Die Aktion" an "Egon Schiele booklet" containing drawings and two presentations by

P 0060

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 651896/2022

RECEIVED NYSCEF: 03/09/2022

Ulrich Brendel and Heinrich Nowak. In June, he writes Roessler about his wish to start xylography.
"Die Aktion" publishes his only two xylographs in issues 35/36 and 39/40. Exhibits in the Berlin Secession with the "Alliance of Austrian Artists".

1917
Military service in Vienna starts in spring. Transfers to the Army Museum in October. Tries to establish a membership club named the "Hall of Art", to give "creative artists, poets and musician a chance to communicate with an audience who will join them in their attempts to fight the ever progressing cultural destruction". A number of distinguished individuals out of the Vienna art circles, among them Peter Altenberg, Joseph Hoffmann, Gustav Klimt, Arnold Schoenberg, promise their support. The difficulties, brought on by the war, prevent the idea from materializing.
The publishing house of Richard Lanyi publishes a portfolio containing 12 drawings.
Participates in the "Art of Austria" show in Stockholm and in the Secession of Munich.

1918
Gustav Klimt, the adored master and friend, dies on February 6. In March, Schiele is granted use of the main room in the exhibition of the Viennese Secession. The exhibition is a great success and finally finds the undivided attention of the public and the press. The greater part of the major works is sold during the show. He receives the order from the "Association of Reproductive Art" to create two landscape lithographs. Instread of the landscapes, he delivers the lithographic prints "Girl" and "Portrait of Paris von Guetersloh". Both works are rejected and will later be included in Arthur Roessler's portfolio "Egon Schiele's Graphic Work", published in 1922.
Schiele is represented with 25 works in the exhibition "One Century of Viennese Painting" at the Zurich House of Art.
In the autumn of 1918, there is a flu going around in Vienna. His beloved wife succumbs on October 28. On the day of her funeral, October 31, Egon Schiele, too, falls victim to the epidemic.

P 0061

PAGE 57

PAGE 57

**FILED: NEW YORK COUNTY CLERK 02/04/2022 08:50 PM**        INDEX NO. 654896/2021

NYSCEF DOC. NO. 197                                        RECEIVED NYSCEF: 02/04/2022

P 0062

PAGE 58

PAGE 58

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**     INDEX NO. 651898/2022

NYSCEF DOC. NO. 197     RECEIVED NYSCEF: 03/09/2022

BIBLIOGRAPHY

Writings by the Artist

1 Poems in Prose, published in "DIE AKTION" weekly of politics, literature, art, edited by Franz Pfemfert, Berlin-Wilmersdorf.

4th year, 1914, No. 11
a. Lady at the Park, p.234
b. Two Clerics, p.234-235
c. Highway, p.235
d. Thunderstorm Coming on, p.235
e. Music While Drowning, p.235
f. Visions, p.235

4th year, 1914, No. 15
g. Sun, p.323-324
h. Wet Evening, p.324

4th year, 1914, No. 20
i. The Art of the New Artists, p.428

5th year, 1915, No. 3/4
k. Observation, p.37
l. Perception, p.37-38

5th year, 1915, No. 31/32
m. Wheat Field, p.398

6th year, 1916, No. 35/36
Egon Schiele portfolio
n. Occident, p.493

These poems, with the exception of (k) and (l), were reprinted in Bibl.2, p.22-25.

2. LETTERS AND PROSE BY EGON SCHIELE, edited by Arthur Roessler. Vienna, Richard Lanyi, 1921.

3. EGON SCHIELE IN PRISON. Notes and Drawings; edited by Arthur Roessler. Vienna, Carl Konegen (1922). Includes 9 plates.
The artist's shattering record keeping of his 24-day imprisonment in Neulengbach during April - May, 1912.

Portfolios

4. DRAWINGS BY EGON SCHIELE. Vienna, Richard Lanyi, 1917. Includes 12 reproduced drawings. Issued in one-time edition of 400 copies. Created under the artist's supervision. Each copy was numbered and signed in Schiele's own hand.

5. EGON SCHIELE. HAND DRAWINGS. Vienna, Ed. Strache, (1920). Includes 15 re-produced drawings. Issued in an edition of 510 copies. 10 copies (Issue A) contain 1 hand drawing each.

6. THE GRAPHIC WORK OF EGON SCHIELE. Introduction by Arthur Roessler. Vienna, Rikola Publishing House, 1922. Issued in one-time edition of 80 copies. Includes 2 lithographs (Cat.No. X, XI) and 6 etchings (Cat.No. II-VII).

Monographs and Selected Essays

AMBROSI, GUSTINUS, see Bibl.13.

7. ANKWICZ VON KLEEHOVEN, HANS. Egon Schiele. (The Work of Art. 1951, No. 3). Wiesbaden 1951, p.22-29, 5 illustrations.

11

**P 0063**

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**    INDEX NO. 651896/2022

NYSCEF DOC. NO. 197    RECEIVED NYSCEF: 03/09/2022

8 BENESCH, OTTO. Egon Schiele, the Draftsman. Vienna, National Printing Press of Austria, n/y, 16 p., 24 plates.

See Bibliography 17

BRENDEL, ULRIK, see Bibliography 9

CSOKOR, F.TH., see Bibliography 17

EISLER, MAX, see Bibliography 17

9 EGON SCHIELE PORTFOLIO in "Die Aktion", 6th year, September 2, 1916, p.477-502. With 1 cover picture, 1 portrait of the artist by F. A. Harta, 5 drawings, 1 original xylography "Men Bathing", and "2 Memorandums about Egon Schiele" by Ulrik Brendel and Heinrich Nowak.

10 FAISTAUER, ANTO. New Austian Painting: A Painter's Reflections. Vienna, Amalthea Publishing House, (1923). P.15-22, 6 illustrations.

11 GROHMANN, WILL, in "Thieme-Becker, General Encyclopedia of the Masters of the Visua Arts ..." vol.30, Leipzig 1936, p.59.

12 GUETERSLOH, PARIS by Egon Schiele. Attempted Preface. Vienna Publishing House of the Brothers Rosenbaum, n/y (1915). 6 p., 9 plates. Reprinted in Bibliography 17.

KAPRALIC, EDUARD, see Bibliography 17

13 KARPFEN, FRITZ. The Egon Schiele Book. Ed. by Fritz Karpfen. With an article by Arthur Roessler and a mission statement by Gustinus Ambrosi. (Vienna, Viennese Graphic Workshop, 1921.) Includes 62 plates.
The article by Arthur Roesler was published as a hardcover in 1922, see Bibliography 18.

14 KUENSTLER, GUSTAV. Egon Schiele, the Graphic Artist. (Top Writings by the Cultural Association of Austria) Vienna, Amandus edition, 1946. 31 plates.

15 LIEGLER, LEOPOLD. Egon Schiele. (The Graphic Arts. 1916, No. 3) Vienna, 1916, p.70-80, 8 illustrations.

16 NIRENSTEIN, OTTO. Egon Schiele - Personality and Work. (Vienna), Paul Zsolnay, 1930. With introduction, index of works, 5 illustrations and 140 plates. The basic work about Schiele.

NOWAK, HEINRICH, see Bibliography 9

RATHE, KURT, see Bibliography 17

RIEGER, ERWIN, see Bibliography 17

17 ROESSLER, ARTHUR. In Memorian, Egon Schiele. Ed. by Arthur Roessler. With contributions by Otto Benesch, F. Th. Csokor, Max Eisler, P. v. Guetersloh, E. Kapralik, Kurt Rathe, Erwin Rieger, Paul Stefan, Hans Tietze. Vienna, Richard Lanyi, 1921. Includes 1 portraiture.

18 ROESSLER, ARTHUR. Memories of Egon Schiele. Marginal Notes of the Personhood of an Artist. Vienna, Carl Konegen, (1922). With one portraiture. Reprint of Bibliography 13

See Bibliography 2, 3, 6, 13

STEFAN, PAUL, see Bibliography 17

TIETZE, HANS, see Bibliography 17

Conpiled by Hans Bolliger

12

P 0064

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654898/2022

RECEIVED NYSCEF: 03/09/2022

**C A T A L O G**

P 0065

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 654896/2028

RECEIVED NYSCEF: 03/09/2022

(1)      **DEAD CITY I.**      1911. Oil on Wood.      37.3 x 30.1 cm.

Signed and dated: "Egon Schiele 1911" (engraved).
Titled on back:   DEAD CITY

Otto Nirenstein, Egon Schiele - Personality and Work, Vienna 1930,
Index of Works No. 94.
Also see Nirenstein No. 63, 112 and 113.

Very well the most beautifully colored and skillfully completed of the
landscapes titled "Dead City" which were created by the artist during
the years of 1910 - 12 in the small Bohemian town of Krumrau, his
mother's birthplace.

Collections:   Fritz Gruenbaum, Dr. Alfred Spitzer, Arthur Roessler,
all of Vienna, then in private ownership in Vienna.

Exhibitions:   The Hagen Alliance, Vienna 1912, No. 237. - Wuerthle's
Art Shop, Vienna 1925/26, No. 11. Memorial Exhibition at the Hagen
Alliance, Vienna 1928, No. 20. - "The Art of Our Time", The Home of
the Artists, Vienna 1930.

Illustrations:   Nirenstein, plate 59. - Karpfen, The Egon Schiele Book,
plate 24.

15

P 0066

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2021

RECEIVED NYSCEF: 03/09/2022

(2)     **SHIPS IN THE HARBOR**.     1908. Oil on Cardboard.     17 x 23.9 cm.

Signed and dated: SCHIELE EGON 08.
Not at Nirenstein's.

Early, pictorially very attractive study. Probably from Trieste. See the
very closely related works at Nirenstein's, Nos. 31 and 32, plates 3 and 12.

(3)     **LANDSCAPE WITH HOUSES**. 1914. Oil on Wood.     25.2 x 38.8 cm.

Signed and dated: EGON SIELE 1914.
Not at Nirenstein's.

Factory-like building on area near a road leading horizontally through a
landscape overgrown with trees. In the upper quarter of the picture, two
granges. - Impressionistic study apparently created substantially earlier
and postdated by the artist.

16

P 0067

PAGE 63

PAGE 63

**FILED: NEW YORK COUNTY CLERK 02/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 651898/2022

RECEIVED NYSCEF: 02/09/2022

(4)   **SELF-PORTRAIT.**   BLACK CHALK WITH WATERCOLOR. 21.5 x 15.3 cm.

Splendid self-portrait of 1910 on yellow packing paper. The strong, mask-like effect, further heightened by the slight watercolor accents, is reached with minimalistic plastic means.
Signed and dated: S. 1910. Probate estate stamp on back.

(5)   **SELF-PORTRAIT, GRIMACING.**   BLACK CHALK, WATERCOLOR AND TEMPERA. 45.3 x 25 cm.

Strongly colored self-portrait, base of pink nuances (with blue accents in dress). On yellow packing paper. Signed and dated: "10".

(6)   **AUTHOR TOM.**   PENCIL AND OIL.   27.5 x 23.2 cm.

The few linear elements and color accents result in a strong portait effect. On yellow packing paper. Monogramed and dated: "10".

(7)   **PICTURE OF A BOY.**   PENCIL, TEMPERA AND PASTE COLOR. 43 x 22 cm.

Gorgeous study of the "Picture of a Boy (Rainer Boy)" of 1910, Nirenstein 72, plate 38. Head, hands and the upper part of the dress as well as the knee area are fully colored, the outlines of the body are drafted in strong blue and purple strokes. On yellow packing paper. Nude Woman on back, pencil. 32.4 x 28.5 cm.

17

P 0068

PAGE 64

PAGE 64

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2028

RECEIVED NYSCEF: 03/09/2022

(8)     **GIRL PUTTING ON SHOE.**     Carbon and Watercolor.
        35.5 x 31.5 cm.

        Charming rendition in yellow, brown, black and green on yellow packing
        paper. Signed and dated: "1910". Probate estate stamp on back.


(9)     Sketch of the **"City Near the Blue River".**     Carbon and Watercolor.
        45 x 31.6 cm

        Richly colored and completed study from Krumrau, the "City Near the Blue
        River" or "The Dead City". The final picture of the theme was done from a
        location different from this sketch's. Monogramed and dated: "10".
        See No. 1.


(10)    **PARTIAL NUDE, RECLINING, WITH RED HAT.**
        Black Chalk, Watercolor, Tempera and Opaque White.
        45.3 x 28.6 cm

        Very colorful and lively sheet. On yellow packing paper.
        Monogramed and dated: "S.10".


18


**P 0069** ·


PAGE 65

PAGE 65

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**    INDEX NO. 651896/2028

NYSCEF DOC. NO. 197    RECEIVED NYSCEF: 03/09/2022

(11)    **GIRL SITTING.**    Watercolor and Pencil. 39.5 x 30.9 cm.

Richly colored and very finely differentiated watercolor of complete freshness of the colors. On yellow packing paper. Monogramed and dated "1911".

(12)    **WOMAN SITTING.**    Pencil and Paste Color. 55 x 25.5 cm.

Large portrait sheet in glowing paste colors. On imitated Japanese paper. Done around 1911.

(13)    **NUDE, STANDING, WITH DRAPERY.**  Watercolor and Pencil. 55 x 19 cm.

Beautiful sheet done in 1911. The colors of the drapery exude a very special charm. Signed and dated "1911". On yellow packing paper.

(14)    **PARTIAL NUDE "BLACK GIRL".**    Watercolor and Pencil. 44.9 x 29.2 cm.

Very attractive work, fully signed and dated "11". On yellow packing paper. - The sitter is the model of the "Black Girl" picture. Nirenstein No. 83, plate 48.

19

P 0070

PAGE 66

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 651896/2022

RECEIVED NYSCEF: 03/09/2022

(15)     **SELF-PORTRAIT - THE PENITENT.**     Pencil. 51.5 x 27.1 cm.

Interesting self-portrait of the artist, around 1911. On yellow packing paper. Likely to be preliminary study of the figure shown on the left side of the "Procession" picture, Nirenstein No. 88, plate 53.


(16)     **SELF-PORTRAIT - IN THE NUDE.**     Pencil, Tempera and Opaque White. 52.2 x 30 cm.

Important picture, typical of a series of pitilessly analyzing self-portraits of this period. Mainly built on red and tan colors. Mono-gramed and dated "1911". On imitated Japanese paper. Also see the "Self-Portrait, Grimacing", No. 5.


(17)     **NUDE.**     Black Chalk.     52.9 x 25.2 cm.

Attractive study sheet. On Japanese paper. Monogramed and dated "1911". - Another nude study of the same sitter on back. Black chalk. 47 x 18.5 cm. - Both drawings from the same series of works as the "Mother and Child" sheet, No. 2 from portfolio "Egon Schiele, Hand Drawings, Vienna, Ed. Strache, 1920".


(18)     **TWO PROLETARIAN CHILDREN.**     Black Chalk and Watercolor. 44 x 23 cm.

Magnificent watercolor, done around 1911. On yellow packing paper. Unsigned.


20

**P 0071**

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 654898/2028

RECEIVED NYSCEF: 09/09/2022

(19)     **SELF-PORTRAIT - THE PRISONER.**   Watercolor and Pencil.
44.5 x 23.5 cm.

One of the rare self-portraits from the Neulengbach jail, where
Schiele was held in custody for 24 days in 1912 on alleged charges
of producing "pornographic pictures". The face mirrors the loneliness
and the horror which have befallen the sensitive artist. - Splendidly
handsome watercolor in four colors: red, black, blue and yellow. On
Japanese paper. Fully signed and dated "4-24-1912" and dubbed,
"I love opposites".

(20)     **GIRL, SLEEPING.**     Watercolor and Pencil. 42.5 x 27 cm.

Very fine work, skilfully and colorfully done, excellently preserved,
with fresh colors. On handmade paper. Fully signed and dated,
"1911".

(21)     **WOMAN, SITTING WITH HANDS RESTING ON HIPS.**
Watercolor, Pencil and Opaque White. 47.8 x 26 cm.

Watercolor in red, black, yellowish brown and white. Grand work of
utmost preservation and complete color freshness. On handmade
paper. Fully signed and dated, "1911". - Pencil draft of the same
sitter on back. 33.5 x 15 cm.

(22)     **MODEL, HIDING FACE.**   Pencil, Watercolor and Tempera.
47.2 x 28.3 cm.

Beautifully colored drawing in 3 colors: black, red, yellow, using the
color of the paper as a fourth color on left arm and face. On hand-
made paper. Fully signed and dated, "1912".

21

**P 0072**

PAGE 68

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 654898/2028

RECEIVED NYSCEF: 03/09/2022

(23)     **WOMAN STANDING**.     Watercolor, Tempera and Pencil.
47.6 x 19.4 cm.

Significant work of 1912. Fully signed and dated. On Japanese
paper.


(24)     **PARTIAL NUDE FROM THE BACK**.     Watercolor and Pencil.
34 x 25.5 cm.

On handmade Japanese paper. Fully signed and dated, "1912".


(25)     **SITTING WOMAN**.     Pencil, Watercolor and Tempera.
44.8 x 26.7 cm.

Pretty color work in black, red, blue, yellow and green. On Japanese
paper. Fully signed and dated, "1912". Child study on back. Pencil.
17.4 x 19 cm.

22

**P 0073**

PAGE 69

PAGE 69.

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**                INDEX NO. 651896/2022

NYSCEF DOC. NO. 197                                                 RECEIVED NYSCEF: 03/09/2022

(26)    **MAN STANDING, WITH BLAZING RED DRAPERY.**
        Pencil and Tempera.
        45.5 x 22.2 cm.

        Wonderfully colored, very expressive drawing on Japanese paper.
        Fully signed, dated "1913", and dubbed "Man Standing". Apparently
        self-portrait. Pencil draft of Heinrich Benesch on back.
        35.1 x 26.1 cm.

(27)    **WOMAN IN RED, STANDING.**   Carpenter's Pencil and
        Red Tempera. 49.3 x 17.9 cm.

        Richly colored drawing on Japanese paper. Fully signed and
        dated "1913".

(28)    **RED BLOUSE.**    Pencil, Watercolor and Tempera.
        48.2 x 31.2 cm.

(29)    **A BOY'S PICTURE.**    Pencil, Watercolor, Colored Chalk
        and Tempera. 44.3 x 31.6 cm.

23

P 0074

PAGE 70

PAGE 70

FILED: NEW YORK COUNTY CLERK 03/04/2022 08:50 PM

.NYSCEF DOC. NO. 197

INDEX NO. 654896/2028

RECEIVED NYSCEF: 03/04/2022

(30)   **SELF-PORTRAIT.**   Black Chalk.   44 x 29.8 cm.

Outstanding self-portrait in profile to the right side, head turned to the viewer in three-quarter profile. On Japanese paper. Produced around 1914. - Pencil drawing of a sitting woman on back, fully signed and dated "1914". 44 x 31.3 cm.

(31)   **PORTRAIT OF ARTHUR ROESSLER.**   Pencil. 27.6 x 26.9 cm.

Preliminary drawing of drypoint etching (Cat. No. IV). Fully signed and dated "1914". On Japanese paper. - Arthur Roessler repeatedly pleaded for the artist from early on and also after Schiele's death. Further, we owe him the publications from the estate "Letters and Prose of Egon Schiele" (Bibliography 2) and "Egon Schiele in Prison" (Bibliography 3) as well as the portfolio "The Graphic Work of Egon Schiele" (Bibliography 6). - Very "free" drawing on back. Pencil. 47.7 x 25.5 cm.

(32)   **MONK.**   Pencil.   45.2 x 16.8 cm.

Expressive, linear drawing. On Japanese paper. Fully signed and dated "1914".

(33)   **LYING NUDE ON ORANGE UNDERLAY.**   Black Chalk and Tempera. 30.8 x 41 cm.

Gorgeous colored drawing on Japanese paper. Fully signed and dated "1914".

24

**P 0075**

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 651898/2028

RECEIVED NYSCEF: 03/09/2022

(34)   **NUDE STANDING, WITH LEGS SPREAD AND YELLOWISH
BROWN DRAPERY.**   Black Chalk and Tempera.
46 x 28.2 cm.

Colored drawing around 1914, made after the same model as
No. 33. On Japanese paper. Like the previous sheet, of highest
artistic quality and excellently preserved.

(35)   **EMBRACING NUDES.**   Black Chalk and Tempera.
48.5 x 26.7 cm.

Perfectly wonderful colored sheet of monumental plastic effects.
On Japanese paper. Fully signed and dated "1914".

(36)   **PICTURE OF EDITH SCHIELE.**   Black Chalk.
29.7 x 21.2 cm.

Gorgeous linear drawing of the artist's wife. This sheet documents
Schiele's unique art of portrayal. Here, the outline becomes a richly
sounding musical instrument doing its utmost to sing about all of this
woman's charms, grace and beauty. The sheet was done in the year
of his marriage to Edith. Fully signed and dated, "1915".

(37)   **WOMAN AND CHILD.**   Black Chalk.   48.4 x 28.1 cm.

Brilliantly beautiful drawing of 115. On imitated Japanese paper.
Fully signed and dated, "1915". - The passionately moving outlines
express, in the most wonderful way, the scene's intimacy and
restrained drama.

25

**P 0076**

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2021

RECEIVED NYSCEF: 03/09/2022

(38)    **PARTIAL NUDE, SITTING.**    Pencil.    40.5 x 24.5 cm.

Lively linear drawing. On Japanese paper. Drawn around 1915. -
Back: Sitting woman, bent forward. Pencil. 39.7 x 29.8 cm.


(39)    **PICTURE OF A RUSSIAN CAPTIVE.**    Black Chalk and Tempera.
47.7 x 26.3 cm.

Nicely constructed portrait study of a Russian soldier from the POW
camp in Muehling, where Schiele had been serving in the camp's
"supply room" since January of 1916. Fully signed and dated,
"1916". The sitter's name in Russian script appears in the top. -
On back: Standing Nude Couple, Leaning Against Each Other.
Pencil. 48.4 x 30.2 cm. Fully signed and dated, "1913". On
Japanese paper.


(40)    **PARTIAL NUDE WITH GREEN BLOUSE.**
Watercolor, Colored Chalk and Tempera. 37.3 x 20.2 cm.

Exceedingly beautiful colored drawing in three-quarter profile to
the left. Fully signed and dated, "1916". On Japanese paper.


(41)    **SUN FLOWER.**    Black Chalk and Tempera.    39.5 x 24.5 cm.

Richly expressive natural study in four colors: green, yellow, purple
and red. On smooth typing paper. Fully signed and dated, "1916".

26

P 0077

FILED: NEW YORK COUNTY CLERK 02/04/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2021

RECEIVED NYSCEF: 02/04/2022

(42)    **MALE**.         Black Chalk.        34.5 x 20.8 cm.

Splendid study portraying the sitter with few accents: head, left arm with hand and right hand, in a psychologically and pictorially valid manner. On smooth typing paper. Fully signed and dated, "1917".

(43)    **CENTRAL INSPECTOR BENESCH**.    Black Chalk and Tempera. 37.5 x 23.5 cm.

Expressive portrait study. Head and hands fully drawn and of wonderful color richness. On smooth typing paper. Fully signed and dated, "1917" on back. - The sitter is the father of Alberina Otto Benisch and one of the earliest Schiele collectors.

(44)    **PICTURE OF A WOMAN**.    Black Chalk and Tempera. 28.5 x 17.5 cm. Watercolor, Colored Chalk and Tempera. 37.3 x 20.2 cm.

Lovely colored drawing on smooth typing paper. Fully signed and dated, "1917". - The woman's head, neck and shoulder area were completely finished, the folded hands were outlined, the dress's color is hinted around the left hand. By its ingenious layout of the drawing, the fully completed upper part, the blank middle, which is completed on the bottom by the beautifully composed hands, the picture is leaving an impression of the intended final achievement, which the artist may have confirmed further by his signing of the sheet.

27

P 0078

PAGE 74

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

INDEX NO. 654896/2023

NYSCEF DOC. NO. 197

RECEIVED NYSCEF: 03/09/2022

(45)   **SUBURBAN HOUSE.**         Pencil and Colored Chalk.
       24 x 36.9 cm.

       Lively colored study sheet on white, handmade paper. Fully signed
       and dated, "1916".


(46)   **MOUNTAIN LANDSCAPE.**     Black Chalk.   17.6 x 41.8 cm.

       Interestingly skilled, drawing of a mountainous Austrian landscape
       with mountain cabins and stables, created with minimal means.


(47)   **REAR BUILDING ROOFS.**    Black Chalk.   25.4 x 45 cm.

       Very typical drawing bringing out his painting handwriting and his
       special preference of frequently representing landscapes and
       models from high viewpoints and the most complicated perspectives
       to enter the innermost and be able to show the subject's entirely new
       aspects . Fully signed and dated, "1917". On smooth typing paper.


(48)   **WOMAN KNEELING, BENT OVER TO FRONT.**   Black Chalk.
       31.5 x 41 cm.

       Magnificent drawing on vellum. Fully signed and dated, "1918".


28


P 0079

Case 1:23-cv-02443-JGK   Document 1-3   Filed 03/22/23   Page 24 of 222

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**     INDEX NO. 651896/2021

NYSCEF DOC. NO. 197     RECEIVED NYSCEF: 03/09/2022

(49)     **FEMALE NUDE BACKVIEW.**     Black Chalk.
38.1 x 19.1 cm.

The wonderful flow of the outline and the matchless artistic skill
appear in this linear drawing in a rarely seen manner. Fully signed
and dated, "1917". On smooth typing paper.

(50)     **PARTIAL NUDE IN GREEN STOCKINGS, SIDEWAYS
FROM REAR.**     Chalk and Tempera.     43.4 x 19.8 cm.

Splendid colored drawing. On smooth typing paper. Fully signed and
dated, "1917".

(51)     **WOMAN SITTING, WITH LEFT LEG DRAWN UP.**     Black Chalk
and Tempera.     35.1 x 25.5 cm.

Lovely colored drawing. On smooth typing paper. Fully signed and
dated, "1917".

29

P 0080

PAGE 76

PAGE 76

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2028

RECEIVED NYSCEF: 03/09/2022

(52)    **BOY LYING DOWN, HOLDING HEAD, WITH LEFT LEG CROSSED**.    Black Chalk.    38.8 x 28 cm.

On smooth typing paper. Fully signed and dated, "1018". - Again, by choosing an unexpected viewpoint, the artist tries to give the subject a new, convincing representation.


(53)    **NUDE SITTING, FROM FRONT**.    Black Chalk. 34.5 x 26.2 cm.

Linear drawing of the artist's wife. On smooth typing paper. Fully signed and dated, "1918". - Since about 1915, Schieles style has been characterized by an increasing economy of the artistic means and a harmonization of the shapes, reaching its peak during the last year of his life. By the improvement of his financial situation and his happy union with Edith, the artist appears to have overcome his personal problems. The pointed explosiveness of the outlines, the exaggeration by deformation have made room for round, harmonic shapes, while the lines themselves are recharged with new and concentrated energy.


(54)    **THE ROUND TABLE (THE FRIENDS)**. Poster Lithograph in 5 Colors..    68.2 x 53.2 cm.

Nirenstein 173. Also see Nirenstein 172. Poster of the 1918 Spring Sale Exhibition at the Vienna Secession which gives a place of honor to Schiele's works. Below the picture, in black print, the line, "Secession 49. Exhibition 9-6 I K". Below, on the left: "Stoneprint Alb. Berger, Vienna VIII". Fully signed in the stone and dated, "1918". Of the utmost freshest preservation. Very rare.

30

P 0081

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**

NYSCEF DOC. NO. 197

INDEX NO. 654896/2022

RECEIVED NYSCEF: 03/09/2022

INDEX OF THE
GRAPHIC WORK

P 0082

PAGE 78

PAGE 78

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM    INDEX NO. 654896/2021

NYSCEF DOC. NO. 197    RECEIVED NYSCEF: 03/09/2022

ADAPTATION by Eberhard W. Kornfeld and Hans Bolliger

We thank Prof. Dr. Otto Benesch of Vienna for his valuable information.

P 0083

PAGE 79

PAGE 79

FILED: NEW YORK COUNTY CLERK 02/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 651898/2021

RECEIVED NYSCEF: 02/09/2022

. . . As regards the artist's original graphic works, all of which were united in this portfolio, with but two exceptions, the early lithograph for the "Sema" portfolio which appeared in Munich and the small xylograph printed in the September 2, 1916 issue (No. 35/36) of the Berlin weekly "Die Aktion" (the author did not know the second xylograph (Cat. No. IX), due to their expressive manifestness, I do not consider them in need of interpretation. However, I feel that the story of their creation is worth telling. During the summer of 1913, when Egon Schiele was my guest for some time in Altmuenster on Lake Traunsee, he once again lamented the material hardship which was crippling his activities, the costs of painting materials, which were high for someone in his circumstances, frames, picture boxes and shipping charges. "You have it so much easier there. All you need are paper, ink and pen, and the postage for a double-sized letter, and you are free from Vienna, not depending on the crowded market of a city. If only I could do it the same way!", he concluded with a sigh. I answered by telling him that he could easily do it the author's way, for example, by creating graphic sheets, for which there was a higher demand and better chances of sales, particularly in Germany, where, with the assistance of an art dealer, someone like Gurlitt in Berlin, he would surely find buyers for graphic sheets, etchings or xylographs. "Well, yes, I would say you may be right. I know from colleagues that graphic works sell better than pictures, especially if the latter's dimensions exceed the size of "home decorations" - I am tempted to do graphics, not only because of easier sales - but I can do neither etchings nor xylographs, and am not patient enough to learn these techniques first. In the time that it would take for me to etch just one plate, I could very well and easily do fifty to sixty, even more, certainly close to a hundred sheets. And then I am increasingly drawn to color." - Schiele answered my reply that Schiele might use the short days of the approaching winter to paint, leaving the long evenings for etching, as follows: "If I am busy painting during the day, I will not be able to etch properly in the evenings, will not have enough strength left for that." "Well," I said, "according to Goethe one will always have the strength to do what one is convinced of"; whereupon we dropped the subject for the time being. Egon Schiele, however, had not forgotten my recommendation since, on February 19, 1914, he wrote me: "Dear Mr. Roessler: I am making a suggestion: Give me the etching tools - for the proper amount of new sheets!

33

**FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM**          INDEX NO. 651896/2022

NYSCEF DOC. NO. 197                                                      RECEIVED NYSCEF: 03/09/2022

Gurlitt wrote that he would like to buy the plates. If you agree and want to come to me, I would ask you to write me first. Kindest regards." I gave Schiele the money needed to purchase the etching tools and copper plates and I then learned that Robert Philippi, the excellent graphic artist, had comradely agreed to teach Schiele how to use the etching needle. On May 12, 1914, Schiele wrote me a letter in which he invited me to his place to view the first two of his etchings. When I arrived, he showed me the small framed plate with the etched picture of Hauer, Innkeeper of the "Griechenbeisl", who was known as a collector of art, too. After we talked about this work and I asked for the second etching, Schiele, smiling benignly, turned the plate and, pointing to the back of the copper sheet, said, "There it is, the first etching. A head. Should have been my self-portrait, but that doesn't mean much." After my comforting remark that the etching was not too bad for a very first try, Schiele merrily declared that his very first try was on one of Philippi's plates. "Philippi thinks the doodle is quite good, promising for the future, but I believe that he is just trying to encourage me. I do have courage, by the way, and I enjoy etching. I just would like to try a larger format now. Wouldn't you want to buy me a large copper sheet and sit for me to do a portrait etching?" - Without hesitation, I agreed to the former, while I did not want to make a decision regarding the latter before having returned from my imminent trip to England. During the months of June and July, 1914, Schiele was etching the two large plates "Cowering" and "Grievance", and my portrait after my return in August of 1914. A few weeks later, when I wanted to provide the artist with several orders by collectors of graphic art, he refused to accept with the resolute declaration that he did not wish to do etchings anymore. He said that he now knew the drypoint technique which was the only "honest and artistic etching method" and was tempting to him no longer, it was just too boring and boring (sic!), he would rather return to drawing, had already given away all of the tool stuff. Indeed, Schiele would never touch another needle thereafter. As long as four years later, however, following repeated invitations by the "Association of Reproductive Art", he deigned to accept an original graphic work, this time a lithograph. The said association had asked Schiele for a landscape to include in their annual volume, instead Schiele drew a little girl in the nude on the stone! The association again asked for a landscape, Schiele, stubborn as he occasionally was, drew the picture of the painting author Guetersloh instead! The association felt snubbed and refused acceptance, even though the picture of Guetersloh was an artistically excellent work. In order to safe these two splendid original stone drawings, in which the artist himself failed to show any

35

P 0086

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 651898/2021

RECEIVED NYSCEF: 03/09/2022

interest, from spoilage, and since the print shop was urging the grinding of the stones, I made arrangements for the prints to be made, which now serve as a valuable enrichment of this portfolio. After these two lithographs, Schiele never again created any further work of graphic art of any kind.

I may add that all etchings are the work of Schiele's drypoint. For the expert, there is no doubt about the quality of the original graphic works contained in this portfolio. Further, there is no doubt about the artistic quality of these works in those blessed with the natural gift which Goethe prided himself in, which is: "To see nature with the eye of the painter before whose picture you are now standing."

Arthur Roessler

Text from Bibliography No. 6

35

P 0086

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654898/2028

RECEIVED NYSCEF: 03/09/2022

(I)        M A L E   N U D E

42 x 23.5 cm

Lithograph, 1912


Signed and dated, "Egon Schiele 1912" in the bottom right of the stone

a.  Sample prints. Very rare. Most of them signed and designated as such.

Issue in the "Sema" portfolio, 15 original stone drawings,
Munich, Delphin printing house, n/y (1912).

b.  15 prints on Japanese handmade paper - preferred issue. All signed by
hand and dated: "Egon Schiele 1912".

c.  200 prints on vellum - regular issue. All signed by hand and designated
like the previous issue.


Among others, the "SEMA Portfolio" included lithographs by the following
artists: Karl Caspar, Paul Klee, Alfred Kubin, Max Oppenheimer, Edwin
Scharff.

37

P 0087

PAGE 83

PAGE 83

FILED: NEW YORK COUNTY CLERK 03/04/2022 08:50 PM   INDEX NO. 654896/2021

NYSCEF DOC. NO. 197                                  RECEIVED NYSCEF: 03/04/2022

1   PORTRAIT OF THE INN KEEPER, FRANZ HAUER

12.8 x 10.8 cm.

Drypoint, 1914

a. Prints during Schiele's lifetime. Mostly in brownish color on Japanese paper, signed and dated by the artist on the bottom margin. Very rare.

   1 Copy Prof. Otto Benesch collection

   1 Copy Klipstein & Kornfeld

b. Prints of the Roessler portfolio, see Bibliography No. 6. In black, on firm vellum, without wide margin.

Also see the forerunner, formerly in the Heinrich Benesch collection, now in Albertina ownership.

38

**P 0088**

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2021

RECEIVED NYSCEF: 03/09/2022

(III)        SELF-PORTRAIT

             12.1 x 10.6 cm

             Drypoint, 1914

             a.  Prints during Schiele's lifetime. (So far they have not become known.)

             b.  Prints of the Roessler portfolio, see Bibliography No. 6. In black, on firm
                 vellum, without wide margin.

39

P 0089

PAGE 85

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 651898/2021

RECEIVED NYSCEF: 03/09/2022

(IV)    PICTURE OF ARTHUR ROESSLER

23.9 x 32 cm

Drypoint, 1914

a.  Prints during Schiele's lifetime. (So far they have not become known.)

b.  Prints of the Roessler portfolio, see Bibliography No. 6. In dark green, on handmade paper.

See Cat. No. 31.

The work's forerunner is in a private collection in Switzerland today.

40

P 0090

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654898/2021
RECEIVED NYSCEF: 03/09/2022

(V)        H E A D

12.8 x 10.6 cm

Drypoint, 1914

a. Prints during Schiele's lifetime. (So far they have not become known.)

b. Prints of the Roessler portfolio, see Bibliography No. 6. In black on firm vellum, without wide margin.

41

P 0091

PAGE 87

PAGE 87

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2022

RECEIVED NYSCEF: 03/09/2022

(VI)        C O W E R I N G

31.5 x 48 cm.

Drypoint, 1914

a. Prings during Schiele's lifetime. (So far they have not become known.)

b. Prints of the Roessler portfolio, see Bibliography No. 6. In dark green, on vellum.

42

P 0092

PAGE 88

PAGE 88

FILED: NEW YORK COUNTY CLERK 03/04/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2022

RECEIVED NYSCEF: 03/04/2022

(VII)          G R I E V A N C E

47.8 x 31.5 cm

Drypoint, 1914

a. Prints during Schiele's lifetime. (So far they have not become known.)

b. Prints of the Roessler portfolio, see Bibliography No. 6. In dark green, on vellum.

43

P 0093

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654898/2021

RECEIVED NYSCEF: 03/09/2022

(VIII)      BATHING MEN

8 x 10 cm

Xylograph, 1916

a.  Sample prints. (So far they have not become known.)

Issued in "Die Aktion" weekly for politics, literature, art. Edited by Franz Pfemfert. Special edition "The Egon Schiele Booklet", No. 35/36. Berlin-Wilmersdorf, September 2, 1916.

b.  Prints of a limited edition of 100 copies, "Handmade Paper Issue". On strong white vellum paper, without text on the back. (Vellum paper despite the statement of "Handmade Paper Issue".

44

P 0094

PAGE 90

PAGE 90

FILED: NEW YORK COUNTY CLERK 02/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654898/2021

RECEIVED NYSCEF: 02/09/2022

(IX)    M A L E   H E A D    (The Mask of Death)

10.1 x 8.1 cm

Xylograph, 1916

Text of cataloging, see No. VIII.

Published in issue 39/40, September 30, 1916, with text on back in both editions.

45

**P 0095**

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM
NYSCEF DOC. NO. 197

INDEX NO. 651896/2021
RECEIVED NYSCEF: 03/09/2022

(X)          G I R L

             45.2 x 63 cm.

             Lithograph, 1918

             a.  Prints during Schiele's lifetime. (So far they have not become known.)

             b.  Issue of 25 numbered copies on vellum. With a signature stamp added
                 by the editor and the wrong date of, "1914".

             c.  Prints of the Roessler portfolio, see Bibliography No. 6. In black, on firm
                 vellum, with wide margin.

46

P 0096

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654896/2021

RECEIVED NYSCEF: 03/09/2022

(XI)        PORTRAIT OF PARIS VON GUETERSLOH

25.6 x 30 cm.

Lithograph, 1918

a.  Prints during Schiele's lifetime. (So far they have not become known.)

b.  Prints with signature stamp and wrong date of, "1914".

c.  Prints of the Roessler portfolio, see Bibliography No. 6. Dark brown on vellum.

The drawing's forerunner of 1918 is now located at the Albertina in Vienna. It also served as a prestudy of the Portrait of Paris von Guetersloh, see Nirenstein 177.

47

**P 0097**

PAGE 93

PAGE 93

FILED: NEW YORK COUNTY CLERK 03/09/2022 08:50 PM

NYSCEF DOC. NO. 197

INDEX NO. 654898/2021

RECEIVED NYSCEF: 03/09/2022

PURCHASE AND SALE

of selected

## PAINTINGS
## WATERCOLORS
## DRAWINGS
## GRAPHIC ART

of old and modern Masters of the 15th - 20th Centuries

Richly Stocked Storerooms - Illustrated Catalogs

Will purchase entire collections and quality individual works

for auctioning

KLIPSTEIN & KORNFELD, formerly

## GUTEKUNST & KLIPSTEIN

Berne          49 Laupen Strasse          Ph. (031) 34673

Printed in Switzerland

Staempfli & Company, Berne
Prints and Color Reproductions
R. Henzi & Co. Ltd., Berne

P 0098

FILED: NEW YORK COUNTY CLERK 02/04/2022 08:50 PM
NYSCEF DOC. NO. 197

INDEX NO. 651898/2021
RECEIVED NYSCEF: 02/04/2022

The foregoing is a true, correct and complete English translation of

forty-seven (47) pages (P 0052 - P 0098)

of Swiss documents, made and confirmed on May 8, 2008 by:

HOERNER BANK
Aktiengesellschaft

Thomas Meyer

( Me/es )

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 11

INDEX NO. 654836/2022
RECEIVED NYSCEF: 12/14/2022

# EXHIBIT J

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 11

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

KLIPSTEIN & CO., VORM.

# GUTEKUNST & KLIPSTEIN

## KUNSTHANDLUNG

Telephon 5 46 73
Telegramm-Adresse: Artus
Bank: Kantonalbank Bern
Postcheck-Konto der Kantonalbank: III 106

BERN, den    18. Sept. 1956
Laupenstrasse 49

# RECHNUNG

Herrn Otto Kallir, 46 West 57th Street, N e w   Y o r k

### Egon Schiele

| | | | | |
|---|---|---|---|---|
| (7) 36766 | Knabenbildnis, Bleistift Tempera u. Kleisterfarbe. | Fr. | 650.— | |
| 9) 36783 | Skizze zur Stadt zum blauen Fluss. 136.47 | Fr. | 800.— | |
| 11) 36781 | Sitzendes Mädchen. Aquarell u. Bleistift. | Fr. | 600.— | |
| 14) 36520 | Halbakt. Schwarzes Mädchen. Aquarell u. Bleistift. | Fr. | 650.— | |
| 18) 36775 | Zwei Proletarierkinder. Schwarze Kreide u. Aquarell. | Fr. | 600.— | |
| 23) 36518 | Stehende Frau. Aquarell Tempera u. Bleistift. | Fr. | 600.— | |
| 26) 36776 | Stehender Mann mit feuerrotem Tuch. Bleistift u. Tempera. | Fr. | 700.— | |
| 36) 36527 | Bildnis Edith Schiele. Schwarze Kreide. | Fr. | 600.— | |
| 37) 36241 | Mutter und Kind. Schwarze Kreide. | Fr. | 600.— | |
| 39) 36765 | Bildnis eines gefangenen Russen. | Fr. | 700.— | |
| 42) 36772 | ✓ Männliches Bildnis. Schwarze Kreide. 54.89 | Fr. | 450.— | |
| 44) 36770 | ✓ Frauenbildnis. Schwarze Kreide u. Tempera | Fr. | 600.— | |
| 45) 36515 | ✓ Vorstadthaus. Bleistift und farbige Kreide | Fr. | 450.— | |
| 46) 36523 | Gebirgslandschaft. Schwarze Kreide. | Fr. | 450.— | |
| 47) 36244 | ✓ Dächer von Hinterhäusern. Schwarze Kreide. Fr. 39.85 | Fr. | 600.— | |
| 50) 36232 | Halbakt mit grünen Strümpfen, seitlich vom Rücken. Kreide u. Tempera. | Fr. | 600.— | |
| 51) 36777 | Sitzende mit angezogenem linkem Bein. Schwarze Kreide u. Tempera. | Fr. | 650.— | |
| 53) 36243 | Sitzender Akt von vorn. Schwarze Kreide. | Fr. | 500.— | |
| | | brutto | Fr. | 10800.— |
| | | netto | Fr. | 9100.— |
| 1) 36763 | Tote Stadt. Oel auf Holz. | netto 836.04 | Fr. | 3650.— |
| | | | Fr. | 12750.— |
| 16) 36921 | Selbsbildnis, Akt. Bleistift, Tempera u. Deckfarbe, weiss. | netto | Fr. | 520.— |
| | | | | 13270.— |

Klipstein & Corn eld, vorm.
**GUTEKUNST & KLIPSTEIN**

à cto 1093.—

$ 3093.—

**KAL 0001**

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# EXHIBIT K

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

**CERTIFICATION**

This is to certify that the attached translation tram German into English was supplied by a licensed translation agency (license number: 3294/f/21/neu, MBA 21-G-F 2363/96).

19/11/2015

Jeffrey U. Waldock

QUICK TRANSLATION
Jeffrey Waldock, akad Ü.
Tomaschekstr. 30, 1210 Wien
Tel.: +43-1-272 45 92-0, Fax: -5
E-mail: office@quicktranslation.com
www.quicktranslation.com

---

Deutsches Zentrum
# Kulturgutverluste

DEUTSCHES ZENTRUM KULTURGUTVERLUSTE
Humboldtstrasse 12 39112 Magdeburg

Herbert Gruber
Office for Genealogy
Rauhensteingasse 10/12a
A-1015 Vienna

Processed by: Görtz
Phone: +49 (0) 391 727 763 23
Fax: +49 (0) 391727 763 6
e-mail:
Jennifer.Goertz@kulturgutverluste.de

Date: 29 October 2015

**Your search request on www.lostart.de**

Dear Mr. Gruber,

The inquiry recently received from Mr. Stockler has challenged the plausibility of a request regarding the Grünbaum collection. Based on the documents you have submitted for registration of individual objects we cannot exclude that the plausibility of further objects is challenged as well. Due to our "General Principles for the Registration and Deletion of Reports on Cultural Artefacts on www.lostart.de" we are requested, pursuant to Section III No. 2, to look into such indications, and ask you to confirm by 1 February 2016 that all objects reported belong to the Grünbaum collection and to submit all indications for the collection having been seized as a result of persecution.

Enclosed please find a letter from Ms. von Falkenhausen regarding the same matter and requesting deletion of search requests for works by Egon Schiele from the Grünbaum collection. She argues that for some objects reported as search requests no relation to Mr. Grünbaum can be established, and that further objects are not suspected to have a persecution-based background. She believes that plausibility of the requests is challenged.

Should it be impossible to prove that the reported objects belong to the Grünbaum collection or that seizure as a result of persecution is suspected, we are obligated, according to Section III No. 3 of the aforementioned "Principles", to remove the corresponding requests from the database.

Best regards

Jennifer Görtz

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

JUTTA FREIFRAU VON FALKENHAUSEN
ATTORNEY-AT-LAW MPA (HARVARD)

RECEIVED ON 25 SEPT 2015

Dr. Andrea Baresel-Brand
Stiftung Deutsches Zentrum Kulturgutverluste
Humboldtstr. 12
39112 Magdeburg

OFFICE K61 KURFÜRSTENDAMM
61 10707 BERLIN
TELEPHONE +49 (030) 88 71 44
70 FAX +49 (030) 88 71 44 720
FALKENHAUSEN@J-V-F.DE

23 September 2015

**Lost Art Database - Request for deletion of certain search reports for works by Egon Schiele from the Grünbaum collection**

Dear Dr. Baresel-Brand,

I herewith notify to represent the following parties involved:

1.      Galerie Kornfeld Verlag AG, Bern, represented by Christine Stauffer, member of the board of directors (party involved under 1),

2.      Galerie St. Etienne, New York, represented by Jane Kallir, managing director (party involved under 2), and

3.      Richard Nagy Ltd., London, represented by Richard Nagy, managing director (party involved under 3).

Powers of attorney made out in my name are enclosed.

In the name and on behalf of my clients I request you to

1) delete the works by Egon Schiele specified in Enclosures 1a and 1b (reported as formerly belonging to the Grünbaum collection) from the Lost Art Database;

2) alternatively, mark the reports specified in Enclosures 1a and 1b, until final clarification, with a note stating that there is justified doubt about the fulfilment of the prerequisites for registration, and, regarding the reports specified in Enclosure 1a, make additional reference to the judgments by US-courts submitted as Enclosures 2 to 4, to the decision by the so-called Michalek Commission submitted as Enclosure 5, and to the dossier by Dr. Sonja Niederacher, provenance researcher, submitted as Enclosure 6;

3) furthermore, to correct the entry on Fritz Grünbaum in section "Jewish collectors and art dealers" of the Lost Art Database, heading "Expropriation" to ensure that no indications exist for seizure of the

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 12

INDEX NO. 654836/2022
RECEIVED NYSCEF: 12/14/2022

collection and that, in any event, the bulk of the collection almost certainly remained within the control of the family, and was offered for sale by a member of the family between 1952 and 1956.

Regarding the reports specified in Enclosure 1c , we reserve the right to come back to those works as well at a later point in time.

The reasons for my request are as follows:

**I.        Search requests concerned**

The search requests we hereby ask to be deleted refer to works by Egon Schiele, which, as the reporters assert, belonged to the collection of Fritz Grünbaum. The Lost Art Database contains a total of 84 such requests. These requests are listed in Enclosure 1 and are completed by information on identification and provenance of the works.

The aforementioned 84 search requests can be allocated to three categories:

a)  Enclosure 1a: Lists 61 works by Schiele, which were sold between 1955 and 1956 by Mathilde Lukacs (Fritz Grünbaum's sister-in-law) to or via the Galerie Kornfeld.

b)  Enclosure 1b: Lists 13 works by Egon Schiele, for which no association with Mathilde Lukacs or Fritz Grünbaum has been documented.

c)  Enclosure 1c: The third category includes ten works by Schiele which are mentioned as belonging to Fritz Grünbaum in pre-war literature, but most of which cannot be clearly identified today.

For the largest part of the works mentioned in Enclosure 1a, their sale by Mathilde Lukacs is the only link with Fritz Grünbaum, and therefore its allocation to the Grünbaum collection is speculation. In any event, the provenance of that group of works has been investigated extensively, and it is consequently proven that the works had never been subject to seizure as a result of Nazi persecution.[1]

Regarding the works listed in Enclosure 1b, no connection whatsoever with Fritz Grünbaum is obvious.

The titles of the works mentioned in Enclosure 1c were taken from different lists of works in his possession in Grünbaum's lifetime, with only two works having been

---

[1] See Enclosures 2 to 6.

PAGE 3

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 12

INDEX NO. 654836/2022
RECEIVED NYSCEF: 12/14/2022

identified correctly (nos. 1 and 2 of <u>Enclosure 1c</u>), whereas allocation of other works to works listed in the catalogue of works is purely speculative (nos. 3, 4 and 5 of <u>Enclosure 1c</u>), and further works do not match any known work by Schiele (nos. 6 to 10 of <u>Enclosure 1c</u>).

**II.    Parties involved**

1.    The <u>party involved under 1)</u> has been engaged in art trade for 150 years; first of all, under the company Galerie Gutekunst (until 1919 in Stuttgart, then in Bern), later on by the name of Gutekunst und Klipstein, thereafter under Kornfeld und Klipstein, and today as Galerie Kornfeld Auktionen AG and Galerie Kornfeld Verlag AG. Apart from traditional art trade with ancient art and classical modern art, they have held significant auctions for ancient and modern art over many years. Except for one work, all works by Egon Schiele covered by the request for deletion were bought, auctioned or sold by private agreement by the party involved under 1), and/or by the auction house affiliated with the party, primarily in the 1950s and 1960s.

2.    The <u>party involved under 2)</u> has been a promoter of German and Austrian classical modern art for almost 100 years, since 1923 through its predecessor, the "Neue Galerie" in Vienna, established by art dealer Otto Kallir, which, after his escape from Nazi persecution in 1939, reopened as "Galerie St. Etienne" in New York. In 1930, Otto Kallir prepared the first catalogue of works of the paintings by Egon Schiele, which was published in a revised edition in 1966. Moreover, he published the catalogue of Schiele's graphic prints in 1970. The present managing director of the gallery, his granddaughter Jane Kallir, has taken over those works and added to them drawings and watercolours by Egon Schiele. Authoring the first comprehensive catalogue of works by Schiele, Jane Kallir investigated the provenance of more than 2500 works of the artist. She is considered to be the leading global expert for Egon Schiele's work and is regularly consulted by all major auction houses, dealers and collectors when it comes to questions of provenance and authenticity of works by Schiele. In addition, she is an advisor to the relevant provenance researchers in Austria and the USA in all matters concerning Schiele.

After the end of World War II, Otto Kallir was one of the few who actively helped Jewish collectors to find stolen works of art. Among others, he supported Alma Mahler, Lea Bondi Jaray and the heirs of Johann Strauss in getting back stolen collection objects. Since the 1980s, Jane Kallir has continued her grandfather's legacy in this respect as well. In 1997 she made available to the New York Times her grandfather's documents proving that "Portrait of Wally" had been stolen. Publication of the resulting article objects led to the confiscation of the portrait by the

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

New York county district attorney and to the first high-profile public restitution court procedure on Nazi-looted art in the United States, resulting in a restitution settlement with the heirs of Lea Bondi Jaray. Jane Kallir was involved in the proceedings as expert witness for the US government.

3.   The party involved under 3) has developed high expertise for the works by Egon Schiele and Gustav Klimt since the foundation of the art store in 1984, and specialised in those two Austrian artists, apart from other masters of classical modern art. The founder, owner and managing director also comes from a Jewish family, who had to leave their Hungarian homeland because of Nazi persecution and managed to emigrate to Australia in 1938.

4.   The parties involved under 2) and 3) are the major contemporary experts of the art of Egon Schiele and leading dealers of those works. More detailed information on the two parties involved, in particular regarding their dealing with, and promotion of, the works of Egon Schiele is attached as Enclosures 7 and 8.[2]

5.   All parties involved are directly affected and impaired with regard to their business activities, but also to their reputation as renowned art dealers and experts for Egon Schiele because of the search requests listed in Enclosures 1a and b. Those unfounded search requests also involve considerable material damage for the parties involved (as well as for other owners of the works concerned), as a work becomes virtually impossible to sell when it has been listed in the Lost Art Database, causing considerable potential for blackmail for the authors of unfounded search requests.

All parties involved are convinced of the accuracy of the approach of the Washington Declaration and support the principle set forth there to seek "fair and just solutions" for Nazi-looted art with the original owners or their successors. Owing to their families' own fate of persecution and their active commitment to restitution of Nazi-looted art, this applies specifically to the parties involved under 2) and 3).

Nevertheless, the parties involved are equally convinced that it is crucial for the integrity of the Washington Declaration and the tools and mechanisms developed for its implementation to prevent obviously unfounded or even abusive search requests.

---

[2] Enclosure 7: Short description of Galerie St. Etienne with special consideration of its commitment to Schiele; Enclosure 8: Resumé of Richard Nagy and description of the commitment of his gallery regarding Egon Schiele.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

### III.    Fritz Grünbaum and his collection

1.    Fritz Grünbaum and his wife Elisabeth (Lilly) were arrested after the National Socialist seizure of power in Austria, because of Fritz Grünbaum's political position and their Jewish origin. Fritz Grünbaum was arrested by the Gestapo in the spring of 1938, deported to several concentration camps, and died in Dachau on 14 January 1941. Elisabeth Grünbaum, née Herzl, survived in several apartments in Vienna until 5 October 1942, before she was deported and killed in Maly Trostinec. There is no doubt about the terrible fate of prosecution suffered by Fritz and Elisabeth Grünbaum, which should not be played down by this submission in any way.[3]

2.    Fritz and Elisabeth Grünbaum owned a large collection of various works of art, among them Russian icons and prints of old masters and drawings by Paul Signac, Oskar Kokoschka, Egon Schiele and lesser known Austrian artists of their time. The collection was never completely catalogued or photographed in Grünbaum's lifetime, which is why it is largely unclear which works belonged to the collection.

Otto Kallir's catalogue of Egon Schiele's paintings from 1930 names Fritz Grünbaum as the owner of three oil paintings by Schiele.[4] Grünbaum also owned a comprehensive collection of watercolours and drawings by Schiele. He provided 22 of those works as a loan for a Schiele exhibition held at the Vienna-based Würthle gallery in 1925.[5] In 1928, moreover, Fritz Grünbaum gave 21 of his Schiele watercolours and drawings on loan for the memorial exhibition for Egon Schiele at the Hagenbund in Vienna.[6] As the catalogue of paintings is illustrated, the works described there as owned by Grünbaum can be identified clearly. However, the catalogues of the exhibitions held at Würthle and Hagenbund contain no pictures of the works on paper from the Grünbaum collection. As a result, the works listed there cannot be identified clearly any more today. Identification is further aggravated by the fact that the titles of Schiele's works on paper mostly are inconclusive, are

---

[3]  See also Sonja Niederachen, Dossier Fritz Grünbaum of 30 June 2010, attached as <u>Enclosure 6</u>, p. 6 et seq.
[4]  Otto Kallir [formerly Otto Nirenstein], Egon Schiele: Persönlichkeit und Werk (Vienna, 1930).
[5]  "Egon Schiele", Würthle art store, Vienna, Dec. 1925 to Jan. 1926.
[6]  "Egon Schiele Memorial Exhibition", Hagenbund and Neue Galerie, Vienna, Oct. to Nov. 1928; receipt of delivery of Fritz Grünbaum's loans, Neue Galerie Archives, Belvedere Museum, Vienna.

PAGE 6

NYSCEF DOC. NO. 12

descriptive only, and many titles are repeated.[7] In addition, the titles are not by the artist himself and were slightly modified from one exhibition to the next.

3.   On 20 July 1938 the collection was inventoried and estimated by Dr. Franz Kieslinger, art historian and expert at the Vienna Dorotheum, in accordance with the ordinance on reporting so-called Jewish property.[8] The inventory mentions five oil paintings by Schiele, each named with title, as well as, under inventory numbers 37 and 37a, "Large hand drawings by Schiele 55 sheets with colours" and "20 Pencil drawings and 1 etching by Schiele"[9], on which the inventory contains neither titles nor other information that would facilitate identification. Incidentally, the individual components of the Grünbaum collection cannot be identified precisely today - this is true both for his works by Schiele and for most of the other works.[10]

4.   In September 1938, Elisabeth Grünbaum took the largest part of the collection by far, including 21 oil paintings, 303 watercolours and drawings, and an undisclosed number of graphic prints to the Vienna branch office of shipping company Schenker & Co. Application for an export permit for those objects, which had been declared as "removal goods", was submitted to the Federal Monuments Office.[11] As the collection objects were not blocked as "valuable national cultural assets", their export was approved. Classified as "degenerate art", works by Egon Schiele were virtually without any commercial value in Austria, and there was no international market for them, either.[12]

There is no evidence available to demonstrate that the collection was actually exported after export had been approved. Nevertheless, it cannot be excluded that the collection was sent to Elisabeth Grünbaum's family members who had emigrated to Belgium (her brother, Max Herzl, had settled as diamond dealer earlier on in Antwerp and had managed to obtain Belgian entry visas for his sisters Mathilde

---

[7] Schiele made hundreds of drawings of female nudes which can hardly be differentiated from each other merely because of their titles. Page 412 of the catalogue of works by Jane Kallir from 1990, for instance, contains two works entitled "Seated female nude" in a row (Kallir D. 562 and 563), followed by another work entitled "Seated girl nude" (Kallir D. 564).
[8] "Expert appraisal of Fritz Grünbaum's art collection from January/April 1938", reprinted in Sophie Lillie, Was einmal war, Handbuch der enteigneten Kunstsammlungen Wiens, 2003, p. 430 et seq.
[9] Lillie, ibid., p. 432.
[10] See also Sophie Lillie, Die tote Stadt, in Marie-Theres Arnbom/Christoph Wagner-Trenkwitz (eds.), "Grüß mich Gott" - Fritz Grünbaum 1880 - 1941 - eine Biographie, 2005, p. 147et seq.
[11] "Application for export permit", on 8 September 1938 issued by Schenker & Co. on behalf of Elisabeth Grünbaum.
[12] Otto Kallir managed to sell the works by Egon Schiele at a profit in the USA only at the end of the 1950s. In the 1940s, the price of the artist's works on paper ranged from $10 to $60 per sheet.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

Lukacs and Anna Reis). Also, the collection may have stayed at the shipping company beyond the outbreak of the war and may have been redeemed by Elisabeth Grünbaum or at her request at a later point in time.[13] However, it can be excluded that the collection was confiscated by the Gestapo or was sold via the "Gestapo Office for the Disposal of the Property of Jewish Emigrants (Vugesta)". Such confiscations were documented in detail by the Nazi authorities, and there is no indication regarding the Grünbaum collection that it had ever been confiscated in its entirety or in parts.[14]

5.  Mathilde Lukacs and her husband survived the war in their Belgian exile and travelled to Vienna regularly from 1948 onwards. In the summers of 1951, 1952 and 1954, they spent two weeks each in Vienna.[15] In May 1952, Mathilde Lukacs first contacted the Galerie Gutekunst & Klipstein in Bern to offer works of art for sale to the gallery.[16] Between 1952 and 1956, she took or sent to the gallery a total of 120 works in seven shipments.[17]

On 3 August 1955, Lukacs wrote to Eberhard Kornfeld, director of the Galerie Gutekunst & Klipstein, and asked him if he was interested in the following works: "Egon Schiele: several watercolours of female nudes, very fine colours, also dressed female figures as well as flower (sunflower) watercolours". According to the documents held in the archives of the Kornfeld gallery, the gallery bought three oil paintings, one etching and 67 works on paper by Schiele possessed by Mathilde Lukacs. Eight of those works were auctioned at Gutekunst Klipstein on 24 November 1955, [18] another 53 works were offered by the gallery in a sales exhibition held in 1956 together with a catalogue and illustrations of all works.[19] The rest was sold directly to customers of the gallery. Details and dates of offers, purchases and sales and/or auctions are noted in column 4 of Enclosure 1a.

Many believe that the works sold by Mathilde Lukacs to or via Klipstein and Kornfeld had belonged to Fritz Grünbaum before. However, not all of those works can be traced back directly to the Grünbaum collection.

---

[13] Cf. Lillie, Die tote Stadt, p. 153 et seq.
[14] Niederachen ibid., p. 14; Lillie, Die tote Stadt, p. 154.
[15] Niederacher, ibid., p. 25.
[16] Letter from Mathilde Lukacs to Gütekunst [sic] & Klipstein of 3 May 1952.
[17] Niederacher, ibid., p. 50; according to Niederacher, five of the 120 were returned unsold to Mathilde Lukacs.
[18] "Graphics and hand drawings of modern masters", Gutekunst & Klipstein, Bern, 24 November 1955.
[19] "Egon Schiele: Bilder - Aquarelle - Zeichnungen - Graphik", Klipstein & Kornfeld, Bern, 8 September to 6 October 6, 1956.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

The business relationship between Mathilde Lukacs and Galerie Gutekunst & Klipstein is documented in the extensive correspondence between them.[20] The party involved under 1) would be happy to provide you with that correspondence and other documents that are available to the party or the other parties involved.

### IV.    Initiator of the search requests

1.    The initiators of the requests at issue not named in the Lost Art Database (hereinafter: the "Reporters") are two distant relatives of Fritz Grünbaum's: Milos Vavra, nephew of a niece of Fritz Grünbaum's, and Leon Fischer, Elisabeth Grünbaum's (and Mathilde Lukacs's) great-nephew.

They were made aware of their position as heirs in 1999 by Hoerner Bank, a Heilbronn-based bank specialising in locating heirs[21].[22] In cooperation with Vienna-based heir researcher Herbert Gruber, Hoerner Bank has identified the initiators as potential heirs to Fritz and Elisabeth Grünbaum and prompted them to have themselves "registered" as sole heirs by the competent Austrian authorities, which took place in 2012.[23]

2.    The motives of Hoerner Bank and Herbert Gruber and of the lawyer retained by the initiators in the USA, Raymond J. Dowd, obviously are of a purely commercial nature.[24] In pursuing their financial interests, they have repeatedly misinterpreted, if not even intentionally misrepresented, the aforementioned and proven facts. Following their defeat in the proceedings against David Bakalar regarding the drawing "Seated woman with bent left leg - Torso", Lost Art-ID 478799 (see V 2. a below), the initiators, interestingly enough, had no longer raised any formal claims to the works which they reclaim for the Grünbaum

---

[20]  The documents of the Galerie Kornfeld contain fifteen handwritten letters and postcards from Mathilde Lukacs (3 May 1952; 7 May 1952; 13 July 1952; 3 May 1953; 11 May 1953; 31 May 1953; 25 June 1953; 3 August 1955; 20 August 1955; 25 October 1955; 28 December 1955; 26 January 1956; 30 January 1956; 11 April 1956; 20 December 1957), five letters from Gutekunst & Klipstein to Lukacs (17 August 1955; 21 September 1955; 31 October 1955; 14 April 1956; 25 October 1957) as well as five receipts and other transaction documents between the Galerie and Lukacs (2 July 1953; autumn of 1953; 24 November 1956; 7 December 1955; stock book February - May 1956).
[21]  See www.hoernerbank.de.
[22]  "Causa Schiele: Grünbaum-Erbe gefunden!" News, July 9, 1998, attached as Enclosure 9.
[23]  Niederacher, ibid., p. 30.
[24]  Both Hoerner Bank and heir researcher Herbert Gruber, when successful, usually charge one third of the entire proceeds plus VAT from the heirs; for Hoerner Bank see https://www.hoernerbank.de/de/erbenermittlung and, for Herbert Gruber, an interview with the "Profil" magazine from 11 June 2009, attached as Enclosure 10.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

estate via the Lost Art Database, and whose present whereabouts are partly well known.[25]

**V.    Assessment of the historical facts concerning the Schieles sold by Mathilde Lukacs**

1.    As explained above, it us unknown what exactly happened to the Schiele works from the Grünbaum collection during the war. This is true also for the works sold by Mathilde Lukacs in the 1950s. However, the obvious conclusion from the fact that those works were sold by Elisabeth Grünbaum's sister, who had been persecuted by the Nazis herself, is that they can neither have been confiscated by the National Socialists nor that those works may have been sold under duress or the like. Rather, the clear conclusion from the fact that Mathilde Lukacs, a close relative and heiress of Fritz Grünbaum, possessed the works by Schiele from the Grünbaum collection in the early 1950s, despite of the uncertainty about historical details, is that those works had remained in the possession of the Grünbaum family during World War II. Consequently, loss caused by Nazi persecution is excluded.

2.    This is the result at which all courts and expert committees dealing with the respective facts (works which - presumably - belonged to the Grünbaum collection and were sold by Mathilde Lukacs) have arrived.

   •    The clear assessment of the historical facts by the court is reflected in several judgments passed by US courts on the drawing referred to under Lost Art-ID 478799 ("Seated woman with bent left leg - Torso"). This drawing was the subject of a long-standing lawsuit - representative of all works by Schiele from the Grünbaum collection sold by Lukacs - between the owner of the drawing, David Bakalar, and the local reporters Milos Vavra and Leon Fischer. As the reporters were opposed to selling the drawing without considerable financial participation, David Bakalar filed a suit for declaration of his rightful ownership. The action was upheld. After its in-depth review of all existing documents, the judgment passed by the US District Court for the Southern District of New York on 17 August 2011 found as follows:

---

[25] The work reported under Lost Art ID-478917, for instance, is located at the Museum of Modern Art in New York, the work reported under Lost Art-ID 478909 at the Allen Memorial Art Museum in Oberlin Ohio, and the work reported under Lost Art-ID 478795 at the Art Institute of Chicago.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

> *"This Court previously found that the Drawing was possessed by Grünbaum prior to his arrest in 1938 and by Lukacs in 1956. The most reasonable inference to draw from these facts is that the Drawing remained in the Grünbaum family's possession and was never appropriated by the Nazis. The alternative inference - that the Drawing was looted by the Nazis and then returned to Grünbaum's sister-in-law - is highly unlikely. [...] In any event, Lukacs' possession of the Drawing after World War II strongly indicates that such a seizure never occurred. Accordingly, what little evidence exists - that the Drawing belonged to Grünbaum and was sold by one of his heirs after World War II - suffices to establish by a preponderance of the evidence that the Drawing was not looted by the Nazis."[26]*

The judgment is final.[27]

b)      Likewise, the independent committee set up to clarify issues of looted art from the Austrian private foundation Leopold (so-called Michalek Commission) found as follows, with a view to the identical historical facts:

> *"In the present case, there is no evidence that (Fritz Grünbaum's) art*

---

[26] Memorandum and Order of 17 August 2011, Enclosure 2, p. 8 et seq.
[27] See rejection of the appeal by United States Court of Appeals, Enclosure 4.

PAGE 11

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

*collection or parts thereof were seized from their owner due to official measures, between 13 March 1938 and 6 May 1945. On the contrary, it must be concluded from the sales conducted by Mathilde Lukacs in the 1950s that the collection remained within the control of the family and/or individual members of the family at least factually. Neither do the documents suggest in any way that there had been a change of ownership because of a legal transaction under private law in said period."[28]*

This finding concerns <u>directly</u> the works by Egon Schiele listed in the Lost Art Database under the following numbers:

- Lost Art-ID 478576 (Dead City III)
- Lost Art-ID 478890 (Devotion) and
- Lost Art-ID 478891 (Nude with orange-coloured stockings).

<u>Indirectly</u>, this finding applies equally to the works listed under the following numbers:

- Lost Art-ID 478904 (Self-portrayal, grimacing)
- Lost Art-ID 478915 (Red blouse)
- Lost Art-ID 478887 (Nude girl with yellow scarf)
- Lost Art-ID 478791 (Embracing nude girls) and
- Lost Art-ID 478812 (Self-portrayal with cloak).

Those works have also been examined by provenance researcher Sonja Niederacher and are part of her dossier, which is the basis of the decision by the Michalek Commission. Those works had also been sold by Mathilde Lukacs to and/or via the Galerie Kornfeld; unlike the first three works, however, it could not be clarified fully, according to the provenance researcher, if those five works had actually belonged to the Grünbaum collection. Regarding assessment of those facts, the Michalek Commission has stated as follows:

*"The only association of those works with the Grünbaum collection, however, is the fact that they, too, were sold by Mathilde Lukacs in the 1950s. But as Mathilde Lukacs was able to export a rather significant art collection herself, and another family member also living in Belgium (Berthold Reif) had works of art, the Commission believes*

---

[28] Decision by the Commission of 18 November 2010, attached as <u>Enclosure 5</u>, p. 11 et seq.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

*that it cannot in any way be concluded cogently from the fact of the sale by Mathilde Lukacs that all works sold by her originated from the former Grünbaum collection. For this reason, the explanations given in this statement merely refer to the works mentioned in the decision and designated in the dossier as belonging demonstrably to the Grünbaum collection. In view of the results of the assessment of the objects referred to in the decision, however, no clarification is needed on issues still unresolved under this item in any event. For, even if the object mentioned in the dossier as 'presumably belonging to the Grünbaum collection' actually was part of the collection owned by Fritz Grünbaum in 1938, an assessment based on that dossier regarding those objects would be in analogy with the assessment made on the three works mentioned in the decision."[28]*

### VI.     Assessment of facts regarding the works listed in Enclosure 1b

The other search requests for which deletion is requested, are works by Egon Schiele, for which there is no indication whatsoever that they had belonged to the Grünbaum collection.

The only common feature those works share with works (presumably in part) belonging to the Grünbaum collection and sold by Mathilde Lukacs is the fact that they, too - except for one work (Lost Art-ID 478820), where not even this detail is correct[29] - were sold and/or auctioned by the party involved under 1). Enclosure 1b contains details about the collectors from whom the party involved under 1) has acquired those works, insofar as that information is available. None of those works shows any congruence with one of the works described by pre-war literature as belonging to Fritz Grünbaum[30]. Those works do not even have any indirect association with Fritz Grünbaum via his sister-in-law Mathilde Lukacs.

### VII.    Conclusions

1.     As demonstrated above, the works by Schiele from the Grünbaum collection listed in Enclosure 1a, which were sold by Mathilde Lukacs in the 1950s, cannot have

---

[28]  Decision of the Commission, ibid., p. 11.
[29]  The reporters erroneously mentioned the party involved under 1) concerning Lost Art-ID 478820 for provenance, but the party involved under 1) has never possessed or sold that work.
[30]  See the sources mentioned in footnotes 6 and 7.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

been lost due to Nazi persecution. However, registration of a search request in the Lost Art Database requires loss due to persecution, but at least plausible presentation of suspicious facts for loss due to persecution.

The "Principles for the registration and deletion of reports on cultural artefacts in www.lostart.de" (hereinafter: "Lost Art principles") drawn up by the Deutsches Zentrum Kulturgutverluste (German Lost Art Foundation) require a plausible explanation of the history of loss from the reporters. The application for registration of a search request for Nazi-looted art, therefore, must include specifically the circumstances of such loss, that is "indications of seizure as a result of Nazi persecution (selling under duress, expropriation, auction etc.) and/or appropriate suspicious facts".[31]

No search report regarding the works by Schiele sold by Mathilde Lukacs includes any such details or suspicious facts.

2.    Regarding the works mentioned in Enclosure 1b, there is no evidence of the reporters' entitlement. These works have no association with Fritz Grünbaum's collection nor is there any plausible explanation of any such association known or obvious.

3.    Therefore, deletion of all of the search requests set forth in Enclosures 1a and b is imperative.

This results directly from the Lost Art principles, where Section III. (deletion), paragraph 3, reads as follows:

> "If plausibility of a request is fundamentally challenged and not restored by the reporter, the request shall be deleted from the database by the Deutsches Zentrum Kulturgutverluste."

Loss due to persecution is excluded for works which (demonstrably or only presumably) had belonged to the Grünbaum collection and were sold by Mathilde Lukacs (Enclosure 1a). No plausible explanation was provided by the reporters for such a loss, either. Therefore, the respective search requests lack plausibility and must be deleted.

The works specified in Enclosure 1b lack any plausibility whatsoever of belonging to Fritz Grünbaum's collection, and hence of plausible demonstration of the reporters' entitlement. This is why those reports must also be deleted.

---

[31] Lost Art principles, checklist for plausibility check, clause 5.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

4.    Since the reporters could not plausibly explain the loss due to persecution in the proceedings before the US-courts described and the Michalek Commission, it is safe to exclude that they will be able to restore plausibility of the requests regarding the works sold by Mathilde Lukacs. As for the other works, the assumption is that - for lack of indications that they had belonged to the Grünbaum collection - the respective requests were not plausible from the very beginning, but that the details provided by the reporters about the works they reclaimed were taken over without any further examination.

Hence, it is appropriate to delete all challenged search requests immediately without previously hearing the reporters.

5.    If you nevertheless wish to obtain a statement by the reporters prior to deletion, we ask you to add, without delay, a clear note to all search requests listed in Enclosures 1a and 1b to the effect that there is justified doubt that the requirements of registration have been fulfilled. Regarding the requests mentioned in Enclosure 1a, this note should be supplemented by direct reference to Enclosures 2 to 6. Such preliminary notes are necessary not only for safeguarding the interests of the parties involved, but also with a view to the mission of the Lost Art Database to provide the greatest possible degree of transparency on potential Nazi-looted art and grant interested persons easy access to relevant information, as such information is indispensable for understanding the search requests.

6.    Apart from deletion of the aforementioned search requests, we suggest to correct the entry on Fritz Grünbaum in section "Jewish collectors and art dealers". Correction is needed because, at the moment, confiscation of the complete collection at the Schenker shipping company is asserted under section "Expropriation". However, as described above, confiscation or another form of appropriation by the National Socialists or their collaborators is excluded, according to the present state of provenance research.[32]

Apparently, the entry on collector Fritz Grünbaum, like many published sources and popular statements, is based on the understandable conceptual reduction that the fate of persecution suffered by a Jewish art owner is inevitably linked with a loss of the

---

[32] See Article III (4) above, with further references, and Article V.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

collection as a result of persecution. While this is true for many cases of persecution, it is definitely not for the present case, and in any event not for the works sold by Mathilde Lukacs.

**VIII.    Possible next steps**

The parties involved would be happy to support you in processing the search requests of works by Schiele filed by the reporters by providing materials, research results and other useful information. Primarily, however, it appears to the parties involved that a personal meeting with you on the subject of the Grünbaum-Schiele reports would be required and reasonable. The point is to jointly protect Egon Schiele's work from damage and to preserve the integrity of art trade and strengthen the acceptance of how looted art is dealt with, as stipulated in the Washington Declaration, specifically of fair and just solutions for documented cases of looted art. In doing so, the parties involved would prefer to avoid legal disputes and claims for compensation as far as possible.

I would greatly appreciate to receive from you a signal of your willingness to discuss this matter with us, and would thereafter try to agree a date for a meeting of the parties involved and your office.


Best regards


Jutta Freifrau von Falkenhausen

(Attorney-at-law)

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM   INDEX NO. 654836/2022

NYSCEF DOC. NO. 12   RECEIVED NYSCEF: 12/14/2022

Deutsches Zentrum
**Kulturgutverluste**

DEUTSCHES ZENTRUM KULTURGUTVERLUSTE
Humboldtstraße 12  39112 Magdeburg

Anschrift

Herbert Gruber
Büro für Genealogie
Rauhensteingasse 10/12a
A-1015 Wien

Bearbeiter: Görtz
Telefon: +49 (0) 391 727 763 23
Telefax: +49 (0) 391 727 763 6
E-Mail:
Jennifer.Goertz@kulturgutverluste.de

Datum: 29.10.2015

**Ihre Suchmeldung auf www.lostart.de**

Sehr geehrter Herr Gruber,

Durch die kürzlich eingegangene Anfrage von Herrn Stockler wurde die Plausibilität einer Meldung aus der Sammlung Grünbaum erschüttert. Durch die von Ihnen zur Eintragung der einzelnen Objekte eingereichten Unterlagen kann nicht ausgeschlossen werden, dass die Plausibilität weiterer Objekte gestört ist. In unseren „Grundsätzen zur Eintragung und Löschung von Meldungen zu Kulturgütern in www.lostart.de" sind wir nach Abschnitt III Nr. 2 dazu aufgefordert, solchen Hinweisen nachzugehen und bitten Sie, uns bis zum 01.02.2016 die Zugehörigkeit aller gemeldeten Objekte zur Sammlung Grünbaum zu bestätigen, sowie alle Hinweise auf einen verfolgungsbedingten Entzug der Sammlung vorzulegen.

Beigefügt übersende ich Ihnen in gleicher Angelegenheit ein Schreiben von Frau von Falkenhausen mit dem Ersuchen um Löschung von Suchmeldungen zu Werken von Egon Schiele aus der Sammlung Grünbaum. Sie argumentiert, dass für einige als Suchmeldungen gemeldete Objekte kein Bezug zu Herrn Grünbaum herzustellen ist und für weitere Objekte kein Verdacht auf einen verfolgungsbedingten Hintergrund besteht. Sie ist der Auffassung, dass die Plausibilität der Meldungen gestört ist.

Sollte die Zugehörigkeit der gemeldeten Objekte zur Sammlung Grünbaum, oder der Verdacht des verfolgungsbedingten Entzugs nicht nachgewiesen werden können, sind wir nach Abschnitt III Nr. 3 der oben genannten „Grundsätze" dazu verpflichtet die entsprechenden Meldungen aus der Datenbank zu entfernen.

Mit freundlichen Grüßen,

Jennifer Görtz

PAGE 17

Deutsches Zentrum Kulturgutverluste
Stiftung bürgerlichen Rechts
Humboldtstraße 12
39112 Magdeburg

Telefon +49 (0) 391 727 763 23
Telefax +49 (0) 391 727 763 6
kontakt@kulturgutverluste.de

Hauptamtlicher Vorstand:
Rüdiger Hütte
Ehrenamtlicher Vorstand:
Prof. Dr. Uwe Schneede

Norddeutsche Landesbank
IBAN: DE53250500000152041596
BIC: NOLADE2HXXX

PAGE 17

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

JUTTA FREIFRAU VON FALKENHAUSEN
RECHTSANWÄLTIN · MPA (HARVARD)

EINGEGANGEN AM  25. SEP. 2015

Frau Dr. Andrea Baresel-Brand
Stiftung Deutsches Zentrum Kulturgutverluste
Humboldtstr. 12
39112 Magdeburg

OFFICE K61
KURFÜRSTENDAMM 61
10707 BERLIN
TELEFON +49 (030) 88 71 44 70
FAX +49 (030) 88 71 44 720
FALKENHAUSEN@J-V-F.DE

23. September 2015

**Lost Art Datenbank – Ersuchen um Löschung bestimmter**
**Suchmeldungen zu Werken von Egon Schiele aus der Sammlung Grünbaum**

Sehr geehrte Frau Dr. Baresel-Brand,

ich zeige an, die folgenden Beteiligten zu vertreten:

1.    Galerie Kornfeld Verlag AG, Bern, vertreten durch das Direktionsmitglied
      Christine Stauffer (Beteiligte zu 1),

2.    Galerie St. Etienne, New York, vertreten durch die Geschäftsführerin Jane
      Kallir (Beteiligte zu 2) und

3.    Richard Nagy Ltd., London, vertreten durch den Geschäftsführer Richard Nagy
      (Beteiligte zu 3).

Auf mich lautende Vollmachten füge ich bei.

Namens und im Auftrag meiner Mandantinnen ersuche ich Sie,

1)    die in der Anlage 1a und 1b spezifizierten Meldungen von Werken von Egon
      Schiele (gemeldet als ehemals zur Sammlung Grünbaum gehörend) aus der
      Lost Art Datenbank zu löschen;

2)    hilfsweise, die in der Anlage 1a und 1b spezifizierten Meldungen bis zur
      endgültigen Klärung der Angelegenheit jeweils mit einem Hinweis darauf zu
      versehen, dass das Vorliegen der Eintragungsvoraussetzungen begründeten
      Zweifeln unterliegt und bei den in Anlage 1a spezifizierten Meldungen zusätzlich
      auf die als Anlagen 2 bis 4 überreichten US-Gerichtsurteile, den als Anlage 5
      überreichten Beschluss der sog. Michalek-Kommission und das als Anlage 6
      überreichte Dossier der Provenienzforscherin Dr. Sonja Niederacher zu
      verweisen;

3)    weiterhin den Eintrag zu Fritz Grünbaum in der Rubrik „Jüdische Sammler und
      Kunsthändler" der Lost Art Datenbank im Punkt „Enteignung" dahingehend zu

PAGE 18

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654836/2022

NYSCEF DOC. NO. 12                                        RECEIVED NYSCEF: 12/14/2022

- 2 -

korrigieren, dass keine Anhaltspunkte für eine Beschlagnahme der Sammlung bestehen und jedenfalls das Gros der Sammlung mit an Sicherheit grenzender Wahrscheinlichkeit in der Verfügungsmacht der Familie verblieb und zwischen 1952 und 1956 von einer Familienangehörigen zum Verkauf angeboten wurde.

Bezüglich der in Anlage 1c spezifizierten Meldungen behalten wir uns vor, zu einem späteren Zeitpunkt auch auf diese Werke zurückzukommen.

Ich begründe dieses Ersuchen wie folgt:

**I.      Betroffene Suchmeldungen**

Die Suchmeldungen, deren Löschung hiermit erbeten wird, betreffen jeweils Werke Egon Schieles, bezüglich derer die Melder die Zugehörigkeit zur Sammlung Fritz Grünbaum behaupten. Die Lost Art Database enthält insgesamt 84 solcher Meldungen. Diese Meldungen sind in Anlage 1 aufgelistet und um Informationen zur Identifizierung und Provenienz der Werke ergänzt.

Diese 84 Suchmeldungen können drei Kategorien zugeordnet werden:

a) Anlage 1a: Hier sind 61 Schiele-Arbeiten aufgeführt, die zwischen 1955 und 1956 von Mathilde Lukacs (der Schwägerin Fritz Grünbaums) an oder über die Galerie Kornfeld verkauft wurden.

b) Anlage 1b: Hier sind 13 Werke Egon Schieles aufgeführt, für die keinerlei Verbindung zu Mathilde Lukacs oder Fritz Grünbaum dokumentiert ist.

c) Anlage 1c: Zur dritten Kategorie gehören zehn Schiele-Werke, die in der Vorkriegsliteratur als Fritz Grünbaum gehörend genannt sind, von denen die meisten heute jedoch nicht eindeutig identifizierbar sind.

Bei einem Großteil der in Anlage 1a aufgeführten Werke ist der Verkauf durch Mathilde Lukacs die einzige Verbindung zu Fritz Grünbaum und ist daher schon ihre Zuordnung zur Sammlung Grünbaum spekulativ. Jedenfalls ist die Provenienz dieser Gruppe von Werken umfassend erforscht worden und ist insoweit erwiesen, dass die Werke nie Gegenstand eines NS-verfolgungsbedingten Entzugs waren.[1]

Bezüglich der in Anlage 1b aufgeführten Werke ist keinerlei Verbindung zu Fritz Grünbaum zu erkennen.

Die Titel der Werke in Anlage 1c wurden aus verschiedenen zu Lebzeiten Grünbaums erstellten Verzeichnissen von Werken aus seinem Besitz übernommen, wobei nur die

---

[1] Siehe Anlagen 2 bis 6.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM          INDEX NO. 654836/2022

NYSCEF DOC. NO. 12                                        RECEIVED NYSCEF: 12/14/2022

- 3 -

Identifizierung zweier Werke zutrifft (Nr. 1 und 2 der Anlage 1c), während die Zuordnung anderer Arbeiten zu im Werkverzeichnis aufgeführten Werken rein spekulativ ist (Nr. 3, 4 und 5 der Anlage 1c) und die weiteren Arbeiten mit keinem bekannten Werk Schieles übereinstimmen (Nr. 6 bis 10 der Anlage 1c).

## II.   Beteiligte

1.   Die Beteiligte zu 1) ist seit 150 Jahren im Kunsthandel tätig; zunächst unter der Firma Galerie Gutekunst (bis 1919 in Stuttgart, danach in Bern), später firmierend unter Gutekunst und Klipstein, dann unter Kornfeld und Klipstein und heute als Galerie Kornfeld Auktionen AG nebst Galerie Kornfeld Verlag AG. Neben dem traditionellen Kunsthandel mit alter Kunst und Kunst der klassischen Moderne führt sie seit vielen Jahren bedeutende Auktionen alter und moderner Kunst durch. Mit Ausnahme eines Werkes wurden sämtliche von dem Löschungsersuchen erfasste Werke Egon Schieles, überwiegend in den 1950er und 1960er Jahren, von der Beteiligten zu 1) bzw. dem mit ihr verbundenen Auktionshaus angekauft, versteigert oder freihändig verkauft.

2.   Die Beteiligte zu 2) ist seit fast 100 Jahren als Förderin und Händlerin der deutschen und österreichischen klassischen Moderne aktiv, seit 1923 über ihre Vorgängerin, die vom Kunsthändler Otto Kallir gegründete „Neue Galerie" in Wien, die nach dessen Flucht vor NS-Verfolgung im Jahr 1939 als „Galerie St. Etienne" in New York wieder eröffnete. Otto Kallir verfasste 1930 das erste Werkverzeichnis der Gemälde von Egon Schiele, das 1966 in einer überarbeiteten Auflage erschien. Außerdem veröffentlichte er 1970 das Werkverzeichnis des druckgraphischen Werks Schieles. Die heutige Geschäftsführerin der Galerie, seine Enkelin Jane Kallir, hat diese Werke übernommen und um die Zeichnungen und Aquarelle Egon Schieles ergänzt. Als Verfasserin des ersten umfassenden Schiele-Werkverzeichnisses hat Jane Kallir die Provenienz von mehr als 2.500 Werken des Künstlers untersucht. Sie gilt als weltweit führende Expertin für das Werk Egon Schieles und wird von allen bedeutenden Auktionshäusern, Händlern und Sammlern regelmäßig konsultiert, wenn es um Fragen der Provenienz und Echtheit von Schiele-Arbeiten geht. Außerdem berät sie die maßgeblichen Provenienzforscher in Österreich und den USA in allen Schiele betreffenden Fragen.

Otto Kallir gehörte nach Ende des zweiten Weltkrieges zu den Wenigen, die jüdischen Sammlern aktiv bei der Auffindung gestohlener Kunst halfen. Unter anderem unterstützte er Alma Mahler, Lea Bondi Jaray und die Erben von Johann Strauss dabei, gestohlene Sammlungsstücke zurückzuerhalten. Jane Kallir hat seit den 80er Jahren auch in dieser Hinsicht das Erbe ihres Großvaters angetreten. 1997 machte sie der New York Times Unterlagen ihres Großvaters zugänglich, die den Diebstahl des Schiele-Bildes "Portrait der Wally" dokumentierten. Die Veröffentlichung des hieraus resultierenden Artikels führte

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654836/2022
NYSCEF DOC. NO. 12                                     RECEIVED NYSCEF: 12/14/2022

- 4 -

zur Beschlagnahme des Portraits durch die New Yorker Staatsanwaltschaft und zum ersten öffentlichkeitswirksamen gerichtlichen Restitutionsverfahren um NS-Raubkunst in den USA, das in einem Restitutionsvergleich mit den Erben von Lea Bondi Jaray mündete. An diesem Verfahren war Jane Kallir als sachverständige Zeugin für die US-Regierung beteiligt.

3.    Die Beteiligte zu 3) hat seit Gründung der Kunsthandlung im Jahr 1984 eine hohe Expertise für die Werke von Egon Schiele und Gustav Klimt aufgebaut und sich neben anderen Meistern der Moderne auf diese beiden österreichischen Künstler spezialisiert. Auch ihr Gründer, Eigentümer und Geschäftsführer stammt aus einer jüdischen Familie, die aufgrund Nazi-Verfolgungs-maßnahmen ihre ungarische Heimat verlassen musste und der es 1938 gelang, nach Australien zu emigrieren.

4.    Bei den Beteiligten zu 2) und 3) handelt es sich um die wichtigsten zeitgenössischen Experten für die Kunst Egon Schieles und maßgebliche Händler dieser Werke. Ausführlichere Informationen zu beiden Beteiligten, insbesondere soweit es um ihre Befassung mit und Förderung des Werkes von Egon Schiele geht, sind als Anlagen 7 und 8 beigefügt.[2]

5.    Alle Beteiligten sind in ihrer Geschäftstätigkeit, aber auch in ihrer Reputation als renommierte Kunsthändler und Experten für Egon Schiele durch die in Anlage 1a und b aufgelisteten Suchmeldungen unmittelbar betroffen und beeinträchtigt. Diese unbegründeten Suchmeldungen führen auch zu erheblichen materiellen Schäden für die Beteiligten (sowie für andere Besitzer der betroffenen Werke), weil ein Werk durch seine Auflistung in der Lost Art Datenbank praktisch unverkäuflich wird. Dies begründet ein erhebliches Erpressungspotential für die Urheber unbegründeter Suchmeldungen.

Alle Beteiligten sind dabei von der Richtigkeit des Ansatzes der Erklärung von Washington überzeugt und unterstützen den dort niedergelegten Grundsatz, in Fällen von NS-Raubkunst „faire und gerechte Lösungen" mit den ursprünglichen Eigentümern oder ihren Nachfahren zu suchen. Mit Blick auf das eigene familiäre Verfolgungsschicksal und ihren aktiven Einsatz für die Restitution von NS-Raubkunst gilt dies in besonderem Maße für die Beteiligten zu 2) und 3).

Allerdings sind die Beteiligten gleichermaßen davon überzeugt, dass es für die Integrität der Erklärung von Washington und der zu ihrer Umsetzung entwickelten Instrumente und Mechanismen von großer Bedeutung ist,

---

[2] Anlage 7: Kurzbeschreibung der Galerie St. Etienne unter spezieller Berücksichtigung ihres Schiele-Engagements; Anlage 8: Lebenslauf Richard Nagy und Beschreibung des Engagements seiner Galerie in Bezug auf Egon Schiele.

PAGE 21

PAGE 21

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 12

INDEX NO. 654836/2022
RECEIVED NYSCEF: 12/14/2022

- 5 -

offensichtlich unbegründete oder gar missbräuchliche Suchmeldungen zu unterbinden.

### III. Fritz Grünbaum und seine Sammlung

1. Fritz Grünbaum und seine Frau Elisabeth (Lilly) wurden nach der nationalsozialistischen Machtübernahme in Österreich aufgrund der politischen Haltung Fritz Grünbaums und ihrer jüdischen Herkunft verfolgt. Fritz Grünbaum wurde im Frühjahr 1938 von der Gestapo verhaftet, in mehrere Konzentrationslager deportiert und starb am 14. Januar 1941 in Dachau. Elisabeth Grünbaum, geb. Herzl, lebte noch bis zum 5. Oktober 1942 in verschiedenen Wohnungen in Wien, bevor sie deportiert und in Maly Trostinec ermordet wurde. Das schlimme Verfolgungsschicksal von Fritz und Elisabeth Grünbaum steht außer Frage und soll durch die vorliegende Eingabe in keiner Weise relativiert werden.[3]

2. Fritz und Elisabeth Grünbaum besaßen eine große Sammlung verschiedenster Kunstwerke, darunter russische Ikonen und Altmeisterdrucke sowie Aquarelle und Zeichnungen von Paul Signac, Oskar Kokoschka, Egon Schiele und weniger bekannten österreichischen Künstlern ihrer Zeit. Die Sammlung wurde zu Lebzeiten Grünbaums nie vollständig katalogisiert oder fotografiert, so dass größtenteils keine Klarheit darüber besteht, welche Werke dazugehörten.

   In Otto Kallirs Werkverzeichnis der Gemälde Egon Schieles aus dem Jahr 1930 ist Fritz Grünbaum als Eigentümer von drei Ölgemälden Schieles aufgeführt.[4] Grünbaum besaß auch eine umfangreiche Sammlung von Aquarellen und Zeichnungen Schieles. 22 dieser Blätter stellte er 1925 als Leihgabe für eine Schiele-Ausstellung in der Wiener Galerie Würthle zur Verfügung.[5] Im Jahr 1928 gab Fritz Grünbaum außerdem 21 seiner Aquarelle und Zeichnungen Egon Schieles als Leihgabe in die Gedächtnis-Ausstellung Egon Schiele im Hagenbund in Wien.[6] Das Werkverzeichnis der Gemälde ist illustriert, so dass die hier als im Besitz Grünbaums stehend verzeichneten Werke eindeutig identifiziert werden können. Die Kataloge der Ausstellungen bei Würthle und im Hagenbund enthalten jedoch keine Abbildungen der Papierarbeiten aus der Sammlung Grünbaum. Daher können die darin bezeichneten Werke heute nicht mehr eindeutig identifiziert werden. Die Identifikation wird dadurch weiter erschwert, dass die Titel von Schieles Papierarbeiten meist wenig

---

[3] S. hierzu Sonja Niederacher, Dossier Fritz Grünbaum vom 30. Juni 2010, beigefügt als <u>Anlage 6</u>, S. 6ff.
[4] Otto Kallir [seinerzeit Otto Nirenstein], Egon Schiele: Persönlichkeit und Werk (Wien, 1930).
[5] „Egon Schiele", Kunsthandlung Würthle, Wien, Dez. 1925 bis Jan. 1926.
[6] „Gedächtnis-Ausstellung Egon Schiele", Hagenbund und Neue Galerie, Wien, Okt. bis Nov. 1928; Empfangsquittung für die Leihgaben Fritz Grünbaums, Neue Galerie Archiv, Belvedere Museum Wien.

PAGE 22

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654836/2022
NYSCEF DOC. NO. 12                                       RECEIVED NYSCEF: 12/14/2022

- 6 -

aussagekräftig und rein beschreibend sind und sich viele Titel wiederholen. [7] Hinzu kommt, dass die Titel nicht vom Künstler selbst stammen und oft von Ausstellung zu Ausstellung leicht verändert wurden.

3.  Am 20. Juli 1938 wurde die Sammlung gemäß der Verordnung über die Anmeldung sogenannten jüdischen Vermögens durch den Kunsthistoriker und Experten am Wiener Dorotheum Dr. Franz Kieslinger inventarisiert und geschätzt.[8] An Schiele-Werken erwähnt dieses Inventar fünf Ölgemälde, die einzeln mit Titel benannt sind, sowie unter den Inventarnummern 37 und 37a „Grosse Handzeichnungen von Schiele 55 Blatt mit Farben" und „20 Bleistiftzeichnungen und 1 Radierung v. Schiele."[9] Hierzu enthält das Inventar weder Titel noch sonstige Informationen, die eine Identifizierung erleichtern würden. Im Übrigen lassen sich die einzelnen Bestandteile der Sammlung Grünbaum heute nicht genau identifizieren – dies gilt für seine Schieles ebenso wie für die meisten anderen Werke.[10]

4.  In September 1938 verbrachte Elisabeth Grünbaum den weitaus größten Teil der Sammlung, darunter 21 Ölgemälde, 303 Aquarelle und Zeichnungen und eine ungenannte Zahl von Druckgrafiken in die Wiener Niederlassung der Spedition Schenker & Co. Für diese Gegenstände, die als „Umzugsgut" deklariert waren, wurde beim Bundesdenkmalamt eine Ausfuhrgenehmigung beantragt.[11] Da die Sammlungsgegenstände nicht als „national wertvolles Gut" gesperrt waren, wurde die Ausfuhr bewilligt. Als „entartete Kunst" waren Werke Egon Schieles in Österreich praktisch ohne kommerziellen Wert und es gab auch keinen internationalen Markt für sie.[12]

Belege dafür, dass die Sammlung nach Bewilligung der Ausfuhr tatsächlich auch ausgeführt wurde, sind nicht auffindbar. Gleichwohl kann nicht ausgeschlossen werden, dass sie an die nach Belgien emigrierten Angehörigen Elisabeth Grünbaums geschickt wurde (ihr Bruder, Max Herzl, hatte sich schon früher in Antwerpen als Diamantenhändler niedergelassen und ihm war es gelungen, belgische Einreisevisa für seine Schwestern Mathilde Lukacs und

---

[7] So hat Schiele hunderte von Zeichnungen weiblicher Akte angefertigt, die nur selten allein aufgrund ihres Titels voneinander zu unterscheiden sind. Zum Beispiel finden sich auf S. 412 des Werkverzeichnisses von Jane Kallir aus dem Jahr 1990 hintereinander zwei Werke mit dem Titel "Sitzender weiblicher Akt" (Kallir D. 562 und 563), denen ein weiteres Werk mit dem Titel „Sitzender Mädchenakt" folgt (Kallir D. 564).
[8] „Schätzgutachten über den Kunstbesitz Fritz Grünbaums aus dem Januar/April 1938", abgedruckt bei Sophie Lillie, Was einmal war, Handbuch der enteigneten Kunstsammlungen Wiens, 2003, S. 430 ff.
[9] Lillie, aaO, S. 432.
[10] S. hierzu auch Sophie Lillie, Die tote Stadt, in Marie-Theres Arnbom/Christoph Wagner-Trenkwitz (Hrsg.), „Grüß mich Gott" – Fritz Grünbaum 1880 – 1941 - eine Biographie, 2005, S. 147ff.
[11] „Ansuchen um Ausfuhrbewilligung", am 8. September 1938 von Schenker & Co. im Namen Elisabeth Grünbaums gestellt.
[12] So konnte Otto Kallir erst Ende der 1950er Jahre in den USA Werke Egon Schieles mit Gewinn veräußern. In den 1940er Jahren lag der Preis für Papierarbeiten des Künstlers zwischen $10 und $60 pro Blatt.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 12

INDEX NO. 654836/2022
RECEIVED NYSCEF: 12/14/2022

- 7 -

Anna Reis zu erhalten). Ebenso ist es möglich, dass die Sammlung über den Kriegsausbruch hinaus bei der Spedition verblieb und später von Elisabeth Grünbaum oder auf deren Veranlassung ausgelöst wurde.[13] Es kann aber ausgeschlossen werden, dass die Sammlung von der Gestapo beschlagnahmt oder über die „Verwertungsstelle für jüdisches Umzugsgut der Gestapo" (Vugesta) verkauft wurde. Solche Beschlagnahmen wurden von den NS-Stellen detailliert dokumentiert und bezüglich der Sammlung Grünbaum existiert keinerlei Hinweis darauf, dass sie je ganz oder in Teilen beschlagnahmt wurde.[14]

5.    Mathilde Lukacs und ihr Ehemann überlebten den Krieg im belgischen Exil und reisten ab 1948 regelmäßig nach Wien. In den Sommern 1951,1952 und 1954 verbrachten sie jeweils zwei Wochen in Wien.[15] Im Mai 1952 wandte sich Mathilde Lukacs erstmals an die Galerie Gutekunst & Klipstein in Bern, um der Galerie Kunstwerke zum Kauf anzubieten.[16] Zwischen 1952 und 1956 brachte oder schickte sie insgesamt 120 Werke in sieben Sendungen an die Galerie.[17]

Am 3. August 1955 schrieb Lukacs an Eberhard Kornfeld, den Direktor der Galerie Gutekunst & Klipstein, und fragte ihn, ob er Interesse an folgenden Werken habe: „Egon Schiele: mehrere Aquarelle weibliche Acte sehr schöne Farben, auch bekleidete weibliche Figuren sowie Blumenstücke (Sonnenblumen) Aquarell". Nach den in der Galerie Kornfeld archivierten Unterlagen kaufte die Galerie insgesamt drei Ölbilder, eine Radierung und 67 Papierarbeiten Schieles aus dem Besitz von Mathilde Lukacs. Acht dieser Werke wurden am 24. November 1955 bei Gutekunst Klipstein zur Versteigerung gebracht,[18] weitere 53 Werke wurden 1956 von der Galerie mit einem Katalog und Abbildungen aller Werke in einer Verkaufsausstellung angeboten.[19] Der Rest wurde unmittelbar an Kunden der Galerie verkauft. Details und Zeitpunkte der Angebote, An- und Verkäufe bzw. Auktionen sind in Spalte 4 der Anlage 1a vermerkt.

Vielfach wird angenommen, dass die von Mathilde Lukacs an oder über Klipstein und Kornfeld verkauften Werke zuvor Fritz Grünbaum gehörten. Allerdings können nicht alle dieser Werke direkt auf die Sammmlung Grünbaum zurückgeführt werden.

---

[13] Vgl. hierzu Lillie, Die tote Stadt, S. 153f.
[14] Niederacher, aaO, S. 14; Lillie, Die tote Stadt, S. 154.
[15] Niederacher, aaO, S. 25.
[16] Schreiben Mathilde Lukacs an Gütekunst [sic] & Klipstein vom 3. Mai 1952.
[17] Niederacher, aaO, S. 50; nach Niederacher wurden fünf der 120 Arbeiten unverkauft an Mathilde Lukacs zurückgegeben.
[18] „Graphiken und Handzeichnungen Moderner Meister", Gutekunst & Klipstein, Bern, 24. November 1955.
[19] „Egon Schiele: Bilder – Aquarelle – Zeichnungen – Graphik", Klipstein & Kornfeld, Bern, 8. September bis 6. Oktober 6, 1956.

PAGE 24

PAGE 24

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

- 8 -

Die Geschäftsbeziehung zwischen Mathilde Lukacs und der Galerie Gutekunst & Klipstein ist in einer umfangreichen Korrespondenz zwischen beiden dokumentiert.[20] Gerne ist die Beteiligte zu 1) bereit, Ihnen diese Korrespondenz und sonstige ihr oder den anderen Beteiligten verfügbare Unterlagen zugänglich zu machen.

### IV.  Veranlasser der Suchmeldungen

1.  Die in der Lost Art Datenbank nicht namentlich benannten Veranlasser der beanstandeten Meldungen (nachfolgend: die „Melder") sind zwei entfernte Verwandte Fritz Grünbaums: Milos Vavra, der Neffe einer Nichte Fritz Grünbaums, und Leon Fischer, der Großneffe von Elisabeth Grünbaum (und Mathilde Lukacs).

    Diese wurden im Jahr 1999 durch die Hoerner Bank, eine in Heilbronn ansässige Bank, die sich auf Erbenermittlung spezialisiert hat[21], auf ihre Erbenstellung aufmerksam gemacht.[22] In Zusammenarbeit mit dem Wiener Erbenermittler Herbert Gruber hatte die Hoernerbank die Melder als mögliche Erben von Fritz und Elisabeth Grünbaum identifiziert und veranlasste sie dazu, sich von den zuständigen österreichischen Behörden als alleinige Erben „einantworten" zu lassen, was im Jahr 2012 erfolgte.[23]

2.  Die Bemühungen der Hoerner Bank und Herbert Grubers sowie des in den USA für die Melder tätigen Rechtsanwalts Raymond J. Dowd sind ganz offensichtlich rein kommerziell motiviert.[24] In Verfolgung ihrer finanziellen Interessen haben sie wiederholt den vorstehend dargelegten und erwiesenen Sachverhalt bewusst fehlinterpretiert, wenn nicht sogar absichtlich falsch dargestellt. Nach ihrer Niederlage im Prozess gegen David Bakalar bezüglich der Zeichnung „Sitzende mit angezogenem linken Bein – Torso", Lost Art-ID 478799 (s. hierzu nachstehend unter V. 2. a) haben die Melder interessanterweise keine förmlichen Ansprüche auf Werke mehr geltend gemacht, die sie über die Lost

---

[20] Die Unterlagen der Galerie Kornfeld enthalten fünfzehn handgeschriebene Briefe und Postkarten von Mathilde Lukacs (3. Mai 1952; 7. Mai 1952; 13. Juli 1952; 3. Mai 1953; 11. Mai 1953; 31. Mai 1953; 25. Juni 1953; 3. August 1955; 20. August 1955; 25. Oktober 1955; 28. Dezember 1955; 26. Januar 1956; 30. Januar 1956; 11. April 1956; 20. Dezember 1957), fünf Briefe von Gutekunst & Klipstein an Lukacs (17. August 1955; 21. September 1955; 31. Oktober 1955; 14. April 1956; 25. Oktober 1957) sowie fünf Quittungen und sonstige Transaktionsdokumente zwischen der Galerie und Lukacs (2. Juli 1953; Herbst 1953; 24. November 1956; 7. Dezember 1955; Bestandsbuch Februar – Mai 1956).

[21] S. www.hoernerbank.de.

[22] "Causa Schiele: Grünbaum-Erbe gefunden!" *News*, July 9, 1998, beigefügt als Anlage 9.

[23] Niederacher, aaO, S. 30.

[24] Sowohl die Hoerner Bank als auch der Erbenermittler Herbert Gruber verlangen im Erfolgsfall von den Erben üblicherweise ein Drittel des Gesamterlöses zzg. MWSt; s. für die Hoerner Bank https://www.hoernerbank.de/de/erbenermittlung und für Herbert Gruber das Interview mit der Zeitschrift „Profil" vom 11. Juni 2009, beigefügt als Anlage 10.

PAGE 25

PAGE 25

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654836/2022
NYSCEF DOC. NO. 12                                       RECEIVED NYSCEF: 12/14/2022

- 9 -

Art Datenbank für den Grünbaum-Nachlass reklamieren und deren heutiger Verbleib teilweise wohlbekannt ist.[25]

**V.    Würdigung des historischen Sachverhalts bezüglich der von Mathilde Lukacs veräußerten Schieles**

1.    Wie ausgeführt, ist das genaue Schicksal der Schiele-Werke aus der Sammlung Grünbaum während des Krieges unbekannt. Dies gilt auch für die von Mathilde Lukacs in den 50er Jahren veräußerten Werke. Aus der Tatsache des Verkaufs dieser Werke durch die Schwester von Elisabeth Grünbaum, die selber nationalsozialistischer Verfolgung ausgesetzt war, ergibt sich jedoch der zwingende Schluss, dass weder eine Beschlagnahme seitens der Nationalsozialisten erfolgt sein kann, noch dass diese Werke Gegenstand von Zwangsverkäufen oder ähnlichem gewesen sein können. Vielmehr ergibt sich daraus, dass Mathilde Lukacs, eine enge Verwandte und Erbin Fritz Grünbaums, in den frühen fünfziger Jahren Besitz an Werken Schieles aus der Sammlung Grünbaum hatte, trotz aller Unklarheit über historische Einzelheiten eindeutig, dass diese Werke während des zweiten Weltkrieges im Besitz der Familie Grünbaum verblieben waren. Ein NS-verfolgungsbedingter Verlust ist damit ausgeschlossen.

2.    Zu diesem Ergebnis sind auch alle mit dem entsprechenden Sachverhalt (Werke die – vermutlich – aus der Sammlung Grünbaum stammen und von Mathilde Lukacs verkauft wurden) befassten Gerichte und Expertengremien gekommen.

       a)    Eine eindeutige gerichtliche Beurteilung des historischen Sachverhalts findet sich in mehreren Urteilen amerikanischer Gerichte betreffend die unter Lost Art-ID 478799 geführte Zeichnung („Sitzende mit angezogenem linken Bein – Torso"). Diese war – stellvertretend für alle von Lukacs verkauften Arbeiten von Schiele aus dem Besitz Grünbaums – Gegenstand eines langjährigen Rechtsstreits zwischen dem Eigentümer der Zeichnung, David Bakalar, und den hiesigen Meldern Milos Vavra und Leon Fischer. Da die Melder sich einem Verkauf der Zeichnung ohne erhebliche finanzielle Beteiligung entgegenstellten, klagte David Bakalar auf Feststellung seines Eigentums. Der Klage wurde stattgegeben. Der US District Court for the Southern District of New York stellte hierzu nach umfassender Prüfung aller vorhandenen Unterlagen in seinem Urteil vom 17. August 2011 fest:

---

[25] Zum Beispiel befinden sich das unter Lost Art-ID-478917 gemeldete Werk im Museum of Modern Art in New York, das unter Lost Art-ID 478909 gemeldete Werk im Allen Memorial Art Museum in Oberlin Ohio und das unter Lost Art-ID 478795 gemeldete Werk im Art Institute of Chicago. PAGE 26

PAGE 26

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

- 10 -

„*This Court previously found that the Drawing was possessed by Grünbaum prior to his arrest in 1938 and by Lukacs in 1956. The most reasonable inference to draw from these facts is that the Drawing remained in the Grünbaum family's possession and was never appropriated by the Nazis. The alternative inference – that the Drawing was looted by the Nazis and then returned to Grünbaum's sister-in-law – is highly unlikely. […] In any event, Lukacs' possession of the Drawing after World War II strongly indicates that such a seizure never occurred. Accordingly, what little evidence exists – that the Drawing belonged to Grünbaum and was sold by one of his heirs after World War II – suffices to establish by a preponderance of the evidence that the Drawing was not looted by the Nazis.*"[26]

[„*Das Gericht hat bereits früher festgestellt, dass die Zeichnung bis zu dessen Verhaftung im Jahr 1938 im Besitz von Grünbaum war und im Jahr 1956 im Besitz von Lukacs. Die vernünftigste Schlussfolgerung, die sich aus diesen Tatsachen ziehen lässt, ist die, dass die Zeichnung im Besitz der Grünbaum-Familie verblieb und nie von den Nazis enteignet wurde. Die alternative Schlussfolgerung – dass die Zeichnung von den Nazis geraubt und dann an die Schwägerin von Grünbaum zurückgegeben wurde – ist äußerst unwahrscheinlich. […] Jedenfalls weist die Tatsache, dass sie nach dem Zweiten Weltkrieg im Besitz von Lukacs war, eindeutig darauf hin, dass eine solche Beschlagnahme nie stattgefunden hat. Daher lassen die wenigen bewiesenen Tatsachen – dass die Zeichnung Grünbaum gehört hatte und dass sie nach dem Zweiten Weltkrieg durch einen seiner Erben veräußert wurde – eindeutig darauf schließen, dass die Zeichnung nicht von den Nazis geraubt wurde.*" (Eigene Übersetzung)]

Das Urteil ist rechtskräftig.[27]

b)    Ebenso hat das zur Klärung von Raubkunstfragen aus der österreichischen Privatstiftung Leopold eingesetzte unabhängige Gremium (sog. Michalek-Kommission) mit Blick auf den identischen historischen Sachverhalt Folgendes festgestellt:

„*Im vorliegenden Fall gibt es keinen Hinweis darauf, dass zwischen dem 13. März 1938 und dem 8. Mai 1945 die*

---

[26] Memorandum and Order vom 17.08.2011, Anlage 2, S. 8f.
[27] S. Zurückweisung der Berufung durch den United States Court of Appeals, Anlage 4.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

- 11 -

> *Kunstsammlung [Fritz Grünbaums] oder Teile davon durch behördliche Maßnahmen ihrem Eigentümer entzogen worden wären. Aus den Verkäufen in den 50er Jahren durch Mathilde Lukacs muss im Gegenteil gefolgert werden, dass die Sammlung jedenfalls faktisch in der Verfügungsmacht der Familie bzw. einzelner Familienmitglieder geblieben ist. Es findet sich in den Unterlagen aber auch kein Hinweis auf einen Eigentümerwechsel durch ein Rechtsgeschäft des Privatrechtes im genannten Zeitraum."[28]*

Diese Feststellung betrifft <u>direkt</u> die in der Lost Art Datenbank unter folgenden Nummern aufgeführten Werke von Egon Schiele:

- Lost Art-ID 478576 (Tote Stadt III)
- Lost Art-ID 478890 (Andacht) und
- Lost Art-ID 478891 (Akt mit orangefarbenen Strümpfen).

<u>Indirekt</u> gilt diese Feststellung gleichermaßen für die unter folgenden Nummern aufgeführten Werke:

- Lost Art-ID 478904 (Selbstdarstellung grimassierend)
- Lost Art-ID 478915 (Rote Bluse)
- Lost Art-ID 478887 (Mädchen – Akt mit gelbem Tuch)
- Lost Art-ID 478791 (Sich umarmende Mädchenakte) und
- Lost Art-ID 478812 (Selbstdarstellung mit Umhang).

Denn auch diese Werke sind von der Provenienzforscherin Sonja Niederacher untersucht worden und Gegenstand ihres Dossiers, das dem Beschluss der Michalek-Kommission zugrunde liegt. Diese Werke wurden ebenfalls von Mathilde Lukacs an bzw. über die Galerie Kornfeld verkauft, im Unterschied zu den drei ersten Werken war aus Sicht der Provenienzforscherin bei diesen fünf Werken jedoch nicht eindeutig zu klären, ob sie tatsächlich zur Sammlung Grünbaum gehört hatten. Zur Bewertung dieses Sachverhalts stellt die Michalek-Kommission fest:

> *„Die einzige Verbindung dieser Werke zur Sammlung Grünbaum ist allerdings, dass auch diese in den 1950er Jahren durch Mathilde Lukacs verkauft wurden. Da aber Mathilde Lukacs selbst eine nicht unbeträchtliche Kunstsammlung ausführen konnte und auch ein anderes, ebenfalls in Belgien lebendes, Familienmitglied (Berthold Reif) über Kunstwerke verfügte, kann nach Ansicht des Gremiums aus der alleinigen Tatsache des*

---

[28] Beschluss des Gremiums vom 18. November 2010, beigefügt als <u>Anlage 5</u>, S. 11 f. <span style="color:red">PAGE 28</span>

<span style="color:red">PAGE 28</span>

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

- 12 -

> *Verkaufes durch Mathilde Lukacs keinesfalls zwingend geschlossen werden, dass alle von ihr verkauften Werke aus der ehemaligen Sammlung Grünbaum stammten. Aus diesem Grund beziehen sich die Ausführungen in dieser Stellungnahme lediglich auf die im Spruch angeführten und im Dossier als nachgewiesenermaßen aus der Sammlung Grünbaum stammend bezeichneten Werke. Angesichts des Ergebnisses der Beurteilung hinsichtlich der im Spruch angeführten Objekte bedarf es aber jedenfalls keiner Klärung der in diesem Punkt noch offenen Fragen. Denn auch wenn die im Dossier als ‚mutmaßlich aus der Sammlung Grünbaum' stammenden Objekte tatsächlich aus der Fritz Grünbaum 1938 gehörenden Sammlung stammten, würde eine auf der Grundlage des gegenständlichen Dossiers hinsichtlich dieser Objekte vorgenommene Beurteilung analog der hinsichtlich der drei im Spruch dieser Stellungnahme angeführten Werke vorgenommenen Beurteilung ausfallen."[29]*

## VI. Würdigung des Sachverhalts bezüglich der in Anlage 1b bezeichneten Werke

Bei den weiteren Suchmeldungen, um deren Löschung ersucht wird, handelt es sich um Werke Egon Schieles, bezüglich derer jeder Anhaltspunkt für eine Zugehörigkeit zur Sammlung Grünbaum fehlt.

Das einzige, was diese Werke mit den (zum Teil vermutlich) zur Sammlung Grünbaum gehörenden von Mathilde Lukacs verkauften Werke gemeinsam haben, ist, dass auch sie – bis auf ein Werk (Lost Art-ID 478820), bezüglich dessen selbst diese Angabe nicht stimmt[30] – von der Beteiligten zu 1) verkauft bzw. versteigert wurden. In <u>Anlage 1b</u> finden sich Angaben über die Sammler, von denen die Beteiligte zu 1) diese Werke erworben hat, soweit diese Information verfügbar ist. Bei keinem dieser Werke ist eine Übereinstimmung mit einem der in der Vorkriegsliteratur als Fritz Grünbaum gehörend beschriebenen Werke[31] ersichtlich. Bei diesen Werken fehlt selbst die indirekte Verbindung zu Fritz Grünbaum über seine Schwägerin Mathilde Lukacs.

## VII. Schlussfolgerungen

1. Wie dargelegt, kann bei den in <u>Anlage 1a</u> aufgeführten Schiele-Werken aus der Sammlung Grünbaum, die in den fünfziger Jahren von Mathilde Lukacs verkauft

---

[29] Beschluss des Gremiums, aaO, S. 11.
[30] Die Melder haben zu Lost Art-ID 478820 fälschlicherweise die Beteiligte zu 1) in der Provenienz angegeben. Die Beteiligte zu 1) hat dieses Werk jedoch niemals besessen oder veräußert.
[31] S. die Quellen in Fußnoten 6 und 7.

PAGE 29

PAGE 29

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

- 13 -

wurden, kein NS-verfolgungsbedingter Verlust vorliegen. Für die Eintragung einer Suchmeldung in der Lost Art Datenbank ist jedoch ein verfolgungsbedingter Verlust, mindestens aber die plausible Darlegung der Verdachtsmomente für einen verfolgungsbedingten Verlust Voraussetzung.

So verlangen die vom Deutschen Zentrum Kulturgutverluste aufgestellten „Grundsätze zur Eintragung und zur Löschung von Meldungen zu Kulturgütern in www.lostart.de" (nachfolgend: „Lost Art-Grundsätze") die plausible Erläuterung der Verlustgeschichte durch die Melder. Im Antrag auf Eintragung einer Suchmeldung bei NS-Raubkunst sind daher insbesondere die Verlustumstände darzustellen, d.h. „Anhaltspunkte des NS-verfolgungsbedingten Entzugs (Zwangsverkauf, Enteignung, Versteigerung, etc.) bzw. entsprechende Verdachtsmomente".[32]

An solchen Angaben bzw. Verdachtsmomenten fehlt es bei allen Suchmeldungen bezüglich der von Mathilde Lukacs veräußerten Schiele-Werke.

2.    Bezüglich der in <u>Anlage 1b</u> bezeichneten Werke fehlt es demgegenüber bereits an einer Berechtigung der Melder. Bei diesen Werken besteht keine Verbindung zur Sammlung Fritz Grünbaums und ist auch keine plausible Darlegung einer solchen Verbindung bekannt oder ersichtlich.

3.    Daher ist die Löschung aller in <u>Anlage 1a und b</u> genannten Suchmeldungen zwingend geboten.

Dies ergibt sich unmittelbar aus den Lost Art-Grundsätzen. Hier heißt es in Abschnitt III. (Löschung), Ziffer 3:

> „Ist die Plausibilität einer Meldung grundlegend erschüttert und wird sie auch durch den Melder nicht wieder hergestellt, wird die Meldung durch das Deutsche Zentrum Kulturgutverluste aus der Datenbank entfernt."

Bei Werken, die (erwiesenermaßen oder nur vermeintlich) aus der Sammlung Grünbaum stammen und die von Mathilde Lukacs veräußert wurden (<u>Anlage 1a</u>), ist ein verfolgungsbedingter Verlust ausgeschlossen. Ein solcher wurde von den Meldern auch nicht plausibel dargelegt. Damit fehlt es an der Plausibilität der diesbezüglichen Suchmeldungen und diese sind zu löschen.

Bei den in <u>Anlage 1b</u> genannten Werken fehlt es an jeder Plausibilität einer Zugehörigkeit zur Sammlung Fritz Grünbaums und damit bereits an der

---

[32] Lost Art-Grundsätze, Checkliste Plausibilitätsprüfung, Ziff. 5.

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

- 14 -

plausiblen Darlegung der Berechtigung der Melder. Aus diesem Grund sind auch diese Meldungen zu löschen.

4.  Nachdem die Melder bereits in den beschriebenen Verfahren vor den US-Gerichten und der Michalek-Kommission einen verfolgungsbedingten Verlust nicht plausibel machen konnten, kann als ausgeschlossen gelten, dass sie die Plausibilität der Meldungen bezüglich der von Mathilde Lukacs verkauften Werke wieder herstellen können. Bei den anderen Werken ist in Ermangelung jeden Anhaltspunkts der Zugehörigkeit der Werke zur Sammlung Grünbaums davon auszugehen, dass die diesbezüglichen Meldungen von vornherein nicht plausibel waren, sondern die Angaben der Melder bezüglich der von ihnen reklamierten Werke ohne weitere Prüfung übernommen wurden.

Daher ist die unverzügliche Löschung aller beanstandeten Meldungen ohne vorherige Anhörung der Melder angebracht.

5.  Sofern Sie gleichwohl vor einer Löschung die Stellungnahme der Melder einholen, ersuchen wir Sie, bei allen in Anlage 1a und 1b aufgeführten Suchmeldungen unverzüglich einen deutlichen Hinweis darauf einzustellen, dass das Vorliegen der Eintragungsvoraussetzungen begründeten Zweifeln unterliegt. Dieser Hinweis sollte bei den in Anlage 1a aufgeführten Meldungen um einen direkten Verweis auf die Anlagen 2 bis 6 ergänzt werden. Nicht nur zur Wahrung der Interessen der Beteiligten, sondern auch mit Blick auf den Auftrag der Lost Art-Datenbank, größtmögliche Transparenz bezüglich möglicher NS-Raubkunst zu schaffen und Interessenten unkompliziert Zugang zu relevanten Informationen zu ermöglichen, sind diese vorläufigen Hinweise erforderlich. Denn diese Informationen sind zum Verständnis der Suchmeldungen unverzichtbar.

6.  Neben der Löschung der genannten Suchmeldungen regen wir die Korrektur des Eintrags zu Fritz Grünbaum in der Rubrik „Jüdische Sammler und Kunsthändler" an. Eine Korrektur ist erforderlich, weil an dieser Stelle derzeit in der Rubrik „Enteignung" die Beschlagnahme der gesamten Sammlung bei der Spedition Schenker behauptet wird. Wie dargelegt, ist eine Beschlagnahme oder andere Form der Aneignung der Sammlung durch die Nationalsozialisten oder deren Helfer nach heutigem Stand der Provenienzforschung jedoch ausgeschlossen.[33]

Offenbar liegt dem Eintrag zum Sammler Fritz Grünbaum, ebenso wie vielen publizistischen Quellen und populären Meinungsäußerungen, die naheliegende gedankliche Verkürzung zugrunde, dass bei einem unbestreitbaren Verfolgungsschicksal eines jüdischen Kunstbesitzers quasi zwangsläufig ein

---

[33] S. oben Abschnitt III. 4. mWN. und Abschnitt V.

PAGE 31

PAGE 31

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

- 15 -

verfolgungsbedingter Verlust der Sammlung vorliegen muss. Dies ist zwar in vielen Verfolgungsfällen der Fall, im vorliegenden jedoch jedenfalls bezüglich der von Mathilde Lukacs veräußerten Werken eindeutig nicht.

**VIII.    Mögliche nächste Schritte**

Gerne sind die Beteiligten bereit, Sie bei der Aufarbeitung der von den Meldern eingestellten Suchmeldungen von Schiele-Werken mit Material, Forschungsergebnissen und sonstigen nützlichen Informationen zu unterstützen. Vor allem aber erscheint den Beteiligten ein persönliches Gespräch mit Ihnen zum Thema der Grünbaum-Schiele-Meldungen erforderlich und sinnvoll. Es geht darum, gemeinsam das Werk Egon Schieles vor Schaden zu bewahren und die Integrität des Kunsthandels zu schützen sowie die Akzeptanz des in der Washingtoner Erklärung niedergelegten Umgangs mit Raubkunst, insbesondere von fairen und gerechten Lösungen für belegte Raubkunstfälle, zu stärken. Rechtliche Auseinandersetzungen und Schadenersatzforderungen möchten die Beteiligen dabei möglichst vermeiden.

Ich wäre Ihnen für ein Signal Ihrer Gesprächsbereitschaft sehr dankbar und würde mich dann mit den Beteiligten und Ihrem Büro um die Abstimmung eines Termins bemühen.


Mit freundlichen Grüßen


Jutta Freifrau von Falkenhausen
(Rechtsanwältin)

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

RECEIVED NYSCEF: 12/14/2022

Anlage 1a

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

### a) Von Mathilde Lukacs an oder durch die Galerie Kornfeld verkaufte Werke

| | Titel (nach Kallir[1], sofern anwendbar) | Kallir-Nr. | Kornfeld Inventar Nr. | Verkauf durch Kornfeld | Lost Art ID-Nummer und Titel |
|---|---|---|---|---|---|
| 1 | Boote, sich im Wasser spiegelnd | Kallir Gemälde 116 | 36228 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 2 | Lost Art-ID: 478578 Boote, sich im Wasser spiegelnd |
| 2 | Landschaft mit Bäumen und Häusern | Kallir Gemälde 122 | 36762 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 3 | Lost Art-ID: 478577 Landschaft mit Bäumen und Häusern |
| 3 | Tote Stadt III | Kallir Gemälde 213 | 36763 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 1 | Lost Art-ID: 478576 Tote Stadt III |
| 4 | Zwei Proletarierkinder | Kallir 412 | 36775 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 18 | Lost Art-ID: 478920 Zwei Proletarierkinder |
| 5 | Knabenbildnis (Herbert Rainer) | Kallir 455 | 36766 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 7 | Lost Art-ID: 478905 Knabenbildnis (Herbert Rainer) |
| 6 | Schuhe anziehendes Mädchen | Kallir 475 | 36512 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 8 | Lost Art-ID: 478917 Schuh anziehendes Mädchen |
| 7 | Sitzende Frau | Kallir 507 | 36781 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 12 | Lost Art-ID: 478907 Sitzende Frau |
| 8 | Liegender Halbakt mit rotem Hut | Kallir 547 | 36519 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 10 | Lost Art-ID: 478919 Liegender Halbakt mit rotem Hut Auch von den Erben nach Heinrich Rieger gemeldet: Lost Art-ID: 484117 |
| 9 | Selbstbildnis | Kallir 686 | 36238 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 4 | Lost Art-ID: 478903 Selbstbildnis |
| 10 | Fratze schneidender Mann (Selbstbildnis) | Kallir 705 | 36768 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 5 | Lost Art-ID: 478904 Selbstbildnis mit Grimasse |
| 11 | Schlafendes Mädchen | Kallir 769 | 36782 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 20 | Lost Art-ID: 478911 Schlafendes Mädchen |
| 12 | Stehender Akt mit Draperietuch | Kallir 808 | 36521 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 13 | Lost Art-ID: 478908 Stehender Akt mit Draperietuch |

[1]Jane Kallir, Egon Schiele, The Complete Works, Expanded Edition, New York, 1998; Band II; Catalogue Raisonné

PAGE 33

PAGE 33

1

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 12

INDEX NO. 051656/2022
RECEIVED NYSCEF: 12/14/2022

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

## a) Von Mathilde Lukacs an oder durch die Galerie Kornfeld verkaufte Werke

| | Titel (nach Kallir[1], sofern anwendbar) | Kallir-Nr. | Kornfeld Inventar Nr. | Verkauf durch Kornfeld | Lost Art ID-Nummer und Titel |
|---|---|---|---|---|---|
| 13 | Schwarzes Mädchen | Kallir 861 | 36520 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 14 | Lost Art-ID: 478909 Halbakt Schwarzes Mädchen |
| 14 | Sitzendes Mädchen | Kallir 874 | 36517 Erwerb Februar 1956 | Ausstellung Schiele 1956, Nr. 11 | Lost Art-ID: 478906 Sitzendes Mädchen |
| 15 | Frau mit schwarzer Schürze | Kallir 888 | 36522 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 21 | Lost Art-ID: 478912 Sitzende Frau mit aufgestützten Händen (Frau mit schwarzer Schürze) |
| 16 | Selbstbildnis als Büßer | Kallir 942 | 36774 Erwerb Mai | Schiele Ausstellung 1956, Nr. 15 | Lost Art-ID: 478812 Selbstbildnis als Büsser |
| 17 | Stehende Frau (Dirne) | Kallir 1045 | 36518 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 23 | Lost Art-ID: 478921 Stehende Frau (Dirne) |
| 18 | Sitzender weiblicher Rückenakt | Kallir 1071 | 36778 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 24 | Lost Art-ID: 478922 Sitzender weiblicher Rückenakt |
| 19 | Sitzendes Mädchen mit langen blonden Haaren | Kallir 1092 | 36234 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 25 | Lost Art-ID: 478923 Sitzendes Mädchen mit langen blonden Haaren |
| 20 | Frau, das Gesicht verbergend | Kallir 1101 | 36237 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 22 | Lost Art-ID: 478913 Frau, das Gesicht verbergend |
| 21 | Hockende Frau mit schwarzen Strümpfen, 1912, Aquarell; Verso: Stehende alte nackte Frau, Bleistift | Kallir 1136/1107? [ungesicherte Identifizierung; im Katalog von 1955 findet sich keine Abbildung und die Strümpfe in D. 1136 sind blau] | Auktionskommission | Auktion Nr. 80, 1955, Los 102 | Lost Art-ID: 478804 Frau mit blauen Strümpfen |
| 22 | Ich liebe Gegensätze | Kallir 1187 | 36767 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 19 | Lost Art-ID: 478910 Selbstbildnis im Gefängnis |
| 23 | Frauenakt mit orangefarbenem Haarband | Kallir 1235/1106 | Auktionskommission | Auktion Nr. 80, 1955, Los 103 | Lost Art-ID: 478899 Sitzender Frauenakt mit rot-orangenem Haarband |

PAGE 34

PAGE 34

2

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

| a) Von Mathilde Lukacs an oder durch die Galerie Kornfeld verkaufte Werke | | | | |
|---|---|---|---|---|
| Titel (nach Kallir[1], sofern anwendbar) | Kallir-Nr. | Kornfeld Inventar Nr. | Verkauf durch Kornfeld | Lost Art ID-Nummer und Titel |
| 24 Stehender Frauenakt mit Bademantel, 1913, Aquarell | Kallir 1270? [ungesicherte Identifizierung; im Katalog von 1955 findet sich keine Abbildung] | Auktionskommission | Auktion Nr. 80, 1955, Los 105 | Lost Art-ID: 478835 Stehender Frauenakt mit Bademantel |
| 25 Sitzendes Mädchen mit gelbem Tuch | Kallir 1278 | Auktionskommission | Auktion Nr. 80, 1955, Los 106 | Lost Art-ID: 478887 Sitzendes Mädchen mit gelbem Tuch |
| 26 Sitzender Mädchenakt mit offener Bluse | Kallir 1333 | 36786 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 38 | Lost Art-ID: 478817 Sitzender Mädchenakt mit offener Bluse |
| 27 Rothaarige hockende Frau mit grünen Strümpfen, 1913, Aquarell | Kallir 1334? [ungesicherte Identifizierung; im Katalog von 1955 findet sich keine Abbildung] | Auktionskommission | Auktion Nr. 80, 1955, Los 104 | Lost Art-ID: 478892 Rothaarige hockende Frau mit grünen Strümpfen |
| 28 Stehende Frau in Rot | Kallir 1347 | 36780 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 27 | Lost Art-ID: 478914 Stehende Frau in Rot |
| 29 Rote Bluse | Kallir 1394 | 36779 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 28 | Lost Art-ID: 478915 Rote Bluse |
| 30 Andacht | Kallir 1418 | 36231 Erwerb Juli 1955 | nicht verzeichnet | Lost Art-ID: 478890, Andacht |
| 31 Stehender Mann in rotem Tuch | Kallir 1420 | 36776 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 26 | Lost Art-ID: 478789 Stehender Mann in rotem Tuch |
| 32 Stehender Frauenakt von vorne mit orangefarbenen Strümpfen, 1914, Aquarell; Verso: Gesichtsfragment, Bleistift | Kallir 1488? [ungesicherte Identi-fizierung; im Katalog von 1955 findet sich keine Abbildung und die Rück-seite von 1488 ist leer] | Auktionskommission | Auktion Nr. 80, 1955, Los 108 | Lost Art-ID: 478891 Stehender Frauenakt von vorne mit orangefarbenen Strümpfen |
| 33 Liegender weiblicher Akt auf rotem Tuch | Kallir 1498 | 36239 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 33 | Lost Art-ID: 478794 Liegender weiblicher Akt auf rotem Tuch |

PAGE 35

PAGE 35

3

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

INDEX NO. 654036/2022

NYSCEF DOC. NO. 12

RECEIVED NYSCEF: 12/14/2022

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

| a) Von Mathilde Lukacs an oder durch die Galerie Kornfeld verkaufte Werke | | | | |
|---|---|---|---|---|
| | Titel (nach Kallir[1], sofern anwendbar) | Kallir-Nr. | Kornfeld Inventar Nr. | Verkauf durch Kornfeld | Lost Art ID-Nummer und Titel |
| 34 | Stehender Akt mit gespreizten Beinen und gelbbraunem Umhangtuch | Kallir 1499 | 36235 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 34 | Lost Art-ID: 478790 Stehender Akt mit gespreizten Beinen und gelbbraunem Umhangtuch |
| 35 | Rückenansicht eines auf rotem Tuch sitzenden Mädchens | Kallir 1504 | Auktionskommission | Auktion Nr. 80, 1955, Los 107 | Lost Art-ID: 478895 Rückenansicht eines auf rotem Tuch sitzenden Mädchens |
| 36 | Sich umarmende Akte | Kallir 1606 | 36513 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 35 | Lost Art-ID: 478791 Sich umarmende Akte |
| 37 | Bildnis des Kunstschrift-stellers Arthur Roessler Verso: Frauenakt mit hochgeschobenem Kleid | Kallir 1631 Verso: Kallir 1308 | 36773 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 31 | Lost Art-ID: 478815 Bildnis des Kunstschriftstellers Arthur Roessler |
| 38 | Knabe in Matrosenanzug | Kallir 1633 | 36771 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 29 | Lost Art-ID: 478916 Knabe in Matrosenanzug |
| 39 | Mönch | Kallir 1641 | 36524 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 32 | Lost Art-ID: 478816 Mönch |
| 40 | Selbstbildnis im Profil nach rechts | Kallir 1667 | 36240 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 30 | Lost Art-ID: 478814 Selbstbildnis im Profil nach rechts |
| 41 | Porträt der Frau des Künstlers, Edith | Kallir 1711 | 36527 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 36 | Lost Art-ID: 478805 Bildnis Edith Schiele |
| 42 | Tante und Neffe | Kallir 1797 | 36241 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 37 | Lost Art-ID: 478806 Tante und Neffe (Mutter und Kind?) |
| 43 | Halbakt mit grüner Bluse | Kallir 1831 | 36514 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 40 | Lost Art-ID: 478924 Halbakt mit grüner Bluse |
| 44 | Russischer Kriegsgefangener (Grigori Kladjischuili) | Kallir 1839/1449 | 36765 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 39 | Lost Art-ID: 478795 Russischer Kriegsgefangener (Grigori Kladjischuili) |
| 45 | Suburban House (Vorstadthaus) | Kallir 1862 | 36515 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 45 | Lost Art-ID: 478792 Vorstadthaus |

PAGE 36

PAGE 36

4

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

**a) Von Mathilde Lukacs an oder durch die Galerie Kornfeld verkaufte Werke**

| | Titel (nach Kallir[1], sofern anwendbar) | Kallir-Nr. | Kornfeld Inventar Nr. | Verkauf durch Kornfeld | Lost Art ID-Nummer und Titel |
|---|---|---|---|---|---|
| 46 | Sonnenblume | Kallir 1869 | 36516 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 41 | Lost Art-ID: 478796 Sonnenblume |
| 47 | Frauenbildnis | Kallir 1898 | 36770 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 44 | Lost Art-ID: 478797 Frauenbildnis |
| 48 | Weiblicher Rückenakt | Kallir 1970 | 36525 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 49 | Lost Art-ID: 478819 Weiblicher Rückenakt |
| 49 | Halbakt mit grünen Strümpfen, seitlich vom Rücken | Kallir 1972 | 36232 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 50 | Lost Art-ID: 478798 Halbakt mit grünen Strümpfen, seitlich vom Rücken |
| 50 | Mädchen in blauem Hemd und mit orangeroten Strumpfbändern | Kallir 1973 | Auktionskommission | Auktion Nr. 80, 1955, Los 109 | Lost Art-ID: 478896 Mädchen in blauem Hemd und mit orangeroten Strumpfbändern |
| 51 | Sitzende mit angezogenem linken Bein (Torso) | Kallir 1974 | 36777 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 51 | Lost Art-ID: 478799 Sitzende mit angezogenem linken Bein (Torso) |
| 52 | Männliches Bildnis | Kallir 2081 | 36772 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 42 | Lost Art-ID: 478818 Männliches Bildnis (Heinrich Wagner) |
| 53 | Zentralinspektor Benesch | Kallir 2098 | 36769 Erwerb Mai 1956 | Schiele Ausstellung 1956, Nr. 43 | Lost Art-ID: 478925 Zentralinspektor Benesch |
| 54 | Gebirgslandschaft | Kallir 2145 | 36523 Erwerb Februar 1956 | Schiele Ausstellung 1956, Nr. 46 | Lost Art-ID: 478807 |
| 55 | Dächer (Rattenberg, Tirol) | Kallir 2152 | 36244 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 47 | Lost Art-ID: 478808 Dächer (Rattenberg, Tirol) |
| 56 | Liegender Knabe mit aufgestütztem Kopf und übergeschlagenem linken Bein | Kallir 2173 | 36242 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 52 | Lost Art-ID: 478810 Liegender Knabe mit aufgestütztem Kopf und übergeschlagenem linken Bein |
| 57 | Sitzender weiblicher Akt von vorn | Kallir 2309 | 36243 Erwerb Dezember 1955 | Schiele Ausstellung 1956, Nr. 53 | Lost Art-ID: 478811 Sitzender weiblicher Akt von vorn |

PAGE 37

PAGE 37

5

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 12

INDEX NO. 654036/2022
RECEIVED NYSCEF: 12/14/2022

Anlage **A b**

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

| | b) Verkauf durch Kornfeld; keine Verbindung zu Lukacs | | | | |
|---|---|---|---|---|---|
| | Titel (nach Kallir) | Kallir-Nr. | Herkunft und Kornfeld Inventar Nr. (sofern verfügbar) | Verkauf durch Kornfeld | Lost Art: ID-Nummer und Titel |
| 1 | Mädchenakt | Kallir 513 | Glowacki, Auktionskommission | Auktion Nr. 108, 1962, Los 1035 | Lost Art-ID: 478885 Drei weibliche Akte Falscher Titel (Drei weibliche Akte), falsche Abbildung |
| 2 | Zwei Mädchen (Liebespaar) | Kallir 774 | Schab, Auktionskommission | Auktion Nr. 121, 1966, Los 972 | Lost Art-ID: 478611 Zwei Mädchen |
| 3 | Stehender Junge, nach links gewandt | Kallir 783 | nicht verzeichnet | nicht verzeichnet | Lost Art-ID: 478888 Stehender Knabe nach links |
| 4 | Kniender weiblicher Akt | Kallir 799 | Erwerb Februar 1956, 36582 | Schiele Ausstellung 1956, Nr. 17 | Lost Art-ID: 478813 Kniender weiblicher Akt |
| 5 | Stehendes Mädchen, das Gesicht mit beiden Händen bedeckend | Kallir 868 | Fohn, Auktionskommission | Auktion Nr. 110, 1963, Los 992 | Lost Art-ID: 478898 Stehendes Mädchen das Gesicht mit beiden Händen bedeckend (Weinende) |
| 6 | Selbstbildnis, Akt | Kallir 944 | Erwerb Juni 1956 Gerd Rosen, 36921 | Schiele Ausstellung 1956, Nr. 16 | Lost Art-ID: 478793 Selbstbildnis, Akt |
| 7 | Verschlungene Akte (Umarmung) | Kallir 1147 | Stenersen, Auktionskommission | Auktion Nr. 99, 1960, Los 914 | Lost Art-ID: 478886 Verschlungene Akte |
| 8 | Zwei Freundinnen, liegend (Zärtlichkeit) | Kallir 1288 | Glowacki, Auktionskommission | Auktion Nr. 108, 1962, Los 1041 | Lost Art-ID: 478894 Zwei Freundinnen, liegend |
| 9 | Liegende mit hochgeschobenem Hemd | Kallir 1550 | Die Herkunftsangabe durch Lost Art ist falsch: Kornfeld hat das Gemälde weder besessen noch verkauft | | Lost Art-ID: 478820 Liegende mit hoch-geschobener Unterwäsche |

PAGE 38

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

| | b) Verkauf durch Kornfeld; keine Verbindung zu Lukacs | | | | |
|---|---|---|---|---|---|
| | Titel (nach Kallir) | Kallir-Nr. | Herkunft und Kornfeld Inventar Nr. (sofern verfügbar) | Verkauf durch Kornfeld | Lost Art: ID-Nummer und Titel |
| 10 | Junges liegendes Mädchen, das rechte Bein angezogen; Verso: Mutter und Kind | Kallir 1579 Verso: Kallir 1671 | nicht verzeichnet | Auktion Nr. 196, 1987, Part 1, Los 173 | Lost Art-ID: 478821 Junges liegendes Mädchen, das rechte Bein angezogen |
| 11 | Mädchen vom Rücken gesehen, mit erhobenen Händen (Friederike Maria Beer) | Kallir 1598 | Leopold, 39880 Erwerb Dezember 1957 | Auktion Nr. 90, 1958, Los 939 | Lost Art-ID: 478832 Mädchen vom Rücken gesehen, mit erhobenen Händen (Friederike Maria Beer) |
| 12 | Stehendes junges Mädchen von vorne gesehen, Dreiviertel-Figur | Kallir 2047 | Kolker, Auktionskommission | Auktion Nr. 142, 1971, Los 1159 | Lost Art-ID: 478833 Stehendes junges Mädchen von vorne gesehen |
| 13 | Mädchenakt en face, Hände vor dem Gesicht | Kallir 2405 | Leopold, 39880, Erwerb 1957 | Auktion Nr. 90, 1958, Los 939 | Lost Art-ID: 478834 Mädchenakt en face, Hände vor dem Gesicht |

PAGE 39

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 12

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

Anlage *1c*

# Meldungen in der Lost Art Datenbank: Grünbaum/Schiele

| c) Werke ohne Nachweis | | | |
|---|---|---|---|
| | **Titel (nach Kallir)** | **Kallir-Nr.** | **Lost Art ID-Nummer** | **Anmerkungen** |
| 1 | Die Selbstseher I | Kallir Gemälde 174 | Lost Art-ID: 478574, Die Selbstseher | |
| 2 | Schwarzes Mädchen (Mädchen in Schwarz) | Kallir Gemälde 200 | Lost Art-ID: 478575, Schwarzes Mädchen | |
| 3 | "Liegender Frauenakt mit roten Strümpfen, 1912, Aquarell | Kallir 1098? [ungesicherte Identifizierung; bei Kallir 1098 handelt es sich nicht um einen Akt] | Lost Art-ID: 478889, Liegende mit roten Strümpfen | Eintrag in der Hagenbund Liste ohne Illustration |
| 4 | Mädchen mit Fahne, 1913, Aquarell | Kallir 1267? [ungesicherte Identifizierung] | Lost Art-ID: 478893, Mädchen mit Fahne | Eintrag im Würthle Katalog ohne Illustration |
| 5 | "Studie zum Wasserfach," 1917, Aquarell | Kallir 2148? [ungesicherte Identifizierung; der Titel ergibt keinen Sinn] | Lost Art-ID: 478897, Studien zum Wasserfall | Eintrag in der Hagenbund Liste ohne Illustration |
| 6 | Proletarierkind, 1911, Aquarell | Nicht identifiziert | Lost Art-ID: 478800, Proletarierkind | Eintrag im Würthle Katalog ohne Illustration |
| 7 | "Torso," 1913, Aquarell | Eventuell identisch mit Kallir 1394. Siehe Lost Art-ID: 478915, Rote Bluse | Lost Art-ID: 478801, Torso | Eintrag im Würthle Katalog ohne Illustration |
| 8 | Akte mit rotem Tuch, 1913, Aquarell | Nicht identifiziert | Lost Art-ID: 478803, Akte mit rotem Tuch | Eintrag im Würthle Katalog ohne Illustration; siehe auch Hagenbund 1928, nr. 21, "2 Mädchen,"1913, Aquarell (blau rot schwarz) |
| 9 | Berglandschaft (Bauernhaus in Tirol) | Nicht identifiziert | Lost Art-ID: 478864, Berglandschaft (Bauernhaus in Tirol) | Auch Lost Art nennt hierzu keine Quelle oder Provenienz |
| 10 | "Frau JR," 1910, Aquarell | Nicht identifiziert | Lost Art-ID: 478802, Frau J.R. | Eintrag in der Hagenbund Liste ohne Illustration |

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 13

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# EXHIBIT L

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 13

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

Search Request | Object report

# Mountain Landscape (Farmhouse in the Tirol)

Lost Art-ID: 478864

| | |
|---|---|
| Artist: | Schiele, Egon |
| | Birth: 1890.06.12, Tulln |
| | Death: 1918.10.31, Wien |
| | Place of activity: Wien |
| Title: | Mountain Landscape (Farmhouse in the Tirol) |
| Object type: | Drawing |
| Group of reported objects: | Graphic |
| Material / Technique: | Gouache, black crayon / drawn |
| Provenance: | Fritz Grünbaum |
| Status: | This announcement is contradicted by third parties. |
| Published since: | 30.01.2014 |
| Contact: | Please contact the German Lost Art Foundation. |

Circumstances of loss reported as Nazi-confiscated property

Search Request, Person
**Grünbaum, Franz Friedrich (Fritz)**

**Additional Information**

Decision of the Supreme Court of the State of New York

Permalink to this page: **https://www.lostart.de/en/Verlust/478864**

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 14

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# EXHIBIT M

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654842/2022
NYSCEF DOC. NO. 14                                          RECEIVED NYSCEF: 12/14/2022

**The New York Times** | https://www.nytimes.com/2018/08/26/arts/design/nazi-art-egon-schiele-fritz-grunbaum.html

# Jewish Heirs Take on an Art Foundation That Rights Nazi Wrongs

**By William D. Cohan**

Aug. 26, 2018

The German Lost Art Foundation operates a database of art likely looted by the Nazis, a list that has earned plaudits for helping to return works taken from Jews during the Holocaust. Established by government officials to address the sins of a prior generation, the foundation and its database alert the market to works that may have painful pasts and cloudy title.

But now the foundation is being criticized for removing from public view 63 works by the Austrian Expressionist Egon Schiele, as a result of lobbying by several dealers who specialize in the artist. The dealers contend the works in question were never stolen.

The removal — a rare step — is being challenged by the heirs of a popular Viennese cabaret performer, Fritz Grünbaum, whose sizable art collection, including 81 Schieles, was inventoried by Nazi agents in 1938 after he had been sent to a concentration camp where he died.

The heirs say the Schieles in question were definitely Grünbaum's property and confiscated by the Nazis. Earlier this year, they persuaded a New York State court of the merits of their claim, and a judge ordered that two of the Schieles, which have been held by one of the dealers, be returned to the family.

But the foundation has discounted the American court's ruling in favor of the dealers' view that the Schieles survived the war in the possession of a Grünbaum relative, not the Nazis, and were later sold fair and square.

Provenance researchers like Uwe Hartmann, left, head of the research department of the German Lost Art Foundation, and art historian Kai Artinger, try to trace the ownership of art works suspected of having been looted by the Nazis.  Dpa Picture Alliance/Alamy

"The fact that Fritz Grünbaum was persecuted by the Nazis is not contested," a spokeswoman for the foundation, Freya Paschen, said in an email. But, she continued, "this does not mean that the entirety of Grünbaum's art collection must have been lost due to Nazi persecution."

INDEX NO. 656642/2022
NYSCEF DOC. NO. 14                                                              RECEIVED NYSCEF: 12/14/2022

The dispute has drawn attention to the question of what sort of evidence the foundation should rely on to list — or delist — works, a difficult decision given the murky histories of much of the art lost in that era and the personal and financial consequences involved. Posting a work by Schiele, whose paintings have sold for as much as $40 million, on the database unquestionably damages its marketability. Refusing to list one just as certainly pains those who view restitution as justice long delayed.

"How does one strike a Jew's name from the book of history in modern days?" asked Raymond Dowd, a lawyer who represents the Grünbaum heirs.

The foundation, based in Magdeburg, was born in 2015, after efforts in Germany, and elsewhere, to find the huge number of works lost during World War II were often criticized as lackluster. That view had only grown with the discovery in 2012 of 1,500 works, some of them later shown to have been looted by the Nazis, in the Munich and Salzburg homes of Cornelius Gurlitt, whose father, an art dealer, had worked with the Nazis.

The foundation, established by the German federal government and other German states and municipalities, is designed to comply with the so-called Washington Principles, a set of nonbinding tenets that emerged from an international conference in 1998 that are meant to encourage restitution. The so-called Lost Art Database was created two years later in Germany and has been operated since by a series of German organizations, the most recent being the foundation. Ms. Paschen said the database provides "transparency" and contains nearly 170,000 detailed reports of stolen artworks and "several million" summaries of other objects.

Searching the database is free, and its website averages some 14,000 visits to its website per month, the foundation said. Works are listed based on requests to the foundation, which evaluates the information presented to it but does not do its own provenance research.

Egon Schiele's "Woman in a Black Pinafore" (1911) was ordered returned to Grünbaum's heirs by a New York judge earlier this year.

The database's guidelines say "the reporting party must plausibly demonstrate that an individual object or a collection was confiscated as a result of Nazi persecution, or was removed or lost during the Second World War, or that such a suspicion cannot be ruled out."

The Schieles were first listed on the database more than a decade ago at the request of the heirs, based on their view that the Nazi agents who inventoried the Grünbaum collection in 1938 ultimately seized it. At that time, the collection contained more than 400 works, including the Schieles. But the inventory did not record the names of many of the works, and it remains unclear what exactly happened to the collection after it was moved to a storage depot in Vienna. The art dealers contend that Grünbaum's wife, Elisabeth Grünbaum-Herzl, who was later sent to a concentration camp where she died, worked to export the bulk of the collection and that it's possible the works actually were shipped from Vienna to her relatives in Belgium.

What is clear is that in 1956, a Swiss art dealer offered 63 Schieles from the Grünbaum collection for sale. It was the first time any of the works had surfaced on the art market since Mr. Grünbaum's death 15 years earlier.

The Swiss dealer, Eberhard Kornfeld, said at the time that he had obtained them from "a refugee," without elaborating. More than 40 years later, in 1998, when questions about the provenance of the Schieles arose, Mr. Kornfeld identified the refugee as Mrs. Grünbaum-Herzl's sister, Mathilde Lukacs-Herzl, who had managed to escape the Nazis. He later presented letters, some logs and receipts that, he said, documented the sale from Ms. Lukacs-Herzl. He also said she had never identified herself as a Grünbaum relative or told him how she had come into possession of the works.

In 2011, a federal court in Manhattan found Mr. Kornfeld's account credible in a separate case in which it ruled a different Schiele from the same collection had not been looted.

But the Grünbaum heirs contend that Mr. Kornfeld's account is a fiction and that the documents are forgeries. They say it is suspicious that he did not identify Ms. Lukacs-Herzl as his supplier until nearly two decades after her death, and they contest the validity of the signatures on the records, pointing to places where Ms. Lukacs-Herzl's name is misspelled or written in pencil.

Schiele created "Woman Hiding her Face" in 1912. An art dealer, Richard Nagy, appealed the judge's order to return this work to Grünbaum's heirs.

Earlier this year, a New York State Supreme Court judge, Charles J. Ramos, found the heirs' arguments persuasive and ordered one of the dealers, Richard Nagy, to return Schiele's "Woman in a Black Pinafore" and "Woman Hiding Her Face" to them. He ruled that the Grünbaum collection had indeed been looted and that any actions by Mrs. Grünbaum-Herzl had been made under duress. "A signature at gunpoint cannot lead to a valid conveyance," the judge said in his ruling. He found discrepancies in Mr. Kornfeld's account, noting, for example, that his 1956 sale catalog had not listed the sister-in-law as the prior owner of the Schieles.

Mr. Nagy has appealed the judge's order and points to the fact that the three experts in lost works he has

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM     INDEX NO. 161342/2022

NYSCEF DOC. NO. 14                                          RECEIVED NYSCEF: 12/14/2022

enlisted said that they too do not find evidence that the Schieles were looted.

"Had any one of them found that the Schiele artworks were owned by Fritz Grünbaum and stolen by the Nazis, Richard would not have hesitated to restitute them," Nina Hartl, the director of Mr. Nagy's gallery, said in a statement earlier this year.

On Aug. 2, an appellate court stayed the heirs' proposed auction of the artworks at Christie's until Oct. 1, as long as Mr. Nagy posts a $4 million bond.

Ms. Paschen said that over the years, the foundation and its predecessors have removed at least four other works from the publicly viewable portion of the database after new evidence suggested they had not been looted. "Should there be new historic facts brought to light that may change the current evaluation," she said, "the works would be publicized again."

Stuart E. Eizenstat, a former deputy U.S. Treasury secretary who helped negotiate the Washington Principles, said that even if the claims by the Grünbaum heirs ultimately turn out to be unfounded, it makes sense to err on the side of caution when it comes to removing items from the database.

"The whole point of the Washington Principles is disclosure," he said. "You can't possibly have any justice on the merits without the disclosure so that claims can be made."

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 15

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# EXHIBIT N

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 15

INDEX NO. 654836/2022

RECEIVED NYSCEF: 12/14/2022

# Egon Schiele : the Leopold collection, Vienna

**Texts by Magdalena Dabrowski and Rudolf Leopold**

Author

Schiele, Egon, 1890-1918

Date

1997

Publisher

DuMont Buchverlag in association with
The Museum of Modern Art, New York

ISBN

0870700618, 0300073224

Exhibition URL

www.moma.org/calendar/exhibitions/264

The Museum of Modern Art's exhibition history—
from our founding in 1929 to the present—is
available online. It includes exhibition catalogues,
primary documents, installation views, and an
index of participating artists.

MoMA

© 2017 The Museum of Modern Art

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM

NYSCEF DOC. NO. 15

INDEX NO. 654838/2022

RECEIVED NYSCEF: 12/14/2022



# EGON SCHIELE
The Leopold Collection, Vienna

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:44 PM    INDEX NO. 654846/2022

NYSCEF DOC. NO. 15    RECEIVED NYSCEF: 12/14/2022

MoMA
1785

The Museum of Modern Art Library

English-language edition published on the occasion of the
exhibition *Egon Schiele: The Leopold Collection, Vienna,*
organized by Magdalena Dabrowski, Senior Curator,
Department of Drawings, The Museum of Modern Art,
New York, October 12, 1997–January 4, 1998

This exhibition is sponsored by ROBERT LEHMAN FOUNDATION, INC.

Additional generous support is provided by Jo Carole and Ronald S. Lauder.

The Museum gratefully acknowledges the assistance of the Österreichische
Nationalbank (Central Bank of Austria), the Austrian Mint, and the Austrian
Cultural Institute, New York.

An indemnity for the exhibition has been granted by the Federal Council
on the Arts and the Humanities.

Edited by Joanne Greenspun
Designed by Peter Dreesen
German texts translated by Russell Stockman

Originally published in German by DuMont Buchverlag, Cologne, in 1995

Original German texts by Rudolf Leopold copyright © 1995 Rudolf Leopold
"Egon Schiele: Master of Expressive Form" by Magdalena Dabrowski
copyright © 1997 The Museum of Modern Art, New York

Certain illustrations are covered by claims to copyright cited in the
Photograph Credits. All rights reserved.

Library of Congress Catalog Card Number: 97-073503
ISBN 0-87070-061-8 (paperbound, The Museum of Modern Art)
ISBN 0-300-07322-4 (clothbound, Yale University Press)
Published by DuMont Buchverlag, Cologne, in association with
The Museum of Modern Art, 11 West 53 Street, New York, New York 10019

English-language clothbound edition distributed throughout the world by
Yale University Press

Front cover: *Mourning Woman* (detail). 1912. See plate 67
Back cover: *Reclining Boy (Erich Lederer)* (detail). 1912. See plate 82
Frontispiece: *Portrait of Egon Schiele.* 1914. Photograph by A. Josef Trčka

Printed in Germany

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654856/2022

NYSCEF DOC. NO. 15                                    RECEIVED NYSCEF: 12/14/2022

53    *Dead City III*
      *("Tote Stadt" III)*
      1911

Oil and gouache on wood,
14 5/8 x 11 3/4" (37.3 x 29.8 cm)
Signed and dated upper right:
"EGON SCHIELE 1911."
Leopold Museum Inv. 460

Provenance:
Arthur Roessler, Vienna;
Alfred Spitzer, Vienna;
Fritz Grünbaum, Vienna;
Gutekunst & Klipstein, Bern;
Galerie St. Etienne, New York;
Rudolf Leopold, Vienna.

Literature:
Karpfen 1921; Leopold 1972, pl. 72;
Mitsch 1974; Whitford 1981;
Malafarina 1982, no. 173; Werkner
1986; Nebehay 1989; L 182; K 213.

Exhibitions:
Vienna 1912; Vienna 1925; Vienna
1928; Bern 1956; Innsbruck 1963;
London 1964; New York,
Guggenheim Museum 1965;
Vienna, Österreichische Galerie
1968; Munich 1975; Venice 1984;
Tokyo 1986; Zurich 1988; Tokyo
1991; Tübingen 1995; Tokyo 1997.

Schiele had already painted this group of houses in Krumau in the fall of 1910 (L 157; see illustration below), and even then he had introduced changes into his motif. In 1911, as one of a series of small-format views of Krumau (L 177–80, 183), he reworked the same subject on a small wood panel. It was probably this cityscape that Schiele referred to in a letter to Arthur Roessler dating from roughly the end of August 1911, saying that he had as yet held it back, and believed that it "is the most solemn in color." In any case, the twenty-one-year-old Schiele created with this painting a striking, fantastic vision.

Here the block of houses appears to have been pulled forward somewhat and isolated more completely than it was in the first version from 1910. The blue-black river still flows beside the houses to the left. The sides of the block form two lines that diverge slightly as they extend upward. The houses are here seen from a higher angle so that the roofs are elongated and the front-facing facades are foreshortened. (For compositional reasons, one wall, the narrow, windowless one at the top, has been lengthened.) This steeper vantage point and the change in the row of windows in the facade on the left from a horizontal to a slight diagonal heighten the three-dimensional effect, especially of the houses in front. This is apparent even in details, such as the shed that projects forward from the house in the center.

The striking arrangement of light and dark areas in this 1911 painting results in a more self-contained composition. The colors, mainly dark, sonorous tonalities enlivened in areas with more intense values–note the greenish-blue that edges the light narrow wall at the top (see pl. 50) and the touch of carmine-pink to the right of it, next to which is a somewhat wider patch of grayish-blue–produce a rich pictorial uniformity. Light reflections shimmer off the roofs; some of them almost appear to be in motion.



First version of *Dead City*, 1910.
Watercolor, gouache,
and Syndetikon on paper

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM
NYSCEF DOC. NO. 15

INDEX NO. 651650/2022
RECEIVED NYSCEF: 12/14/2022



FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654846/2022

NYSCEF DOC. NO. 15

RECEIVED NYSCEF: 12/14/2022

90  *Red Blouse*
    *("Rote Bluse")*
    1913

Gouache, watercolor,
and pencil on paper.
19 x 12 5/8" (48.2 x 31.9 cm)
Signed and dated lower right:
"EGON SCHIELE 1913."
Inscribed lower right:
"ROTE BLUSE"
Leopold Museum Inv. 1433

Provenance:
Fritz Grünbaum, Vienna; Heirs of
Fritz Grünbaum, The Netherlands;
Galerie Kornfeld, Bern (auction),
1981; Rudolf Leopold, Vienna.

Literature:
K 1394.

Exhibitions:
Bern 1956; Bern 1957; St. Gallen
1957; Vienna, Albertina 1968;
Zurich 1973; Tokyo 1986; Tokyo
1991; Tübingen 1995.

Schiele here produced an exciting contrast between the flat, brilliant scarlet of the blouse and the fully three-dimensional body. He depicts only a torso, but formally it strikes one as "complete," a self-contained composition.

The open blouse serves to frame the naked body. Shading here and there along the outlines of the legs and arms lifts them off the paper and places them in space (see the standing torso in the drawing on p. 223).

Just as the shoulder and head are cut off at the top, the left foot is cut off at the bottom. Thanks to this formal juxtaposition, one does not perceive their absence as a deficiency. Nor does one register the highly casual rendering of the hands, for they serve as key elements in the composition. The right hand appears at the apex of a roughly triangular shape only interrupted by the naked body, its curved base formed by the left arm and sleeve. The spread legs form another triangle, the point of which is represented by the pubes, which are executed in three dimensions in contrast to the flat surface of the blouse. It was not only for formal reasons that Schiele made this part of the body the center of his composition.

220

FILED: NEW YORK COUNTY CLERK 12/14/2022 08:44 PM    INDEX NO. 654836/2022

NYSCEF DOC. NO. 15                                              RECEIVED NYSCEF: 12/14/2022



FILED: NEW YORK COUNTY CLERK 03/13/2023 10:05 AM

NYSCEF DOC. NO. 16

INDEX NO. 654836/2022

RECEIVED NYSCEF: 03/13/2023

IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

| | | |
|---|---|---|
| TIMOTHY REIF AND DAVID FRAENKEL, AS CO-TRUSTEES OF THE LEON FISCHER TRUST FOR THE LIFE AND WORK OF FRITZ GRUNBAUM; MILOS VAVRA | | Hearing Date: |
| | Plaintiff/Petitioner | INDEX NO:    654836/2022 |
| vs. | | Index Date:    12/14/2022 |
| The Art Institute of Chicago | | AFFIDAVIT OF SERVICE OF: |
| | Defendant/Respondent | SUMMONS; VERIFIED COMPLAINT; EXHIBITS; NOTICE OF ELECTRONIC FILING |

Received by **Christopher Rodriquez**, on the 2nd day of March, 2023 at 4:40 PM to be served upon **The Art Institute of Chicago** at **111 South Michigan Avenue, Chicago, Cook County, IL 60603.**

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **8th day of March, 2023 at 3:01 PM** at the address of **111 South Michigan Avenue, Chicago, Cook County, IL 60603**, this affiant served the above described documents upon **The Art Institute of Chicago** in the manner described below:

**CORPORATE SERVICE**, by personally delivering 1 true and correct copy(ies) of the above described documents, with the date and hour of service endorsed thereon by this affiant, to the corporation described as the named defendant.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS: **Jennifer Sostaric, I delivered the documents to Jennifer Sostaric who indicated they were the person authorized to accept with identity confirmed by subject reaching for docs when named. The individual accepted service with direct delivery. The individual appeared to be a gray-haired white female contact 45-55 years of age, 5'6"-5'8" tall and weighing 120-140 lbs.**

Deponent asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.

Executed on _____3-10-23_____, 20 _23_.

**Christopher Rodriquez, Reg. # 129-386636,**
**Illinois Department of Financial and Professional**
**Regulation - PERC, IL**
ABC Legal Services, LLC
DCA Lic. #1380619 Exp. 02/28/24
147 Prince St, Suite 4-6, Brooklyn, NY 11201

STATE OF _Illinois_    COUNTY OF _Cook_
SWORN TO AND SUBSCRIBED BEFORE ME THIS _10_ OF _March_ 20 _23_ BY _Christopher Rodriquez_ (AFFIANT NAME)

SIGNATURE OF NOTARY PUBLIC
_Brian Riebel_
PRINT, TYPE OR STAMP NOTARY'S COMMISSIONED NAME

BRIAN RIEBEL
OFFICIAL SEAL
NOTARY PUBLIC    Notary Public - State of Illinois
STATE OF ILLINOIS    My Commission Expires
January 14, 2024

PERSONALLY KNOWN_____ OR PRODUCED IDENTIFICATION_____
TYPE OF IDENTIFICATION PRODUCED_____

Page 1 of 1
FOR: **Dunnington Bartholow & Miller LLP**
REF: **REF-12073877**

Tracking #: 0102452956

1 of 1

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 18

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TIMOTHY REIF and DAVID FRAENKEL, as Co-Trustees of the LEON FISCHER TRUST FOR THE LIFE AND WORK OF FRITZ GRUNBAUM and MILOS VAVRA,

          *Plaintiffs,*

    -against -

THE MUSEUM OF MODERN ART,

          Defendant,

An Artwork *Prostitute* (1912) by the Artist Egon Schiele,

          *Defendant-in-rem.*

Index No.: 654839/2022

Mot. Seq. 001

## MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE

DUNNINGTON BARTHOLOW & MILLER LLP
*Attorneys for Plaintiffs*

Raymond J. Dowd
Claudia G. Jaffe
230 Park Avenue, 21st Floor
New York, New York 10169
(212) 682-8811
RDowd@dunnington.com
CJaffe@dunnington.com

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 18

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................2

ARGUMENT ...........................................................................................................................3

I.  THE RELATED ACTIONS CONCERNING ARTWORKS STOLEN FROM
HOLOCAUST VICTIM FRITZ GRÜNBAUM INVOLVE COMMON QUESTIONS
OF LAW AND FACT AND SHOULD BE CONSOLIDATED FOR BRIEFING
AND DISCLOSURE UNDER CPLR 602 ..........................................................................3

A.  Absent A Showing Of Prejudice, CPLR 602 Warrants Consolidation Based On
Common Issues Of Fact And Law Relating To The Stolen Artworks, On Lack Of
Prejudice To Defendants And In The Interests of Justice And Judicial Economy ........3

B.  The Related Actions Are Based On A Core Set Of Common Facts Regarding a
Holocaust-Era Theft ..........................................................................................................4

C.  The Related Actions Share Common Questions Of Law Related To Title To
Stolen Artwork ...................................................................................................................5

D.  Because The  Related Actions Are Based On The Same Nazi Theft And
Swiss/New York Provenance Path In *Reif v. Nagy*, It Is Likely The Defenses
Asserted Will Be Common In Each Action ......................................................................6

II. BECAUSE THE RELATED ACTIONS ALL CONCERN THE PROPERTY OF
THE SAME DECEDENT, THE COURT SHOULD CONSOLIDATE THE
RELATED ACTIONS TO PROMOTE JUDICIAL EFFIENCY, TO AVOID
IMPOSING UNNECESSARY FINANCIAL AND LOGISTICAL BURDENS ON
THE HEIRS OF HOLOCAUST VICTIMS, AND BECAUSE CONSOLIDATION
WILL NOT CAUSE PREJUDICE TO ANY PARTY ........................................................7

A.  The Court Should Consolidate The Related Actions To Conserve Judicial
Resources ............................................................................................................................7

B.  Consolidation Will Benefit Plaintiffs And The Judicial Administration By
Allowing For Efficient Pre-Trial Preparation ...............................................................8

C.  Consolidating The Actions Can Help Reduce The Incidence Of Obtaining
Inconsistent Determinations Based On Practically Identical Claims ...........................8

D.  Conslidation Will Cause No Prejudice To Defendants.................................................9

E.  Consolidation Will Avoid Unnecessary.......................................................................10

CONCLUSION.......................................................................................................................12

i

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 18

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

# TABLE OF AUTHORITIES

Page(s)

Cases

*Amcan Holdings, Inc. v. Torys LLP,*
   32 A.D.3d 337 (1st Dept. 2006) ............................................................. 10

*Belt Parkway Imaging, P.C. v State Wide Ins. Co.,*
   30 Misc 3d 127(A) (App Term 2010) ..................................................... 10

*Braun v. Fraydun Realty Co.,*
   158 A.D.2d 430, 552 N.Y.S.2d 5 (1st Dept. 1990) ................................. 3

*Cantalupo Const. Corp. v Richmond Terrace Corp.,*
   96 A.D.3d 706 (2d Dept 2012) .............................................................. 11

*CPT Medical Services, PC, Assignee of Audrey Douglas v. Government Employees Ins. Co.,*
   2003 WL 22047892 (Queens Cty. Civ. Ct., August 25, 2003) ................ 11

*Daniel v. MVAIC,*
   181 Misc. 2d 941; 694 N.Y.S.2d 913 (Sup. Ct., Bronx Cty. 1999) ......... 10

*Datz v. Economy Cotton Goods Stores, Inc.,*
   263 N.Y.252, 188 N.E. 728 (1934) ......................................................... 3

*Eagle Pet Service Co. v. Pacific Employers Ins. Co.,*
   102 A.D.2d 810 ......................................................................................... 9

*East 92nd Street Corp.,*
   149 A.D.2d 354 ......................................................................................... 3

*Fransen v. Maniscalco,*
   256 A.D.2d 305, 681 N.Y.S.2d 310 (2d Dept. 1998) .............................. 4

*Geneva Temps, Inc. v. New World Communities, Inc.,*
   24 A.D.3d 332 (1st Dept. 2005) ............................................................. 10

*Guasconi v. Pohl,*
   2 A.D.3d 1202, 770 N.Y.S.2d 203 (3rd Dept. 2003) ............................... 3

*Hoss Medical Services, P.C. v. Government Employees Ins. Co.,*
   778 N.Y.S.2d 876 (N.Y. County Civ. Ct., June 17, 2004) ....................... 11

*J. Grotto & Assoc., Inc. v. Lax,*
   174 A.D.2d 394, 572 N.Y.S.2d 293 (1st Dept. 1991) ............................ 10

ii

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 18

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

*Kay v. Kritzer,*
   298 A.D.2d 560, 748 N.Y.S.2d 679 (2d Dept. 2002)............................................................ 3, 9

*Metroscan Imaging, PC, Assignee of Barbara Molina, et. al. v. GEICO,*
   797 N.Y.S.2d 737 (N.Y. County Civ. Ct., New York Co., June 8, 2005) ............................... 11

*Niles v. Long Island R.R.,*
   291 A.D.2d 538, 738 N.Y.S.2d 242 (2d Dept. 2002)............................................................ 3, 9

*Padula v. City of New York,*
   52 A.D.3d 795 (2d Dept. 2008).................................................................................................. 4

*Reif v. Nagy,*
   175 A.D.3d 107 ...................................................................................................... 1, 5, 6, 7

*The Angelo J. Melillo Center for Mental Health v. Denise B.,*
   777 N.Y.S.2d 830 (Nassau Cty. Dist. Ct., March 1, 2004) ..................................................... 11

*Vigo Steam Ship Corp.,*
   26 N.Y.2d 157, 309 N.Y.S.2d 165 (1970) ................................................................................. 3

Rules

CPLR 602.................................................................................................................................. 3, 12

CPLR 3126.................................................................................................................................... 11

iii

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022

NYSCEF DOC. NO. 18                                                                                      RECEIVED NYSCEF: 03/09/2023

Plaintiffs Timothy Reif and David Fraenkel as Co-Trustees of the Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust") and Milos Vavra (collectively the co-heirs of Fritz Grünbaum) bring this motion to consolidate for briefing and disclosure purposes the following actions, each of which is pending in Supreme Court, New York County and related to *Reif v. Nagy*[1],

>  N.Y. Civ. 654835/2022, *Reif v. The Santa Barbara Museum of* Art and *Portrait of the Artist's Wife* (1915)
>
>  N.Y. Civ. 654833/2022, *Reif v. The Allen Memorial Art Museum* and *Girl with Black Hair* (1911)
>
>  N.Y. Civ. 654831/2022, *Reif v. The Museum of Modern Art* and *Girl Putting on Shoe* (1910)
>
>  N.Y. Civ. 654839/2022: *Reif v. Museum of Modern Art* and *Prostitute* (1912)
>
>  N.Y. Civ. 654830/2022, *Reif v. The Morgan Library & Museum, New York* and *Self Portrait* (1910)
>
>  N.Y. Civ. 654828/2022, *Reif v. Successor Trustee to Ira Wender as Trustee of the Estee Lauder 2002 Trust* and *I Love Antitheses* (1912)
>
>  N.Y. Civ. 654836/2022, *Reif v. The Art Institute of Chicago* and *Russian Prisoner of War* (1916)

("the Related Actions"). The provenance paths of each of the artworks involved in the Related Actions are, for all legal purposes, identical to the Egon Schiele artworks *Woman in a Black Pinafore* (1911) and *Woman Hiding Her Face* (1912) stolen from the Viennese Jewish cabaret artist Fritz Grünbaum while he was in the Dachau Concentration Camp that were the subject of *Reif v. Nagy*. The allegations in the complaint in each Related Action are almost identical. The Related actions seek to recover Egon Schiele artworks, like those in *Reif v. Nagy*, that were looted

---

[1] 2015 CIV. 161799, 61 Misc. 3d 319, 80 N.Y.S.3d 629 (Sup. Ct. N.Y. Co. Comm. Div. 2018), aff'd, 175 A.D.3d 107 106 N.Y.S.3d 5 (1st Dept. 2019), leave to review declined, 25 N.Y.3d 986, 125 N.Y.S.3d 76 (May 24, 2022).

1

by the Nazis in 1938-39 from Grünbaum while he was imprisoned in the Dachau Concentration Camp and before he died there in 1941. For the reasons set forth below, the Court should consolidate this case with the Related Actions for briefing and disclosure purposes and should grant such other and further relief as the Court deems appropriate.

## PRELIMINARY STATEMENT

The Court should grant the motion to consolidate the Related Actions seeking to recover Nazi-looted artwork that was expropriated from Holocaust victim Fritz Grünbaum because each case involves artwork stolen from Grünbaum, trafficked through Nazi art dealers, marketed by a Swiss art gallery in 1956, and imported into the United States and into New York State through Otto Kallir, a Viennese emigré who operated Galerie St. Etienne in New York City and used that gallery to launder artwork stolen from Grünbaum's collection and take advantage of the New York marketplace for fine art.

Under the common law, where there is a thief in the chain of title, no one can take good title. Because New York does not recognize a good faith purchaser defense in cases of stolen artwork, that defense is not applicable in these actions. Each defendant in each Related Action was on notice of Nazi depredations of Jewish art collectors and had been warned by the U.S. government against acquiring artworks that were in Europe after 1932 but created prior to 1946 without checking the provenance of those artworks. Also, disclosure and briefing has not commenced in any of the Related Actions, so no Defendant could be prejudiced on the grounds that one Related Action was in a different litigation stage. Thus, none of the Defendants can demonstrate any prejudice from consolidation. Because each Related Action concerns an Egon Schiele artwork stolen from Grünbaum and trafficked through the same Swiss art dealer and then by Otto Kallir, common issues of fact and law predominate. To conserve judicial resources,

2

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 18

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

promote the efficient preparation of cases, reduce the risk of obtaining inconsistent determinations based on substantially similar claims, and on fairness grounds, Plaintiffs urge this Court to consolidate the Related Actions for briefing and disclosure purposes.

## ARGUMENT

I.  **THE RELATED ACTIONS CONCERNING ARTWORKS STOLEN FROM HOLOCAUST VICTIM FRITZ GRÜNBAUM INVOLVE COMMON QUESTIONS OF LAW AND FACT AND SHOULD BE CONSOLIDATED FOR BRIEFING AND DISCLOSURE UNDER CPLR 602**

A.  **Absent A Showing Of Prejudice, CPLR 602 Warrants Consolidation Based On Common Issues Of Fact And Law Relating To The Stolen Artworks, On Lack Of Prejudice To Defendants And In The Interests of Justice And Judicial Economy**

Because Defendants can show no prejudice at this early stage of proceedings involving art stolen from the same Holocaust victim, consolidation pursuant to CPLR 602 is warranted. When common questions of law or fact are present, a motion to consolidate should be granted unless the opposing party demonstrates prejudice to a substantial right or surprise. *Zupich,* 156 A.D.2d at 677 (citing *Matter of Vigo Steam Ship Corp.,* 26 N.Y.2d 157, 309 N.Y.S.2d 165 (1970)); *Datz v. Economy Cotton Goods Stores, Inc.,* 263 N.Y.252, 188 N.E. 728 (1934). Absent a showing of prejudice, a motion to consolidate pursuant to CPLR Section 602 should be granted where there are common questions of law or fact. *Kay v. Kritzer,* 298 A.D.2d 560, 748 N.Y.S.2d 679 (2d Dept. 2002); *Niles v. Long Island R.R.,* 291 A.D.2d 538, 738 N.Y.S.2d 242 (2d Dept. 2002) (reversible error in denying consolidation motion where there were common issues of law and fact, and no showing of prejudice). A motion to consolidate pending actions should be granted where consolidating would further the interests of justice and judicial economy. *Braun v. Fraydun Realty Co.,* 158 A.D.2d 430, 552 N.Y.S.2d 5 (1st Dept. 1990); *Atherton v.2 East 92nd Street Corp.,* 149 A.D.2d 354; 539 N.Y.2d 933 (1st Dept. 1989); *Guasconi v. Pohl,* 2 A.D.3d 1202, 770 N.Y.S.2d

3

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 18

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

203 (3rd Dept. 2003) (consolidating two actions sharing common issues of fact and law); *Padula v. City of New York*, 52 A.D.3d 795 (2d Dept. 2008) (citing *Fransen v. Maniscalco*, 256 A.D.2d 305, 306, 681 N.Y.S.2d 310 (2d Dept. 1998); *Zupich v. Flushing Hosp. and Med Center*, 156 A.D.2d 677, 549 N.Y.S2d 441 (2d Dept. 1989). Applying the foregoing fundamental precepts to the facts at bar, the Related Actions should be consolidated with this Action for briefing and disclosure purposes.

### B. The Related Actions Are Based On A Core Set Of Common Facts Regarding a Holocaust-Era Theft

Each of the Related Actions shares common questions of fact and law.  In each of these actions, the Grünbaum Heirs assert:

(i)     that Fritz Grünbaum, a Jewish resident of Vienna, Austria, at the time Germany annexed Austria in 1938, owned a number of artworks by Austrian artist Egon Schiele;

(ii)    that Grünbaum was arrested by the Gestapo on March 22, 1938 and imprisoned in the Dachau Concentration Camp;

(iii)   that in April 1938 the Nazis passed an anti-Semitic law requiring Jews (and only Jews) with property valued over 5,000 Reichmarks to declare the property they owned each quarter so that the assets would be available to the Nazi regime to fund Field Marshal Goering's Four Year Plan to build the Nazi war machine;

(iv)    that on July 16, 1938, while Grünbaum was imprisoned at Dachau, the Nazis compelled him to sign an unlawful power of attorney that ostensibly gave his wife Elisabeth ("Lilly") Grünbaum authority to convey his property, including his collection of Egon Schiele artworks, liquidating Grünbaum's assets in order to hand the assets over to the Nazi regime;

(v)     that Franz Kieslinger, an expert of the Dorotheum, a Nazi-controlled auction house, inventoried Grünbaum's art collection on behalf of the Jewish Property Transaction Office of Vienna (the "Kieslinger Inventory");

(vi)    that the Kieslinger Inventory shows Grünbaum's art collection contained at least 81 works by Egon Schiele;

4

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 18

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

(vii)    that the Nazis stamped Grünbaum's July 1938 Jewish Property Declaration "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed" or "blocked"], indicating that Grünbaum's property had been spoliated;

(viii)   that in accordance with Nazi laws passed in November-December 1938, the Nazi regime appointed an "Aryan" trustee, Vienna attorney Ludwig Rochlitzer, to oversee Grünbaum's property, and after Rochlitzer's appointment, neither Fritz nor Elisabeth Grünbaum had access to Fritz's art collection;

(ix)     Grünbaum never voluntarily abandoned his art collection during his lifetime;

(x)      Grünbaum died as a Nazi prisoner in the Dachau Concentration Camp;

(xi)     After World War II, a number of Schiele artworks from Grünbaum's collection were featured for sale at the Gutekunst & Klipstein art gallery in Bern, Switzerland, in 1956;

(xii)    All artworks in the 1956 Gutekunst & Klipstein sales catalogue were stolen from Grünbaum, including the famous *Dead City III*, which was seized by the District Attorney Robert Morgenthau from the Museum of Modern Art in New York City in 1998, as described in *Reif v. Nagy,* 175 A.D.3d 107 at 110, 114, 121.

(xiii)   Art dealer Otto Kallir purchased *Dead City III*, together with 19 other artworks by Egon Schiele, from Gutekunst & Klipstein during the 1956 sale.

(xiv)    Otto Kallir purchased each of the Egon Schiele artworks at issue in this Action and Related Actions, trafficking them out of his Galerie St. Etienne in New York City and giving rise to Plaintiffs' claims to recover those Schiele artworks.

**C.  The Related Actions Share Common Questions Of Law Related To Title To Stolen Artwork**

The Related Actions have a central common question of law, namely, whether because legal title to the artwork underlying each lawsuit remained with Fritz Grünbaum because Grünbaum never voluntarily surrendered his collection, because the Power of Attorney that enabled artwork to be transferred from Grünbaum's collection was executed under duress, because the Nazis acquired the Schiele artworks through theft, and because where a chattel is stolen no one

5

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

INDEX NO. 654839/2022
NYSCEF DOC. NO. 18                                    RECEIVED NYSCEF: 03/09/2023

acquiring that chattel from a thief can take good title, do Plaintiffs have legal title or a superior

right of possession over the Schiele artwork at issue in this Action and Related Actions, as against

the defendant in possession in those actions? This central question was answered in *Reif v. Nagy*.

All of the remaining questions of law are subsidiary to this central question.

D. **Because The Related Actions Are Based On The Same Nazi Theft And Swiss/New York Provenance Path In *Reif v. Nagy*, It Is Likely The Defenses Asserted Will Be Common In Each Action**

The common factual background running through the Related Actions suggests that

defendants may raise similar defenses. Because the Related Actions are based on a core set of facts

going to Fritz Grünbaum's ownership of particular Egon Schiele artworks, the theft of Grünbaum's

artworks under the Nazi regime, and the flow of the artworks into the marketplace after World

War II from Gutekunst & Klipstein to Otto Kallir's Galerie St. Etienne in New York City, all of

which were determined in *Reif v. Nagy*, it is anticipated that defendants in these actions will raise

similar defenses.

Defendants are each privileged museums that were well aware of Nazi depredations of

Jewish art collectors during World War II and were specifically warned by the U.S. government

against collecting stolen artwork. *See* Jaffe Aff. Ex. A, Expert Historian Report of Dr. Jonathan

Petropoulos dated March 2, 2023 at 3, 4, 7, 15, 54 discussing U.S. government warnings and other

facts, including the Nazi murders and spoliations of multiple prominent Viennese Jewish Schiele

collectors putting U.S. museums on notice that Egon Schiele artworks were "red flags" and likely

stolen). Because of the significant overlap between the factual and legal issues in the Related

Actions, and because of the likelihood that defendants in the actions will raise similar defenses,

Plaintiffs respectfully submit that consolidation is necessary to afford Plaintiffs the opportunity to

prove their claims and defend against any counterclaims under the supervision of a single judge

6

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 18

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

familiar with the case, as opposed to litigating the issue multiple times on a case-by-case basis and running a risk of inconsistent outcomes.

## II. BECAUSE THE RELATED ACTIONS ALL CONCERN THE PROPERTY OF THE SAME DECEDENT, THE COURT SHOULD CONSOLIDATE THE RELATED ACTIONS TO PROMOTE JUDICIAL EFFIENCY, TO AVOID IMPOSING UNNECESSARY FINANCIAL AND LOGISTICAL BURDENS ON THE HEIRS OF HOLOCAUST VICTIMS, AND BECAUSE CONSOLIDATION WILL NOT CAUSE PREJUDICE TO ANY PARTY

Each of the Related Actions alleges theft of the property of the same decedent, Fritz Grünbaum. Accordingly, the Court should grant the motion to consolidate the actions on grounds that consolidation will promote efficient use of judicial resources, avoid unnecessary duplication of efforts and legal fees and will not cause prejudice to any party.

### A. The Court Should Consolidate The Related Actions To Conserve Judicial Resources

The Court should consolidate the Related Actions to preserve judicial resources and avoid taxing the Court with the collective burden that would result if each of the actions were handled completely independently of each other, as opposed to being consolidated for briefing and disclosure purposes. These cases are in their initial stages, so it makes good sense to gather these cases before a single court from the start, rather than allowing the cases to be distributed among a number of judges.[2] Although very similar to *Reif v. Nagy*, the Related Actions are grounded in historical realities that are unusual and complicated and within this Court's particular competence. Nazi art looting is a subject area involving arguments based on foreign law, numerous historical documents, documents in languages other than English, experts in history and art provenance, the

---

[2] Defendants were recently served in six of the seven actions that are the subject of this motion to consolidate. Plaintiffs' counsel has attempted to serve and continues to attempt to serve defendant The Santa Barbara Museum of Art (in *Reif v. The Santa Barbara Museum of Art and Portrait of the Artist's Wife* (1915), pending in New York State Supreme Court, New York County, under Index No. 65435/2022.

7

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 18

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

function of New York property law, and painful testimony from heirs of victims, such that the cases can be expected to take up a significant amount of judicial resources, particularly if handled piecemeal. Efficiencies could be achieved if the Court consolidates the Related Actions to avoid an unnecessary waste of judicial resources.

### B. Consolidation Will Benefit Plaintiffs And The Judicial Administration By Allowing For Efficient Pre-Trial Preparation

The Plaintiffs and Judicial Administration will benefit from consolidation of matters common to the Related Actions that can be handled at one time, rather than seven separate times, and therefore legal expenses and use of court resources will be better controlled. Because each of the Related Actions involves the same provenance path through the September 1956 Gutekunst & Klipstein sale in Bern, Switzerland and then Galerie St. Etienne in New York, and involves similar defenses, discovery in the Related Actions should be consistent. Additionally, to the extent the Plaintiffs or judicial staff may be involved in attending appearances, executing supporting affidavits, sitting for depositions, etc., consolidating the actions will prevent duplication of efforts.

### C. Consolidating The Actions Can Help Reduce The Incidence Of Obtaining Inconsistent Determinations Based On Practically Identical Claims

Consolidating the Related Actions can reduce the risk of obtaining inconsistent determinations based on practically identical claims. If the Related Actions are not consolidated, there is a risk of conflicting determinations. That creates an innate unfairness. Inconsistent determinations would create a risk of multiple appeals, diverting the system's resources from other matters. If the Related Actions are prepared for pre-trial before the same court, however, the risk of inconsistencies is greatly reduced, particularly in motion practice and disclosure disputes. Accordingly, the motion to consolidate should be granted.

8

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022

NYSCEF DOC. NO. 18    RECEIVED NYSCEF: 03/09/2023

### D.  Consolidation Will Cause No Prejudice To Defendants

Defendants are all sophisticated art museums that will suffer no prejudice from consolidation, or in one case, *Timothy Reif et al. v. Ronald S. Lauder et al.,* a highly sophisticate business person and museum owner.  Because the Related Actions are all at an initial procedural stage, Defendants will suffer no prejudice, warranting consolidation.  Absent a showing of prejudice, consolidation should be granted where there are common issues of law and fact. *See Kay v. Kritzer,* 298 A.D.2d 560; *Niles v. Long Island R.R.,* 291 A.D.2d 538; *Eagle Pet Service Co. v. Pacific Employers Ins. Co.,* 102 A.D.2d 810. Because the Related Actions involve common issues of law and fact, the consolidation is warranted because defendants will suffer no prejudice by consolidation. Each of the Related Actions has been brought in New York County, so there is no prejudice caused by the selection of the forum. Two of the Related Actions involve the same museum (the Museum of Modern Art), highlighting the efficiencies that the Museum of Modern Art could enjoy if consolidation occurs. Defendants will likely benefit from sharing certain anticipated expenses, for example, for conducting depositions of an expert witness when the expert would likely need to be deposed for each action, and instead, could be deposed one time and each defendant could potentially share in the costs of conducting the expert's deposition.

Similarly, consolidation would promote efficiency and savings without also sacrificing fairness. In fact, it would be burdensome to defendants and create risks of inconsistent judgments if separate litigations were to proceed.  Finally, as the legal and factual foundation underlying the defenses in the Related Actions are substantially the same, consolidation would not elevate the risk of unfair surprise, under any cognizable theory.

Conversely, if consolidation is not granted, the same could not be said for Plaintiffs, as Reif, Fraenkel and Vavra would in fact suffer substantial prejudice. The threat of random and

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 18

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

disparate decisions based on incomplete evidence and hearings in any action imperils the Plaintiffs' prosecution of any given case. The denial of consolidation could lead to inconsistent results among the Related Actions. Further, absent consolidation, coordination of witnesses, i.e., securing the attendance of the same witnesses to litigate multiple actions, also would present a considerable burden to the Plaintiffs, particularly those who reside outside of New York or the United States.

### E.  Consolidation Will Avoid Unnecessary Costs Or Delays

Consolidating the Related Actions would clearly serve the central purpose of CPLR § 602. If granted, consolidation would avoid needless multiplicity of trials, straining of judicial resources and expenditure of time and legal expense. Indeed, by having all issues decided in one proceeding, judicial economy is achieved and the possibility of inconsistent determinations is eliminated. *See, e.g., Amcan Holdings, Inc. v. Torys LLP,* 32 A.D.3d 337 (1st Dept. 2006), *see also Geneva Temps, Inc. v. New World Communities, Inc.,* 24 A.D.3d 332 (1st Dept. 2005); *J. Grotto & Assoc., Inc. v. Lax,* 174 A.D.2d 394, 572 N.Y.S.2d 293, 294 (1st Dept. 1991); *In the Matter of Daniel v. MVAIC,* 181 Misc. 2d 941; 694 N.Y.S.2d 913 (Sup. Ct., Bronx Cty. 1999) (court granted consolidation request because joint trial and consolidation would achieve judicial economy and not prejudice any of the parties). Moreover, "[t]he final beneficiary of consolidation is the judicial system, which, with its ever[-]increasing caseloads, can ill afford to tolerate or encourage a needless multiplicity of lawsuits." *In the Matter of Daniel v. MVAIC,* 181 Misc. 2d at 953. Plaintiffs' instant application to consolidate furthers these important judicial objectives.

It is the promotion of these very interests that have led courts to repeatedly conclude that joint resolution of common issues is preferable whenever possible. *See Belt Parkway Imaging, P.C. v State Wide Ins. Co.,* 30 Misc 3d 127(A) (App Term 2010) (consolidating motions, *sua*

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 18

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

*sponte,* for the purposes of disposition); *Cantalupo Const. Corp. v Richmond Terrace Corp.,* 96 A.D.3d 706, 707 (2d Dept 2012) (consolidating actions in the interests of judicial economy); *Hoss Medical Services, P.C. v. Government Employees Ins. Co.,* 778 N.Y.S.2d 876, 878 (N.Y. County Civ. Ct., June 17, 2004) (consolidating motions, *sua sponte,* for the sole purpose of deciding motions brought by defendant to dismiss plaintiffs' complaints pursuant to *CPLR § 3126); CPT Medical Services, PC, Assignee of Audrey Douglas v. Government Employees Ins. Co.,* 2003 WL 22047892 at 1 (Queens Cty. Civ. Ct., August 25, 2003) (consolidating no-fault motions seeking discovery responses in relation to depositions and document production); *see also The Angelo J. Melillo Center for Mental Health v. Denise B.,* 777 N.Y.S.2d 830, 831 (Nassau Cty. Dist. Ct., March 1, 2004) (consolidating actions involving the same core issues for the purpose of deciding then pending motions); *Metroscan Imaging, PC, Assignee of Barbara Molina, et. al. v. GEICO,* 797 N.Y.S.2d 737 (N.Y. County Civ. Ct., New York Co., June 8, 2005) (consolidating 61 no-fault actions for purposes of amending the answers to include an affirmative defense of fraud in the incorporation of the provider professional corporation). The same principles apply here, and strongly support consolidation.

11

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM          INDEX NO. 654839/2022
NYSCEF DOC. NO. 18                                        RECEIVED NYSCEF: 03/09/2023

## CONCLUSION

Because common questions of law and fact predominate in this action to recover artwork stolen from the same decedent, because no defendant in the Related Actions can show prejudice from consolidation, and because consolidation would spare unnecessary expense and expenditure of limited judicial resources, it is respectfully requested that the Court consolidate the Related Actions for briefing and disclosure purposes, pursuant to CPLR § 602, and that the Court grant such other relief as the Court deems fit.

Dated: New York, New York
       March 9, 2023

**DUNNINGTON BARTHOLOW & MILLER LLP**
*Attorneys for Plaintiffs*

By:     s/Raymond J. Dowd
        Raymond J. Dowd
        Claudia G. Jaffe
        230 Park Avenue, 21st Floor
        New York, New York 10169
        Phone: (212) 682-8811
        Facsimile: (212) 661-7769
        RDowd@dunnington.com
        CJaffe@dunnington.com

12

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 18    RECEIVED NYSCEF: 03/09/2023

## WORD COUNT CERTIFICATION

I, Claudia G. Jaffe, an attorney duly admitted to practice law before the Courts of the State of New York, hereby certify that this Memorandum complies with the word count limit set forth 22 NYCRR § 202.8-b, because it contains 3,491 words, excluding the caption and signature block. In preparing this certification, I have relied on the word count of Microsoft Word, the word-processing system used to prepare this affirmation.

By:  /s/ Claudia G. Jaffe_____
Claudia G. Jaffe

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 19

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TIMOTHY REIF and DAVID FRAENKEL, as Co-Trustees of the LEON FISCHER TRUST FOR THE LIFE AND WORK OF FRITZ GRUNBAUM and MILOS VAVRA,

*Plaintiffs,*

-against -

THE MUSEUM OF MODERN ART,

*Defendant,*

An Artwork *Prostitute* (1912) by the Artist Egon Schiele,

*Defendant-in-rem.*

Index No.: 654839/2022

Mot. Seq. 001

**AFFIRMATION OF CLAUDIA G. JAFFE IN SUPPORT OF ORDER TO SHOW CAUSE**

CLAUDIA G. JAFFE, an attorney authorized to practice law in the State of New York, hereby affirms under penalty of perjury as follows:

1.    I am a partner at Dunnington Bartholow & Miller LLP, attorneys for Plaintiffs Timothy Reif and David Fraenkel, as Co-Trustees of the Leon Fischer Trust for the Life and Work of Fritz Grünbaum, and Plaintiff Milos Vavra (the "Heirs").

2.    I submit this affirmation in support of the Heirs' motion by Order to Show Cause to consolidate.

3.    Attached hereto as **Exhibit A** is the Expert Historian Report of Jonathan Petropoulos dated March 2, 2023.

4.    Attached hereto as **Exhibit B** is the Complaint in N.Y. Civ. 654835/2022, *Reif v. The Santa Barbara Museum of* Art and *Portrait of the Artist's Wife* (1915).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 19

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

5.     Attached hereto as **Exhibit C** is the Complaint in N.Y. Civ. 654833/2022, *Reif v. The Allen Memorial Art Museum* and *Girl with Black Hair* (1911).

6.     Attached hereto as **Exhibit D** is the Complaint in N.Y. Civ. 654831/2022, *Reif v. The Museum of Modern Art* and *Girl Putting on Shoe* (1910).

7.     Attached hereto as **Exhibit E** is the Complaint in N.Y. Civ. 654839/2022: *Reif v. Museum of Modern Art* and *Prostitute* (1912).

8.     Attached hereto as **Exhibit F** is the Complaint in N.Y. Civ. 654830/2022, *Reif v. The Morgan Library & Museum, New York* and *Self Portrait* (1910).

9.     Attached hereto as **Exhibit G** is the Complaint in N.Y. Civ. 654828/2022, *Reif v. Successor Trustee to Ira Wender as Trustee of the Estee Lauder 2002 Trust* and *I Love Antitheses* (1912).

10.     Attached hereto as **Exhibit H** is the Complaint in N.Y. Civ. 654836/2022, *Reif v. The Art Institute of Chicago* and *Russian Prisoner of War* (1916).

11.     Plaintiffs bring this application for an order consolidating seven related actions for purposes of briefing and disclosure purposes by order to show cause rather than by notice of motion because it will be most efficient if the matter is decided expeditiously and before the disparate actions might otherwise be assigned to multiple justices of this Court.

12.     No prior request has been made for the relief requested herein.

Dated: New York, New York
      March 9, 2023

                /s/Claudia G. Jaffe_____
                CLAUDIA G. JAFFE

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

# EXHIBIT A

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

2 MARCH 2023

# EXPERT HISTORIAN REPORT OF DR. JONATHAN G. PETROPOULOS ON CARNEGIE SCHIELE

**DR. JONATHAN G. PETROPOULOS**, hereby affirms the following to be true as follows, subject to the penalties of perjury, except where such information is stated upon information and belief, and with respect to those matters, I believe them to be true:

1.      I am over the age of twenty-one and reside and am employed in the State of California. I have been retained by the attorneys for the heirs of Fritz Grünbaum to provide this Report concerning their claim for the restitution of an Artwork by Egon Schiele titled, *Portrait of a Man* (1917), currently in the Carnegie Institute in Pittsburgh, and the subject of litigation in *Reif v. Carnegie Institute*. The artwork in question ("the Artwork") was part of the collection of Fritz Grünbaum, a Jewish-Viennese comedian who was imprisoned by the Nazis on March 13, 1938 and deported to the Dachau concentration camp where he perished on 14 January 1941.

2.      I have been retained at the rate of $350 per hour for preparation and $500 per hour trial and deposition work.  I agreed to a flat fee for this report of $7,500, which has been fully paid.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

# TABLE OF CONTENTS

Professional Qualifications/Witness Credentials...................................................................4

I.    Evidence of the Artwork's Provenance Available Prior to and Following The 1960 Kallir Gift To The Carnegie Institute ...........................................................................................................................7

    A.    Otto Kallir's Knowledge of Fritz Grünbaum's Art Collection in 1928 ...............................8

    B.    Published Information Available Pre-1960 To Carnegie Institute Showing Fritz Grünbaum Ownership of the Art Collection ...................................................................................................9

    C.    The Carnegie Institute's 1961 Display of Artworks Stolen From Fritz Grünbaum In An Exhibition Organized By Otto Kallir..................................................................................................11

II.    The Carnegie Institute Had Direct and Circumstantial Knowledge About Grünbaum's Ownership And About Nazi Art Looting Prior to and Contemporaneous with Receiving the Artwork as a Gift from Art Dealer Otto Kallir ............................................................................................................................15

    A.    Charlotte Weidler's Role In Acquiring Artworks For The Carnegie Institute And Reporting To Homer Saint-Gaudens.........................................................................................................................15

    B.    Public Warnings Putting The Carnegie Institute On Notice of Nazi Art Looting ............................21

    C.    U.S. Government Policies Favorable To Restitution........................................................................22

    D.    Allied Restitution Courts .................................................................................................................23

    E.    U.S. Government Warnings To Museums Against Acquiring Looted Artwork And Making U.S. Courts Open "Forever" ...........................................................................................................................24

    F.    U.S. Government Efforts To Restitute Stolen Artwork Located In The United States.........................25

    G.    U.S. Media Coverage Of Nazi Art Looting ....................................................................................26

    H.    In 1948 The Carnegie Hosts Controversial "Salt Mines" Exhibit .................................................27

III.    The Carnegie Institute's Knowledge of Grünbaum's Ownership of Dead City III Prior To The 1960 Kallir Gift and the 1961 Carnegie Institute Schiele Show Including Artworks Stolen From Fritz Grünbaum.........28

IV.    Grünbaum's Tragic Fate and Loss of the Artwork ......................................................................29

    A.    Fritz Grünbaum as a Victim of Nazi Persecution and the Spoliation of His Art Collection.............29

    B.    The July 1938 Power of Attorney ...................................................................................................30

    C.    The Kieslinger Inventory ................................................................................................................30

    D.    The Schenker Inventory ..................................................................................................................32

    E.    Additional Evidence of Nazi Confiscation or Spoliation.................................................................34

    F.    Debunking Speculations ..................................................................................................................36

    G.    Obvious Austrian Corruption Scenarios ........................................................................................37

    H.    Kornfeld's Lack of Credibility .......................................................................................................41

V.    Kornfeld's Forged Documentation ..............................................................................................44

VI.    Otto Kallir's Knowledge of the Artwork's Nazi-era Provenance and the Nazis Persecution of Jews ..45

VIII. The Carnegie Institute's Troubling Lack of Provenance Transparency ................................................50

SUMMARY OF CONCLUSIONS ...........................................................................................53

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

3.  In this report, I  address the following questions and come to the following conclusions:

1) **Did the Carnegie Institute have knowledge of red flags warranting investigation of the Artwork's provenance prior to acquiring it as a gift in 1960?**

> Answer: Yes, the Carnegie Institute had general and specific knowledge of red flags warranting investigating the Artwork's provenance before accepting it as a gift in 1960.

2) **What knowledge did the Carnegie Institute have about Nazi art looting prior to receiving the Artwork as a gift from art dealer Otto Kallir?**

> Answer: The Carnegie Institute was aware of Fritz Grünbaum's ownership of *Dead City III* through Otto Kallir's 1930 catalogue raisonné of Schiele's oils and the 1956 Gutekunst & Klipstein catalogue depicting the Artwork which should have prompted an inquiry into the Artwork's relationship to a prominent Holocaust victim. Additionally, the Carnegie Institute was warned by the U.S. government in the 1940s and 1950s not to acquire artworks created prior to 1946 that had been in Europe after 1932 without inquiring into provenance and was particularly aware of the dangers because of its deep involvement in the German art scene during the Nazi era. Carnegie Institute Director Homer Saint Gaudens had first-hand knowledge of persecution of Jewish artists and art collectors through his annual visits to Germany and also through his agent Charlotte Weidler in Berlin who reported to Saint Gaudens and assisted with the Carnegie Institute's collecting practices during this time.

3) **What knowledge did Otto Kallir have of the Artwork's Nazi-era provenance?**

> Answer: Otto Kallir acquired the Artwork in the same 18 September 1956 transaction that he acquired *Dead City III*, a work he'd previously catalogued in 1930 as belonging to Fritz Grünbaum, so unquestionably knew in 1956 that he was acquiring artwork stolen from a Jewish Holocaust victim. Otto Kallir (and later his grand-daughter Jane) knew that in the 1960s the Reif family was searching for Fritz Grünbaum's art collection and had promised to assist them.

4) **Was Fritz Grünbaum a victim of Nazi persecution and is the Artwork Nazi-looted art?**

> Answer: Yes. All of the artworks in the 1956 Gutekunst & Klipstein sale, including *Dead City III* and the Artwork, have repeatedly found to have been stolen from Fritz Grünbaum.

5) **Was the Carnegie Institute prejudiced in any way by any delay of Fritz Grünbaum's heirs to assert legal claims?**

> Answer: No. Fritz's 1941 death in the Dachau Concentration Camp was well-publicized prior to 1960, as was his ownership of *Dead City III*, which put the museum community on inquiry notice long prior to 1960. The world has been on

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

heightened notice of the theft of Fritz Grünbaum's art collection due to the efforts of the Reif family since the 1960s culminating in District Attorney Robert Morgenthau's seizure of *Dead City III* in 1998 at the Museum of Modern Art in New York City, a case that made world headlines and led to major changes in the legal landscape for the recovery of stolen artworks. But prior to 1960, the Carnegie Institute had superior knowledge of the systematic murder of Europe's Jews, had received specific warnings from the U.S. government against acquiring European unprovenanced works and thus was in a very privileged position to inquire into the Artwork's provenance in 1960. Despite these red flags and knowledge, it appears that the Carnegie Institute never conducted appropriate provenance research either before acquiring the Artwork in 1960 or at any time thereafter. The Carnegie Institute could have asked Otto Kallir where the Artwork came from, collected appropriate documents and interviewed relevant witnesses, but through its own willful blindness, chose not to do so. Nor has the Carnegie Institute followed appropriate transparency protocols adopted by the American Alliance of Museums.

## PROFESSIONAL QUALIFICATIONS/WITNESS CREDENTIALS

4.    I am the John V. Croul Professor of European History at Claremont McKenna College in Southern California, USA, where I have held an appointment since 1999 (a complete curriculum vitae is attached to this report as **Exhibit A**). I earned my Ph.D. from Harvard University (1990), where I studied history and art history. I also had an appointment at Harvard as a Lecturer in History and in History & Literature (1990–1993). I authored *Art as Politics in the Third Reich* (University of North Carolina Press, 1996); *The Faustian Bargain: The Art World in Nazi Germany* (Oxford University Press, 2000); *Royals and the Reich: The Princes von Hessen in Nazi Germany* (Oxford University Press, 2006); *Artists Under Hitler: Collaboration and Survival in Nazi* Germany (Yale University Press, 2014); and *Göring's Man in Paris: The Story of a Nazi Art Plunderer and His* World (Yale University Press, 2021). I served as co-editor of *The Spoils of War: The Loss, Reappearance, and Recovery of Cultural Property During and After World War II* (New York: Harry Abrams, 1997) and *Gray Zones: Ambiguity and Compromise in the Holocust and its Aftermath* (New York/Oxford: Berghahn Books, 2005). I have also helped organize art exhibitions

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

including *Degenerate Art: The Fate of the Avant-Garde in Nazi Germany*, which opened at the Los Angeles County Museum of Art in 1991.

5.      I have personal knowledge of the facts set forth in this Report, except as otherwise noted.  To the extent my opinions are based upon information and belief, I believe such information and such opinions to be true and accurate.

6.      I began researching Nazi art looting and restitution in 1983 as the focus of my graduate work in history and art history. I am fluent in German and for many years have researched original source archival materials in Germany and elsewhere concerning the general policies and practices of the Nazi government, with my research concentrated on Nazi handling of artworks. I have studied extensively the Nazi campaign to rid German culture of modern or "degenerate" art, and the close association in Nazi party perception and ideology between "degenerate art" and the modern art collections owned by prominent Jewish collectors that the Nazis targeted for plunder.

7.      From 1998 to 2000, I served as Research Director for Art and Cultural Property on the Presidential Commission on Holocaust Assets in the United States, where I helped draft the report, *Restitution and Plunder: The U.S. and Holocaust Victims' Assets* (2001). As Research Director, I supervised a staff of researchers who combed archives in the United States and Europe to better understand how U.S. government representatives (including the Armed Forces) handled Holocaust victim assets during and after World War II. In this capacity, I provided expert testimony to the Select Committee on Culture, Media, and Sport in the United Kingdom (U.K.) House of Commons and to the Banking and Finance Committee of the U.S. House of Representatives.

8.      I have served as an expert witness in numerous cases where Holocaust victims sought to recover lost artworks, including *Republic of Austria v. Altmann* (No. CV 00-8913 (FMC))  (U.S. District Court for the Central District of California) (six paintings by Gustav Klimt); *De Csepel v.*

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

*Republic of Hungary* (No. 10 Civ. 1261 (ESH)(U.S. District Court for the District of Columbia) (art belonging to the Herzog family of Hungary); *Rosner v. United States of America* (No. 01 CV 01859)(U.S. District Court for the Southern District of Florida) ("Hungarian Gold Train"); *Warin v. Wildenstein* (No. 115143/99)  (New York State Supreme Court, New York County) (medieval manuscripts looted by the Nazis); *Schoeps v. The Museum of Modern Art* (No. 07 Civ. 11074 (JSR)) (U.S. District Court for the Southern District of New York) (painting by Picasso); *Grosz v. The Museum of Modern Art* (No. 09 Civ. 3706 (CM) (THK))(U.S. District Court for the Southern District of New York) (three Artworks by George Grosz); *Schoeps v. Bayern* (No. 13 Civ. 2048 (JSR))(U.S. District Court for the Southern District of New York) (painting by Picasso, lost by Paul von Mendelssohn-Bartholdy); *Cassirer v. Thyssen Bornemisza Collection Foundation* (No. CV 05-03459 (JFW) (U.S. District Court for the Central District of California, Western Division) (painting by Pissarro); *Marei von Saher v. The Norton Simon Museum* (No. CV 07-2866 (JFW))(U.S. District Court for the  Central District of California, Western Division) (two paintings by Cranach the Elder); *Frenk v. Rabenou*,  (New York State Supreme Court, New York County) (No. 650298/2013) (art collection of Paul Westheim); and *Reif v. Nagy* (New York State Supreme Court, New York County), No. 161799/2015) (two Artworks by Egon Schiele); *Schoeps v. Sompo Holdings* in U.S. District Court, Northern District of Illinois concerning a painting by Vincent van Gogh); *Holtzman v. Philadelphia Museum of Art* in U.S. District Court, for the Eastern District of Pennsylvania (Civil Action No. 22-cv-00122-JMY) concerning a painting by Piet Mondrian; *Stern Heirs (Judith Silver, et. Al.) v. Basil and Elise Goulandris Foundation, Athens in* U.S. District Court, Northern District (Oakland), concerning a painting by Vincent van Gogh; *Benningston v. Guggenheim Museum* in U.S. District Court, New York, regarding a painting by Pablo Picasso; and the heirs of *Paul von Mendelssohn-Bartholdy (Julius Schoeps, et. al) v. Art Institute of Chicago* (demand letter and expert

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022

NYSCEF DOC. NO. 20    RECEIVED NYSCEF: 03/09/2023

report sent to museum) concerning a painting by Georges Braque. I submitted a declaration in *Boston Museum of Fine Arts vs. Seger-Thomschitz* in U.S. District Court, District of Massachusetts (No. No. 08-10097-RWZ) (Kokoschka painting), and in *Bakalar v. Vavra*, but in both cases, I was commissioned to draft reports after the time for identifying expert witnesses had passed and the reports were not entered into evidence.

9.    In 2022, the heirs of Fritz Grünbaum commissioned me to write an original scholarly essay *Kindred Spirits: The Courage and Creativity of Egon Schiele and Fritz Grünbaum* for a November 17, 2022 Christie's auction of the two Schiele artworks recovered in *Reif v. Nagy*.[1]

## I.  Evidence of the Artwork's Provenance Available Prior to and Following The 1960 Kallir Gift To The Carnegie Institute

10.    Egon Schiele is (1890-1918) is a "red flag" artist because during his brief lifetime few of his works were sold outside Vienna, his artworks were concentrated in Vienna at the time of his death and many of the most important collectors were Viennese Jews murdered in the Holocaust.[2]  Schiele died in October 1918 at age 28 of the Spanish Influenza.  His estate did not sell artworks until 1928, ten years after his death.  Based simply on this historical snapshot, persons with even a passing knowledge of Schiele and World War II acquiring Schieles after 1938 without researching provenance did so knowing that the artworks were at substantial risk of being looted.

---

[1] https://www.collectiongruenbaum.com/2022/11/09/kindred-spirits-the-courage-and-creativity-of-egon-schiele-and-fritz-grunbaum/ (last accessed February 28, 2023).
[2] Sophie Lillie, "A Legacy Forlorn: The Fate of Egon Schiele's Early Collectors" (Ronald S. Lauder and Serge Sabarsky Foundation New York 2005).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023



11.     The Artwork (pictured above) is a 1917 drawing *Portrait of a Man* (*Männerliches Bildnis*) by the artist Egon Schiele.  Schiele was an Austrian modernist painter, known for oils, watercolors and drawings exploring daring themes about sexuality, for probing portraits (and self-portraits), and for haunted landscapes. The Artwork measures 34.5 by 20.8 cm and is rendered in black crayon.

12.     The Artwork is signed and dated by the artist in the lower left. A 1925 Würthle Gallery catalogue that displayed 22 works from Fritz Grünbaum's art collection states that the Artwork is a portrait of Heinrich Wagner belonging to Fritz Grünbaum. I have attached a true copy of the 1925 Würthle Catalogue hereto as **Exhibit B**.

**A.  Otto Kallir's Knowledge of Fritz Grünbaum's Art Collection in 1928**

13.     In 1928, Fritz Grünbaum permitted Otto Kallir to enter his Vienna apartment (in Grünbaum's absence) to select from among Grünbaum's Schieles the works that Kallir wanted to display at an exhibition commemorating the tenth anniversary of Schiele's death.  A true copy of the Kallir/Grünbaum 1928 correspondence ("the 1928 Correspondence") which was authenticated by Otto's grand-daughter Jane Kallir during the *Bakalar* trial is attached hereto as **Exhibit C**.  These

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

documents are part of the archive of the Neue Galerie, Vienna, housed in the Oesterreichische Galerie, Belvedere.

**B.  Published Information Available Pre-1960 To Carnegie Institute Showing Fritz Grünbaum Ownership of the Art Collection**



*Dead City III (1911) – Catalogued as P.213 in 1990 Kallir and as belonging to Fritz Grünbaum in Otto Kallir's 1930 Catalogue Raisonné*

14.     Otto Kallir had compiled the first catalogue raisonné on the paintings of Egon Schiele in 1930, which listed Fritz Grünbaum as *Dead City III's* owner.[3]

15.     The Artwork is catalogued as D.2081 in Jane Kallir's, *Egon Schiele: The Complete Works* (New York: 1990, 1998) ("1990 Kallir").  I have attached hereto as **Exhibit D** the entry in Kallir at drawing number D.2081.

16.     The 1990 Kallir provenance for the Artwork --- published in 1990 and in 1998 --- starts with the art gallery and auction house Gutekunst & Klipstein in Bern, Switzerland.  1990 Kallir lists the Artwork as having been published as number 42 in an illustrated catalogue at

---

[3] Otto Nirenstein, *Egon Schiele.  Persönlichkeit und Werk* (Berlin/Vienna: Paul Zsolnay Verlag, 1930) (D & M 00663 – D & M 00929).  This catalogue focuses on Schieles oils and does not survey Schiele's graphic works, such as watercolors and drawings.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

Gutekunst & Klipstein in Bern in 1956. Attached hereto as **Exhibit E** a true copy of the 1956 illustrated Gutekunst & Klipstein catalogue in which the Artwork appears as number 42.

17. Today, Gutekunst & Klipstein is known as Galerie Kornfeld and is run by Eberhard Kornfeld who joined Gutekunst & Klipstein in 1945. The 1990 Kallir provenance shows that after being at Gutekunst & Klipstein, the Artwork was sold to Galerie Saint-Etienne, New York. The most salient fact to be drawn from the 1956 Gutekunst & Klipstein Schiele catalogue is that the first artwork listed is *Dead City III*, which lists Fritz Grünbaum as the owner prior to Gutekunst & Klipstein. *Dead City III* was listed as Fritz Grünbaum's property in a 1930 catalogue raisonné written by Otto Kallir. As explained below, these 1930 and 1956 references to *Dead City III* being the property of a Holocaust victim, together with U.S. government warnings against acquiring artworks stolen from Holocaust victims and the murders of many Viennese Jewish Schiele collectors put the world on inquiry notice that the Artwork was likely stolen.

18. *Dead City III* was seized as stolen property at the Museum of Modern Art in New York City in 1998. As the New York Court of Appeals observed:

> "… Kathleen E. Reif and Rita Reif, as heirs of Fritz Grunbaum, stated that "Dead City III" was taken from Grunbaum's collection by Nazi agents or collaborators after his arrest following the Nazi annexation of Austria. Mr. Grunbaum subsequently died in the Dachau concentration camp. The Reifs indicated that they never consented to the sale or transfer of the painting, and that they, as Mr. Grunbaum's heirs, were the lawful owners of the painting. The Reifs also demanded that the Museum turn "Dead City III" over to the them; take no steps to move the painting to another jurisdiction or transfer title or possession to anyone other than themselves; and inform Dr. Rudolf Leopold or the Leopold Foundation of their claim. The Reifs stated a willingness to discuss other options, but added that the Museum had to provide specific written assurances that "Dead City III" would not be moved or transferred during the pendency of those discussions. The Reifs also indicated that they reserved the right "to pursue alternative remedies, including legal remedies" with regard to this matter.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

*Matter of In re Grand Jury Subpoena Duces Tecum Served on Museum of Modern Art*, 93 N.Y.2d 729, 733 (1999). As the Appellate Division, First Department, affirmed in *Reif v. Nagy* (based on my expert report), the artworks in the 1956 Gutekunst & Klipstein catalogue, which included *Dead City III,* belonged to Fritz Grünbaum. Grünbaum involuntarily lost his entire art collection due to Nazi persecution while in the Dachau Concentration Camp at some point after 13 March 1938, but prior to his 14 January 1941 death.

19.    According to a Gutekunst & Klipstein invoice dated 18 September 1956, Eberhard Kornfeld sold the Artwork, as well as eighteen other works by Egon Schiele (including *Dead City III*), to Otto Kallir, of Galerie Saint-Etienne in New York. Otto Kallir had been the director of the Neue Galerie in Vienna and had emerged as one of the chief purveyors of Austrian modernism, and in particular, the works of Egon Schiele. I have attached a true copy of the 18 September 1956 invoice hereto as **Exhibit F**.

20.    According to Carnegie Institute records, the Acquisitions Committee of the Carnegie Institute, Chaired by Roy Hunt, accepted a gift of the Artwork from Otto Kallir on 8 February 1960. Attached hereto as **Exhibit G** is a true copy of a letter from Kimberly J. Pierson of Reed Smith dated 1 December 2005 with a subpoena response Bates-numbered CMA00001-00019.

21.    As I discuss more fully below, because Otto Kallir knew in 1956 that *Dead City III* had been stolen from Fritz Grünbaum when he purchased it along with the Artwork, Otto Kallir knew that the Artwork was stolen when he gifted it to the Carnegie Institute.

## C. The Carnegie Institute's 1961 Display of Artworks Stolen From Fritz Grünbaum In An Exhibition Organized By Otto Kallir

22.    From 1 March to 2 April 1961, the Carnegie Institute hosted an exhibition organized by the Institute of Contemporary Art in Boston.   I have attached a true copy of the exhibition catalogue as **Exhibit H** ("the Boston/Carnegie Catalogue").   As shown by illustrations in the

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

Boston/Carnegie Catalogue, the 1961 Carnegie Institute exhibition contained numerous works belonging to Fritz Grünbaum that had been illustrated in the 1956 Gutekunst & Klipstein Catalogue. For example, *Black Girl* (1911) is illustrated in the Boston/Carnegie Catalogue as number 21, in the 1956 Gutekunst & Klipstein Catalogue as number 14 and in the 1990 Kallir as D.861. *Black Girl* is currently at Oberlin College's Allen Museum.



*Black Girl (1911) – Boston/Carnegie Catalogue #21, 1956 Gutekunst & Klipstein Catalogue #14, 1990 Kallir #D.861 (currently at Oberlin College's Allen Museum)*

23.     Another example of a visual match, *Embracing Nudes* (1914) is listed in the Boston/Carnegie Catalogue as number 42, in the 1956 Gutekunst & Klipstein Catalogue as number 35 and in the 1990 Kallir as # D.1606.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023



*Embracing Nudes (1914) – Boston/Carnegie Catalogue #42, 1956 Gutekunst & Klipstein Catalogue #35, 1990 Kallir #D.1606*

24.    Other visual matches include *Self-Portrait (Nude)* (1911) 1990 Kallir #D.944, 1956 Gutekunst & Klipstein #16, Boston/Carnegie Catalogue #20; *Two Proletarian Children (1910),* 1990 Kallir #D.412, Boston Carnegie Catalogue #25, 1956 Gutekunst & Klipstein #18; *Portrait of a Boy (Herbert Rainer)* (1910) 1990 Kallir #D.455, 1956 Gutekunst & Klipstein #7, Boston/Carnegie Catalogue #15; *Seated Woman With Bent Left Leg* ("*Torso*") (1917), 1990 Kallir #D.1974, 1956 Gutekunst & Klipstein #51, Boston/Carnegie Catalogue #63, *Rooftops* (Rattenberg, Tirol) (1917) 1990 Kallir #D.2152, 1956 Gutekunst & Klipstein #47, Boston/Carnegie Catalogue #64; *Portrait of a Lady with Crossed Hands* (1917)Kallir # D.1898, Boston Carnegie Catalogue #59, 1956 Gutekunst & Klipstein #44.

13

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

63



Original from
NEW YORK PUBLIC LIBRARY

*Seated Woman With Bent Left Leg ("Torso")* – The Subject of the *Bakalar* Litigation

25.     The appearance of *Seated Woman With Bent Left Leg ("Torso")* in the 1961 Carnegie Institute is significant to weighing the Carnegie Institute's knowledge since a Massachusetts resident sued Fritz Grünbaum's heirs in 2005 claiming title in this artwork. Judge Pauley invoked timeliness grounds to exclude historical evidence in that case (including my expert report) and invoke the doctrine of laches to resolve the action against Fritz Grünbaum's heirs.

26.     I am aware of no evidence that the Carnegie Institute inquired into the Artwork's provenance prior to 2005. According to Carnegie Institute records, the Carnegie Institute Assistant Curator Amanda Zehnder received a 5 October 2005 facsimile transmission from Jane Kallir (in response to an oral query) stating that Galerie Saint-Etienne purchased the Artwork from Gutekunst & Klipstein. **Exhibit F** at CMA 00016-00019.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

27.    Below I discuss the overwhelming evidence that the Carnegie Institute was both generally warned about acquiring Nazi looted art and had specific knowledge that this transaction was a dangerous "red flag" warranting a diligent provenance inquiry as of the time of it received a gift of the Artwork in 1960.

## II.    The Carnegie Institute Had Direct and Circumstantial Knowledge About Grünbaum's Ownership And About Nazi Art Looting Prior to and Contemporaneous with Receiving the Artwork as a Gift from Art Dealer Otto Kallir

28.    Based on the historical record I explain below, Carnegie Institute's leadership had received U.S. government warnings against acquiring artworks created prior to 1946 that were in Europe after 1932. That leadership certainly would have known about the Nazis' persecution of Jews, Nazi campaigns against modernist art ("degenerate" art), and the looting of Jewish-owned artworks in the Third Reich, when these leaders accepted the gift of the Artwork from Otto Kallir in 1960.

29.    Also as explained below, in 1960 the leadership of the Carnegie Institute also would have known that Allied tribunals were then applying an irrebuttable presumption of invalidity to transfers of property of Jews following passage of the Nuremberg Laws in 1935.

30.    The mission of the Carnegie Institute is "To preserve and expand the resources of art and science as agents of personal growth and social advancement in Pittsburgh and beyond."

31.    In the 1930s, the Carnegie Institute made a concerted effort to monitor the treatment of artists in Nazi Germany. This focus on German art and the German art world was an important part of the Institute's work and history.

## A.    Charlotte Weidler's Role In Acquiring Artworks For The Carnegie Institute And Reporting To Homer Saint-Gaudens

32.    Notably, Homer Saint-Gaudens (1880 - December 1958), the Director of the Carnegie Institute from 1922 to 1950.  During World War I, Saint-Gaudens was the director of the

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

U.S. Army's first camouflage units, in World War II he was chief of the Camouflage Section in Europe (1941-1945).[4] In the run-up to World War II, Saint-Gaudens frequently visited Germany for the Carnegie Institute to organize annual exhibitions that continued well into the Nazi regime. Saint-Gaudens engaged Charlotte Weidler (1895-1983), a German art journalist located in Berlin, to report to him back in Pittsburgh on the German art scene. Weidler emigrated to the United States in 1939 and lived in New York in the postwar period; she remained employed by the Carnegie Institute until at least 1950.[5] Weidler's job was to collect information about the art world in Germany and to help artists. Weidler spoke excellent English and knew many cultural figures on both sides of the Atlantic. Saint-Gaudens agreed to Weidler's plan to include Nazi artists "in order to placate the powers that be."[6] In 1937, Weidler took Saint-Gaudens to the infamous Nazi Degenerate Art show in Berlin.[7] Saint-Gaudens visited Austria after the Anschluss in 1938.[8] Weidler had a romantic relationship with Paul Westheim, a well-known Jewish art historian and art critic. When Westheim fled from Germany to Paris in 1933, Weidler helped conceal his art collection from Nazi seizure. Weidler has been accused of stealing artworks from Westheim's collection.

33.     In *Frenk v Solomon,* 173 A.D.3d 490, 490 (1st Dept. 2019) the court found that the Westheim family had released claims against Weidler, so could not proceed with a suit:

---

[4] Gangewere, Robert J., *Palace of Culture: Andrew Carnegie's Museums and Library in Pittsburgh* (University of Pittsburgh Press 2011).

[5] See Charlotte Weidler to Alfred Barr (5 February 1950), from the Museum of Modern Art Archives, but reproduced in Stefan Koldehoff, *Die Bilder sind unter uns*, 51.

[6] Platt, Susan *Gambling, Fencing and Camouflage: Homer St. Gaudens and the Carnegie International 1922-*1950 https://www.artandpoliticsnow.com/wp-content/uploads/2012/03/homer_saint_gaudens.pdf (last accessed March 1, 2023)(first published in *International Encounters*, Carnegie Museum of Art, Pittsburgh 1996).

[7] Id.

[8] Id.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

The claim of fraudulent inducement is supported by the allegations that Charlotte Weidler, Westheim's former colleague, friend, and lover, had converted art entrusted to her by Westheim and lied about its whereabouts in the years after the Second World War.

The plaintiffs contend that each of the Paintings was consigned at one time or another to Alfred Flechtheim, Grosz's art dealer (*id.* ¶¶ 38–39), and that after Flechtheim's death in 1937, the three Paintings fell prey to a network of unscrupulous art professionals, who took advantage of the political climate of the time to divest Grosz of his ownership. First, they allege that within one month of the dealer's death, an opportunistic art historian (Charlotte Weidler) stole *Poet,* which she is alleged to have hidden in Germany until 1952, when she sold it to MoMA.

34.    In *Grosz v Museum of Modern Art,* 772 F.Supp.2d 473, 477 (SDNY 2010), *aff'd*, 403 Fed. Appx. 575 (2d Cir 2010), the Court dismissed claims of heirs seeking restitution on statute of limitations grounds.  The complaint made allegations that Charlotte Weidler sold artwork that had been stolen from Jewish art dealer Alfred Flechtheim:

> … Charlotte Weidler is alleged to have been busy embezzling the third of the three Paintings (*Poet*). Weidler was a German art dealer, critic and curator for the Carnegie Institute in Pittsburgh. (*Id.* ¶ 74.) One month after Flechtheim's death in April 1937, in a letter to a fellow art historian, Weidler claimed that she had "inherited" *Poet* from the late dealer. (*Id.* ¶¶ 12, 74–75 & Ex. 16.) The plaintiffs suggest that Weidler was actually an international art thief and/or Nazi agent, who wrongfully and willfully converted the painting. (*Id.* ¶¶ 76, 12.)
>
> In support of their theory, the plaintiffs recount the fate of the art collection of one Paul Westheim. Westheim was a modernist art collector who entrusted his portfolio to Weidler shortly before he fled Berlin. (*Id.* ¶ 79.) The Complaint says nothing about the precise date Westheim left Germany, but it appears to have been some time in the 1920s, and in any event before the Nazis came to power in 1933, because Weidler attempted to sell Westheim's collection to MoMA in either 1929 or 1930 (with no authorization to do so). (*Id.* ¶ 80 & Ex. 20.)
>
> The plaintiffs further allege that Weidler would come to New York in 1939 as a Nazi agent. (*See id.* ¶¶ 77–78.) The plaintiffs back their allegation with a handful of letters (all of them rank hearsay) between an assistant director of the Freer Gallery of Art in Washington, D.C., and a trustee of the Carnegie Institute, in which the two *480 speculate that Weidler might be a Nazi—though, their suspicions, as they acknowledge, lacked a certain "logical" basis. (*Id.* ¶ 78 & Ex. 17.) For example, one of the letters explains:
> Not for one minute do I want to persuade you that Dr. Weidler is in truth what she claims to be—anti-Nazi. I, personally, have a hunch that she is not ... but there is

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

nothing I can offer in proof. Nothing at all; but at times I am blessed with a feminine intuition and you know that often it is as certain as it is without logic. (*Id.* Ex. 17.)

Whether or not Weidler may was an agent of the Third Reich, she did contact MoMA in 1950 in an attempt to sell *Poet* to the museum. (*Id.* ¶ 87.) Unable to persuade MoMA to purchase the piece, Weidler then contacted Alfred Flechtheim's one-time assistant, Curt Valentin, to help her liquidate the work. (*Id.* ¶ 90.) In 1952, Valentin was successful in brokering a deal with MoMA for *Poet,* which became museum property on April 10 of that year. (*Id.*)

The Complaint does not explain how Weidler was acquainted with Valentin, although the plaintiffs do allege that Valentin, like Weidler, was a "Nazi agent" who set up the Buchholz Gallery in New York, through which the deal with MoMA over *Poet* was brokered, in order "to sell Nazi-looted artworks." (*Id.* ¶ 60 Heading)

*Grosz v Museum of Modern Art,* 772 F.Supp.2d 473, 479-80 (SDNY 2010), *aff'd,* 403 Fed Appx 575 (2d Cir 2010).

35.    Both cases were resolved on procedural grounds without a finding of fact about whether or not Weidler was a thief, but there is no doubt that as an agent for the Carnegie Institute, Weidler was well-informed about Nazi looted art and well acquainted with Jews in the art world persecuted by the Nazis.

36.    According to historical documents, Weidler had friends in the Nazi government, specifically, the Reich Ministry for People's Enlightenment and Propaganda. Weidler knew cultural bureaucrats (and artists) Otto Andreas Schreiber and Hans Weidemann, who worked for Joseph Goebbels's Reich Propaganda Ministry. They were modernist artists and Nazis (I wrote about them in my book *Artists Under Hitler*). "Homer Saint-Gaudens "tried to delicately balance the artistic scales by exhibiting official Nazi art, as well as work by Jewish artists."[9]

37.    In the 1937 Carnegie Institute Exhibition, third prize went to "Nazi Josef Pieper," for his painting titled *Family Portrait* (the work had won the State Prize at the Prussian Academy of

[9] Robert Gangewere, *Palace of Culture: Andrew Carnegie's Museums and Library in Pittsburgh* (Pittsburgh: University of Pittsburgh Press, 2011).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

Fine Arts and can be considered representative of "Nazi art").[10] Pieper's portrait of an "Aryan" family (featuring three blond children) was not only exhibited in the august neo-Renaissance building of the Carnegie Institute in Pittsburgh, but also recognized with a prestigious award worth $500 (Pieper placed higher than Austrian modernist master Oskar Kokoschka, who received second honorable mention).[11] Joseph Pieper went on to have his art displayed in Nazi exhibitions, such as *Deutsche Künstler und die SS* (German Artists and the SS) staged in Breslau (Wroclow) during the war.[12] The Carnegie Institute's public celebration of Nazi culture was controversial in 1937, with the Nuremberg Laws of 1935 and the remilitarization of the Rhineland in 1936 serving among other events to alert the world to the dangers posed by Hitler's regime.

38.    Weidler and Saint-Gaudens no longer worked for the Carnegie Institute when Kallir offered the Artwork as a gift in 1960, but they had been part of the Institute's history. Weidler's reports are evidently still in the Carnegie Institute's files: the finding aid for the Carnegie Institute archives reads, "Weidler's correspondence with Carnegie throughout the 1930s provides unique insight and detail about the situation of artists in Nazi Germany, and about matters of degenerate art. Weidler's correspondence with Carnegie president Homer Saint-Gaudens is an extraordinary source of information for provenance researchers about the location of artwork pre-war and the changing attitude towards modern art in Germany as the Nazis rose to power.'"[13]

---

[10] "Art: Carnegie Show" in *Time* (25 October 1937), at
https://content.time.com/time/subscriber/article/0,33009,882819,00.html.
[11] "Art: Carnegie Show" in *Time* (25 October 1937), at
https://content.time.com/time/subscriber/article/0,33009,882819,00.html.
[12] See the webpage devoted to Josef Pieper at German Art Gallery at
https://germanartgallery.eu/josef-pieper-sitzender-akt/.
[13] See *Methodology and Resources: Carnegie Institute, Museum of Art Records, 1883-1962*, in the Archives of American Art at https://www.aaa.si.edu/collection-features/a-guide-to-provenance-research-at-the-archives-of-american-art/methodologies-and-resources-carnegie-institute-museum-of-art-records-1883-1962.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

39.    Homer Saint-Gaudens, who lived until December 1958, also knew a great deal about Nazi art looting and postwar restitution. In addition to having reports from Charlotte Weidler, he had friendships with many German artists. As a graduate of Harvard University (1903) and a former journalist and editor, Saint-Gaudens was sophisticated and knowledgeable. "To aid in his reformation of the International [art exhibition], Saint-Gaudens formalized a team of European agents who worked year round to scout artists' studios, recommend suitable art and artists, navigate local politics, arrange local transportation and logistics, and maintain cordial relations with artists abroad. In the spring, Saint-Gaudens would travel to Europe to meet with his agents in person, tour the most promising studios, and meet with artists personally."[14] Saint-Gaudens' deep knowledge of Nazi depredations and the ensuing challenges was part of the institutional history of the Carnegie Institute.

40.    The successor to Homer Saint-Gaudens, Gordon Bailey Washburn (1904-1983), also would have known about Nazi looted art and the attendant issues. Washburn had been Director of Albright-Knox Gallery in Buffalo, from 1931-1942, as well as Director of Museum of Art, Rhode Island School of Design from 1942-1949. Washburn served as Director of the Department of Fine Arts, Carnegie Institute, from 1950-1962. The Carnegie Museum of Art's own history states, "By the 1950s, the museum was poised for reinvention under the leadership of director Gordon Bailey Washburn, who, with the support of Pittsburgh collector G. David Thompson, revitalized the International as a leading exhibition of the world's most adventurous art of the postwar period. Washburn maintained his predecessor's use of foreign advisors…"[15] With the emphasis on the

---

[14] See the "Historical Note" in the *Methodology and Resources: Carnegie Institute, Museum of Art Records, 1883-1962*, in the Archives of American Art at
https://www.aaa.si.edu/collections/carnegie-institute-museum-art-records-7343/historical-note.
[15] See the Carnegie Museum of Art, "History of the Carnegie International," at
https://cmoa.org/history-of-the-carnegie-international/.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

international art scene, the Carnegie leadership would have to have been aware of the issues relating to Nazi looted art when they acquired the Artwork in 1960.

**B. Public Warnings Putting The Carnegie Institute On Notice of Nazi Art Looting**

41.    The Carnegie Institute was certainly aware of the many public warnings against acquiring the property looted from Europe's Jews and of U.S. government efforts to restitute such property.  During and immediately following World War II, the U.S. in conjunction with its Allies stated and reaffirmed repeatedly in pronouncements receiving considerable media intention that they intended to nullify transfers of personal property that victims of Nazi persecution had made under duress during the Nazi era. In 1943 the Allied governments expressed their intention in this regard with the *Inter-Allied Declaration against Acts of Dispossession committed in Territories under Enemy Occupation and Control* (*London Declaration*). The *London Declaration* reserved to the Allied governments "all of their rights to declare invalid any transfer of, or dealings with, property, rights and interests of any description whatsoever which are, or have been, situated in" territories coming under Nazi occupation. The *London Declaration* cautioned that it applied "whether such transfers or dealings have taken the form of open looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected."

42.    The Carnegie Institute was certainly aware of legal presumptions favoring Jewish property owners in the post-War period and aware of the risks associated with acquiring looted property. In 1945 the U.S. Government again acted to nullify sales of personal property that victims of Nazi persecution made under duress when it established The American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas (also known as the "Roberts Commission" after its Chairman, Supreme Court Justice Owen J. Roberts). The Roberts Commission initially aimed to safeguard cultural property threatened by combat.  Later it played a leading role in

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM          INDEX NO. 654839/2022
NYSCEF DOC. NO. 20                                        RECEIVED NYSCEF: 03/09/2023

restitution efforts. The Roberts Commission included several high-profile museum directors, such as John Walker of the National Gallery of Art in Washington, DC, and Francis Henry Taylor of the Metropolitan Museum of Art in New York, and their prominence helped attract publicity. The work of the Roberts Commission quickly became central to the idea that the Americans had "fought the good fight" and battled the evils of Hitler and National Socialism.  The photographs of Generals Dwight D. Eisenhower, Omar Bradley, and George S. Patton inspecting stacks of paintings in the Nazi depot at the Merkers salt mine were among the most famous images from war's end.[16] Furthermore, the Roberts Commission distributed circulars in 1945 on this subject to "museums, art and antique dealers, and auction houses."[17] This warning included the observation that "[i]t is, of course, obvious, that no clear title can be passed on objects that have been looted from public or private collections abroad." In other words, the Roberts Commission officially put the art world and art market participants such as Carnegie Institute on formal notice about the dangers of trafficking in works lost under Nazi duress.

43.    Additionally, beginning in the fall of 1945, the International Military Tribunal at Nuremberg undertook the trial of the major Nazi leaders, and the issue of art looting was treated at length in the deliberations (especially with regard to the cases against Hermann Göring and Alfred Rosenberg, the latter heading the notorious plundering agency, the Einsatzstab Reichsleiter Rosenberg). Prior to the October 1946 conclusion of the Nuremberg trials, American journalists including William Shirer reported extensively on this issue to the American public.

**C.  U.S. Government Policies Favorable To Restitution**

44.    In 1947 the U.S. Government and its Allies established a formal legal presumption that any transfer of property that a persecuted Jew made in Germany after the Nazis took power in

---

[16] Lynn Nicholas, *The Rape of Europa* (New York: Alfred Knopf, 1994) at 334.
[17] American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas, Circular to Museums, Art and Antiques Dealers, and Auction Houses (n.d.), in NARA, RG 59 Entry 62D-4, State Department (Ardelia Hall), Box 1.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

January 1933 was so inherently coercive that the victim was entitled to the return of the item. In 1947, the U.S. Government promulgated *Military Government Law No. 59* (hereinafter "MGL No. 59"), 12 *Federal Register* 7983 (29 November 1947), the stated purpose of which was "to effect to the largest extent possible the speedy restitution of identifiable property… to persons who were wrongfully deprived of such property" within this period "for reasons of race, religion, nationality, ideology or political opposition to National Socialism" (Article 1). This provision established **a rebuttable presumption** that any transfer of property that any Jew or other persecuted person made during this period in a Nazi-occupied country had been unlawfully confiscated, and that the claimant was entitled to restitution (Article 2). MGL No. 59 made the presumption **irrebuttable** for transfers of personal property that occurred after passage of the Nuremberg Laws in September 1935.

45.    MGL No. 59 became the model for similar post-War legislation, including the Berlin Restitution Law enacted in 1949. Like MGL No. 59, the Berlin Restitution Law established a presumption that any sale or other transfer of personal property that a Jew in Germany made after Hitler became Chancellor on 30 January 1933 was an "unjust deprivation."[18]

**D. Allied Restitution Courts**

46.    Allied restitution courts applied these provisions and entertained appeals from rulings until the mid-1960s. The nearly 20-year period in which the restitution courts operated served as a continuing reminder of the pervasive coercion and duress in Germany during the Nazi era, and helped afford reasonable notice of these prevailing conditions to all parties concerned, especially for sophisticated patrons of the international art market like the Carnegie Institute and Otto Kallir.

---

[18] U.S. Government, *Military Government Law No. 59,* Article 3, No.1 "Presumption of Unjust Deprivation."

### E. U.S. Government Warnings To Museums Against Acquiring Looted Artwork And Making U.S. Courts Open "Forever"

47.     The U.S. government made efforts to warn museums, university art galleries, and prominent art dealers about Nazi looted art by sending direct notices warning against acquiring potentially-looted artwork.  In the years following World War II, the U.S. Department of State (State Department or Department) similarly stated the intent of the U.S. Government to return to rightful owners property that the Nazi government confiscated during the years 1933–1945.

48.     On 27 April 1949, the Department issued Press Release No. 296 titled "Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers," publishing a letter that Jack Tate, the Acting Legal Advisor of the Department, wrote to the attorney for the plaintiff of a Nazi victim seeking to recover—in a proceeding before the U.S. District Court for the Southern District of New York—property that the victim sold under duress in Nazi Germany. As the court noted in *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, the letter stated the policy of the U.S. Government was "to undo the forced transfers and restitute identifiable property to victims of Nazi persecution wrongfully deprived of such property" as well as to "relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials."[19] Subsequently known as a "Tate Letter" and the "*Bernstein* Exception" to the Act of State Doctrine, this 1949 letter represents a lasting departure from the absolute view of sovereign immunity precluding U.S. courts from adjudicating claims against foreign governments in many contexts, not only in cases involving Nazi looted art. The *Bernstein* Exception provides the historical backdrop for the still unsettled law that informs Holocaust era claims against foreign sovereigns.[20]

---

[19] *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij (Chemical Bank & Trust Co, Third-Party Defendant*, 210 F. 2d 375, 376 (2d Cir. 1954).
[20] Todd Grabarsky*, "Comity of Errors: The Overemphasis of Plaintiff Citizenship in Foreign Sovereign Immunities Act 'Takings Exception' Jurisprudence," *Cardozo Law Review* 33 (2011), 237, 238-44.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

### F.  U.S. Government Efforts To Restitute Stolen Artwork Located In The United States

49.     In 1950, the U.S. Department of State signaled its intent specifically to help return Nazi-confiscated artworks to their rightful owners when the Department sent a letter to art world constituents and participants including "Universities, Museums, Libraries, Art Dealers, and Booksellers."[21] This pronouncement communicated the obligation and intention of the U.S. Government to restitute artworks misappropriated from both private and public collections and then subsequently brought into the U.S. after the War. Moreover, the letter declared that U.S. cultural institutions shared this responsibility, and referred expressly to the Robert's Commission circular of 1945. The letter stated that "[t]he continued vigilance of American institutions and individuals in identifying cultural objects improperly dispersed during World War II is needed," and asked recipients to notify the U.S. Department of State whenever they encountered such materials.[22]

50.     In 1951, State Department official Ardelia R. Hall wrote an article in the *State Department Bulletin* entitled "The Recovery of Cultural Objects Dispersed During World War II."[23] The article reaffirmed that "[t]he introduction of looted objects into the United States is … contrary to the general policy of this Government."[24] The article asserted additionally that Nazi-confiscated artworks should be recoverable in the U.S. forever: "[f]or the first time in history, restitution may be expected to continue for as long as works of art have been plundered during a war continue to be rediscovered."[25]

---

[21]Ardelia R. Hall, "The Recovery of Cultural Objects Dispersed During World War II," Vol. XXV, No. 635, *The Department of State Bulletin* (27 August 1951), Appendix 2.
[22] Hall, "Recovery of Cultural Objects," Appendix 2.
[23] Hall, "Recovery of Cultural Objects," 339.
[24] Hall, "Recovery of Cultural Objects," 339.
[25] Hall, "Recovery of Cultural Objects," 339.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

### G. U.S. Media Coverage Of Nazi Art Looting

51.    From 1945 until the present, the press and popular culture more generally have covered the Nazis' art looting program, thereby perpetuating notice to interested persons of coercive Nazi policies. The articles on the subject in magazines such as *Time* and *Life* in the 1940s, and the coverage in the newsreels of the time (still available at the National Archives and Records Administration), count among the widespread media coverage.[26]

52.    The U.S. media also publicized the work and the efforts of the Monuments, Fine Arts, and Archives (MFA&A) division within the U.S. Army ("the Monuments Men") that helped to locate, preserve, and restitute many thousands of artworks the Nazis had plundered during the War.

53.    Journalist Janet Flanner covered Nazi art looting in a 1947 series of *New Yorker* articles (as well as in her 1957 book, *Men and Monuments*).[27]  Former OSS officer and member of the Art Looting Investigation Unit James Plaut wrote a piece, "Hitler's Capital: Loot from the Master Race," that appeared in *The Atlantic* in 1946.[28]  Other key figures in the Allies' restitution effort also wrote memoirs, including Thomas Carr Howe's *Salt Mines and Castles: The Discovery and Restitution of Looted European Art* (1946) and James Rorimer's *Survival: The Salvage and Protection of Art in War* (1950).[29]  That Howe became the director of the San Francisco Legion of Honor and Rorimer later headed the Metropolitan Museum of Art in New York only increased the

---

[26] Lynn Nicholas, *The Rape of Europa* (New York: Alfred Knopf, 1994), 344 reproduces the *Life* magazine photo of Hofer; *Time* (28 May 1945); Lincoln Kirstein, "In Quest of the Golden Lamb," *Town and Country* (September 1945).

[27] Janet Flanner, "Annals of Crime: The Beautiful Spoils," in *The New Yorker* 40 (22 February 1947); and Janet Flanner, *Men and Monuments* (New York: Harper and Row, 1957).

[28] James Plaut, "Hitler's Capital: Loot from the Master Race," *The Atlantic* (October 1946), 75-80.

[29] Thomas Carr Howe, *Salt Mines and Castles: The Discovery and Restitution of Looted European Art* (Indianapolis: Bobbs-Merril, 1946); and James Rorimer, *Survival: The Salvage and Protection of Art in War* (New York: Abelard, 1950).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

visibility of these books, which recounted both the Nazis' plundering operations, and also the challenges of restitution work. Indeed, dozens of Americans who had served as Monuments Officers assumed leading positions in U.S. museums in the postwar period as documented by Robert Edsel's scholarship.[30]  Many people in the art world had first-hand knowledge of Nazi art looting and the challenges of restitution.

### H.  In 1948 The Carnegie Hosts Controversial "Salt Mines" Exhibit

54.    The Carnegie Institute was also one of the venues of the controversial 1948 exhibition officially titled, "Berlin Masterpieces" (but unofficially dubbed, "the salt mine show"). The exhibition concerned 202 paintings that the Americans had secured at war's end (the majority from the Merkers salt mine). Many of the Monuments, Fine Arts, and Archives officers had protested sending the works to the U.S.A. in the so-called "Wiesbaden Manifesto," arguing that the optics were bad when the U.S. removed such treasures to America, and the transport and tour of the artworks would put them at risk of damage. The exhibition nevertheless drew large crowds at the 13 U.S. venues—including the Carnegie Institute.[31] The works in this show belonging to German museums engendered public discussion and drew attention to Nazi art looting and the ongoing restitution process.

---

[30] Robert Edsel's list of Monuments Officers who assumed positions in the American museum establishment can be found at http://www.rescuingdavinci.com/HelpSolve/list_cultins.aspx.

[31] Minneapolis Museum of Art, "Saved from the Salt Mines: Part II of Rediscovering an Incredible 1948 Exhibition of Art Stolen by Nazis" (26 March 2014) at https://new.artsmia.org/stories/saved-from-the-salt-mines-part-ii-of-rediscovering-an-incredible-1948-exhibition-of-art-stolen-by-nazis/.  For the protest of the U.S. Monuments officers, see Walter Farmer, "Custody and Controversy at the Wiesbaden Collecting Point," in Elizabeth Simpson, ed., *The Spoils of War* (New York: Harry Abrams, 1997), 131-34.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

III.    **The Carnegie Institute's Knowledge of Grünbaum's Ownership of Dead City III Prior To The 1960 Kallir Gift and the 1961 Carnegie Institute Schiele Show Including Artworks Stolen From Fritz Grünbaum**

55.    As demonstrated above, the 1961 Boston/Carnegie Schiele exhibition catalogue referenced the 1930 Kallir catalogue raisonné and the 1956 Gutekunst & Klipstein catalogue, each of which referenced *Dead City III* belonging to Fritz Grünbaum, a famous Holocaust victim personally known to Otto Kallir under circumstances requiring the Carnegie Institute to inquire into the provenances of artworks displayed and heightening the institutional need to scrutinize the 1960 Kallir gift of the Artwork to the Carnegie Institute.

56.    As summarized above, the overwhelming direct and circumstantial evidence in the historical record demonstrates that Carnegie leadership in 1960 would have known about Nazi art looting both directly and institutionally. This evidence is also strong at the individual level.  For example, Roy Hunt was a trustee of the Carnegie Institute and a member of the committee that approved the acquisition of the Artwork as a gift. His son, Richard M. Hunt, completed his Ph.D. in history at Harvard University on the topic of Reich Propaganda Minister Joseph Goebbels (and more specifically, the Nazi leader's youth). Because Goebbels played a central role in the Nazi campaigns against "degenerate" art and with regard to the looting of artworks, the scholarly work of Roy Hunt's son presumably would have helped make him more aware of the issue of Nazi looted art. Richard Hunt submitted his doctoral dissertation and received his Ph.D. from Harvard in 1960, the same year his father Roy Hunt approved the Carnegie's acquisition of the Schiele.[32]

---

[32] Nate Herpich, "Respected Teacher and Administrator Richard M. Hunt Dies at 93," in the *Harvard Gazette* (29 April 2020), at https://news.harvard.edu/gazette/story/2020/04/respected-teacher-and-administrator-richard-hunt-dies-at-93/

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

**IV. Grünbaum's Tragic Fate and Loss of the Artwork**

57.    After Fritz Grünbaum was imprisoned in Dachau in 1938, his art collection was placed in the Schenker warehouse in central Vienna—a business that had been Nazified and became complicit in the Nazis' plundering operations. Except for revealing Fritz Grünbaum's ownership of *Dead City III*, Kornfeld concealed the source of the remaining artworks for the 1956 Schiele sale—all of them from Fritz Grünbaum's collection—until 1998, when Kornfeld maintained (for the first time) that Grünbaum's sister-in-law sold the artworks to him in the 1950s. Until his 1998 claim, the name Mathilde Lukacs was unknown to Egon Schiele experts. As I explained in expert reports for *Bakalar v. Vavra* and *Reif v. Nagy*, the available evidence strongly suggests Kornfeld did not obtain these Schiele works from Mathilde Lukacs.

**A. Fritz Grünbaum as a Victim of Nazi Persecution and the Spoliation of His Art Collection**

58.    Franz Friedrich ("Fritz") Grünbaum was an Austrian Jewish comedian, best-known for his stand-up comedy and for his comic films in the interwar period. Grünbaum's cabaret performances mocked the Nazis. When the Germans invaded Austria and carried out the "Anschluss" starting on 12 March 1938, Grünbaum attempted to flee to Czechoslovakia. But border guards refused to allow him and most others attempting to flee to cross into safety. Grünbaum returned to Vienna and went into hiding, but he was betrayed to the Nazis, apprehended, and imprisoned in Vienna. He was transported by train to the Dachau concentration camp outside Munich. Grünbaum later endured several months in the Buchenwald concentration camp before being returned to Dachau, where he perished. Famously, he performed and helped organize theatre for the other inmates, thereby providing a much-needed spiritual sustenance. Grünbaum fell ill and succumbed to heart failure in January 1941.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

### B. The July 1938 Power of Attorney

59.    In July 1938, while in the Dachau Concentration Camp, Fritz Grünbaum signed a power of attorney giving his wife, Elisabeth ("Lily") the authority to sell his property and turn the proceeds over to the Nazi authorities. I have attached a true copy hereto as **Exhibit I**. (true copy of the power of attorney ("Vollmacht") (including a certified English translation**). This** authorization must be viewed as coerced, and hence, as invalid. Any transaction involving his property, including his art collection, that occurred once Fritz Grünbaum had entered the Nazi concentration camp system, should be viewed as invalid, and the property should be returned to his heirs. As I demonstrated in my report for *Reif v. Nagy*, Fritz Grünbaum's July 1938 Dachau power of attorney directive did not convey ownership of the art collection to Elisabeth.

### C. The Kieslinger Inventory

60.    Prior to her death, Elizabeth Grünbaum tried to mitigate the persecution that she experienced, and also win the release of her husband, by cooperating with the Nazi authorities.  In accordance with the Nazi state's regulation for property valued in excess of RM 5,000, Lily Grünbaum filed a report registering Fritz's and her property and then cooperated with Nazi authorities in filing successive Jewish Property declarations reporting the liquidation of Fritz's assets. As part of this process, Fritz Grünbaum's art was appraised by Dr. Franz Kieslinger, a Nazi art historian and art dealer.[33] **Exhibit J** at 3, 14-16, 27, 40-43 (true copy of Fritz Grönbaum's 16 July 1938 Jewish Property Declaration, which declares the art collection and includes the Kieslinger Inventory).  The Kieslinger inventory listed 21 oil paintings, 15 watercolors, 2 pastel drawings, and 278 partial colored drawings, among other objects.[34]  Kieslinger later became director for the Weinmüller auction house (an "Aryanized" firm that processed a tremendous quantity of looted

---

[33] Dr. Franz Kieslinger, "Schätzungsgutachten" 20 July 1938 (D & M 000448 – D & M 000449).

[34] "Ansuchen um Ausfuhrbewilligung," 8 September 1938 (D & M 000579 – D & M 000580).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

art). Elisabeth Grünbaum was compelled to pay Kieslinger, as an appointed consultant of the Nazi regime, to compile the inventory. While the art collection had been removed from the Grünbaums' apartment at Rechte Weinzelle 29 in Vienna's 4th District and taken to the premises of Schenker & Co in Vienna's First District, Elisabeth did not remain long in her and Fritz's large apartment. On 29 October 1938 she was relocated to a much smaller flat at Hofzeile 27/2/24, with no place to store the art collection (and later to Kaasgrabengasse 15, and then to Marc Aurel Strasse 5/7, from where she was deported to her death in October 1942). Marc Aurel Strasse 5/7 was a "collective residence" (Sammelwohnung), where a great many people were crammed into a dwelling, prior to Lilly Grünbaum's deportation to Minsk in October 1942. Lilly Grünbaum was murdered at the Maly Trostenic facility in what is now Belarus.

61.     The purpose of the Kieslinger Inventory was to comply with the Jewish Property Declaration Law of 27 April 1938 by documenting the art collection and to communicate this information to the state so that the property could be utilized by the Nazi state in accordance with the regime's Four Year Plan, which aimed to put Germany on a war footing. Thus, the Kieslinger inventory communicated the contents of the Grünbaum collection to the Nazi state through the Property Transfer/Declaration Office (Vermögensverkehrsstelle), which worked closely with the Central Agency for Jewish Emigration run by the infamous Adolf Eichmann. This Eichmann-led agency coordinated the emigration of Jews in Vienna, but also tracked and processed the property of Jewish victims, working with the Vermögensverkehrsstelle, to ensure that all of the assets went to the Nazi state before any Jews left the Reich or were murdered. Eichmann's method of stealing from Jews was so profitable that he was tasked with setting up this "Vienna model" in other jurisdictions. The extant records are now stored in the Austrian State Archives.[35]

---

[35] See Austrian State Archives, Archive of the Republic 06, Vermögensvekehrsstelle, VA 44614, Fritz Grünbaum (D & M 00443 – D & M 00459)

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

### D. The Schenker Inventory

62.     Hoping to obtain Fritz's release from Dachau and to flee the Third Reich, Elisabeth Grünbaum appears to have taken steps to export the art collection. An application for an export permit in her name was prepared by the storage and transport firm, Schenker & Co., but does not bear her signature.[36]  There is no evidence indicating whether Elisabeth Grünbaum worked with Schenker in filling out the export application: on the application, when asked to list the place of origin, there is a handwritten response of "Vienna" and when asked about the mode of transport, the handwritten response is "Train, ship." The Schenker inventory is signed and stamped by Dr. Otto Demus (1902-1990) of the Federal Monuments Office, the agency that handled such matters in Austria after the Anschluss (it was renamed only in 1940).[37] The Schenker Inventory appears to be in Demus's handwriting demonstrating that he sketched his own inventory to accompany the export application and did not rely on the Kieslinger Inventory.[38]   Demus's lack of reliance on the Kieslinger Inventory (the two inventories differ in overall number and in specific descriptions) suggests that Demus was examining the artworks themselves: that is, that they were physically present at the Schenker & Co. premises.  That Demus worked for this Nazified Monuments Office and compiled an independent inventory is additional proof that the Grünbaum art collection was being tracked by multiple Nazi state authorities.  Dr. Demus sometimes worked hand-in-hand with representatives of the GESTAPO and other Nazi police agencies in executing the regime's rapacious policies.[39]

---

[36]  (D & M 00443 – D & M 00459); "Ansuchen um Ausfuhrbewilligung," 8 September 1938 (D & M 000579 – D & M 000580).

[37] The Bundesdenkmalamt (Federal Monuments Office) was renamed the Zentralstelle für Denkmalschutz (Central Agency for Monuments Protection) in 1940.

[38]  "Ansuchen um Ausfuhrbewilligung," 8 September 1938 (D & M 000579 – D & M 000580).

[39]For an example of Dr. Otto Demus and a representative of the GESTAPO (a Kommissar Schulz or Scholz) collaborating in the seizure of art from the Unger family, see Sophie Lillie, *Was Einmal War.  Handbuch der enteigneten Kunstsammlungen Wiens* (Vienna: Czernin Verlag, 2003), 90.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

63.    Elisabeth's application for export also contains the notation that there has been no charge for a "handling fee" (Manipulationsgebühr), as the figure "0.0" is listed.  Any real export would have entailed a fee, and this notation suggests that a seizure of the art collection had already been effected.  The export permit application does not list a destination for the works, or bear customs stamps showing that the collection left Vienna. In other words, the Nazi-era records demonstrate positively that Fritz Grünbaum's art collection did not leave Vienna during World War II.  Of course, Elisabeth Grünbaum was unable to emigrate from the German Reich.  Elisabeth Grünbaum declared in a June 1939 document that, "I had to pay attorneys' fees, treatment expenses, continuous bills for purchases and the costs to prepare emigration, costs for relocation to pay the transport company (or forwarder)—all together about RM 7,000.[40]  This logically included any payment she was forced to render to Schenker & Co. to store the artworks and prepare them for export.  In short, there is no doubt that the Grünbaum art collection was housed with Schenker & Co. in 1938 with the knowledge of the Nazi authorities.

64.    As of 31 January 1939, the Nazis appointed an "Aryan" trustee, Dr. Ludwig Rochlitzer (1880-1945), who required the Grünbaums to pay him for his "services."[41] **Exhibit K** (a true copy of a 31 January 1939 letter from Rochlitzer to Elisabeth announcing Rochlitzer's appointment as Aryan trustee for the Grünbaum property, together with certified English translation). Rochlitzer charged them exorbitant sums: e.g., RM 3,000 in unexplained expenses on 31 January 1939 plus a fee of RM 2,500 (the latter alone more than an average worker's annual income).  According to the 6 December 1938 "Proclamation of the Regulation Concerning the Utilization of Jewish Property," the Nazi appointed trustee had responsibility for all the assets

---

[40] Elisabeth Grünbaum, "Verzeichnis über das Vermögen der Elisabeth Sara Grünbaum," June 1939 (DBM 000467 - DBM 000468).
[41] Dr. Ludwig Rochlitzer to Elisabeth Grünbaum, 31 January 1939 (D & M 00255 – D & M 00256).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

("Vermögen") of the affected Jewish person.[42]  According to this law, only the trustee would have had the power to make the contract with Schenker & Co.  Other portions of the Grünbaums' property were seized and liquidated, including Fritz and Elisabeth Grünbaum's jewelry.  This evidence demonstrates that neither Elisabeth nor Fritz had access to or control over Fritz's art collection.

### E.  Additional Evidence of Nazi Confiscation or Spoliation

65.    There is substantial evidence that the Nazis confiscated or otherwise spoliated the Grünbaum art collection: first, as I will detail below, it is clear that once the works entered Schenker & Co., there was no way for Fritz or Elisabeth Grünbaum, or Elisabeth's sister, Mathilde Lukacs, to remove them from this Nazified agency.  Second, a property declaration filled out by Elisabeth Grünbaum in June 1939 indicates that all of her and her husband's assets, including the art collection, had been frozen, and were subject to seizure by various Nazi agencies.[43]  Third, when her husband Fritz died in 1941, Elisabeth reported that the art collection was no longer among Fritz's remaining assets.[44]  I have attached a true copy of Elisabeth's Property Declaration as **Exhibit M** at 3.

66.    As art historian Dr. Sophie Lillie has noted: "… during the hearing of Fritz Grünbaum's estate in 1941 … Lilly Grünbaum's recorded testimony stated that there was no existing estate.  Likewise, her declaration in 1942, a few days before her deportation, revealed no liquid assets."[45]  This evidence signifies that the Nazis had already seized Fritz's art collection.

---

[42] "Proclamation of the Regulation Concerning the Utilization of Jewish Property," in the *Gesetzblatt für das Land Österreich* (6 December 1938), Nr. 633/1938.  A lawyer from Munich, Dr. Alexander Bayer, was also charged with facilitating the "Aryanization" of the Grünbaum property (D & M 000255 – D & M 000256).

[43] Elisabeth Grünbaum, "Vermögensbekenntnis" 19 July 1939, Österreichisches Staatsarchiv, Archiv der Republik 06 VA 44614, Fritz Grünbaum (STHB 000516).

[44] Fritz Grünbaum, "Todfallsaufnahme" (declaration of death) signed by Elisabeth Grünbaum, 14 January 1941 (D & M 00053 – D & M 00057).

[45] Translation of Sophie Lillie, "The Dead City," 4 (NG 0022).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

Also, Fritz's June 1939 Jewish Property Declaration bears Nazi government stamps signifying that the blocking of all the major assets had been completed, signifying that the Nazis had custody and control of the art collection (the stamps read "gesperrt" and "erledigt" and "Vermoegens-Anmeldung" which mean "seized" and "completed" and "property office"). **Exhibit M** (true copy of Elisabeth's and Fritz's Jewish Property Declarations (including a certified English translation) (stamp "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed"] and Vermoegens-Anmeldung). If the art had been returned to Elisabeth Grünbaum, her sister Mathilde, or any other family member, Elisabeth would have had to file forms with the Nazi authorities to account for it, and it is clear from available records that such restitution or transfer did not happen. Also, it would have been nearly impossible for Mathilde Lukacs to recover the art collection: Lukacs had left Austria for Belgium in August 1938—that is, a month before the application for an export permit (when the collection was clearly in the hands of Schenker & Co.). It is important to recall that the Grünbaum art collection included not only Austrian modernist works that had monetary value, but also objects by Old Masters that were coveted by the Nazi leaders. Because the Grünbaum collection contained paintings by nineteenth century Austrian painters like Ferdinand Waldmüller that were highly prized by Nazi leaders, including both Adolf Hitler and Reichsmarschall Hermann Göring, a Jewish person would not have been permitted to remove the art collection from Schenker. Export was near impossible once the war commenced on 1 September 1939.

67.    The Nazi officials would not have let the Grünbaum art collection out of the country—especially in Vienna where Adolf Eichmann established an extraordinarily efficient expropriation operation to seize the property of Jews leaving the country.

68.    Both Fritz and Elisabeth Grünbaum were Holocaust victims—persecuted from the moment they came under Nazi rule in 1938. At the time of the German invasion, Fritz Grünbaum

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

possessed an art collection of some 450 works, of which 81 were by Egon Schiele. Fritz Grünbaum was known as a major collector of Egon Schiele: he had loaned Artworks from his collection to major exhibitions, including the one held at the Würthle Galerie in Vienna in 1925 and the Hagenbund exhibition in 1928. The Würthle Galerie catalogue has been a crucial resource for scholars to reconstruct Fritz Grünbaum's collection: the notations and correspondences allow for certain Grünbaum Schieles to be identified. Note that the Galerie Würthle was an important gallery for selling works by Schiele and that Otto Kallir worked there in the 1920s before establishing his own business, the Neue Galerie.

**F. Debunking Speculations**

69.     Historians and researchers have not uncovered documents showing what happened to Fritz Grünbaum's art collection after it was placed in the Schenker warehouse in central Vienna. I have seen no evidence that Carnegie Institute or any other museum possessing artworks stolen from Fritz Grünbaum has made any inquiries into acquiring such documents or explain why they are missing.  Schenker and Co. was one of the largest transport firms in Europe. It had been founded in Vienna in 1872 by Gottfried Schenker, who was Jewish, and it had Jewish leadership until the Nazis' seizure of power. The firm, which had been sold to the Reichsbahn (German Railway) was completely "Aryanized" (Jewish employees were fired). Both the Reichsbahn and Schenker played key roles in Nazi plundering operations, as they transported and stored vast stores of plunder.   The Schenker Company has been described as "one of the most important enterprises engaged in pillage and plunder during German aggressions and mass crimes throughout Europe in the period from 1938 to 1945."[46]

---

[46] See the website German-Foreign-Policy.com, "The Schenker Papers" (2016) at https://web.archive.org/web/20190905065551/https://www.german-foreign-policy.com/en/news/detail/6970/.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 20    RECEIVED NYSCEF: 03/09/2023

70.    It has been suggested that Lilly Grünbaum entered Schenker warehouse in central Vienna and somehow was able to remove the art collection at some point after June 1939 (the last date we have a record of Fritz Grünbaum's art collection being stored in the Schenker warehouse). I find this suggestion preposterous. Anti-Semitic measures had extended so far by the summer of 1939 (and Lilly had been forced from her home) that it is unthinkable that a Jewish woman could have entered this facility and removed property, let alone valuable artworks.

71.    I also regard speculations that a representative for Fritz and/or Lilly Grünbaum could have removed the art collection from the warehouse as directly contradicted by the overwhelming evidence. In *Reif v. Nagy*, Nagy expert Laurie Stein speculated about what happened to the Grünbaum collection in the Schenker facility:  they may have been "held by attorney Ludwig Rochlitzer or by Lilly's friend Margarethe Hassel or held by an unknown person in Vienna for safekeeping."[47] These speculations are contrary to the evidence and were rejected by the Court in *Reif v. Nagy*. It is impossible (or wildly improbable) that Ludwig Rochlitzer, the attorney who was tasked by the Nazis with overseeing the "Aryanization" (that is, the liquidation) of the Grünbaum assets, went into Schenker, took the artworks, and returned them to the family that the Nazis had tasked him with looting.  The Nazis would have promptly arrested Rochlitzer had he done that.  The same goes for Margarethe Hassel --- there is simply no evidence supporting this wildly unlikely scenario that, had it occurred, would likely have generated Nazi-era documentation and reprisals.

**G.  Obvious Austrian Corruption Scenarios**

72.    The more speculative scenarios overlook much more obvious scenarios involving laundering of Nazi-looted property in post-war Vienna. For example, Otto Benesch (1896-1964) was the son of a major collector of Schiele (Heinrich Benesch).  Benesch was the director of the

---

[47] Stein 37.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

Vienna's Albertina Museum in from 1947-1961. In the introduction to the 1956 Gutekunst & Klipstein Catalogue, Benesch wrote the following:

> Three major collections of his drawings formed during Schiele's lifetime: Dr. Oskar Reichel, Dr. Heinrich Rieger, and Heinrich Benesch. While the former were partly scattered and partly destroyed, the latter [Benesch's father's] continued to exist as the one most complete. One half of it is now in the writer's ownership, the other was transferred to the Albertina which possesses the most omnibus [complete] and most beautiful Schiele collection today.

73.    It is a striking omission that Benesch's introduction to the 1956 Gutekunst & Klipstein Catalogue said nothing about the Grünbaum provenance of the artworks his introduction was presenting nor made any mention of the famous Grünbaum collection. As a contemporary of Fritz Grünbaum (1880-1941), a fellow Viennese collector of Schiele, and as the Director of the Albertina Museum, Benesch certainly would have known that Grünbaum was the source of the artworks. The Grünbaum collection of Schieles sold by Kornfeld also included a portrait of Otto Benesch's father (object number 43).

74.    Benesch's omission of Grünbaum's ownership of the artwork in the 1956 Gutekunst & Klipstein Catalogue may be explained by his very close business relationship with Kornfeld that certainly created the opportunity for corruption. On 20 April 1956, Kornfeld held an auction of "Doubletten der Albertina" (Doubles of the Albertina) at Gutekunst & Klipstein, where Benesch used Kornfeld to sell allegedly redundant works from the Albertina Museum's collection (graphic works by Rembrandt, Dürer, and other Old Masters). Benesch likely attended the April 1956 auction (which occurred less than five months prior to the September sale of the Grünbaum works and at almost exactly the time that Kornfeld claimed purportedly acquiring works from Lukacs).

38

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

75.     Benesch's silence suggests his complicity in profiting from the sale of Grünbaum's artworks. Benesch's role in selling Albertina works in Switzerland through Kornfeld gave him the opportunity to smuggle Nazi looted artwork out of Austria into Switzerland.

76.     The improbability of the "Mathilde Lucas" provenance is further supported by the 1997 scholarship of Rudolf Leopold and Magdalena Dabrowski. In the 1997 Museum of Modern Art Catalogue:  *"Egon Schiele: the Leopold collection, Vienna, Texts by Magdalena Dabrowski and Rudolf Leopold* (Yale University Press), the provenance of *Dead City III* (1911) appears as follows (with no mention of Mathilde Lukacs):



Arthur Roessler, Vienna; Alfred Spitzer, Vienna; Fritz Grünbaum, Vienna; Gutekunst & Klipstein, Bern, Galerie St. Etienne, New York; Rudolf Leopold, Vienna.

77.     Rudolf Leopold, a sophisticated Schiele collector, certainly knew that Fritz Grünbaum could not have sold *Dead City III* to Gutekunst & Klipstein as his provenance falsely suggests.

78.     In a 2005 article on *Dead City III* (an Egon Schiele painting in Fritz Grünbaum's collection), art historian Sophie Lillie wrote:

> It is unclear how some parts of the Grünbaum collection appeared in the mid-1950s at the Klipstein & Kornfeld gallery in Bern. Mathilde Lukacs,

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

sister of Lilly Grunbaum, brought the art works in. Regarding the small dimensions of the pieces, Leopold and Kornfeld concur that Lukacs might have fled from Austria carrying the works with her in her luggage. They viewed Mathilde Lukacs's acquisition of her sister Lilly Grunbaum property as "de jure." This representation of events is incorrect. The idea that Lukacs could have carried and saved any artwork while on a flight from the Nazis that took her across half of Europe and ended in Belgian detention camp defies the mournful reality of escape and persecution. With the facts then present, Mathilde Lukacs could have been viewed, at best, as possessor of the art works, but proof of ownership either through a gift or purchase is missing. In retrospect, the legality of the transaction is due to the rise of the National Socialism and cannot be characterized as "de jure."[48]

79.    Sophie Lillie also wrote:

Moreover, being the wife of a well-known regime critic and Jewish, Lilly Grünbaum would have been unable to save her property or her life. As a Jew she already lacked the legal grounds to claim her husband's estate. It is equally unlikely that her sister was able to rescue the art collection. Only a politically unsuspicious person would have been able to react in this manner at that time.[49]

I concur with Sophie Lillie that the overwhelming evidence suggests that it would have been impossible for Mathilde Lukacs to transport the art collection to Eberhard Kornfeld and that even if she did, Kornfeld knew that she lacked legal title to the artworks.

80.    Pursuant to a Certificate of Heirship issued by the District Court Innere Stadt Vienna dated September 12, 2002, Leon Fischer ("Fischer") and Milos Vavra ("Vavra") were each declared an heir of Fritz Grönbaum's estate entitled to an undivided fifty percent (50%) share. **Exhibit N** (true copy of the Certificate of Heirship).  My understanding of Austrian law from reading the expert reports in the *Bakalar* case is that because there were no Austrian heirs appointed from 1941 through 2002, no person was empowered under Austrian law to lawfully make any transfers of Fritz

---

[48] Sophie Lillie, "The Dead City: The Unresolved Destiny of the Fritz Grünbaum Collection" (translation into English of "Die Tote Stadt. Das ungeklärte Schicksal der Kunstsammlung Fritz Grünbaum," in Marie-Theres Arnbom and Christoph Wagner-Trenkwitz, eds., *Grüss mich Gott! Fritz Grünbaum. Eine Biographie, 1880-1914* (Vienna: Verlag Christian Brandstätter, 2005).
[49] Lillie, "The Dead City."

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM          INDEX NO. 654839/2022

NYSCEF DOC. NO. 20                                        RECEIVED NYSCEF: 03/09/2023

Grünbaum's property following his death until 2002 when Fischer and Vavra obtained legal authority from an Austrian court.

81.    In *Bakalar v. Vavra,* Judge William Pauley concluded that Egon Schiele's *Seated Woman with Bent Left Leg* (1917), together with his oil painting *Dead City III*, were among 65 artworks by Schiele appearing in a 1956 Swiss auction catalogue (the Gutekunst & Klipstein or "1956 Kornfeld Catalogue"), and that had belonged to Fritz Grünbaum when he was arrested by the Gestapo in March, 1938.[50]  Art dealer Jane Kallir, who authored a catalogue raisonné of Schiele's works on paper, testified at the *Bakalar v. Vavra* trial that she believed all the works in the Gutekunst & Klipstein catalogue from 1956 belonged to Fritz Grünbaum.[51]  Somehow, Eberhard Kornfeld obtained most of Fritz Grünbaum's Schieles.

### H.  Kornfeld's Lack of Credibility

82.    While Kornfeld maintained (starting in 1998) that he obtained the works from Mathilde Lukacs, his story is not credible. Recall that by September 1938, Grünbaum had amassed

---

[50] Gutekunst & Klipstein, *Egon Schiele. Katalog zur Ausstellung Gutekunst &* works after the essay by Arthur Roessler. The attached price list notes that six works (numbers 19, 31, 33, 34, 41, and 43) that were exhibited were private property ("Privatbesitz") and thus presumably not offered for sale.

[50] Jane Kallir testimony, 15 July 2008 (*Reif v. Nagy* (161799/2015) NYSCEF 253). 337.  Kallir testified here, "And I was not able to match these works up with specific images until I received the information that everything in the Kornfeld catalog, the 56 catalog, came from the Grünbaum collection."  On page 363, Jane Kallir states regarding the comparison of the Kornfeld (Gutekunst & Klipstein) 1956 catalogue and the Galerie Würthle catalog, "You can only do that once you know that the works in the Kornfeld catalog came from the collection of Fritz Grünbaum." *Klipstein 1956* (D & M 00634 – D & M 00659).  The catalogue includes an initial listing of 54 works, plus an additional 11 works after the essay by Arthur Roessler. The attached price list notes that six works (numbers 19, 31, 33, 34, 41, and 43) that were exhibited were private property ("Privatbesitz") and thus presumably not offered for sale.

[51] Jane Kallir testimony, 15 July 2008 in (NYSCEF 253). 337.  Kallir testified here, "And I was not able to match these works up with specific images until I received the information that everything in the Kornfeld catalog, the 56 catalog, came from the Grünbaum collection."  On page 363, Jane Kallir states regarding the comparison of the Kornfeld (Gutekunst & Klipstein) 1956 catalogue and the Galerie Würthle catalog, "You can only do that once you know that the works in the Kornfeld catalog came from the collection of Fritz Grünbaum."

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

a collection of 446 works, including 81 by Egon Schiele. Fritz Grünbaum was a famous comedian, a star of stage and screen. Grünbaum was also a major collector of modernist graphic artworks, which was one of Kornfeld's areas of expertise. For Kornfeld to say he had never heard of Grünbaum when he obtained the works in the mid-1950s (or earlier) defies belief. Even worse, in *Bakalar v. Vavra*, Kornfeld testified he'd never heard of Fritz Grünbaum until the 1990s. Kornfeld's testimony was entirely discredited in *Reif v. Nagy*, where it was noted that Kornfeld included Grünbaum in the provenance of *Dead City III* in the 1956 catalogue he prepared.

83.    In the 1956 catalogue for the September Schiele sale, Kornfeld provided a misleading provenance for *Dead City III*. There was not only no mention of Mathilde Lukacs, but also there was also no place-holder designation, such as "private collection" or "family collection." The provenance Kornfeld published in the 1956 catalogue shows that Kornfeld obtained *Dead City III* directly from Fritz Grünbaum --- a clear falsehood.[52]

84.    Kornfeld's implication in the 2013 scandal "Munich art hoard" scandal further impeaches Kornfeld's credibility and reputation.[53] The Gurlitt family amassed a cache of artworks, some of which were plundered from Jewish victims, and others purged from German state museums as part of the Nazis' "degenerate" art campaign in the late-1930s. It emerged that Eberhard Kornfeld had been secretly helping the Gurlitts sell off artworks for decades.[54] The Gurlitt collection of over

---

[52] Sophie Lillie also pointed out the incorrect order of the provenance in her article on Dead City *III*. Lillie pointed out that the "private collection," needed to be the last entry for Kornfeld's provenance to be truthful and accurate.

[53] GURLITT'S SWISS DEALER BREAKS SILENCE ON HIS CLIENT 10 DECEMBER 2017. HTTPS://WWW.EXPATICA.COM/CH/GENERAL/SW-GURLITTS-SWISS-DEALER-BREAKS-SILENCE-ON-HIS-CLIENT-56323/ (LAST ACCESSED MARCH 1, 2023)(DESCRIBING KORNFELD'S REPEATED SALES IN SWITZERLAND OF GURLITT'S SECRET ART HOARD).

[54] There is a sizeable literature about the Gurlitt cache, including Catherine Hickley, *The Munich Art Hoard: Hitler's Dealer and His Secret Legacy* (Farnborough: Thames & Hudson, 2015); Meike Hoffmann, *Hitlers Kunsthändler: Hildebrand Gurlitt, 1895-1956* (Munich: C. H. Beck, 2016); and Mary Lane, *Hitler's Last Hostages: Looted Art and the Soul of the Third Reich* (New

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 20                                           RECEIVED NYSCEF: 03/09/2023

1,500 artworks originated with Hildebrand Gurlitt, who had been a dealer of the purged "degenerate" art starting in 1938, and also an agent for Adolf Hitler and the Führermuseum during World War II. Hildebrand Gurlitt amassed a sizeable collection of his own, and then lied to the Americans after the war by saying that most of his art was destroyed in a bombing raid on Dresden, when in fact it had survived in hiding. Hildebrand Gurlitt died in a car accident in 1956, but his widow and children took over the collection and sold works over the years to generate income. A number of these works were Nazi looted art (thus far, at least 21 works from the cache have been restituted).[55] Kornfeld profited from serving as a fence for the Gurlitts' secret collection of artworks and in concealing for decades the existence of the looted artworks.[56] The Gurlitt trove was gifted to the Kunstmuseum in Kornfeld's hometown of Bern.

85.    In 2018, the Geneva Court of Justice summoned Eberhard Kornfeld, according to a contemporaneous press report, "to answer a list of questions in connection with an estate. This request for information was made by heirs of the Lederer Collection, which prior to World War II, was composed of 600 to 700 drawings by the famous Austrian symbolist painter Gustav Klimt and of 380 drawings by his protegé Egon Schiele." The account continues, "Eberhard Kornfeld requested to be excused from having to take the stand due to his age (93 years old at the time of the trial) and the 'emotional charge of the case.'" His request was turned down by the Court, but the

---

York: Public Affairs, 2019). A commission established to evaluate the cache issued a report in 2017: Kunstmuseum Bern, et. al., *Gurlitt: Status Report* (Munich: Hirmer, 2017).

[55] Angelica Villa, "Kunstmuseum Bern to Return Seven Works from Gurlitt Trove," in ARTnews (13 December 2021) at https://www.artnews.com/art-news/news/kunstmuseum-bern-returns-gurlitt-collection-works-1234613181/ .

[56] See Alastair Sooke, "The True Story of the Nazi Art Dealer and a Collection that Will be Forever Tainted," in *The Telegraph* (6 November 2017) at http://www.telegraph.co.uk/art/artists/true-story-nazi-art-dealer-collectionworks-will-forever-tainted/. Note that Catherine Hickley documents eleven works Cornelius sold to Kornfeld in 1988 and four others in 1990. Hickley also cites irregularities in Kornfeld's provenances in re-selling the works. Catherine Hickley, *The Munich Art Hoard: Hitler's Dealer and his Secret Legacy* (London: Thames and Hudson, 2015), 156-57.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 20                                              RECEIVED NYSCEF: 03/09/2023

results proved disappointing: "Having been ordered by the Court to do so, Eberhard Kornfeld answered the questions but sometimes evasively. 'His answers are largely inadequate,' deplores [counsel for the heirs] Arun Chandraskekharan."[57]  In short, Kornfeld has a reputation of not being forthcoming with important provenance information.

86.    Kornfeld, similarly, concealed the origins of the Grünbaum Schieles for many years. Only in 1998 and in conjunction with a restitution lawsuit did Kornfeld claim he had acquired the works from Mathilde Lukacs, a sister of Lilly Grünbaum.  Mathilde Lukacs and her husband had fled Austria in the summer of 1938 for Belgium, where they went into hiding and barely survived the Holocaust. There is no evidence that they returned to Vienna during the war.  And there is no documentation on how Lukacs could have obtained artworks from the Grünbaum collection.

**V. Kornfeld's Forged Documentation**

87.    Kornfeld supplied photocopies of receipts that he claimed documented his acquisition of the works from Mathilde Lukacs, but there are grave problems with this purported documentation.  The documents don't cover all the artworks that he purportedly acquired. Some of the signatures are in pencil, which is unusual for a commercial document.  The signatures themselves vary greatly and don't appear to be from the same person.  In *Bakalar v. Vavra*, a forensic handwriting expert analyzed the documents and came away with "massive doubts" about whether the documents came from one hand, and whether they were authentic.[58] For the handwriting analysis

---

[57] Translation of "Geneva Judicial Authorities Sentence an Auction House," in Tribune de Genève (10 April 2018).

[58] Handwriting expert Christian Farthofer wrote, "Furthermore, for instance, several signatures which were produced at an earlier date appear to be made rather slowly and show disturbances in writing (they seem to be explainable plausibly by age-induced deterioration), while others were written in a rather speedy and fluent way of writing at a later point in time. Based on those findings I have massive doubts that all the signatures were produced by one person. Translation of Christian Farthofer, "Handwriting Expertise," 7 November 2005 (D & M 02141 – D & M 02185), with the quotation on p. 13 at D & M.02154.  Judge Pauley also excluded on timeliness grounds the Declaration of Dr. Milan Kostohryz Regarding Czech Law Applicable To Plaintiff's Claim of

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022

NYSCEF DOC. NO. 20    RECEIVED NYSCEF: 03/09/2023

to be entered into evidence, the original documents must be provided to the experts, and Eberhard Kornfeld refused to provide the originals for expert inspection.  In other words, he chose not to put to rest doubts about the authenticity of his documentation.

88.    In sum, Fritz Grünbaum was in possession of his art collection when he was arrested by the Nazis in March 1938 and lost possession while he was in a concentration camp.  Franz Kieslinger, who inventoried the Grünbaum art collection,was not only a hands-on art looter (he was very active stealing art in the Netherlands during the war, working for the notorious agency called the Dienststelle Mühlmann), but also a passionate admirer of Egon Schiele. The well-known collector of Schiele Dr. Rudolf Leopold (founder of the Leopold Museum) called Kieslinger his mentor and acknowledged that Kieslinger helped him develop a passion for Schiele.[59] During the war, Kieslinger arranged for a great deal of art plundered by the Dienststelle Mühlmann to be sold in Vienna at the Dorotheum auction house, where he had a position as an adviser.  In other words, Kieslinger was experienced in liquidating Nazi looted art and had the motive and opportunity to steal Fritz Grünbaum's art collection.

## VI. Otto Kallir's Knowledge of the Artwork's Nazi-era Provenance and the Nazis Persecution of Jews

89.    Otto Kallir (1 April 1894 - 30 November 1978) (born Otto Nirenstein) was a Viennese émigré art dealer who was born Jewish, but married into a Catholic family and had intimate knowledge of Fritz Grünbaum's art collection. In considering whether Otto Kallir knew the Artwork he gifted the Carnegie Institute was looted, it is important to note that Kallir was familiar with the Nazi persecution of Viennese Jews.   Kallir was born Jewish and thus risked Nazi

---

Laches dated September 5, 2007 explaining how it was legally and factually impossible and dangerous for Fritz Grünbaum's heirs located behind the Iron Curtain to make claims to artworks.  (a true copy is annexed hereto as **Exhibit N**).

[59] Diethold Leopold, *Rudolf Leopold—Kunstsammler* (Vienna: Holzhausen Verlag, 2003), 17 (DBM 005852). The English translation is DBM 005853.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 20

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

persecution.  Kallir had the foresight to transfer his art gallery to his Christian assistant, Vita Künstler, in early 1938 and to flee Vienna.  By taking this step, Kallir maintained profitable relations with the Nazi regime that he continued to exploit in Paris and New York.  His Neue Galerie in Vienna continued on and he was able to export his stock to France and to the United States through Nazi art dealer Curt Valentin.

90.    As explained above, Otto Kallir knew Fritz Grünbaum very well. The extant correspondence suggests a close working relationship between the two men, who were leaders in the Viennese cultural milieu. When Kallir wanted to borrow works by Schiele from Grünbaum for a Schiele memorial exhibit in 1928 (when Fritz was away in Munich performing), Grünbaum permitted Kallir to go to his apartment and select the artworks he wished to borrow. In one letter from 10 September 1938, Fritz Grünbaum wrote to Otto Kallir (then Nirenstein) and, in agreeing to loan works to the Schiele exhibition at the Hagenbund, instructed the dealer: "Please call my apartment, where my sister-in-law, Mrs. Koppel, currently lives, and arrange with her the hour of the pick-up."[60] For Grünbaum to loan Kallir works in this manner indicates a degree of trust and familiarity.  For Grünbaum to allow Kallir into his home and to offer these works as a loan indicates a close, trusting relationship.

91.    Rita Reif testified in the *Bakalar* case that in the 1960a she and Paul Reif had contacted Otto Kallir, who promised to look out for Grünbaum artworks surfacing on the market. Kallir's granddaughter Jane Kallir promised the same to the Reif family and offered to recover the Egon Schiele artwork *Self-Seers* on their behalf in exchange for a percentage of the recovery.

92.    Fritz Grünbaum was a famous figure in German-speaking interwar Europe and his death would have been known to Kallir, through press reports. The German language newspaper

---

[60] See the translation of the letter from Fritz Grünbaum to Otto (Nirenstein) Kallir (10 September 1928) in the Archive of the Neue Galerie housed in the Oesterreichische Galerie, Belvedere.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

published in New York, *Aufbau*, published a substantial article about Grünbaum's death on 17 August 1945, with the title, "Erinnerung an Beda-Loehner und Fritz Grünbaum" (In Memory of Beda-Loehner and Fritz Grünbaum").[61]  Beda-Loehner was a poet who had died in Buchenwald. By 1960, that is, the time of Kallir's gift of the Artwork to the Carnegie Institute, Kallir would have known that Grünbaum had died due to Nazi persecution.

93.    Kallir had an exceptional knowledge of the oeuvre of Egon Schiele, and he knew a great deal about the histories of specific works. As noted above, in 1930 Otto Kallir compiled the first catalogue raisonné of Schiele's oil paintings (not the graphic works). This project entailed the intense study of all of Schiele's works, including the graphic works. In the 1930 catalogue raisonné, Kallir listed Fritz Grünbaum as the owner of the painting *Dead City III.  Dead City III*, surfaced in the 1956 Eberhard Kornfeld sale, alongside the Artwork. Kornfeld provided the name Fritz Grünbaum in the provenance for the 1956 sale (but did not mention Mathilde Lukacs or indicate that there was another owner after Fritz Grünbaum). But at least it was clear to all involved that *Dead City III* was from the Fritz Grünbaum collection. Kallir bought both the painting and the Artwork in the same 18 September 1956 transaction.

94.    Otto Kallir's "connections" to "dealers of looted art" demonstrate that he was knowledgeable about the subject.[62]  In particular, Kallir's relationships with Dr. Bruno Grimschitz (director of the Austrian National Gallery during the Third Reich), Dr. Friedrich Welz (a Salzburg dealer who acquired works in duress sales), and Dr. Wolfgang Gurlitt (a dealer who trafficked in

---

[61] Ernst Federn, "Erinnerung an Beda-Loehner und Fritz Grünbaum," in *Aufbau* (17 August 1945), 13.
[62] "Connections Between Otto Kallir and Dealers of Looted Art," (n.d.) (DBM 03519 - DBM 03523).  Note also that Welz, Buchholz, Gurlitt, and Valentin are listed as problematic dealers in the OSS Art Looting Investigation Unit's Final Report (1946) (DBM 03804 – DBM 03805).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM          INDEX NO. 654839/2022
NYSCEF DOC. NO. 20                                        RECEIVED NYSCEF: 03/09/2023

looted works) raise serious issues: all three men were deeply complicit in the expropriation of artworks from persecuted Jews and worked to implement the Nazi leaders' policies.

95.     In an essay published by Otto Kallir's granddaughter Jane Kallir titled "Egon Schiele's Rise To Posthumous Fame" Wolfgang G. Fischer describes how Bruno Grimschitz wrote a preface to the catalogue for Otto Kallir's 1928 Schiele exhibition at Kallir's Neue Galerie and Hagenbund.[63]  Fischer describes how Grimschitz rose to power as a Nazi party member and Director of Vienna's Belvedere Museum and how Grimschitz's protection helped Otto Kallir continue to sell Schieles during the Nazi period, including to the infamous Nazi dealer Wolfgang Gurlitt.[64]

96.     Otto Kallir's conduct has been questioned repeatedly.  For example, Kallir's name has surfaced in connection with other art looting cases, such as concerning a claim for a painting by Oskar Kokoschka (*Two Nudes*) involving Dr. Claudia Seger-Thomschitz and the Museum of Fine Arts, Boston.[65]  Dr. Seger-Thomschitz is an heir to Dr. Oskar Reichel, a prominent Viennese art dealer, who had a business closed down by the Nazis in November 1938.  By February 1939 Oskar Reichel, who remained in Austria with his wife and certain family members, had sold two paintings by Kokoschka to Kallir, then living in Paris.  The Reichel family suffered greatly during the war (one son died in a concentration camp and Oskar Reichel himself died of "natural causes" in 1943).[66]  Although the painting *Two Nudes* was never confiscated by Nazi authorities, the heirs alleged a duress sale.

---

[63] Kallir, Jane, *Egon Schiele:  The Complete Works* (Harry Abrams 1990, 1998) at 248.

[64] Kallir, Jane, *Egon Schiele:  The Complete Works* (Harry Abrams 1990, 1998) at 248-250.

[65] Museum of Fine Arts, Boston v. Dr. Claudia Seger-Thomschitz (U.S. District Court, District of Massachusetts, Case 1:08-cv-10097).  Dr. Seger-Thomschitz alleges that Kallir purchased Kokoschka's painting *Two Nudes* in early 1939 from Dr. Oskar Reichel, a Jewish physician in Vienna, who transferred the painting under duress.  Kallir then sold the painting to another dealer who in turn sold it to Sarah Blodgett in 1947 or 1948 (and Blodgett bequeathed it to the MFA, Boston).

[66] Arabella Yip and Ronald Spencer, "Untouched by Nazi Hands, but Still…" in *The Wall Street Journal* (28 February 2008).

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

97.    Otto Kallir had close connections to other émigré dealers who have been implicated in controversial transactions involving Nazis and the Nazi state.  Perhaps most notably, Curt Valentin (1902-1954) helped Kallir import his stock of artworks from Austria when Kallir was establishing himself in New York in September 1939.[67]  Valentin was a close associate of Karl Buchholz, a Berlin art and book dealer who liquidated so-called "degenerate" artworks purged from German state collections on behalf of the Nazi regime.  Buchholz sold off many such works on behalf of the Nazi state.[68]  In November 1936, Buchholz's business partner Curt Valentin received permission from to sell artworks abroad from the President of the Reich Chamber for the Visual Arts (a National Socialist corporatist body that all individuals working in the art world were required to join); Valentin emigrated to the United States in 1937.[69]  Valentin operated a branch of Buchholz's Berlin art gallery on 57th Street in New York (Otto Kallir's Galerie St. Etienne was also on 57th Street) called the Buchholz Gallery-Curt Valentin and did so from 1937 to 1954.[70]

98.    Otto Kallir was responsible for providing *Dead City III* to an October – November 1964 Marlborough Fine Art, London ("Marlborough Gallery") show of Egon Schiele's "Paintings, Watercolours and Drawings."   In his introductory essays to the exhibition catalogue, Wolfgang Fischer (the son of Harry Fischer, a Marlborough Gallery co-founder) wrote:

> The fate of Schiele's work was as tragic as his untimely death.  In 1938 a few daring private collectors and connoisseurs of his work such as Erich Lederer […], Dr. Oskar Reichel, Dr. Otto Kallir, Professor Otto Benesch and others

---

[67] See the translation of Fanny Kallir's diary: for example, the entries for 2 September 1939 (DBM 04764).

[68] Andreas Hüneke, "On the Trail of Missing Masterpieces: Modern Art from German Galleries," in Stephanie Barron, ed.,*"Degenerate Art": The Fate of the Avant-Garde in Nazi Germany* (New York: Abrams, 1991), 121-33.

[69] Reinhardt on behalf of the President of the Reichskammer der bildenden Künste (Adolf Ziegler) to Curt Valentin, 14 November 1936, Jane Wade Papers, Archives of American Art, microfilm reel #2322.

[70] Andreas Hüneke, "On the Trail of Missing Masterpieces: Modern Art from German Galleries," in Stephanie Barron, ed.,*"Degenerate Art": The Fate of the Avant-Garde in Nazi Germany* (New York: Abrams, 1991), 129.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM        INDEX NO. 654839/2022
NYSCEF DOC. NO. 20                                        RECEIVED NYSCEF: 03/09/2023

– mostly members of the Viennese Jewish haute bourgeoisie – were exiled, imprisoned or killed by the all-powerful Nazi element of the time. Their Schieles – 'decadent art' – suffered a similar persecution and fate and were likewise dispersed. It is a haunting thought that possibly Hitler's ravings could have been kindled by a Schiele, which he might well have seen during his youth in the gutters of Vienna.... [71]

99.     Thus, in 1964, Otto Kallir and all others attending the Marlborough Gallery Schiele show were on notice that most of Schiele's collectors were Jews murdered by the Nazis and that provenances of Schiele artworks should be checked. Art historian Sophie Lillie documented the tragic fate of many Schiele collectors during the Holocaust, including the Lederers, Dr. Heinrich Rieger, Oskar Reichel, Karl Mayländers, and Fritz Grünbaum, among others.[72] It is telling that Wolfgang Fischer did not include Grünbaum's name in the catalogue for an exhibition of *Dead City III* when all connoisseurs knew that work belonged to Grünbaum.

## VIII.    The Carnegie Institute's Troubling Lack of Provenance Transparency

100.    In light of the foregoing evidence, the record is clear that Otto Kallir knew the Artwork had belonged to Fritz Grünbaum, that Kallir knew Fritz Grünbaum was a victim of Nazi persecution, and that Kallir owed much of his stock of artworks to the assistance of art dealers who had been complicit in the Nazis' rapacious policies.

101.    The Carnegie Institute's records show that when Otto Kallir gifted the Artwork to the Carnegie Institute, he never provided a provenance. Nor have I seen any records showing that the Carnegie Institute asked for a provenance at any time prior to 2005, or to make any other inquiries into whether this was Nazi looted art. The records show that Kallir took a tax break of $1,800, which was a considerable sum in 1960 and that the Carnegie Institute supported him in this

---

[71] *See* Reply Affirmation of Claudia G. Jaffe, dated September 27, 2022 ("Jaffe Reply Aff.") at Ex. A and Ex. 2, p. 252 [NYSCEF 230 at ROLF000448, ROLF000454].
[72] Sophie Lillie, "A Legacy Forlorn: The Fate of Egon Schiele's Early Collectors," in Renée Price, ed., *Egon Schiele: The Ronald S. Lauder and Serge Sabarsky Collections* (Munich: Prestel, 2005), 111-39.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

regard. The Carnegie Institute's 1961 hosting of an Egon Schiele show promoting Otto Kallir and many artworks owned by a private art dealer raises ethical questions and suggests that the 1960 "gift" may be the product of unclean hands or an unethical "quid pro quo." Both Kallir and the Carnegie Institute got something out of the gift. The record suggests that Carnegie Institute failed to exercise any diligence in acquiring a donation of Nazi looted art to the detriment of American taxpayers.

102.    I have not seen the Carnegie Institute publish a provenance for the Artwork. The website of the Carnegie Institute for the Artwork does not list a provenance.[73]  The website states that it was a gift from Otto Kallir, and from the accession number ("60.5"), one can discern that the Carnegie Institute acquired the Artwork in 1960; but no further information is given. There is no mention of Fritz Grünbaum's ownership of the Artwork.  A search of the NEPIP database maintained by the American Alliance of Museums shows that the Carnegie Institute has listed 278 objects in its holdings as having potential Nazi looted art issues.  However I found no Schieles listed. http://www.nepip.org/public/search/itemsearch.cfm?action=itmresults&FromRec=241&artist=&nationality=&place=&title=&type=&description=&keyword=&museum_id=7542&name_Submit.

103.    I find the absence of a provenance for the Artwork on the Carnegie Institute's website or elsewhere to be problematic.  The Carnegie Institute is one of 179 museums that are part of the Nazi-Era Provenance Internet Portal Project ("NEPIP") found at http://nepip.org/  (last accessed 1 March 2023).

104.    NEPIP's mission is stated as follows:

**About the Portal**

---

[73] See the Carnegie Institute website for the Artwork at
https://collection.cmoa.org/objects/26c95794-eb1e-472c-8441-5ce1e11fd11d.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

INDEX NO. 654839/2022

NYSCEF DOC. NO. 20

RECEIVED NYSCEF: 03/09/2023

The Nazi-Era Provenance Internet Portal provides a searchable registry of objects in U.S. museum collections that changed hands in Continental Europe during the Nazi era (1933-1945).

## WHO WE SERVE

People Researching Lost Objects
By providing a single point of contact to hundreds of U.S. museum collections, the Portal helps people seeking lost objects to refine their searches.
U.S. Museums

By providing a searchable online registry of objects, the Portal helps U.S. museums fulfill their responsibility to make information about objects in their collections centrally accessible.

## HISTORICAL BACKGROUND

From the time it came into power in Germany in 1933 through the end of World War II in 1945, the Nazi regime orchestrated a program of theft, confiscation, coercive transfer, looting, pillage, and destruction of objects of art and other cultural property in Europe on a massive and unprecedented scale. Some confiscated objects were sold to fund Nazi activities, while others were retained for the private collections of high-ranking party officials.

U.S. museums were closely involved in the recovery and restitution of looted art after the war. During the post-war occupation of Germany, art historians and museum curators serving with the U.S. Army's Monuments, Fine Arts and Archives Commission operated collecting points where discovered loot was inventoried, catalogued, and returned to countries of origin. Through these efforts, many thousands of works were repatriated to their countries of origin and often were returned to their rightful owners.

Over the past decade, U.S. museums have become aware that their responsibilities in relation to Nazi looting did not end in the immediate postwar period. Increasingly, museums have come to recognize that objects unlawfully appropriated during the Nazi era without subsequent restitution—that is, with neither return of the object nor payment of compensation to the object's original owner or legal successor—may have made their way into U.S. museum collections in the decades since the war.

## INCEPTION OF THE PROJECT

As publicly accountable institutions, U.S. museums are working openly to resolve the status of objects in their custody. Through its professional associations, the American Alliance of Museums and the Association of Art Museum Directors (AAMD), the U.S. museum community has adopted a set of Recommended Procedures for investigating Nazi-era cultural assets. These procedures call for

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

research into the provenance, or ownership history, of all art objects in U.S. museum collections that changed hands in Continental Europe from 1933 to 1945. They also call on museums to make the resulting information available to the public.

Stakeholders involved this issue quickly identified the need for a searchable central registry of Nazi-era cultural property held by U.S. museums, beginning with European paintings and Judaica. The Alliance accepted the responsibility of developing this Internet-accessible, searchable registry. The result is the Nazi-Era Provenance Internet Portal.

105.    A search of the NEPIP database reveals 278 works from the Carnegie Institute's collection.  However, the NEPIP database lists no works by Egon Schiele.  This appears to be a troubling lack of transparency on the Carnegie Institute's part.

106.    The Carnegie Institute purports to be a leader in the field of provenance research. For example, the Carnegie Museum has an initiative titled, "Art Tracks Digital Provenance Project." According to the website:

> "Art Tracks is an initiative of the Carnegie Museum of Art that aims to turn provenance into structured data by building a suite of open source software tools. These tools transform traditional written provenance records into searchable data."[74]

107.    This website notes that project has been financially supported by a number of agencies and foundations, including the National Endowment for the Humanities, the Samuel H. Kress Foundation, and the Paul Mellon Centre for Studies in British Art. I am puzzled that the Carnegie Museum of Art should accept this funding and yet not provide a provenance for works in their collections.

## SUMMARY OF CONCLUSIONS

In this report, I addressed the following questions and have come to the following conclusions:

---

[74] Carnegie Museum of Art, "Art Tracks Digital Provenance Project," at https://cmoa.org/art/art-tracks-digital-provenance-project/.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

**1)    Did the Carnegie Institute have knowledge of red flags warranting investigation of the Artwork's provenance prior to acquiring it as a gift in 1960?**

Answer:        Yes, the Carnegie Institute had general and specific knowledge of red flags warranting investigating the Artwork's provenance before accepting it as a gift in 1960.

**2)    What knowledge did the Carnegie Institute have about Nazi art looting prior to receiving the Artwork as a gift from art dealer Otto Kallir?**

Answer:        The Carnegie Institute was aware of Fritz Grünbaum's ownership of *Dead City III* through Otto Kallir's 1930 catalogue raisonné of Schiele's oils and the 1956 Gutekunst & Klipstein catalogue depicting the Artwork which should have prompted an inquiry into the Artwork's relationship to a prominent Holocaust victim. Additionally, the Carnegie Institute was warned by the U.S. government in the 1940s and 1950s not to acquire artworks created prior to 1946 that had been in Europe after 1932 without inquiring into provenance and was particularly aware of the dangers because of its deep involvement in the German art scene during the Nazi era. Carnegie Institute Director Homer Saint-Gaudens had first-hand knowledge of persecution of Jewish artists and art collectors through his annual visits to Germany and also through his agent Charlotte Weidler in Berlin who reported to Saint-Gaudens and assisted with the Carnegie Institute's collecting practices during this time.

**3)    What knowledge did Otto Kallir have of the Artwork's Nazi-era provenance?**

Answer:        Otto Kallir acquired the Artwork in the same 18 September 1956 transaction that he acquired *Dead City III*, a work he'd previously catalogued in 1930 as belonging to Fritz Grünbaum, so unquestionably Kallir knew in 1956 that he was acquiring artwork stolen from a Jewish Holocaust victim. Otto Kallir (and later his grand-daughter Jane) knew that in the 1960s the Reif family was searching for Fritz Grünbaum's art collection and had promised to assist them.

**4)    Was Fritz Grünbaum a victim of Nazi persecution and is the Artwork Nazi-looted art?**

Answer:        Yes. All of the artworks in the 1956 Gutekunst & Klipstein sale, including *Dead City III* and the Artwork, have repeatedly found to have been stolen from Fritz Grünbaum.

**5)    Was the Carnegie Institute prejudiced in any way by any delay of Fritz Grünbaum's heirs to assert legal claims?**

Answer:        No. Fritz's 1941 death in the Dachau Concentration Camp was well-publicized prior to 1960, as was his ownership of *Dead City III*, which put the museum community on inquiry notice long prior to 1960. The world has been on heightened notice of the theft of Fritz Grünbaum's art collection due to the efforts of the Reif family since the 1960s culminating in District Attorney Robert Morgenthau's seizure of *Dead City III* in 1998 at the Museum of Modern Art in New York City, a case that made world headlines and led to major changes in the legal landscape for the recovery of stolen artworks. But prior to

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

1960, the Carnegie Institute had superior knowledge of the systematic murder of Europe's Jews, had received specific warnings from the U.S. government against acquiring European unprovenanced works and thus was in a very privileged position to inquire into the Artwork's provenance in 1960. Despite these red flags and knowledge, it appears that the Carnegie Institute never conducted appropriate provenance research either before acquiring the Artwork in 1960 or at any time thereafter. The Carnegie Institute could have asked Otto Kallir where the Artwork came from, collected appropriate documents and interviewed relevant witnesses, but through its own willful blindness, chose not to do so. Nor has the Carnegie Institute followed appropriate transparency protocols adopted by the American Alliance of Museums.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 20

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

Dated:  2 MARCH 2023

Los Angeles, California

*Jonathan Petropoulos*

Jonathan G. Petropoulos

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM          INDEX NO. 654839/2022
NYSCEF DOC. NO. 21                                        RECEIVED NYSCEF: 03/09/2023

# EXHIBIT B

FILED: NEW YORK COUNTY CLERK 12/14/2022 06:47 PM
NYSCEF DOC. NO. 21

INDEX NO. 654839/2022
RECEIVED NYSCEF: 12/14/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TIMOTHY REIF and DAVID FRAENKEL, as Co-Trustees of the LEON FISCHER TRUST FOR THE LIFE AND WORK OF FRITZ GRUNBAUM and MILOS VAVRA,

*Plaintiffs,*

-against -

THE SANTA BARBARA MUSEUM OF ART,

*Defendant,*

An Artwork *PORTRAIT OF THE ARTIST'S WIFE* (1915) by the Artist Egon Schiele,

*Defendant-in-rem.*

Index No.:

**SUMMONS**

To The Defendants Named Above:

**YOU ARE HEREBY SUMMONED** to answer the attached Verified Complaint in this action, and to serve a copy of your verified answer, or if the Verified Complaint is not served with this Summons, to serve a notice of appearance on the Plaintiffs' counsel, Dunnington Bartholow & Miller LLP, at the address set forth below within twenty (20) days after the service of this Summons (not counting the day of service itself), or within thirty (30) days after service is complete if this Summons is not delivered personally to you within the State of New York.

**PLEASE TAKE FURTHER NOTICE** that should you fail to answer or appear, a judgment will be entered against you by default for the relief in the Verified Complaint together with the costs and disbursements of this action.

Dated: New York, New York
           December 14, 2022

1

FILED: NEW YORK COUNTY CLERK 02/04/2022 06:47 PM   INDEX NO. 654839/2022

NYSCEF DOC. NO. 21   RECEIVED NYSCEF: 02/04/2022

**DUNNINGTON BARTHOLOW & MILLER LLP**
*Attorneys for Plaintiffs*

By:      s/Raymond J. Dowd
       Raymond J. Dowd
       Claudia G. Jaffe
       230 Park Avenue, 21st Floor
       New York, New York 10169
       Phone: (212) 682-8811
       Facsimile: (212) 661-7769
       RDowd@dunnington.com
       CJaffe@dunnington.com

2

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TIMOTHY REIF and DAVID FRAENKEL, as Co-Trustees of the LEON FISCHER TRUST FOR THE LIFE AND WORK OF FRITZ GRUNBAUM and MILOS VAVRA,

*Plaintiffs,*

-against -

THE SANTA BARBARA MUSEUM OF ART,

*Defendant,*

An Artwork *PORTRAIT OF THE ARTIST'S WIFE* (1915) by the Artist Egon Schiele,

*Defendant-in-rem.*

Index No.:

**VERIFIED COMPLAINT**

**Jury Trial Demanded**

Plaintiffs, by and through their counsel, DUNNINGTON BARTHOLOW & MILLER LLP, hereby complain of the Defendants as follows:

**PRELIMINARY STATEMENT**

1.    This is an action by the heirs of Franz Friedrich ("Fritz") Grünbaum (the Grünbaum Heirs) to recover a painting by Egon Schiele entitled *Portrait of the Artist's Wife* (1915) (the "Artwork") which, upon information and belief, is currently located in the City of Santa Barbara at the Santa Barbara Museum of Art at 1130 State St, Santa Barbara, CA 93101 ("the Museum").



FILED: NEW YORK COUNTY CLERK 02/04/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/04/2022

2.      The Artwork, pictured above, is catalogued in Kallir, Jane, *Egon Schiele: The Complete Works* (Harry Abrams 1990 & 1998) as a drawing, designated D. 1711.

3.      Plaintiffs assert causes of action for replevin and declaratory judgment.

4.      The Artwork is a unique chattel as defined by CPLR 7109(a) which authorizes injunctive relief.

5.      The Nazi regime stole the Artwork from Grünbaum while he was imprisoned in the Dachau Concentration Camp, where the Nazis tortured him and compelled him to sign an unlawful power of attorney giving his wife authority to convey his property, before murdering him.

6.      This action is related to *Reif v. Nagy* because the Hon. Charles Ramos determined conveyances pursuant to the unlawful Dachau power of attorney to be invalid because "[a] signature at gunpoint cannot lead to a valid conveyance."  *Reif v. Nagy,* 61 Misc.3d 319, 326, 80 N.Y.S.3d 629, 634 (Sup. Ct. New York County Comm. Div. 2018), *aff'd,* 175 A.D.3d 107, 106 N.Y.S.3d 5 (1st Dept. 2019), *leave to review declined,* 25 N.Y.3d 986, 125 N.Y.S.3d 76 (May 24, 2022).

7.      The Artwork was among artworks stolen from Grünbaum by the Nazis based on the unlawful Dachau power of attorney.

### THE PARTIES

8.       Plaintiffs are co-heirs of the estate of Grünbaum, a Viennese Jewish cabaret performer (born in Brno, Moravia) who was arrested by the Gestapo on March 22, 1938, imprisoned in the Dachau Concentration Camp, despoiled of all of his property by the Nazi regime, and murdered in Dachau on January 14, 1941.

2

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM          INDEX NO. 654839/2022
NYSCEF DOC. NO. 21                                        RECEIVED NYSCEF: 02/09/2022

9.      Plaintiffs Reif and Fraenkel are co-trustees of the testamentary Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust") and hold valid letters of trusteeship representing the late Leon Fischer's 50% ownership interest in Grünbaum's estate.

10.     Plaintiff Reif is a resident of the City, County and State of New York.

11.     Plaintiff Fraenkel is a resident of the State of Florida.

12.     Plaintiff Vavra is a resident of the Czech Republic who owns a 50% interest in Grünbaum's estate.

13.     Defendant the Museum is a museum and institution located at 1130 State St. Santa Barbara, CA 93101.

14.     The Artwork, upon information and belief, is presently located at the Museum and is being sued herein *in rem.*

**ALLEGATIONS SUPPORTING JURISDICTION IN NEW YORK COUNTY**

15.      From late 1956 until around 1966, the Artwork was located in New York County in the possession of the Galerie St. Etienne on 57th Street.

16.     From late 1956 until around 1966, Grünbaum's heirs were entitled to possession and all right, title and interest in and to the Artwork which was part of Grünbaum's estate.

17.     From late 1956 until the present, one or more of Grünbaum's heirs resided and continues to reside in New York County.

18.     Without any right, title or interest in the Artwork, and without conducting a reasonable provenance inquiry that would have shown that the Artwork belonged to New York residents, the Allen Memorial Art Museum tortiously caused Galerie St. Etienne to transport the Artwork outside New York County.

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM
NYSCEF DOC. NO. 21

INDEX NO. 654839/2022
RECEIVED NYSCEF: 02/09/2022

19.    Because this tort occurred in New York County, this court has long arm jurisdiction over this controversy under Section 302 of the New York Civil Practice Law and Rules.

20.    Because this controversy seeks declaratory relief and involves the rights of a decedent's estate held by residents of New York to sue for a stolen chattel, this court has jurisdiction to grant declaratory relief and exercise jurisdiction over non-domiciliaries for this "chose in action" involving a chattel located outside New York for the reasons set forth in *Estate of Stettiner,* 148 A.D.3d 184 (First Dept. 2017).

### ALLEGATIONS SUPPORTING PLAINTIFFS' STANDING

21.    On July 16, 1938, Nazis forced Grünbaum to sign a power of attorney in the Dachau Concentration Camp permitting his wife Elisabeth to liquidate his assets and hand the assets over to the Nazi regime.  **Exhibit A** at 3. (true copy of the power of attorney ("Vollmacht") (including a certified English translation))**.**

22.    From 1938 to 1939, Elisabeth was forced to liquidate Fritz's assets pursuant to Nazi decrees.

23.    On Grönbaum's death (in the Dachau Concentration Camp where he was imprisoned), a Vienna notary certified that Fritz had no property, there was nothing left. **Exhibit B** at 3 (true copy of the notary's certification).

24.    On October 5, 1942 Elisabeth was deported to the Maly Trostinec death camp in Minsk, where she was murdered.

25.    Elisabeth Grönbaum's June 1939 Jewish Property Declaration shows that all of her property had been taken by the Nazis before she was murdered. E**xhibit C** ( true copy of

4

FILED: NEW YORK COUNTY CLERK 02/04/2022 06:47 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 21                                             RECEIVED NYSCEF: 02/04/2022

Elisabeth's Jewish Property Declaration (including a certified English translation); *see* **Exhibit C** at 3, 28 (stamp "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed"]).

26.     As explained more fully below, these documents show conclusively that the Grünbaums lost Grünbaum's art collection prior to their deaths.

27.     Austrian government records demonstrate that no Grünbaum family member could have legally recovered the art collection following the deaths of Fritz and Elisabeth Grünbaum.

28.     Austrian government records show that from 1941 until 2002 Grünbaum had no heirs appointed by an Austrian court and no Austrian decrees of distribution were issued.

29.     Under Austrian law, for a family member to transfer a decedent's assets, that family member must first be declared an heir and receive a decree of distribution.

30.     Thus, the lack of any heirship or distribution decrees from 1941 until 2002 in Austrian government files signifies, as a matter of law, that no family member could have taken title to Grünbaum's art collection, or title to any individual artworks belonging to Grünbaum.

31.     Pursuant to a Certificate of Heirship issued by the District Court Innere Stadt Vienna dated September 12, 2002, Leon Fischer ("Fischer") and Milos Vavra ("Vavra") were each declared an heir of Fritz Grönbaum's estate entitled to an undivided fifty percent (50%) share. **Exhibit D** (true copy of the Certificate of Heirship).

32.     Prior to District Attorney Robert Morgenthau's seizure of Grünbaum's *Dead City III* at the Museum of Modern Art in New York City in 1999, neither Fischer nor Vavra had any idea that Grünbaum's art collection survived World War II.

33.     Pursuant to a last will and testament dated February 2012, Fischer appointed Reif and Fraenkel as executors of his estate.

5

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM
NYSCEF DOC. NO. 21

INDEX NO. 654839/2022
RECEIVED NYSCEF: 02/09/2022

34.    Fischer died on August 16, 2013.

35.    Upon learning of the art collection's existence, Fischer and Vavra diligently pursued Grönbaum's art collection.

36.    Letters testamentary were issued to Reif and Fraenkel and Fischer's will was duly probated.

37.    Fischer's will created the Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust") to pursue Grönbaum's artworks with proceeds going to charity.

38.    Reif and Fraenkel are now co-trustees of the Fischer Trust and hold valid letters of trusteeship.

**ALLEGATIONS SUPPORTING RECOVERY OF THE STOLEN ARTWORK**

39.    Otto (Nirenstein) Kallir (1894-1978) was a Viennese art dealer who worked at the Wurthle Gallery in Vienna before founding his own art gallery in 1923 called the "Neue Galerie".

40.    In 1925 the Wurthle Gallery displayed 22 artworks from Fritz Grunbaum's art collection.  A true copy of the 1925 Wurthle Gallery catalogue is attached hereto as **Exhibit E**.

41.    In 1928, Fritz Grünbaum permitted Otto Kallir to enter his Vienna apartment (in Grünbaum's absence) to select from among Grünbaum's Schieles the works that Kallir wanted to display at an exhibition commemorating the tenth anniversary of Schiele's death.  A true copy of the Kallir/Grunbaum 1928 correspondence ("the 1928 Correspondence") is attached hereto as **Exhibit F**.

42.    The 1928 Correspondence was donated by the Kallir family to the Austrian National Gallery (the Belvedere) as a gift of the Neue Galerie's business records following Otto

6

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

Kallir's death and is currently maintained by the Austrian government as part of the Neue Galerie archive.

43.    The 1928 Correspondence shows that Grünbaum trusted Kallir.

44.    The 1928 Correspondence shows that Kallir was familiar with the contents of Grünbaum's art collection, in particularly Grünbaum's Schieles.

45.    The 1928 Correspondence lists four oils and 21 drawings and watercolors either by name or by description, including "Ich liebe Gegensatze" (1912) or "I Love Antitheses" (1912).

46.    In 1930, Otto Kallir published a catalogue raisonné of Egon Schiele's oil paintings that documented Fritz Grünbaum's ownership of works including "Dead City III".

47.    The foregoing pre-war documentation was used by scholars and historians to trace artworks looted from Fritz Grünbaum's art collection when portion of the collection after World War II when portions of the collection surfaced in Berne, Switzerland.

48.

49.    On April 26, 1938, the Nazi regime decreed all Jewish property in excess of 5,000 Reichsmarks ("RM") to be available to the Nazi Reich for Field Marshal Goering's Four Year Plan to build the Nazi war machine.

50.    The April 26, 1938 decree required all Jews with property in excess of 5,000 RM to declare their assets quarterly until the assets were gone or until the Jews left the Reich.

51.    Jews were forbidden to transfer declared property, including art, without permission from Nazi authorities.

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM
NYSCEF DOC. NO. 21

INDEX NO. 654839/2022
RECEIVED NYSCEF: 02/09/2022

52.    As part of the process of securing Jewish assets to prevent transfers or sales, the Jewish Property Transaction Office (Vermögensverkehrsstelle) of Vienna commissioned inventories and valuation reports.   The Jewish victims were charged a fee for this process.

53.    A Vermögensverkehrsstelle inventory thus signified that Jewish assets were secured by the Nazi government.

54.    Pursuant to that process, the Vermögensverkehrsstelle commissioned Franz Kieslinger, an expert of the Dorotheum, to inventory Grünbaum's art collection while Grünbaum was in the Dachau Concentration Camp in 1938.

55.    The Kieslinger Inventory is part of the Elisabeth and Fritz Grunbaum Jewish Property files maintained in the Austrian State Archives. **Exhibit E** at 3, 14-16, 27, 40-43. (true copy of Fritz Grönbaum's July 16, 1938 Jewish Property Declaration, which declares the art collection and includes the Kieslinger Inventory).

56.    The Dorotheum was a Nazi-controlled auction house in Vienna used by the Nazi regime to sell art plundered from Jews and turn the proceeds over to the Nazi Reich.

57.    The Kieslinger Inventory shows Grönbaum's art collection to be valued at 5,791 RM.  **Exhibit G** at 16, 42.

58.    Grönbaum's art collection contained at least eighty-one works by the artist Egon Schiele.

59.    The stamps "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed" or "blocked"] were official Nazi stamps indicating that the property of the Jewish person in question had been spoliated.

60.    Fritz's Jewish Property Declarations bears "Erledigt" and "Gesperrt" stamps. **Exhibit G** at 17, 43.

FILED: NEW YORK COUNTY CLERK 02/04/2022 06:47 PM
NYSCEF DOC. NO. 21

INDEX NO. 654839/2022
RECEIVED NYSCEF: 02/04/2022

61.     Because the art collection was inventoried and described in the Jewish Property Declarations, the "Erledigt" and "Gesperrt" stamps demonstrate conclusively that the Nazis stole Fritz Grünbaum's art collection.

62.     In November and December 1938, surrounding the Kristallnacht pogrom, the Nazis passed additional laws to steal Jewish property and to forbid Jews from engaging in property transactions without Nazi approval.

63.     One of the laws provided for "Aryan" trustees to be appointed to liquidate Jewish property.

64.     All proceeds from sales or transfers of Jewish property went to the Nazi Reich, with commissions to the Aryan trustees.

65.     Some time prior to January 1939, Vienna attorney Ludwig Rochlitzer was appointed Aryan trustee of the "property of the Grünbaums." **Exhibit H** (a true copy of a January 31, 1939 letter from Rochlitzer to Elisabeth announcing Rochlitzer's appointment as Aryan trustee for the Grünbaum property, together with certified English translation).

66.     From the time of Rochlitzer's appointment as Aryan trustee, neither Fritz nor Elisabeth had access to Fritz's art collection.

67.     Grünbaum never voluntarily abandoned his art collection during his lifetime.

**U.S. State Department Warns U.S. Museums, Colleges And Art Dealers Against Acquiring Potentially Stolen Artworks From Europe In Highly Publicized Campaign, Thus Putting The World On Notice**

68.     Following World War II, Nazi looting of artworks from Jewish victims received tremendous media attention in the United States.

9

FILED: NEW YORK COUNTY CLERK 02/04/2022 06:41 PM    INDEX NO. 654839/2022

NYSCEF DOC. NO. 21                                              RECEIVED NYSCEF: 02/04/2022

69.    Following World War II, the U.S. State Department put out bulletins to museums, universities, art dealers and others urging U.S. citizens to be vigilant against acquiring Nazi-looted artwork and asking for assistance in returning stolen art.

70.    Media and government efforts put the art and museum community on heightened notice that acquiring artworks that were in Europe after 1933 and created prior to 1946 without complete provenances.

71.    Accordingly, any U.S. person acquiring artworks that were in Europe after 1933 and created prior to 1946 without complete provenances cannot be prejudiced by the inaction of a Holocaust victim family in seeking to recover artworks stolen by Nazis because that person should have exercised vigilance prior to and after acquiring the artwork.

72.    The Museum was on inquiry notice prior to acquiring the Artwork that it might be stolen and failed to exercise appropriate diligence in acquiring the Artwork or to make reasonable efforts to ascertain the true owners of the Artwork prior to taking possession.

73.    New York law protects the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value.

*Solomon R. Guggenheim Found. v. Lubell,* 77 NY2d 311, 317-18 [1991]

74.    New York places the burden of investigating the provenance of a work of art on the potential purchaser in furtherance of discouraging the trade in stolen art. *Solomon R. Guggenheim Found. v. Lubell,* 77 N.Y.2d 311, 320-21 (1991).

**Grünbaum's Art Collection Surfaces In Switzerland In 1956**

75.    The Artwork is featured in a 1956 Gutekunst & Klipstein Sales catalogue of Egon Schiele's artworks as number 36. **Exhibit I (**a true copy of the 1956 Gutekunst & Klipstein Schiele sale catalogue, with certified English translation) at 25.

10

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

76.  All artworks in the 1956 Gutekunst & Klipstein sales catalogue were stolen from Grünbaum, including the famous *Dead City III*, which was seized by the District Attorney Robert Morgenthau from the Museum of Modern Art in New York City in 1998. *Reif v. Nagy,* 175 A.D.3d 107 at 110, 114, 121.

77.  According to a Gutekunst & Klipstein invoice September 18, 1956 Otto Kallir purchased *Dead City III*, from Gutekunst & Klipstein together with 19 other artworks by Egon Schiele.  A true copy is attached hereto as **Exhibit J**.

78.  Examination of pre-war documentation prior to acquisition of the Artwork would have revealed evidence that it had been stolen from Grünbaum.

**Bakalar Sues The Grünbaum Heirs To Extinguish Rights In Grünbaum's Art Collection Using Fabricated Evidence**

79.  In 2005, Fischer and Vavra were sued by David Bakalar, a Massachusetts resident who sought to extinguish their rights in an Egon Schiele drawing stolen from Grünbaum titled *Seated Woman with Bent Left Leg* in an action captioned *Bakalar v. Vavra.*

80.  Bakalar had sought to auction *Seated Woman With Bent Left Leg* at Sotheby's in New York and London.

81.  In doing so, Bakalar promoted the false story that Grünbaum's sister-in-law Mathilde Lukacs obtained Grünbaum's art collection and sold it to Swiss art dealer Eberhard Kornfeld in 1956.

82.  The "Mathilde Lukacs" story, first floated in 1998 by Eberhard Kornfeld after *Dead City III'*s seizure, has long been derided by Holocaust scholars as implausible because Lukacs was herself imprisoned in Belgium during World War II after escaping Vienna.

83.  Bakalar succeeded in excluding as untimely an expert report of historian Dr. Jonathan Petropoulos debunking the Mathilde Lukacs provenance and excluding an expert report

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

on Czech law of Dr. Milan Kostohryz showing that the Vavra line of heirs was persecuted and trapped behind the Iron Curtain in Communist Czechoslovakia.

84.    Because of these exclusions of key evidence and because Eberhard Kornfeld denied the Grünbaum Heirs' handwriting expert access to handwriting samples of Mathilde Lukacs that would have demonstrated forgeries, the *Bakalar v. Vavra* case was not fully or fairly litigated.

85.    In 2006, the Southern District of New York denied Fischer's and Vavra's request to amend the pleadings to permit them to pursue additional artworks owned by Fritz Grünbaum. *Bakalar v. Vavra,* 237 F.R.D. 59 (S.D.N.Y. 2006).

86.    From 2005 to 2012, Fischer and Vavra unsuccessfully sought in *Bakalar v. Vavra* to assert a possessory interest in *Seated Woman with Bent Left Leg*.

87.    Following a bench trial, the district court concluded that Bakalar could not establish by a preponderance of the evidence that Grünbaum voluntarily relinquished possession of the drawing or that he did so intending to pass title. *Bakalar v. Vavra,* 819 F.Supp.2d 293 at 300.

88.    The district court further found that Mathilde Lukacs did not acquire valid title to the drawing.  819 F.Supp.2d 293 at 302-303.

89.    Despite Bakalar's inability to prove legal title, the Hon. William Pauley determined that inactions of predecessors-in-interest of Leon Fischer and Milos Vavra extinguished possessory rights of the Grünbaum Heirs, as against Bakalar, a Massachusetts purchaser who purchased an artwork in New York from Otto Kallir of Galerie St. Etienne, who had in turn purchased *Seated Woman with Bent Left Leg* from the 1956 Gutekunst & Klipstein sale together with 18 other Schiele artworks, including *Dead City III.*   819 F.Supp.2d 293, 305

12

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

(S.D.N.Y. 2011). The district court invoked the doctrine of laches to reach this result. The court applied laches in a manner inconsistent with the approach of New York common law courts to applying the equitable doctrine of laches and in a manner inconsistent with public policy protecting true owners of stolen artworks.

90.     On October 11, 2012, the Second Circuit Court of Appeals, in a summary (non-precedential) order, affirmed Judge Pauley's decision by finding it not clearly erroneous. *Bakalar v. Vavra*, 500 Fed. Appx. 6 (2d Cir. 2012).

91.     In doing so, the Second Circuit mistakenly relied on a fabricated version of the Grünbaum Heirs' case offered by the plaintiff that was nowhere contained in the record and --- when raised for the first time on appeal by plaintiff ---- had been vigorously contradicted by Vavra and Fischer. *Bakalar v Vavra*, 500 Fed Appx. 6, 7-8 (2d Cir. 2012) ("Vavra and Fischer's hypothesis—that the Nazis stole the Drawing from Grunbaum only to subsequently return or sell it to his Jewish sister-in-law—does not come close to showing that the district court's finding was clearly erroneous.").

92.     To underscore, neither Vavra nor Fischer ever argued that Nazis returned or sold artworks to Mathilde Lukacs (and the record contained no evidence to support this manufactured narrative).

93.     To the contrary, from the first pleadings, Vavra and Fischer argued that the story that Mathilde Lukacs sold Grünbaum's art collection to Gutekunst & Klipstein was entirely a fabrication.

94.     Also from the first pleadings, Vavra and Fischer argued that even if, assuming arguendo, the Mathilde Lukacs story were true, Lukacs would not have had good title, which, in turn, meant that she could not have given good title to Bakalar.

13

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM    INDEX NO. 654839/2022

NYSCEF DOC. NO. 21    RECEIVED NYSCEF: 02/09/2022

95.    *In Matter of Flamenbaum*, 22 N.Y.3d 962, 966 (2013), decided after *Bakalar*, clarified that, in the context of missing testimony relevant to a laches defense, the proponent of the defense must show that the missing evidence would have been relevant to establishing legal title. ("although the decedent's testimony may have shed light on how he came into possession of the (artwork), we can perceive of no scenario whereby the decedent could have shown that he held (good) title").

**In The Wake Of *Bakalar*, And Prior to *Reif v. Nagy*, Three Art Dealers Conspire To Strip German Lost Art Database (www.lostart.de) of Grünbaum Claims**

96.    During the course of the *Bakalar* litigation, Grünbaum's heirs were criticized for not having registered search requests related to Grünbaum's art collection on the Lost Art Database located at www.lostart.de.

97.    Accordingly, Vavra and Fischer registered the "search requests" based on the Kieslinger inventory and other pre-World War II material to artworks that appeared circumstantially to fit the description of artworks lost by Grünbaum.

98.    Below is the Lost Art Database's description of what "search requests" are:

*Lost Art Database*

*The Lost Art Database documents cultural property expropriated as a result of Nazi persecution, especially from Jewish owners, between 1933 and 1945 ("Nazi-looted art"), or which such a loss cannot be ruled out. With the help of the publication of so-called Search Requests and Found-Object Reports, former owners or their heirs are to be brought together with current owners and thus support all stakeholders in finding a just and fair solution.*

*The Lost Art Database also contains reports on cultural property that was removed as a result of the Second World War ("trophy art"). Their publication is intended to support solutions in accordance with international law. The Lost Art Database is accessible worldwide free of charge. www.lostart.de/en/start*

14

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

99.    On September 23, 2015, German attorney Jutta von Falkenhausen wrote to the

Lost Art Database on behalf of Galerie Kornfeld Verlag AG (Bern) represented by Christine

Stauffer, Galerie St. Etienne (New York) represented by Jane Kallir, and Richard Nagy Ltd.

(London) represented by Richard Nagy. **Exhibit K** (true copy of von Falkenhausen's letter)**.**

100.    Relying on *Bakalar v. Vavra* and on Austrian decisions that, in turn, relied on

*Bakalar v. Vavra* and the fabricated "Mathilde Lukacs" story, von Falkenhausen demanded that

the Lost Art Database delist certain of the Grünbaum heirs' claims.

101.    Von Falkenhausen's request included Schiele's *Dead City III* and the *Red Blouse*,

both of which are located at the Leopold Museum in Vienna.  **Exhibit K** at 12.

102.    Over the Grünbaum Heirs' objections, the Lost Art Database erased the

Grünbaum Heirs' claims, in particular, the claims relating to artworks in the 1956 Gutekunst &

Klipstein Schiele sale.

103.     Today, if one types in the name "Grünbaum" one will find a number of requests.

Under "status" it states "This announcement is contradicted by third parties."  **Exhibit L**

(Mountain Landscape (Farmhouse in the Tirol) Lost art-ID 478864.  On August 26, 2018, the

New York Times reported on the dispute between the Grünbaum Heirs and the Lost Art

Database in the article by William Cohan: *Jewish Heirs Take on an Art Foundation That Rights*

*Nazi Wrongs* **Exhibit M**. https://www.nytimes.com/2018/08/26/arts/design/nazi-art-egon-

schiele-fritz-grunbaum.html.

***Reif v. Nagy*** **Debunks Fabricated Mathilde Lukacs Provenance**

104.    In November 2015, shortly after learning that two other Egon Schiele artworks

from the 1956 Gutekunst & Klipstein sale catalogue (*Woman Hiding Her Face* and *Woman In*

*Black Pinafore*) were displayed by London art dealer Richard Nagy at the Park Avenue Armory,

15

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

Reif, Fraenkel and Vavra commenced *Reif v. Nagy* in the New York State Supreme Court, New York County.

105.    The Supreme Court, Ramos, J., after carefully considering expert testimony from Dr. Petropoulos and Dr. Kostohryz that had been excluded in the *Bakalar* case, granted summary judgment on the plaintiffs' replevin and conversion claims.  *Reif v. Nagy,* 61 Misc.3d at 330, 80 N.Y.S.3d at 367.

106.    Justice Ramos found that the Nazis confiscated Fritz Grünbaum's artworks by forcing him to sign the power of attorney to his wife, who was herself later murdered by the Nazis, and that the act of signing the power of attorney was involuntary: "[a] signature at gunpoint cannot lead to a valid conveyance." *Id.,* 61 Misc.3d at 326, 80 N.Y.S.3d at 634.

107.    In affirming, the Appellate Division, First Department, determined that the power of attorney the Nazis forced Fritz to execute in favor of Elisabeth while Fritz was imprisoned in Dachau was not voluntarily executed, "reject[ing] the notion that a person who signed a power of attorney in a death camp can be said to have executed the document voluntarily." *Reif v. Nagy,* 175 A.D.3d 107, 129, 106 N.Y.S.3d 5, 21 (First Dept. 2019).

108.    The First Department concluded Elisabeth was never able to convey good title. 175 A.D.3d at 129, 106 N.Y.S.3d at 21.

109.    The First Department determined that Grönbaum's art collection "never legally left Austria."  175 A.D.3d at 111.

110.    The First Department also determined that the art collection was in Austria on June 30, 1939, after Grönbaum's sister-in-law Mathilde Lukacs had fled Vienna for Belgium. 175 A.D.3d at 112.

16

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM          INDEX NO. 654839/2022

NYSCEF DOC. NO. 21                                    RECEIVED NYSCEF: 02/09/2022

111.    Unlike the *Bakalar* court, *Reif v. Nagy* carefully analyzed the historical

circumstances and rejected decisively the arguments that Grönbaum's sister-in-law Mathilde

Lukacs had laundered Grönbaum's artworks through Switzerland.

112.    The Appellate Division carefully analyzed overwhelming evidence suggesting

that Mathilde Lukacs never had custody of the art collection, and certainly lacked custody during

the War when she was imprisoned.

113.    The Appellate Division further noted:

> We note that there are no records, including invoices, checks, or receipts
> documenting that the Artworks were purchased by Kornfeld from Mathilde.
> Moreover, even if Mathilde had possession of Grunbaum's art collection,
> possession is not equivalent to legal title.

*Id.* at 127.

114.    The First Department also analyzed record evidence not available to the *Bakalar*

court, such as post-*Bakalar* revelations involving Eberhard Kornfeld's dealings with Cornelius

Gurlitt and Kornfeld's trafficking other Nazi-looted artworks.

115.    Thus, *Reif v. Nagy's* factual findings are based on a developed factual record and

supercede the factual record in *Bakalar*, further making *Bakalar* an untrustworthy precedent.

116.    In affirming, the First Department determined that relative to the art dealer

(Nagy), Reif, Frankel and Vavra had "superior ownership and possessory interests" in the

Schiele artworks. *Id.,* 175 A.D.3d at 132, 106 N.Y.S.3d at 24.

117.    Unlike *Bakalar, Reif v. Nagy* rejected the proposition that the decedent Mathilde

Lukacs's missing testimony could have prejudiced Nagy because "Mathilde could not have

shown she had good title to the artworks and her testimony would not have been probative." 175

A.D.3d 107 (First Dept. 2019).

17

FILED: NEW YORK COUNTY CLERK 03/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2022

118.    In rejecting Nagy's "prejudice" argument, *Reif v. Nagy* relied on the New York Court of Appeals 2013 decision clarifying that a the proponent of the laches defense must show that a decedent's missing testimony would have supported a claim of title. *Matter of Flamenbaum*, 22 N.Y.3d 962, 966 (2013).

119.    *Reif v. Nagy's* trustworthy application of *Matter of Flamenbaum* constitutes an intervening change or clarification of law that further renders the *Bakalar* precedent unreliable.

120.    Because Nagy refused to return the artworks, the Appellate Division affirmed an award of prejudgment interest in the amount of $700,964.44. *Reif v. Nagy,* 199 A.D.3d 616, 158 N.Y.S.3d 89 (1st Dept. 2021).

121.    Nagy persisted in challenging the Heirs' possessory interest in artworks stolen from Grünbaum until the Court of Appeals' May 24, 2022 denial of Nagy's motion for leave to appeal. *Reif v. Nagy,* 38 N.Y.3d 908, 168 N.Y.S.3d 720 (2022).

122.    The Court of Appeals' May 2022 decision established a possessory interest in Grünbaum's heirs under New York law to artworks stolen from Fritz Grünbaum, by the Nazis, such as Schiele's *Portrait of the Artist's Wife (1915)* in the Museum's possession.

**Schieles Stolen From Grünbaum Featured in 1956 Gutekunst & Klipstein Sales Catalogue**

123.    The Artwork is featured in a 1956 Gutekunst & Klipstein Sales catalogue of Egon Schiele's artworks.

124.    All artworks in the 1956 Gutekunst & Klipstein sales catalogue were stolen from Grünbaum, including the famous *Dead City III*, which was seized by District Attorney Robert Morgenthau from the Museum of Modern Art in New York City in 1998. *Reif v. Nagy,* 175 A.D.3d 107 at 110, 114, 121 (1st Dept. 2019). The Gutekunst & Klipstein sales catalogue made no mention of Mathilde Lukacs in the provenance of the artworks.

18

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 21                                    RECEIVED NYSCEF: 02/09/2022

125.    In the 1997 Museum of Modern Art Catalogue:  *"Egon Schiele: the Leopold collection, Vienna, Texts by Magdalena Dabrowski and Rudolf Leopold* (Yale University Press), the provenance of *Dead City III* (1911) appears as follows (with no mention of Mathilde Lukacs):



Arthur Roessler, Vienna; Alfred Spitzer, Vienna; Fritz Grünbaum, Vienna; Gutekunst & Klipstein, Bern, Galerie St. Etienne, New York; Rudolf Leopold, Vienna.    **Exhibit N** at 144.



126.    In the 1997 Museum of Modern Art Catalogue:  *"Egon Schiele : the Leopold collection, Vienna, Texts by Magdalena Dabrowski and Rudolf Leopold* (Yale University Press), the provenance of *Red Blouse ("Rote Bluse")* (1913) appears as follows (with no mention of

19

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM

NYSCEF DOC. NO. 21

INDEX NO. 654839/2022

RECEIVED NYSCEF: 02/09/2022

Mathilde Lukacs): Fritz Grunbaum, Vienna; Heirs of Fritz Grunbaum, The Netherlands; Galerie Kornfeld, Bern (auction), 1981; Rudolf Leopold, Vienna. **Exhibit N** at 220.

## AS AND FOR A FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT

127.    Plaintiffs repeat and reallege the foregoing paragraphs as if set forth herein.

128.    CPLR 3001 authorizes the Court to enter a declaratory judgment where a justiciable controversy exists regardless of whether other relief is available.

129.    A justiciable controversy exists concerning the ownership of the Artwork that only the Supreme Court may determine.

130.    Therefore, Plaintiffs request a declaratory judgment that the Artwork is the property of Plaintiffs.

**WHEREFORE,** Plaintiffs demand: (1) a declaratory judgment that Plaintiffs own the Artwork; (2) an award of costs and interest; and (3) such other and further relief the Court deems just, proper and equitable.

20

FILED: NEW YORK COUNTY CLERK 02/09/2022 06:47 PM                    INDEX NO. 654839/2022

NYSCEF DOC. NO. 21                                                  RECEIVED NYSCEF: 02/09/2022

Dated: New York, New York
       December 14, 2022

Respectfully submitted,

**DUNNINGTON BARTHOLOW & MILLER LLP**
*Attorneys for Plaintiffs*


By:  /s/ Raymond J. Dowd_____
        Raymond J. Dowd
        Claudia G. Jaffe
        230 Park Avenue 21st Floor
        New York, New York 10169
        Telephone: 212-682-8811
        Facsimile: 212-661-7769
        rdowd@dunnington.com
        cjaffe@dunnington.com

21

FILED: NEW YORK COUNTY CLERK 02/04/2022 06:47 PM
NYSCEF DOC. NO. 21

INDEX NO. 654839/2022
RECEIVED NYSCEF: 02/04/2022

## VERIFICATION

TIMOTHY M. REIF, affirms, subject to penalties of perjury under the laws of the State

of New York as follows:

1. I am a plaintiff in this action and an attorney admitted to practice in the State of New

   York.

2. I have read the foregoing Complaint with exhibits, know the contents thereof and the

   same are true and correct to my own knowledge, except where alleged upon

   information and belief, and with respect to those allegations, I believe them to be true.

3. The grounds of my belief as to all matters not stated to upon my knowledge are

   documents, papers and data contained in the files pertaining to this matter.

December 14, 2022

_____
TIMOTHY M. REIF

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

# EXHIBIT C

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 22    RECEIVED NYSCEF: 03/09/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TIMOTHY REIF and DAVID FRAENKEL, as Co-
Trustees of the LEON FISCHER TRUST FOR THE
LIFE AND WORK OF FRITZ GRUNBAUM and
MILOS VAVRA,

              *Plaintiffs,*

-against -

THE ALLEN MEMORIAL ART MUSEUM,

              *Defendant,*

An Artwork *GIRL WITH BLACK HAIR* (1911) by the
Artist Egon Schiele,

              *Defendant-in-rem.*

Index No.:

**SUMMONS**

To The Defendants Named Above:

       **YOU ARE HEREBY SUMMONED** to answer the attached Verified Complaint in this

action, and to serve a copy of your verified answer, or if the Verified Complaint is not served

with this Summons, to serve a notice of appearance on the Plaintiffs' counsel, Dunnington

Bartholow & Miller LLP, at the address set forth below within twenty (20) days after the service

of this Summons (not counting the day of service itself), or within thirty (30) days after service is

complete if this Summons is not delivered personally to you within the State of New York.

       **PLEASE TAKE FURTHER NOTICE** that should you fail to answer or appear, a

judgment will be entered against you by default for the relief in the Verified Complaint together

with the costs and disbursements of this action.

Dated: New York, New York
       December 14, 2022

1

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 22

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

**DUNNINGTON BARTHOLOW & MILLER LLP**
*Attorneys for Plaintiffs*

By:  ___s/Raymond J. Dowd_____
     Raymond J. Dowd
     Claudia G. Jaffe
     230 Park Avenue, 21st Floor
     New York, New York 10169
     Phone: (212) 682-8811
     Facsimile: (212) 661-7769
     RDowd@dunnington.com
     CJaffe@dunnington.com

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

TIMOTHY REIF and DAVID FRAENKEL, as Co-Trustees of the LEON FISCHER TRUST FOR THE LIFE AND WORK OF FRITZ GRUNBAUM and MILOS VAVRA,

<em>Plaintiffs,</em>

-against -

THE ALLEN MEMORIAL ART MUSEUM,

<em>Defendant,</em>

An Artwork *GIRL WITH BLACK HAIR* (1911) by the Artist Egon Schiele,

<em>Defendant-in-rem.</em>

Index No.:

**VERIFIED COMPLAINT**

**Jury Trial Demanded**

---

Plaintiffs, by and through their counsel, DUNNINGTON BARTHOLOW & MILLER LLP, hereby complain of the Defendants as follows:

PRELIMINARY STATEMENT

1.      This is an action by the heirs of Franz Friedrich ("Fritz") Grünbaum (the Grünbaum Heirs) to recover a painting by Egon Schiele entitled *Russian Prisoner of War* (1916) (the "Artwork") which, upon information and belief, is currently located in the City of Oberlin at the Allen Memorial Art Museum, 87 N. Main St., Oberlin, OH 44074 ("the Museum").



FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022

NYSCEF DOC. NO. 22                                   RECEIVED NYSCEF: 03/09/2023

2.      The Artwork, pictured above, is catalogued in Kallir, Jane, *Egon Schiele: The Complete Works* (Harry Abrams 1990 & 1998) as a drawing, designated D. 1045.

3.      Plaintiffs assert causes of action for replevin and declaratory judgment.

4.      The Artwork is a unique chattel as defined by CPLR 7109(a) which authorizes injunctive relief.

5.      The Nazi regime stole the Artwork from Grünbaum while he was imprisoned in the Dachau Concentration Camp, where the Nazis tortured him and compelled him to sign an unlawful power of attorney giving his wife authority to convey his property, before murdering him.

6.      This action is related to *Reif v. Nagy* because the Hon. Charles Ramos determined conveyances pursuant to the unlawful Dachau power of attorney to be invalid because "[a] signature at gunpoint cannot lead to a valid conveyance."  *Reif v. Nagy,* 61 Misc.3d 319, 326, 80 N.Y.S.3d 629, 634 (Sup. Ct. New York County Comm. Div. 2018), *aff'd,* 175 A.D.3d 107, 106 N.Y.S.3d 5 (1st Dept. 2019), *leave to review declined,* 25 N.Y.3d 986, 125 N.Y.S.3d 76 (May 24, 2022).

7.      The Artwork was among artworks stolen from Grünbaum by the Nazis based on the unlawful Dachau power of attorney.

**THE PARTIES**

8.       Plaintiffs are co-heirs of the estate of Grünbaum, a Viennese Jewish cabaret performer (born in Brno, Moravia) who was arrested by the Gestapo on March 22, 1938, imprisoned in the Dachau Concentration Camp, despoiled of all of his property by the Nazi regime, and murdered in Dachau on January 14, 1941.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 22

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

9.      Plaintiffs Reif and Fraenkel are co-trustees of the testamentary Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust") and hold valid letters of trusteeship representing the late Leon Fischer's 50% ownership interest in Grünbaum's estate.

10.     Plaintiff Reif is a resident of the City, County and State of New York.

11.     Plaintiff Fraenkel is a resident of the State of Florida.

12.     Plaintiff Vavra is a resident of the Czech Republic who owns a 50% interest in Grünbaum's estate.

13.     Defendant the Museum is a museum and institution located at 87 N. Main St, Oberlin, OH 44074.

14.     The Artwork, upon information and belief, is presently located at the Museum and is being sued herein *in rem.*

**ALLEGATIONS SUPPORTING JURISDICTION IN NEW YORK COUNTY**

15.      From late 1956 until around 1966, the Artwork was located in New York County in the possession of the Galerie St. Etienne on 57th Street.

16.     From late 1956 until around 1966, Grünbaum's heirs were entitled to possession and all right, title and interest in and to the Artwork which was part of Grünbaum's estate.

17.     From late 1956 until the present, one or more of Grünbaum's heirs resided and continues to reside in New York County.

18.     Without any right, title or interest in the Artwork, and without conducting a reasonable provenance inquiry that would have shown that the Artwork belonged to New York residents, the Allen Memorial Art Museum tortiously caused Galerie St. Etienne to transport the Artwork outside New York County.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

19.    Because this tort occurred in New York County, this court has long arm jurisdiction over this controversy under Section 302 of the New York Civil Practice Law and Rules.

20.    Because this controversy seeks declaratory relief and involves the rights of a decedent's estate held by residents of New York to sue for a stolen chattel, this court has jurisdiction to grant declaratory relief and exercise jurisdiction over non-domiciliaries for this "chose in action" involving a chattel located outside New York for the reasons set forth in *Estate of Stettiner,* 148 A.D.3d 184 (First Dept. 2017).

### ALLEGATIONS SUPPORTING PLAINTIFFS' STANDING

21.    On July 16, 1938, Nazis forced Grünbaum to sign a power of attorney in the Dachau Concentration Camp permitting his wife Elisabeth to liquidate his assets and hand the assets over to the Nazi regime.  **Exhibit A** at 3. (true copy of the power of attorney ("Vollmacht") (including a certified English translation))**.**

22.    From 1938 to 1939, Elisabeth was forced to liquidate Fritz's assets pursuant to Nazi decrees.

23.    On Grünbaum's death (in the Dachau Concentration Camp where he was imprisoned), a Vienna notary certified that Fritz had no property, there was nothing left. **Exhibit B** at 3 (true copy of the notary's certification).

24.    On October 5, 1942 Elisabeth was deported to the Maly Trostinec death camp in Minsk, where she was murdered.

25.    Elisabeth Grünbaum's June 1939 Jewish Property Declaration shows that all of her property had been taken by the Nazis before she was murdered. E**xhibit C** ( true copy of

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

Elisabeth's Jewish Property Declaration (including a certified English translation);  *see* **Exhibit C** at 3, 28 (stamp  "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed"]).

26.     As explained more fully below, these documents show conclusively that the Grünbaums lost Grünbaum's art collection prior to their deaths.

27.     Austrian government records demonstrate that no Grünbaum family member could have legally recovered the art collection following the deaths of Fritz and Elisabeth Grünbaum.

28.     Austrian government records show that from 1941 until 2002 Grünbaum had no heirs appointed by an Austrian court and no Austrian decrees of distribution were issued.

29.     Under Austrian law, for a family member to transfer a decedent's assets, that family member must first be declared an heir and receive a decree of distribution.

30.     Thus, the lack of any heirship or distribution decrees from 1941 until 2002 in Austrian government files signifies, as a matter of law, that no family member could have taken title to Grünbaum's art collection, or title to any individual artworks belonging to Grünbaum.

31.     Pursuant to a Certificate of Heirship issued by the District Court Innere Stadt Vienna dated September 12, 2002, Leon Fischer ("Fischer") and Milos Vavra ("Vavra") were each declared an heir of Fritz Grönbaum's estate entitled to an undivided fifty percent (50%) share. **Exhibit D** (true copy of the Certificate of Heirship).

32.     Prior to District Attorney Robert Morgenthau's seizure of Grünbaum's *Dead City III* at the Museum of Modern Art in New York City in 1999, neither Fischer nor Vavra had any idea that Grünbaum's art collection survived World War II.

33.     Pursuant to a last will and testament dated February 2012, Fischer appointed Reif and Fraenkel as executors of his estate.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

34.    Fischer died on August 16, 2013.

35.    Upon learning of the art collection's existence, Fischer and Vavra diligently pursued Grönbaum's art collection.

36.    Letters testamentary were issued to Reif and Fraenkel and Fischer's will was duly probated.

37.    Fischer's will created the Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust") to pursue Grönbaum's artworks with proceeds going to charity.

38.    Reif and Fraenkel are now co-trustees of the Fischer Trust and hold valid letters of trusteeship.

**ALLEGATIONS SUPPORTING RECOVERY OF THE STOLEN ARTWORK**

39.    Otto (Nirenstein) Kallir (1894-1978) was a Viennese art dealer who worked at the Wurthle Gallery in Vienna before founding his own art gallery in 1923 called the "Neue Galerie".

40.    In 1925 the Wurthle Gallery displayed 22 artworks from Fritz Grunbaum's art collection.  A true copy of the 1925 Wurthle Gallery catalogue is attached hereto as **Exhibit E**.

41.    In 1928, Fritz Grünbaum permitted Otto Kallir to enter his Vienna apartment (in Grünbaum's absence) to select from among Grünbaum's Schieles the works that Kallir wanted to display at an exhibition commemorating the tenth anniversary of Schiele's death.  A true copy of the Kallir/Grunbaum 1928 correspondence ("the 1928 Correspondence") is attached hereto as **Exhibit F**.

42.    The 1928 Correspondence was donated by the Kallir family to the Austrian National Gallery (the Belvedere) as a gift of the Neue Galerie's business records following Otto

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 22

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

Kallir's death and is currently maintained by the Austrian government as part of the Neue Galerie archive.

43.      The 1928 Correspondence shows that Grünbaum trusted Kallir.

44.      The 1928 Correspondence shows that Kallir was familiar with the contents of Grünbaum's art collection, in particularly Grünbaum's Schieles.

45.      The 1928 Correspondence lists four oils and 21 drawings and watercolors either by name or by description, including "Ich liebe Gegensatze" (1912) or "I Love Antitheses" (1912).

46.      In 1930, Otto Kallir published a catalogue raisonné of Egon Schiele's oil paintings that documented Fritz Grünbaum's ownership of works including "Dead City III".

47.      The foregoing pre-war documentation was used by scholars and historians to trace artworks looted from Fritz Grünbaum's art collection when portion of the collection after World War II when portions of the collection surfaced in Berne, Switzerland.

48.

49.      On April 26, 1938, the Nazi regime decreed all Jewish property in excess of 5,000 Reichsmarks ("RM") to be available to the Nazi Reich for Field Marshal Goering's Four Year Plan to build the Nazi war machine.

50.      The April 26, 1938 decree required all Jews with property in excess of 5,000 RM to declare their assets quarterly until the assets were gone or until the Jews left the Reich.

51.      Jews were forbidden to transfer declared property, including art, without permission from Nazi authorities.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

52.     As part of the process of securing Jewish assets to prevent transfers or sales, the Jewish Property Transaction Office (Vermögensverkehrsstelle) of Vienna commissioned inventories and valuation reports.   The Jewish victims were charged a fee for this process.

53.     A Vermögensverkehrsstelle inventory thus signified that Jewish assets were secured by the Nazi government.

54.     Pursuant to that process, the Vermögensverkehrsstelle commissioned Franz Kieslinger, an expert of the Dorotheum, to inventory Grünbaum's art collection while Grünbaum was in the Dachau Concentration Camp in 1938.

55.     The Kieslinger Inventory is part of the Elisabeth and Fritz Grunbaum Jewish Property files maintained in the Austrian State Archives. **Exhibit E** at 3, 14-16, 27, 40-43. (true copy of Fritz Grönbaum's July 16, 1938 Jewish Property Declaration, which declares the art collection and includes the Kieslinger Inventory).

56.     The Dorotheum was a Nazi-controlled auction house in Vienna used by the Nazi regime to sell art plundered from Jews and turn the proceeds over to the Nazi Reich.

57.     The Kieslinger Inventory shows Grönbaum's art collection to be valued at 5,791 RM.  **Exhibit G** at 16, 42.

58.     Grönbaum's art collection contained at least eighty-one works by the artist Egon Schiele.

59.     The stamps "Erledigt" ["done" or "completed"] and "Gesperrt" ["closed" or "blocked"] were official Nazi stamps indicating that the property of the Jewish person in question had been spoliated.

60.     Fritz's Jewish Property Declarations bears "Erledigt" and "Gesperrt" stamps. **Exhibit G** at 17, 43.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 22

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

61.     Because the art collection was inventoried and described in the Jewish Property Declarations, the "Erledigt" and "Gesperrt" stamps demonstrate conclusively that the Nazis stole Fritz Grünbaum's art collection.

62.     In November and December 1938, surrounding the Kristallnacht pogrom, the Nazis passed additional laws to steal Jewish property and to forbid Jews from engaging in property transactions without Nazi approval.

63.     One of the laws provided for "Aryan" trustees to be appointed to liquidate Jewish property.

64.     All proceeds from sales or transfers of Jewish property went to the Nazi Reich, with commissions to the Aryan trustees.

65.     Some time prior to January 1939, Vienna attorney Ludwig Rochlitzer was appointed Aryan trustee of the "property of the Grünbaums." **Exhibit H** (a true copy of a January 31, 1939 letter from Rochlitzer to Elisabeth announcing Rochlitzer's appointment as Aryan trustee for the Grünbaum property, together with certified English translation).

66.     From the time of Rochlitzer's appointment as Aryan trustee, neither Fritz nor Elisabeth had access to Fritz's art collection.

67.     Grünbaum never voluntarily abandoned his art collection during his lifetime.

**U.S. State Department Warns U.S. Museums, Colleges And Art Dealers Against Acquiring Potentially Stolen Artworks From Europe In Highly Publicized Campaign, Thus Putting The World On Notice**

68.     Following World War II, Nazi looting of artworks from Jewish victims received tremendous media attention in the United States.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM    INDEX NO. 654839/2022
NYSCEF DOC. NO. 22    RECEIVED NYSCEF: 03/09/2023

69.    Following World War II, the U.S. State Department put out bulletins to museums, universities, art dealers and others urging U.S. citizens to be vigilant against acquiring Nazi-looted artwork and asking for assistance in returning stolen art.

70.    Media and government efforts put the art and museum community on heightened notice that acquiring artworks that were in Europe after 1933 and created prior to 1946 without complete provenances.

71.    Accordingly, any U.S. person acquiring artworks that were in Europe after 1933 and created prior to 1946 without complete provenances cannot be prejudiced by the inaction of a Holocaust victim family in seeking to recover artworks stolen by Nazis because that person should have exercised vigilance prior to and after acquiring the artwork.

72.    The Museum was on inquiry notice prior to acquiring the Artwork that it might be stolen and failed to exercise appropriate diligence in acquiring the Artwork or to make reasonable efforts to ascertain the true owners of the Artwork prior to taking possession.

73.    New York law protects the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value.

*Solomon R. Guggenheim Found. v. Lubell,* 77 NY2d 311, 317-18 [1991]

74.    New York places the burden of investigating the provenance of a work of art on the potential purchaser in furtherance of discouraging the trade in stolen art. *Solomon R. Guggenheim Found. v. Lubell,* 77 N.Y.2d 311, 320-21 (1991).

**Grünbaum's Art Collection Surfaces In Switzerland In 1956**

75.    The Artwork is featured in a 1956 Gutekunst & Klipstein Sales catalogue of Egon Schiele's artworks as number 14. **Exhibit I (**a true copy of the 1956 Gutekunst & Klipstein Schiele sale catalogue, with certified English translation) at 19.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 22

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

76.    All artworks in the 1956 Gutekunst & Klipstein sales catalogue were stolen from Grünbaum, including the famous *Dead City III*, which was seized by the District Attorney Robert Morgenthau from the Museum of Modern Art in New York City in 1998. *Reif v. Nagy,* 175 A.D.3d 107 at 110, 114, 121.

77.    According to a Gutekunst & Klipstein invoice September 18, 1956 Otto Kallir purchased *Dead City III*, from Gutekunst & Klipstein together with 19 other artworks by Egon Schiele.  A true copy is attached hereto as **Exhibit J**.

78.    Examination of pre-war documentation prior to acquisition of the Artwork would have revealed evidence that it had been stolen from Grünbaum.

**Bakalar Sues The Grünbaum Heirs To Extinguish Rights In Grünbaum's Art Collection Using Fabricated Evidence**

79.    In 2005, Fischer and Vavra were sued by David Bakalar, a Massachusetts resident who sought to extinguish their rights in an Egon Schiele drawing stolen from Grünbaum titled *Seated Woman with Bent Left Leg* in an action captioned *Bakalar v. Vavra.*

80.    Bakalar had sought to auction *Seated Woman With Bent Left Leg* at Sotheby's in New York and London.

81.    In doing so, Bakalar promoted the false story that Grünbaum's sister-in-law Mathilde Lukacs obtained Grünbaum's art collection and sold it to Swiss art dealer Eberhard Kornfeld in 1956.

82.    The "Mathilde Lukacs" story, first floated in 1998 by Eberhard Kornfeld after *Dead City III*'s seizure, has long been derided by Holocaust scholars as implausible because Lukacs was herself imprisoned in Belgium during World War II after escaping Vienna.

83.    Bakalar succeeded in excluding as untimely an expert report of historian Dr. Jonathan Petropoulos debunking the Mathilde Lukacs provenance and excluding an expert report

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 22

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

on Czech law of Dr. Milan Kostohryz showing that the Vavra line of heirs was persecuted and trapped behind the Iron Curtain in Communist Czechoslovakia.

84.    Because of these exclusions of key evidence and because Eberhard Kornfeld denied the Grünbaum Heirs' handwriting expert access to handwriting samples of Mathilde Lukacs that would have demonstrated forgeries, the *Bakalar v. Vavra* case was not fully or fairly litigated.

85.    In 2006, the Southern District of New York denied Fischer's and Vavra's request to amend the pleadings to permit them to pursue additional artworks owned by Fritz Grünbaum. *Bakalar v. Vavra,* 237 F.R.D. 59 (S.D.N.Y. 2006).

86.    From 2005 to 2012, Fischer and Vavra unsuccessfully sought in *Bakalar v. Vavra* to assert a possessory interest in *Seated Woman with Bent Left Leg.*

87.    Following a bench trial, the district court concluded that Bakalar could not establish by a preponderance of the evidence that Grünbaum voluntarily relinquished possession of the drawing or that he did so intending to pass title. *Bakalar v. Vavra,* 819 F.Supp.2d 293 at 300.

88.    The district court further found that Mathilde Lukacs did not acquire valid title to the drawing.  819 F.Supp.2d 293 at 302-303.

89.    Despite Bakalar's inability to prove legal title, the Hon. William Pauley determined that inactions of predecessors-in-interest of Leon Fischer and Milos Vavra extinguished possessory rights of the Grünbaum Heirs, as against Bakalar, a Massachusetts purchaser who purchased an artwork in New York from Otto Kallir of Galerie St. Etienne, who had in turn purchased *Seated Woman with Bent Left Leg* from the 1956 Gutekunst & Klipstein sale together with 18 other Schiele artworks, including *Dead City III.*   819 F.Supp.2d 293, 305

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

(S.D.N.Y. 2011). The district court invoked the doctrine of laches to reach this result. The court applied laches in a manner inconsistent with the approach of New York common law courts to applying the equitable doctrine of laches and in a manner inconsistent with public policy protecting true owners of stolen artworks.

90.     On October 11, 2012, the Second Circuit Court of Appeals, in a summary (non-precedential) order, affirmed Judge Pauley's decision by finding it not clearly erroneous. *Bakalar v. Vavra*, 500 Fed. Appx. 6 (2d Cir. 2012).

91.     In doing so, the Second Circuit mistakenly relied on a fabricated version of the Grünbaum Heirs' case offered by the plaintiff that was nowhere contained in the record and --- when raised for the first time on appeal by plaintiff ---- had been vigorously contradicted by Vavra and Fischer. *Bakalar v Vavra*, 500 Fed Appx. 6, 7-8 (2d Cir. 2012) ("Vavra and Fischer's hypothesis—that the Nazis stole the Drawing from Grunbaum only to subsequently return or sell it to his Jewish sister-in-law—does not come close to showing that the district court's finding was clearly erroneous.").

92.     To underscore, neither Vavra nor Fischer ever argued that Nazis returned or sold artworks to Mathilde Lukacs (and the record contained no evidence to support this manufactured narrative).

93.     To the contrary, from the first pleadings, Vavra and Fischer argued that the story that Mathilde Lukacs sold Grünbaum's art collection to Gutekunst & Klipstein was entirely a fabrication.

94.     Also from the first pleadings, Vavra and Fischer argued that even if, assuming arguendo, the Mathilde Lukacs story were true, Lukacs would not have had good title, which, in turn, meant that she could not have given good title to Bakalar.

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

95.    *In Matter of Flamenbaum*, 22 N.Y.3d 962, 966 (2013), decided after *Bakalar*, clarified that, in the context of missing testimony relevant to a laches defense, the proponent of the defense must show that the missing evidence would have been relevant to establishing legal title.  ("although the decedent's testimony may have shed light on how he came into possession of the (artwork), we can perceive of no scenario whereby the decedent could have shown that he held (good) title").

**In The Wake Of *Bakalar*, And Prior to *Reif v. Nagy*, Three Art Dealers Conspire To Strip German Lost Art Database (www.lostart.de) of Grünbaum Claims**

96.    During the course of the *Bakalar* litigation, Grünbaum's heirs were criticized for not having registered search requests related to Grünbaum's art collection on the Lost Art Database located at www.lostart.de.

97.    Accordingly, Vavra and Fischer registered the "search requests" based on the Kieslinger inventory and other pre-World War II material to artworks that appeared circumstantially to fit the description of artworks lost by Grünbaum.

98.    Below is the Lost Art Database's description of what "search requests" are:

*Lost Art Database*

*The Lost Art Database documents cultural property expropriated as a result of Nazi persecution, especially from Jewish owners, between 1933 and 1945 ("Nazi-looted art"), or for which such a loss cannot be ruled out. With the help of the publication of so-called Search Requests and Found-Object Reports, former owners or their heirs are to be brought together with current owners and thus support all stakeholders in finding a just and fair solution.*

*The Lost Art Database also contains reports on cultural property that was removed as a result of the Second World War ("trophy art"). Their publication is intended to support solutions in accordance with international law. The Lost Art Database is accessible worldwide free of charge. www.lostart.de/en/start*

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM
NYSCEF DOC. NO. 22

INDEX NO. 654839/2022
RECEIVED NYSCEF: 03/09/2023

99.    On September 23, 2015, German attorney Jutta von Falkenhausen wrote to the Lost Art Database on behalf of Galerie Kornfeld Verlag AG (Bern) represented by Christine Stauffer, Galerie St. Etienne (New York) represented by Jane Kallir, and Richard Nagy Ltd. (London) represented by Richard Nagy. **Exhibit K** (true copy of von Falkenhausen's letter)**.**

100.    Relying on *Bakalar v. Vavra* and on Austrian decisions that, in turn, relied on *Bakalar v. Vavra* and the fabricated "Mathilde Lukacs" story, von Falkenhausen demanded that the Lost Art Database delist certain of the Grünbaum heirs' claims.

101.    Von Falkenhausen's request included Schiele's *Dead City III* and the *Red Blouse*, both of which are located at the Leopold Museum in Vienna.  **Exhibit K** at 12.

102.    Over the Grünbaum Heirs' objections, the Lost Art Database erased the Grünbaum Heirs' claims, in particular, the claims relating to artworks in the 1956 Gutekunst & Klipstein Schiele sale.

103.     Today, if one types in the name "Grünbaum" one will find a number of requests. Under "status" it states "This announcement is contradicted by third parties."  **Exhibit L** (Mountain Landscape (Farmhouse in the Tirol) Lost art-ID 478864.  On August 26, 2018, the New York Times reported on the dispute between the Grünbaum Heirs and the Lost Art Database in the article by William Cohan: *Jewish Heirs Take on an Art Foundation That Rights Nazi Wrongs* **Exhibit M**. https://www.nytimes.com/2018/08/26/arts/design/nazi-art-egon-schiele-fritz-grunbaum.html.

***Reif v. Nagy* Debunks Fabricated Mathilde Lukacs Provenance**

104.    In November 2015, shortly after learning that two other Egon Schiele artworks from the 1956 Gutekunst & Klipstein sale catalogue (*Woman Hiding Her Face* and *Woman In Black Pinafore*) were displayed by London art dealer Richard Nagy at the Park Avenue Armory,

FILED: NEW YORK COUNTY CLERK 03/09/2023 06:41 PM

NYSCEF DOC. NO. 22

INDEX NO. 654839/2022

RECEIVED NYSCEF: 03/09/2023

Reif, Fraenkel and Vavra commenced *Reif v. Nagy* in the New York State Supreme Court, New York County.

      105.    The Supreme Court, Ramos, J., after carefully considering expert testimony from Dr. Petropoulos and Dr. Kostohryz that had been excluded in the *Bakalar* case, granted summary judgment on the plaintiffs' replevin and conversion claims. *Reif v. Nagy,* 61 Misc.3d at 330, 80 N.Y.S.3d at 367.

      106.    Justice Ramos found that the Nazis confiscated Fritz Grünbaum's artworks by forcing him to sign the power of attorney to his wife, who was herself later murdered by the Nazis, and that the act of signing the power of attorney was involuntary: "[a] signature at gunpoint cannot lead to a valid conveyance." *Id.,* 61 Misc.3d at 326, 80 N.Y.S.3d at 634.

      107.    In affirming, the Appellate Division, First Department, determined that the power of attorney the Nazis forced Fritz to execute in favor of Elisabeth while Fritz was imprisoned in Dachau was not voluntarily executed, "reject[ing] the notion that a person who signed a power of attorney in a death camp can be said to have executed the document voluntarily." *Reif v. Nagy,* 175 A.D.3d 107, 129, 106 N.Y.S.3d 5, 21 (First Dept. 2019).

      108.    The First Department concluded Elisabeth was never able to convey good title. 175 A.D.3d at 129, 106 N.Y.S.3d at 21.

      109.    The First Department determined that Grönbaum's art collection "never legally left Austria." 175 A.D.3d at 111.

      110.    The First Department also determined that the art collection was in Austria on June 30, 1939, after Grönbaum's sister-in-law Mathilde Lukacs had fled Vienna for Belgium. 175 A.D.3d at 112.