**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

───────────────────────────────

**TIMOTHY REIF, ET AL.,**

                    **Plaintiffs,**            **23-cv-2443 (JGK)**

        **- against -**

**THE ART INSTITUTE OF CHICAGO,**              **OPINION AND ORDER**

                    **Defendant,**

**AN ARTWORK, RUSSIAN PRISONER OF WAR**
**(1916) BY THE ARTIST EGON SCHIELE,**

          **Defendant-in-Rem.**

───────────────────────────────

**JOHN G. KOELTL, District Judge:**

The plaintiffs Timothy Reif, David Fraenkel, and Milos Vavra -- the heirs of Franz Freidrich ("Fritz") Grünbaum -- brought this diversity action against the Art Institute of Chicago ("the defendant"). The plaintiffs assert claims for declaratory judgment, conversion, and replevin, arising out of the alleged theft of Russian Prisoner of War (1916) created by Egon Schiele ("the Artwork").[1] The Artwork was allegedly stolen from Grünbaum by the Nazi regime while Grünbaum was imprisoned in the Dachau Concentration Camp.

The plaintiffs originally filed this action in New York State Supreme Court, New York County, on December 14, 2022. Am. Compl. ¶ 29, ECF No. 15. The action was removed to this Court based on diversity of citizenship jurisdiction on March 22,

───────────────

[1] Russian Prisoner of War (1916) is a drawing with watercolor, with another black-and-white drawing on its recto (back). Am. Compl. ¶¶ 1-2, ECF No. 15.

2023. ECF No. 1.[2] The plaintiffs filed an amended complaint on March 31, 2023. ECF No. 15. The defendant filed a motion to dismiss the amended complaint on June 8, 2023, arguing that the plaintiffs' claims were barred by the statute of limitations and laches. Def.'s Mot. to Dismiss, ECF No. 31. The plaintiffs filed a cross-motion for summary judgment on June 29, 2023. ECF No. 35.

For the reasons set forth below, the defendant's motion to dismiss the amended complaint is **granted**, and the plaintiffs' cross-motion for summary judgment is **denied** without prejudice.

**I.**

Unless otherwise indicated, the following facts are taken from the amended complaint and are accepted as true for purposes of deciding the defendant's motion to dismiss.

Fritz Grünbaum was a Jewish Viennese cabaret performer, Am. Compl. ¶ 11, who had a collection of works by Austrian expressionist artist Egon Schiele, id. ¶ 71. The plaintiffs, Grünbaum's heirs, allege that Grünbaum involuntarily lost his collection prior to his death. Id. ¶ 41. Grünbaum was arrested by the Gestapo on March 22, 1938, and imprisoned in the Dachau

---

[2] Reif is a citizen of the State of New York. Fraenkel is a citizen of the State of Florida. Vavra is a citizen of the Czech Republic. The Art Institute of Chicago is a not-for-profit corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois, and is a citizen of the State of Illinois. Notice of Removal at 2, ECF No. 1; Am. Compl. ¶¶ 13-16.

Concentration Camp. Id. ¶ 11. On April 27, 1938, the Nazi regime passed a law requiring Jews with property valued over 5,000 Reichsmarks to declare and forfeit their property to the regime. Id. ¶ 32. On July 16, 1938, in the Dachau Concentration Camp, Nazis allegedly forced Grünbaum under duress to sign a power of attorney permitting his wife Elisabeth to liquidate his assets and hand the proceeds over to the regime. Id. ¶ 34. As a result, from 1938 to 1939, Elisabeth was forced to liquidate Grünbaum's assets. Id. ¶ 36. Among these assets were eighty-one works by Schiele, which were inventoried by a Nazi-controlled auction house that sold art seized from Jews. Id. ¶¶ 68-69, 71. Grünbaum was murdered in Dachau on January 14, 1941. Id. ¶ 11. On Grünbaum's death, both Elisabeth and a Vienna notary certified that Grünbaum had no property. Id. ¶ 37. On October 5, 1942, Elisabeth was deported to the Maly Trostinec death camp in Minsk, where she was murdered. Id. ¶ 38. Fritz and Elisabeth Grünbaum had separate property under Austrian law, and Elisabeth's June 1939 Jewish Property Declaration shows that all her property had been taken by the Nazi regime before she was murdered. Id. ¶¶ 39-40.

The plaintiffs allege that, in 1999, Leon Fischer and Milos Vavra first learned that Grünbaum's art collection survived World War II, when District Attorney Robert Morgenthau seized Grünbaum's Dead City III by Schiele at the Museum of Modern Art

in New York City. Id. ¶ 47. Upon learning of the existence of Grünbaum's art collection, Fischer and Vavra began to pursue it. Id. ¶ 50. In 2002, Fischer and Vavra were each declared an heir of Fritz Grünbaum's estate entitled to an undivided, fifty-percent (50%) share, pursuant to a Certificate of Heirship issued by the District Court Innere Stadt Vienna. Id. ¶ 46.

In 2005, Fischer and Vavra were sued by David Bakalar, who sought to extinguish their rights in Seated Woman with Bent Left Leg (Torso), a Schiele drawing that Bakalar purchased in 1964. Id. ¶¶ 92-93, 106. After a bench trial, a court in this District applying Swiss law initially awarded judgment to Bakalar. Bakalar v. Vavra, No. 05-cv-3037, 2008 WL 4067335 (S.D.N.Y. Sept. 2, 2008). The Court of Appeals for the Second Circuit vacated the judgment and remanded, holding that New York law, rather than Swiss law, should be applied. Bakalar v. Vavra, 619 F.3d 136 (2d Cir. 2010). On remand, the district court found that "Bakalar c[ould] not establish by a preponderance of the evidence that Grunbaum voluntarily relinquished possession of the [d]rawing, or that he did so intending to pass title."[3] Bakalar v. Vavra, 819 F. Supp. 2d 293, 300 (S.D.N.Y. 2011). The court also found that Bakalar did not satisfy his burden of proving that Mathilde Lukacs -- Grünbaum's sister-in-law who

---

[3] Unless otherwise noted, this Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

sold the drawing to Gallery Gutekunst & Klipstein in 1956 --
acquired valid title in the drawing. See id. at 295, 299-302.
However, the court held that Fischer and Vavra's "claims against
Bakalar [we]re barred by laches" because they or their ancestors
knew or should have known about a potential claim, and Bakalar
was prejudiced by their delay. Id. at 304-07. The Court of
Appeals for the Second Circuit affirmed the judgment in favor of
Bakalar, holding that "there [wa]s no clear error in the
findings that Vavra and Fischer's ancestors knew or should have
known of a potential claim to the [d]rawing, that they took no
action in pursuing it, and that Bakalar was prejudiced in this
litigation as a result of that delay." Bakalar v. Vavra, 500 F.
App'x 6, 9 (2d Cir. 2012).

On January 24, 2006, as part of the Bakalar litigation,
Fischer and Vavra made a demand on the Art Institute of Chicago,
the defendant in this case, to return Russian Prisoner of War,
the Artwork at issue in this case. Lonergan Decl., Ex. C, ECF
No. 32-3; Oral Arg. Tr. at 29:18-21, ECF No. 72 ("Tr."). This
was because the Artwork in this case and the work in Bakalar
were both part of a common collection -- Grünbaum's Schieles
sold by Mathilde Lukacs to Gallery Gutekunst & Klipstein in 1956
-- before they were eventually sold to Bakalar and the defendant
in this case in the 1960s. Bakalar, 819 F. Supp. 2d at 295; Am.
Compl. ¶¶ 23, 87, 102, 155, 162. On February 3, 2006, the

defendant declined to return the Artwork. Lonergan Decl., Ex. D, ECF No. 32-4.

In February 2012, Fischer appointed Reif and Fraenkel as executors of his estate in a last will and testament. Am. Compl. ¶ 48. Fischer created the Leon Fischer Trust for the Life and Work of Fritz Grünbaum, id. ¶ 52, of which Reif and Fraenkel are co-trustees, id. ¶ 53. Fischer died in August 2013. Id. ¶ 49.

In November 2015, Reif, Fraenkel, and Vavra filed an action in New York State Supreme Court, New York County, against London art dealer Richard Nagy and Richard Nagy Ltd. for two other Schiele works, titled Woman Hiding Her Face and Woman in Black Pinafore. Id. ¶ 124. Although the two works in Nagy were part of the same collection of Grünbaum's Schieles that included the work at issue in Bakalar and the Artwork at issue in this case, Reif v. Nagy, 80 N.Y.S.3d 629, 631 (Sup. Ct. 2018); Am. Compl. ¶¶ 23, 87, 102, the Nagy defendants purchased the two Schiele works in December 2013, Nagy, 80 N.Y.S.3d at 631. The New York State Supreme Court granted summary judgment to the plaintiffs on the plaintiffs' replevin and conversion claims, holding that the defendants' "statute of limitations and laches defenses fail[ed]." Id. at 635. The Appellate Division affirmed, holding that the Nagy defendants, having acquired the works at issue in 2013, "suffered no change in position[,] [n]or was any evidence lost between defendants' acquisition and plaintiffs' demand for

the return of the [a]rtworks." <u>Reif v. Nagy</u>, 106 N.Y.S.3d 5, 22
(App. Div. 2019). In fact, "Nagy was on notice of plaintiffs'
claims to the Grunbaum collection prior to the purchase, as he
filed a brief in the Bakalar action[,] . . . purchased the
[a]rtworks at a substantial discount from the price sought by
Sotheby's prior to the claim being publicized, and . . .
obtained insurance for the very purpose of insuring title
against plaintiffs' claims." <u>Id.</u> at 22-23.

## II.

The defendant moves to dismiss the plaintiffs' claims
pursuant to Federal Rule of Civil Procedure 12(b)(6).

In deciding a Rule 12(b)(6) motion to dismiss for failure to
state a claim, the Court must accept the allegations in the
complaint as true and draw all reasonable inferences in the
plaintiff's favor. <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d
184, 191 (2d Cir. 2007). The Court's function on a motion to
dismiss is "not to weigh the evidence that might be presented at
a trial but merely to determine whether the complaint itself is
legally sufficient." <u>Goldman v. Belden</u>, 754 F.2d 1059, 1067 (2d
Cir. 1985). To survive a motion to dismiss, the plaintiff's
complaint "must contain sufficient factual matter, accepted as
true, to state a claim for relief that is plausible on its face."
<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A claim has facial
plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss, the Court may consider documents attached to or referenced in the complaint, documents that the plaintiff either possessed or knew about and relied on in bringing the lawsuit, or matters of which judicial notice may be taken. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). In particular, courts may take judicial notice of court documents and other public records. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras, No. 98-cv-3099, 2001 WL 300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) (taking judicial notice of "relevant pleadings, motion papers, orders, and judgments in [a] [separate] [c]ourt [a]ction" in resolving a Rule 12(b)(6) motion to dismiss). The purpose of taking judicial notice of such documents is to determine what statements the documents contained, not to establish the truth of the matters asserted therein. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Kramer, 937 F.2d at 774 ("[C]ourts routinely take

judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.").

### III.

In this case, the defendant argues that the plaintiffs' amended complaint must be dismissed pursuant to Rule 12(b)(6) because the claims are barred by the statute of limitations and laches. "[B]ecause the defendant[] bear[s] the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." Fargas v. Cincinnati Mach., LLC, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013). A court may grant a motion to dismiss based on an affirmative defense such as laches where "the complaint itself establish[es] the circumstances required as a predicate to a finding that the affirmative defense applies." In re Sept. 11 Prop. Damage & Bus. Loss Litig., 481 F. Supp. 2d 253, 258 (S.D.N.Y. 2007). The Court addresses the statute of limitations and laches in turn.

#### A. Statute of Limitations

##### 1. Applicable Law

A preliminary question is what law governs the statute of limitations in this case. The parties raise various arguments, citing both New York and Illinois laws. "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in

New York must apply the New York . . . statutes of limitations." Thea v. Kleinhandler, 807 F.3d 492, 497 (2d Cir. 2015). As a result, this Court, which sits in New York and hears this action brought in diversity, must apply the New York laws on statutes of limitations.

### 2. New York Statute of Limitations

Applying the New York laws on the statute of limitations, the plaintiffs' claims against the defendant are time-barred.

The defendant argues that the New York statute of limitations for conversion and replevin should apply, namely the three-year statute of limitations in N.Y. C.P.L.R. § 214(3). See Def.'s Mot. to Dismiss at 11. The plaintiffs argue that a longer Illinois statute of limitations should apply. See Pls.' Opp'n at 4, ECF No. 38. New York has a specific statutory provision that applies to a claim that accrues outside New York, namely N.Y. C.P.L.R. § 202, and that provision must be applied in this diversity action. See Thea, 807 F.3d at 497. N.Y. C.P.L.R. § 202 provides: "An action based upon a cause of action accruing without [New York] cannot be commenced after the expiration of the time limited by the laws of either [New York] or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of [New York] the time limited by the laws of [New York] shall apply." In other words, "when a nonresident plaintiff sues upon a cause

10

of action that arose outside of New York, the court must apply
the shorter limitations period, including all relevant tolling
provisions, of either: (1) New York; or (2) the state where the
cause of action accrued."[4] Thea, 807 F.3d at 497 (emphasis
added).

This cause of action accrued in Illinois, where the
defendant refused the plaintiffs' demand to return the Artwork.
In diversity cases, state law governs not only the limitations
period but also the commencement of the statute of limitations.
See Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d
Cir. 2002). In New York, the statute of limitations on
conversion and replevin claims accrues -- against innocent
purchasers[5] -- when there is a demand and refusal. See Grosz v.
Museum of Mod. Art, 772 F. Supp. 2d 473, 482 (S.D.N.Y. 2010),
aff'd, 403 F. App'x 575 (2d Cir. 2010). It follows that
conversion and replevin claims also accrue where the demand is
refused. See, e.g., Kunstsammlungen Zu Weimar v. Elicofon, 678
F.2d 1150, 1152–53, 1160-61 (2d Cir. 1982) (applying N.Y.
C.P.L.R. § 214(3) -- indicating that the conversion and replevin

---

[4] As applicable to this case, where the New York statute of limitations is
shorter than the statute of limitations of the state where the cause of
action accrued, the result is the same whether the plaintiffs are New York
residents or not: the New York statute of limitations applies.
[5] Though not applicable to this case, in New York, the statute of limitations
begins to run against bad faith possessors at the time of acquisition. See
Grosz v. Museum of Mod. Art, 772 F. Supp. 2d 473, 481–82 (S.D.N.Y. 2010)
(citing Close-Barzin v. Christie's, Inc., 857 N.Y.S.2d 545 (App. Div. 2008)),
aff'd, 403 F. App'x 575 (2d Cir. 2010).

claim accrued in New York -- where the defendant refused the demand in New York). Conversion and replevin claims are distinguishable from claims for damages, in which claims arise where the plaintiff sustains the economic impact of the loss, often where the plaintiff resides. See Thea, 807 F.3d at 498. Indeed, the plaintiffs in this case seek the return of the Artwork, rather than damages. See Am. Compl. ¶ 1. Therefore, the shorter statute of limitations of either New York or Illinois -- where the plaintiffs' claims accrued -- must apply.

The New York statute of limitations for the plaintiffs' claims is three years from the date of accrual. See Wallace Wood Properties v. Wood, 117 F. Supp. 3d 493, 497 (S.D.N.Y. 2015), aff'd, 669 F. App'x 33 (2d Cir. 2016) (for conversion and replevin); Grosz, 772 F. Supp. 2d at 481 (for declaratory judgment based on conversion and replevin). The Illinois statute of limitations is five years from the date of accrual, see 735 Ill. Comp. Stat. Ann. 5/13-205, also upon refusal of a demand, see First Illini Bank v. Wittek Indus., Inc., 634 N.E.2d 762, 763 (Ill. App. Ct. 1994) (citing Solomon R. Guggenheim Found. v. Lubell, 569 N.E.2d 426 (N.Y. 1991)). Thus, the statute of limitations applicable to this case is the shorter, New York statute of limitations: three years after the accrual of the plaintiffs' claims.

The plaintiffs brought this action more than three years after their claims accrued. In New York, the three-year statute of limitations begins to run after the plaintiff has demanded return of the chattel and such demand has been refused. See Grosz, 772 F. Supp. 2d at 481-82; Lubell, 569 N.E.2d at 429-30; Howard Univ. v. Borders, 588 F. Supp. 3d 457, 468 (S.D.N.Y. 2022). In this case, the plaintiffs' claims accrued and the statute of limitations began to run on February 3, 2006, when the defendant refused by email to return the Artwork during the Bakalar litigation. See Lonergan Decl., Ex. D. The statute of limitations expired three years later, on February 3, 2009, long before the plaintiffs brought this action in New York state court in December 2022. Accordingly, the plaintiffs' claims are time-barred under New York's statute of limitations.

### 3. HEAR Act: Statute of Limitations

The Holocaust Expropriated Art Recovery Act Of 2016 ("HEAR Act") does not save the plaintiffs' time-barred claims.

By way of background, Congress enacted the HEAR Act in 2016 to "remedy th[e] injustice" that is "the unique and horrific circumstances of World War II and the Holocaust[.]" S. Rep. No. 114-394, at 5 (2016). More specifically, Congress sought to address "[s]tate statutes of limitations[,] [which] can be an unfair impediment to the victims and their heirs[.]" Id. Accordingly, the HEAR Act facilitates the return of Nazi-stolen

artwork to Holocaust victims, heirs, and their survivors by preempting state statutes of limitations and imposing a uniform nationwide six-year statute of limitations. See HEAR Act, Pub. L. No. 114-308, § 5(a), 130 Stat. 1524, 1526 (2016) ("a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during [the period between 1933 and 1945] because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant . . . ."). Generally, the HEAR Act revives causes of action, which may otherwise have been time-barred, for six years after the Holocaust victim, heir, or survivor first learns of the existence of the Nazi-stolen artwork.

However, Congress did not intend to revive claims where the parties had a reasonable opportunity to bring their claims but failed to do so. One of the stated purposes of the HEAR Act is to ensure that claims to recover art lost in the Holocaust are "resolved in a just and fair manner." HEAR Act § 3(2). To allow potential claimants to wait indefinitely to bring a claim would be neither just nor fair. Thus, Congress carved out a narrow exception in the HEAR Act. The Act provides, in relevant part:

> (e) EXCEPTION.—Subsection (a) shall not apply to any civil claim or cause of action barred on the day before the date of enactment of this Act [i.e. December 16, 2016] by a Federal or State statute of limitations if—
> (1) the claimant or a predecessor-in-interest of the claimant had knowledge of the elements set forth in subsection (a) on or after January 1, 1999; and

14

> (2) not less than 6 years have passed from the date such claimant or predecessor-in-interest acquired such knowledge and during which time the civil claim or cause of action was not barred by a Federal or State statute of limitations.

HEAR Act § 5(e). The Senate Judiciary Committee Report for the HEAR Act explains:

> Subsection (e) states that claims do not benefit from the HEAR Act limitations period if the claimant had the relevant actual knowledge on or after January 1, 1999, not less than six years have passed from the date the claimant . . . had such knowledge, <u>during any portion of that time the claim was timely</u> and, nonetheless, the claimant failed to bring it.

S. Rep. No. 114-394, at 10 (emphasis added). <u>See also</u> <u>Zuckerman</u> <u>v. Metro. Museum of Art</u>, 928 F.3d 186, 196-97 (2d Cir. 2019) (relying on this Senate Report to interpret the HEAR Act). In other words, the HEAR Act does not revive causes of action where the potential claimant or a predecessor-in-interest knew about a possible cause of action after 1999,[6] could have brought a timely claim, but waited more than six years to bring a claim. This exception is clearly aligned with Congress's intent to "quiet[] title in property generally" and ensure "that claimants assert their rights in a timely fashion." S. Rep. No. 114-394, at 10.

---

[6] The effect of having the operative year be 1999 is that Holocaust victims, heirs, and survivors are not penalized for having a predecessor-in-interest who knew about a possible claim but could not act on their knowledge due to the political climate in Europe through the 1990s. Put differently, the HEAR Act specifically addresses the plaintiffs' appeal that "[u]ntil at least the fall of the Iron Curtain in 1991, a line of Grünbaum's heirs were in Czechoslovakia, a totalitarian Communist State that did not recognize private property and where Jewish persons with private wealth would be in danger of expropriation and persecution." Am. Compl. ¶ 45.

The plaintiffs' claims fall squarely within the exception of the HEAR Act. The plaintiffs' claims were time-barred on February 3, 2009 -- years before December 15, 2016, the day before the date of enactment of the HEAR Act -- by the New York statute of limitations. See HEAR Act § 5(e). Also, the plaintiffs had knowledge of the elements set forth in subsection 5(a) of the Act -- the identity and location of the Artwork (Russian Prisoner of War at the Art Institute of Chicago) as well as a possessory interest of the plaintiffs in the Artwork (prompting their demand email) -- on February 3, 2006, which was "on or after January 1, 1999." Lonergan Decl., Exs. C-D; see also HEAR Act § 5(e)(1). Finally, over nine years -- that is, "not less than 6 years" -- had passed between the date the plaintiffs acquired such knowledge (a date no later than February 3, 2006) and December 15, 2016. See HEAR Act § 5(e)(2).

Reading the HEAR Act as the Senate Report instructs, the plaintiffs' claims did not have to be timely for the entire six-year period, see S. Rep. No. 114-394, at 10 ("during any portion of that time the claim was timely"), as long as "[t]he claimant . . . had . . . an opportunity to bring a claim that was not time-barred during that six year period[,]" id. at 11. In fact, the Senate Report explicitly addresses the situation that the plaintiffs find themselves in: "[I]f the relevant conditions are met and the claim arose after 1999; the applicable limitations

16

period was three years; and three years elapsed before the HEAR Act was enacted, the claim would fall under the 5(e) exception." Id. As the Senate Report demonstrates, the plaintiffs' claims fall under the 5(e) exception because: the claims arose after 1999 (namely, on February 3, 2006); the applicable limitations period was three years (the New York statute of limitations); and three years elapsed on February 3, 2009, before the HEAR Act was enacted on December 16, 2016. Indeed, this is consistent with the Senate Report's explanation that "[t]he six year period in subsection 5(e) reflects [the six-year period] in subsection 5(a), but it is not intended to extend shorter limitations periods that came and went prior to the enactment of the HEAR Act." S. Rep. No. 114-394, at 11.[7]

The plaintiffs argue that "[b]ecause the Grünbaum Heirs' claims were time-barred prior to January 1, 1999 and because the Grünbaum Heirs did not acquire a possessory interest under Austrian law until 2002, the Grünbaum Heirs' claims do not fall under the HEAR Act's exception[.]" Pls.' Opp'n at 47. However, the plaintiffs have simply confused the undisputed facts. The plaintiffs were indeed given rights in 2002 under Austrian law as heirs of the Grünbaum estate. Thereafter, they made a demand

---

[7] It is unnecessary to reach the defendant's additional argument that the plaintiffs' claims fall outside the scope of the HEAR Act, see HEAR Act § 5(a), because the plaintiffs are collaterally estopped from relitigating the finding in Bakalar that Grünbaum's Schieles were "not looted by the Nazis[,]" 819 F. Supp. 2d 293, 299 (S.D.N.Y. 2011).

for the return of the Artwork in February 2006, which was
refused, and the statue of limitations then began to run under
New York law. For the following three years -- until February
2009 -- they could have brought a timely claim in New York for
the return of the Artwork. But they failed to do so. Indeed,
they failed to bring a claim for more than six years. This
period of time was after 1999 and was prior to the enactment of
the HEAR Act. This is plainly not the type of action that the
HEAR Act was drafted to resurrect. As a result, the plaintiffs
cannot and should not benefit from the HEAR Act, see HEAR Act §
5(e), which was not enacted to revive a claim that the
plaintiffs had a reasonable opportunity to bring but failed to
bring, see S. Rep. No. 114-394, at 11.[8]

### B. Laches

In addition to being time-barred, the plaintiffs' claims
are barred by laches.

---

[8] The plaintiffs asserted -- for the first time at oral argument -- that the
plaintiffs could not have timely filed their claims between 2006 and 2009
because "[t]here was no remedy." Tr. 36:10. The plaintiffs claimed that
denial of class certification in Bakalar meant that the claims had to be
litigated in the states where the individual artworks were located, and this
cause of action was already time-barred in Illinois, where the Artwork was
located. Id. This argument was forfeited because it was not raised in the
plaintiffs' papers. It is also contrary to the plaintiffs' complaint in this
action, which was originally brought in New York state court and alleged that
the tort occurred in New York County because one or more of the Grünbaum
heirs resided in New York County and the Artwork was tortuously removed from
New York County. See Notice of Removal, Exh. A at 6-7, ECF No. 1-1.

## 1. HEAR Act: Defenses

As an initial matter, the HEAR Act does not affect the defendant's ability to assert the defense of laches. Although, generally, "laches cannot be invoked to bar legal relief" against "a statute of limitations enacted by Congress," the Court of Appeals for the Second Circuit has held that "[t]his general rule does not apply to the HEAR Act." Zuckerman, 928 F.3d at 196 (distinguishing SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 580 U.S. 328, 334-35 (2017); Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 679 (2014)). "While the HEAR Act revives claims that would otherwise be untimely under state-based statutes of limitations, it allows defendants to assert equitable defenses like laches." Id. "The statute explicitly sets aside defenses at law relating to the passage of time." Id. (citing HEAR Act § 5(a)). "It makes no mention of defenses at equity. A major departure from the long tradition of equity practice should not be lightly implied." Id. (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). Moreover, the Senate Committee Report accompanying the statute unequivocally indicates that the Act does not preclude equitable defenses. See id. (citing S. Rep. No. 114-394, at 7). The Court of Appeals for the Second Circuit recently cited Zuckerman in its laches analysis in Republic of Turkey v. Christie's Inc., 62 F.4th 64, 72 (2d Cir. 2023).

The plaintiffs argue that "[i]n the face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief within the time period prescribed by Congress." Pls.' Opp'n at 63 (citing SCA Hygiene Prods., 580 U.S. at 346; Petrella, 572 U.S. at 664). However, the Court of Appeals for the Second Circuit explicitly rejected that argument and acknowledged the same Supreme Court cases in Zuckerman because the express terms and legislative history of the HEAR Act exempt equitable defenses. The plaintiffs also claim that Zuckerman "did not apply the HEAR Act." Id. at 64. But that assertion is plainly wrong. Zuckerman did, in fact, interpret the HEAR Act and found that "it allows defendants to assert equitable defenses like laches." 928 F.3d at 196. Accordingly, the HEAR Act does not preclude the defendant from asserting the equitable defense of laches.

### 2. Collateral Estoppel

Having found that the defendant may assert the defense of laches, it is plain that the plaintiffs' claims are barred by laches as decided in Bakalar. Moreover, the plaintiffs are collaterally estopped from relitigating that issue.

"Collateral estoppel prevents a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the causes of action are the same." Simmons v.

20

Trans Express Inc., 170 N.E.3d 733, 737 (N.Y. 2021). Because
"the consequences of a determination that a party is
collaterally estopped from litigating a particular issue are
great, strict requirements for application of the doctrine must
be satisfied." Gramatan Home Invs. Corp. v. Lopez, 386 N.E.2d
1328, 1331 (N.Y. 1979). First, "[t]he doctrine applies only
where the issue in the second action is identical to an issue
which was raised, necessarily decided[,] and material in the
first action." Simmons, 170 N.E.3d at 737. "What is controlling
is the identity of the issue which has necessarily been decided
in the prior action or proceeding. Of course, the issue must
have been material to the first action or proceeding and
essential to the decision rendered therein." Ryan v. N.Y. Tel.
Co., 467 N.E.2d 487, 490 (N.Y. 1984).

The issue here -- whether plaintiffs' claims are barred by
laches -- is identical to the issue in Bakalar, and that issue
was raised, necessarily decided, and material to the decision in
Bakalar. The defendants in Bakalar were the Grünbaum heirs, the
same plaintiffs here against whom the defense of laches is
asserted.[9] In Bakalar, the district court clearly considered
whether: "(1) [the Grünbaum heirs] were aware of their claim,

---

[9] In Bakalar v. Vavra, David Bakalar (the plaintiff) sued the Grünbaum heirs
Milos Vavra and Leon Fischer (the defendants). The same Grünbaum heirs -- now
Milos Vavra and the co-executors of Leon Fischer's estate and co-trustees of
the Leon Fischer Trust (Timothy Reif and David Fraenkel) -- are the
plaintiffs in this case against the defendant the Art Institute of Chicago.

(2) they inexcusably delayed in taking action; and (3) Bakalar
was prejudiced as a result." 819 F. Supp. 2d at 303 (citing the
elements of laches as set out in Ikelionwu v. United States, 150
F.3d 233, 237 (2d Cir. 1998)). The district court found: "Given
[both Vavra's and Fischer's ancestors' awareness of their
relationship to the Grunbaums and their eventual deaths in
concentration camps], . . . [the plaintiffs'] ancestors were
aware of—or should have been aware of—their potential intestate
rights to Grunbaum property, and Vavra and Fischer [we]re bound
by the knowledge of their respective families." Id. at 305. It
also found that "Vavra's and Fischer's ancestors were not
diligent in pursuing their claims to the [d]rawing." Id. at 306.
Finally, it found that "[t]he resulting prejudice to Bakalar
[wa]s clear[:]" The plaintiffs' delay in pursuing their claims
"resulted in deceased witnesses, faded memories, lost documents,
and hearsay testimony of questionable value." Id. The court
pointed particularly to the death of Mathilde Lukacs in 1979,
perhaps the only person who could have explained the manner in
which she obtained the work at issue, or indeed, whether she
owned it at all. Id.[10]

---

[10] The plaintiffs argue that, since Bakalar, In re Flamenbaum, 1 N.E.3d 782
(N.Y. 2013), changed the law and requires that a missing witness in an
alleged chain of legal title, for laches purposes, needs to be shown to have
been able to demonstrate legal title. Pls.' Opp'n at 45, ECF No. 38. But, as
the defendant argues, Flamenbaum did not purport to change the New York law
of laches. See Def.'s Reply at 13-14, ECF No. 41. In Flamenbaum, the New York
Court of Appeals found that the defendant in that case was not prejudiced by

Indeed, the Bakalar court seemed to anticipate this very case. The court held that "where several items are treated collectively for the purposes of knowledge, the current possessor may show a lack of diligence with respect to the collection as a whole, rather than the individual items." Id. at 304-05. This is because to hold otherwise "would defeat laches in virtually every case." Id. at 304. The Court of Appeals for the Second Circuit upheld these findings. See Bakalar, 500 F. App'x at 9. The Court of Appeals concluded: "In sum, there is no clear error in the findings that Vavra and Fischer's ancestors knew or should have known of a potential claim to the Drawing, that they took no action in pursuing it, and that Bakalar was prejudiced in this litigation as a result of that delay. It was therefore sound to recognize Bakalar's title on the basis of his laches defense." Id.

Accordingly, the plaintiffs lacked diligence not only with respect to the work in Bakalar but also with respect to the collection as a whole -- namely Grünbaum's Schieles that went through Mathilde Lukacs and Galerie Gutekunst & Klipstein --

---

the death of the relevant witness because there was "no scenario whereby the decedent could have shown that he held title to this antiquity[,]" the proposition for which the decedent would have testified. In re Flamenbaum, 1 N.E.3d at 784; see also Def.'s Reply at 14. In this case, however, Mathilde Lukacs (Grünbaum's sister-in-law) could have spoken to title and the circumstances pursuant to which she obtained the Artwork. Moreover, the absence of Lukacs was only one of a number of indicia of prejudice that Bakalar suffered.

which includes the Artwork at issue in this case. 819 F. Supp. 2d at 295; Am. Compl. ¶¶ 23, 87, 102, 155, 162. The plaintiffs conceded at argument that the Artwork in this case was part of the collection of Grünbaum's Schieles that went through Mathilde Lukacs and Galerie Gutekunst & Klipstein (sometimes called Galerie Kornfeld) and therefore appeared in the gallery's 1956 catalog. Tr. at 25-26.

Furthermore, the laches issue was fully litigated. The plaintiffs allege that the Bakalar court "denied additional class discovery, frustrating the Grünbaum Heirs' efforts to trace Grünbaum's art collection" and that "[b]ecause of this lack of judicial relief, the Grünbaum Heirs have not been able to trace the 450-work art collection." Pls.' Opp'n at 56-57. But the Court of Appeals for the Second Circuit specifically held that "[t]he district court did not abuse its discretion in abiding by its discovery calendar, especially in light of its generous extension [that the plaintiffs failed to meet]." 500 F. App'x at 9. The Court of Appeals found no error in the record before the district court and affirmed the judgment.

In response, the plaintiffs argue that Nagy, rather than Bakalar, should control the outcome of this case. However, the plaintiffs in this case -- the Grünbaum heirs -- are bound by the issues decided against them in the Bakalar case in which they were defendants, while the defendant in this case -- the

Art Institute of Chicago -- is not bound by the adverse findings in the Nagy case, in which it was not a party. In any event, the facts in Nagy are completely distinguishable from the facts in this case. Unlike Bakalar and the defendant in this case, who bought the Schiele works in the 1960s, see 819 F. Supp. 2d at 295; Am. Compl. ¶ 155, the Nagy defendants bought the relevant Schiele works in 2013, see 80 N.Y.S.3d at 631, when Nagy was fully aware of the title issues relating to the artworks. The plaintiffs made a demand on Nagy in 2015, see id., as opposed to 2006, as in this case, see Lonergan Decl., Exs. C-D. Unlike Bakalar and the defendant in this case, the Nagy defendants were not prejudiced by the plaintiffs' delay because the Nagy defendants purchased the Schiele works long after the relevant witnesses, documents, and testimony were gone. See Bakalar, 819 F. Supp. 2d at 306. The Appellate Division explained why the defense of laches that applied in Bakalar did not apply to Nagy:

> Nagy acquired both pieces in 2013. He suffered no change in position. Nor was any evidence lost between defendants' acquisition and plaintiffs' demand for the return of the Artworks. Significantly, Nagy was on notice of plaintiffs' claims to the Grunbaum collection prior to the purchase, as he filed a brief in the Bakalar action. Further, it is undisputed that Nagy purchased the Artworks at a substantial discount from the price sought by Sotheby's prior to the claim being publicized, and he obtained insurance for the very purpose of insuring title against plaintiffs' claims.

Nagy, 106 N.Y.S.3d at 22-23.

In fact, the plaintiffs implicitly concede this point. In their reply brief, the plaintiffs argue that the Grünbaum heirs were not aware that they had a claim to the Artwork until May 24, 2022, when the New York Court of Appeals rejected Nagy's challenge based on Bakalar. Pls.' Reply Br. at 11-13, ECF No. 45. In so doing, they appear to concede that they are bound by Bakalar.

In summary, the plaintiffs' claims are barred by laches as decided in Bakalar, and the plaintiffs are collaterally estopped from relitigating the issue.

### IV.

Finally, the plaintiffs have cross-moved for summary judgment.

However, a motion for summary judgment is procedurally barred for two reasons. First, the plaintiffs did not comply with Local Rule 56.1 and failed to file a required Rule 56.1 statement. See Local Civil Rule 56.1(a) ("Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion."). Additionally, a motion for summary judgment is procedurally

premature because the defendants have not consented to such a motion, and there has been no discovery in this case. See, e.g., Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) ("[W]e cannot conclude that the parties had already had a fully adequate opportunity for discovery when the district court granted summary judgment. . . . [T]he grant of summary judgment here was premature.")

In any event, to the extent that the plaintiffs' motions for summary judgment can be limited to the issues of the statute of limitations and laches, they are denied for the same reasons that the motion to dismiss is granted.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to dismiss the plaintiffs' amended complaint is **granted**. The plaintiffs' cross-motion for summary judgment is **denied** without prejudice. The Clerk is directed to close all pending motions.[11]

SO ORDERED.

Dated:       New York, New York
             November 24, 2023

                                    John G. Koeltl
                                United States District Judge

---

[11] After the motion to dismiss and cross-motion for summary judgment were fully briefed, the defendant filed an answer and counterclaim which included a defense of failure to join an indispensable party -- namely the District Attorney's Office of New York County -- because the District Attorney purported to seize the Artwork in place. ECF No. 55. That provoked correspondence in which both sides made arguments, see ECF Nos. 56, 57, 61, and 62, resulting in the defendant's offering to withdraw the defense of failure to join an indispensable party, see ECF No. 64, to which the plaintiffs objected, and the plaintiffs submitting a proposed order pursuant to which the Court would remand the case to the New York State Supreme Court, see ECF No. 68. Because none of these proposed issues were briefed before the argument on the motion to dismiss and cross-motion for summary judgment, the Court instructed the parties that they could make any necessary motions after the Court's decisions on the current motions. Tr. 5:2-4. Therefore, the plaintiffs can make any motions that are appropriate and in good faith at this point by **December 15, 2023**. The defendant can respond by **January 5, 2024**. The plaintiffs may reply by **January 16, 2024**.